U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2011 NOV 29  PM 4:04

CLERK

BY_____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT

# DISTRICT OF VERMONT

LOUISIANA MUNICIPAL POLICE
EMPLOYEES' RETIREMENT SYSTEM
on behalf of itself and all others similarly situated,

Plaintiff,

v.

GREEN MOUNTAIN COFFEE ROASTERS, INC.,
ROBERT P. STILLER, LAWRENCE J. BLANFORD,
FRANCES G. RATHKE, BARBARA D. CARLINI,
WILLIAM D. DAVIS, JULES A. DEL VECCHIO,
MICHAEL J. MARDY, HINDA MILLER, DAVID E.
MORAN, MERRILL LYNCH, PIERCE, FENNER &
SMITH INC., SUNTRUST ROBINSON
HUMPHREY, INC., WILLIAM BLAIR &
COMPANY, L.L.C., CANACCORD GENUITY INC.,
JANNEY MONTGOMERY SCOTT LLC, PIPER
JAFFRAY & CO., RBC CAPITAL MARKETS, LLC,
WELLS FARGO SECURITIES, LLC, RABO
SECURITIES USA, INC., AND SANTANDER
INVESTMENT SECURITIES INC.

Defendants.

2:11-cv-289

## CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

Page

I.      SUMMARY OF THE ACTION ...................................................................... 1

II.     JURISDICTION AND VENUE ...................................................................... 5

III.    PARTIES ......................................................................................................... 6

        A.    Plaintiff ................................................................................................. 6

        B.    Exchange Act Defendants .................................................................... 6

        C.    Securities Act Defendants .................................................................... 8

IV.     FACTUAL ALLEGATIONS AND DEFENDANTS' MATERIALLY FALSE
        AND MISLEADING STATEMENTS ........................................................... 11

        A.    The Rise Of GMCR And The K-Cup Coffee Maker ........................... 11

        B.    GMCR's "At-Home" Distribution Channel ......................................... 12

        C.    Pre-Class Period Financial Restatements And The Purported Exoneration
              Of GMCR'S Relationship With Mblock ............................................. 13

        D.    GMCR Announces First-Quarter 2011 Results And Issues 2011 Guidance ........ 14

        E.    GMCR Announces Better-Than-Expected Second-Quarter 2011 Results ........... 16

        F.    GMCR'S May 2011 Secondary Stock Offering .................................. 20

        G.    GMCR Announces Better-Than-Expected Third-Quarter 2011 Results ............. 22

        H.    GMCR'S Correspondence With The Sec About Mblock ..................... 24

        I.    The Truth About Defendants' Scheme Begins To Emerge ................... 27

V.      ADDITIONAL EVIDENCE OF SCIENTER – EXCHANGE ACT CLAIMS ............... 31

VI.     LOSS CAUSATION – EXCHANGE ACT CLAIMS ................................... 32

VII.    APPLICABILITY OF FRAUD ON THE MARKET PRESUMPTION .......... 35

VIII.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND
        BESPEAKS CAUTION DOCTRINE ........................................................... 36

IX.     CLASS ACTION ALLEGATIONS ............................................................... 37

X.     CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ............................................ 39

     COUNT I ..................................................................................................... 39

     For Violations Of § 11 Of The Securities Act (Against The Securities Act
         Defendants) ......................................................................................... 39

     COUNT II .................................................................................................... 41

     For Violations Of § 12(a)(2) Of The Securities Act (Against Defendants GMCR,
         Stiller, Blanford, Davis, Moran, And The Underwriter Defendants) ................... 41

     COUNT III................................................................................................... 42

     For Violations Of § 15 Of The Securities Act (Against The Officer Defendants
         And Director Defendants)...................................................................... 42

XI.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................................... 43

     COUNT IV .................................................................................................. 43

     Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Against The
         Exchange Act Defendants) ................................................................... 43

     COUNT V .................................................................................................... 45

     Violations of Section 20(a) of the Exchange Act (Against The Officer
         Defendants).......................................................................................... 45

     PRAYER FOR RELIEF – Applicable To All Claims...................................................... 47

     JURY TRIAL DEMAND – Applicable To All Claims................................................... 48

Plaintiff Louisiana Municipal Police Employees' Retirement System ("LAMPERS" or "Plaintiff"), by its undersigned counsel, brings this action on behalf of itself and all other similarly situated persons or entities (the "Class"), other than Defendants and their affiliates (as described herein), who purchased or otherwise acquired common stock issued by Green Mountain Coffee Roasters, Inc. ("GMCR" or the "Company"), from February 2, 2011 through November 9, 2011, inclusive (the "Class Period"), for violations of the federal securities laws. Plaintiff seeks to recover damages caused to the Class by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Section 11, 12 and 15 of the Securities Act of 1933 ("Securities Act"). The allegations in this Complaint are based on Plaintiff's personal knowledge as to itself and on information and belief (including the investigation of counsel and a review of publicly available information) as to all other matters.

## I.    SUMMARY OF THE ACTION

1.    GMCR is a Vermont-based leader in the specialty coffee and coffee maker businesses. The Company has achieved significant growth in recent years, driven by sales from its popular Keurig single-cup brewing system, which uses "K-Cup" portion packs to brew single servings of coffee and other beverages. Alone, these two line items—*i.e.*, K-Cups and the brewers into which they are inserted—accounted for approximately 86% and 84% of GMCR's consolidated net sales in fiscal 2010 and 2011, respectively.[1]   GMCR rolls out its lucrative K-Cup and Keurig brewing products primarily through its "At-Home" distribution channel. GMCR's At-Home distribution channel relies almost *exclusively* on a single order fulfillment entity, M.Block & Sons ("MBlock"). The Company's relationship with MBlock is therefore critical to its success, with MBlock processing the majority of U.S. sales orders for GMCR's

---

[1] GMCR operates on a 52-week fiscal year that ends on the last Saturday in September.

single-cup business, which accounted for more than 95% of the Company's revenues in fiscal 2010 and 2011.

2.      Three months prior to the start of the Class Period, on September 28, 2010, GMCR disclosed that it was the subject of an inquiry being conducted by the United States Securities and Exchange Commission (the "SEC") concerning revenue recognition practices and the Company's relationship with a key fulfillment vendor—MBlock.  Within two months of disclosing the SEC's inquiry, GMCR announced a sweeping restatement of previously issued financial statements for fiscal 2006-2009 and the first three quarters of 2010.  Significantly, in issuing those restatements prior to the Class Period, GMCR vehemently denied MBlock's connection to any of the identified accounting errors.  GMCR repeatedly emphasized that "***none of the financial statement errors are related to the Company's relationship with M.Block & Sons***."  The Company's 2006-2009 restatements and repeated representations that none of those financial accounting errors related to MBlock signaled to investors that the brunt of the SEC's inquiry was over (although it technically remained ongoing).  GMCR once again assured investors that the Company's financial statements were being presented in conformance with Generally Accepted Accounting Principles ("GAAP"), and that business was booming.

3.      Throughout the Class Period, the Company was portrayed to the investing public as a healthy and growing business, with rapidly increasing revenues and K-Cup sales.  GMCR was frequently described as one of the hottest stories on the NASDAQ Global Market ("NASDAQ") during the Class Period, with shares nearly quadrupling in price from January 2011 to September 2011.

4.      This portrayal of the Company was false.  Defendants named herein orchestrated an elaborate scheme to materially overstate the Company's apparent success, complete with

2

falsified financial statements. Revelations concerning the Company's true state of affairs—punctuated by a shocking earnings miss for the first time in eight quarters—destroyed billions of dollars in market capitalization, and directly and proximately caused significant damage to the Company's investors.

5.      As detailed below, during the Class Period, Defendants systematically manipulated and strategically managed the Company's revenues. To do so, Defendants used MBlock as a captive warehouse to park excessively manufactured, expired, or otherwise unsold product. The fraudulent scheme at GMCR involved materially overstating the Company's revenues based on falsified sales orders—including through sham inventory shipments—for hundreds of millions of dollars in K-Cup and Keurig brewer products. GMCR booked "revenues" associated with these false sales orders and shipments as though they were real. These acts caused a ripple effect throughout the Company's financial statements, resulting in the material overstatement of multiple metrics on which investors and analysts relied, including the Company's profits, and inventory and product demand levels. Throughout the Class Period, Defendants also fraudulently overstated GMCR's assets in proportion to the Company's fictitious revenues by carrying the proceeds of dummy sales as assets on the Company's balance sheet.  In short, GMCR essentially ran a shell game through MBlock, which it secretly controlled, to manufacture earnings during the Class Period.

6.      Defendants' scheme was revealed in a series of partial disclosures.  On October 17, 2011, at the seventh annual Value Investing Conference, the truth about the misconduct at GMCR began to emerge.  David Einhorn, an investor in GMCR who became well-known for helping to bring the financial fraud at Lehman Brothers to light, undertook a lengthy and in-depth analysis of GMCR's financial reporting and relationship with MBlock (the "Einhorn

3

Presentation"). The Einhorn Presentation cited expert analysis of detailed information gleaned from numerous sources, not all of which were readily available to the public. The Einhorn Presentation revealed that, during the Class Period, GMCR and MBlock engaged in what one analyst later called a *"variety of shenanigans that appear designed to mislead auditors and to inflate financial results."*

7.      First, the Einhorn Presentation described a fraudulent scheme centered on the "unusual" and "peculiar" relationship between GMCR and MBlock. Unbeknownst to investors, GMCR effectively controlled MBlock and exploited the relationship to conduct regular "cross-shipping," whereby product was transferred from one facility to another (often multiple times) for no apparent reason. Second, the Einhorn Presentation detailed "odd material movements" between GMCR and MBlock, such that MBlock employees were directed to inventory and process orders that were never shipped. Third, the Einhorn Presentation disclosed systemic excess production practices at GMCR that the Company used to generate fake demand for its products, leading to a "significant problem with expired coffee" housed at MBlock. In short, as one analyst reported, the Einhorn Presentation revealed that *GMCR's growth was built on a "house of cards*."

8.      The revelation of GMCR's scheme as detailed in the Einhorn Presentation and subsequent analyst and media reports wiped out billions of dollars of shareholder value as the price of the Company's common stock collapsed. Specifically, the price of GMCR's common stock dropped 33% in response to the stunning news in the Einhorn Presentation and resulting media reports.

9.      Then, while market concern over the Einhorn Presentation continued to swell, the Company made its own disclosure, surprising analysts by announcing highly disappointing

earnings on November 9, 2011. The Company missed sales estimates for the first time in more than eight quarters, and fell approximately $50 million short of analysts' consensus revenue estimates. The Company also announced skyrocketing inventory (up 156% year-over-year) in sharp contrast to prior statements about inventory being in "good shape." Analysts expressed astonishment at the Company's about-face. GMCR's shares plummeted 40%, from a close of $67.02 on November 8 to $40.89 on November 9, on extremely heavy trading volume. All told, these corrective disclosures wiped out approximately $6.5 billion in market capitalization.

10. This action seeks to recover the damages caused by Defendants' misconduct.

## II. JURISDICTION AND VENUE

11. This Complaint asserts claims arising under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). This Complaint also asserts claims arising under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

12. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

13. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22(a) of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b), (c) and (d). GMCR maintains its principle corporate offices in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

14. In connection with the acts alleged in this Complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

## III.   PARTIES

### A.   PLAINTIFF

15.    Plaintiff Louisiana Municipal Police Employees' Retirement System ("LAMPERS" or "Plaintiff") is a public pension system established and maintained by the government of the State of Louisiana for the benefit of municipal police employees in Louisiana. During the Class Period, LAMPERS purchased GMCR common stock as set forth in the attached certification and was injured thereby.

### B.   EXCHANGE ACT DEFENDANTS

16.    Defendant GMCR, formed in 1993 in the State of Delaware, maintains corporate headquarters at 33 Coffee Lane, Waterbury, Vermont 05676.  The Company and its subsidiaries operate in the specialty coffee and coffee maker businesses.  As of September 24, 2011, the Company had approximately 5,600 full-time employees.

17.    Defendant Robert P. Stiller ("Stiller") is, and was at all relevant times during the Class Period, the Founder of GMCR and the Chairman of the Company's Board of Directors.

18.    Defendant Lawrence J. Blanford ("Blanford") is, and was at all relevant times during the Class Period, the President, Chief Executive Officer and a Director of GMCR.

19.    Defendant Frances G. Rathke ("Rathke") is, and was at all relevant times during the Class Period, the Chief Financial Officer, Treasurer, Secretary, and Principal Financial and Accounting Officer of GMCR.

20.    Defendants Stiller, Blanford and Rathke are referred to collectively herein as the "Officer Defendants."

21.     Defendants GMCR, Stiller, Blanford, and Rathke are referred to collectively herein as the "Exchange Act Defendants."

22.     During the Class Period, the Officer Defendants, as senior executive officers and/or directors of GMCR, had access to material adverse non-public information concerning GMCR, its operations, finances, financial condition, and present and future business prospects. Because of their positions with GMCR, the Officer Defendants were privy to confidential and proprietary information, and information about GMCR's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Officer Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

23.     The Officer Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Officer Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Officer Defendants were able to and did, directly or indirectly, control the conduct of GMCR's business.

24.     The Officer Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and, through them, to the investing public. The Officer Defendants were provided with copies of the Company's reports and press releases alleged

7

herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Officer Defendants had the opportunity to commit the fraudulent acts alleged herein.

25.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Officer Defendants had a duty to promptly disseminate accurate and truthful information with respect to GMCR's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of GMCR common stock would be based upon truthful and accurate information. The Officer Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26.     The Officer Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of GMCR common stock by disseminating materially false and misleading statements and/or concealing material adverse facts, which caused Plaintiff and members of the Class to purchase GMCR common stock at artificially inflated prices.

### C.     SECURITIES ACT DEFENDANTS

27.     Defendant Barbara D. Carlini ("Carlini") joined the GMCR Board of Directors in 2002, and served as a member of the GMCR Board of Directors at all relevant times herein. As a director of GMCR, Carlini signed the 2011 Offering Materials (defined *infra*).

28.     Defendant William D. Davis ("Davis") joined the GMCR Board of Directors in 1993, and served as a member of the GMCR Board of Directors at all relevant times herein. As

a director of GMCR, Davis signed the 2011 Offering Materials.

29.     Defendant Jules A. Del Vecchio ("Del Vecchio") joined the GMCR Board of Directors in 1993, and served as a member of the GMCR Board of Directors at all relevant times herein.  As a director of GMCR, Del Vecchio signed the 2011 Offering Materials.

30.     Defendant Michael J. Mardy ("Mardy") joined the GMCR Board of Directors in 2007, and served as a member of the GMCR Board of Directors at all relevant times herein.  As a director of GMCR, Mardy signed the 2011 Offering Materials.

31.     Defendant Hinda Miller ("Miller") joined the GMCR Board of Directors in 1999, and served as a member of the GMCR Board of Directors at all relevant times herein.   As a director of GMCR, Miller signed the 2011 Offering Materials.

32.     Defendant David E. Moran ("Moran") joined the GMCR Board of Directors in 1999, and served as a member of the GMCR Board of Directors at all relevant times herein.  As a director of GMCR, Moran signed the 2011 Offering Materials.

33.     Defendants Carlini, Davis, Del Vecchio, Mardy, Miller, and Moran are referred to collectively herein as the "Director Defendants."

34.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill") was an underwriter of the 2011 Offering as specified herein.  As an underwriter of the 2011 Offering, Merrill was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2011 Offering Materials.

35.     Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") was an underwriter of the 2011 Offering as specified herein.  As an underwriter of the 2011 Offering, SunTrust was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2011 Offering Materials.

9

36. Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter of the 2011 Offering as specified herein. As an underwriter of the 2011 Offering, William Blair was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2011 Offering Materials.

37. Defendant Canaccord Genuity Inc. ("Canaccord") was an underwriter of the 2011 Offering as specified herein. As an underwriter of the 2011 Offering, Canaccord was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2011 Offering Materials.

38. Defendant Janney Montgomery Scott LLC ("Janney") was an underwriter of the 2011 Offering as specified herein. As an underwriter of the 2011 Offering, Janney was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2011 Offering Materials.

39. Defendant Piper Jaffray & Co. ("Piper Jaffray") was an underwriter of the 2011 Offering as specified herein. As an underwriter of the 2011 Offering, Piper Jaffray was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2011 Offering Materials.

40. Defendant RBC Capital Markets, LLC ("RBC") was an underwriter of the 2011 Offering as specified herein. As an underwriter of the 2011 Offering, RBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2011 Offering Materials.

41. Defendant Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter of the 2011 Offering as specified herein. As an underwriter of the 2011 Offering, Wells Fargo was responsible for ensuring the truthfulness and accuracy of the various statements contained in or

10

incorporated by reference into the 2011 Offering Materials.

42.     Defendant Rabo Securities USA, Inc. ("Rabo") was an underwriter of the 2011 Offering as specified herein.  As an underwriter of the 2011 Offering, Rabo was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2011 Offering Materials.

43.     Defendant Santander Investment Securities Inc. ("Santander") was an underwriter of the 2011 Offering as specified herein.  As an underwriter of the 2011 Offering, Santander was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2011 Offering Materials.

44.     Defendants Merrill, SunTrust, William Blair, Canaccord, Janney, Piper Jaffray, RBC, Wells Fargo, Rabo, and Santander are referred to collectively herein as the "Underwriter Defendants."

45.     GMCR, Officer Defendants, Underwriter Defendants, and Director Defendants are referred to collectively herein as the "Securities Act Defendants."

## IV.     FACTUAL ALLEGATIONS AND DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.     THE RISE OF GMCR AND THE K-CUP COFFEE MAKER

46.     GMCR began as a small coffee shop and café in rural Vermont in 1981. The Company, which went public in 1993, today employs over 5,600 full-time workers, boasts market capitalization of more than $10 billion, and is an established leader in the specialty coffee industry selling "high-quality coffee and innovative coffee brewing."

47.     Critical to GMCR's growth and success was the Company's 2006 acquisition of Keurig—a pioneer and leading manufacturer of a patented single-cup brewing system and the accompanying single-brewer K-Cup portion packs.  An article entitled "The Growing Popularity

of the K-Cup Coffee Makers," published on May 6, 2010, described the Keurig and K-Cup phenomenon:

> For those of you who have been blissfully brewing your coffee 8 cups at a time, it might come as a surprise that there is a technology out there used by thousands of consumers to brew coffee one cup at a time. Not so long ago, a group of folks had the idea to make it simple to brew a single cup of coffee without the hassle of grinding beans or keeping coffee grounds fresh in a large container. In 2004, consumers were introduced to the Keurig brand of single cup coffee makers, and the K-Cup was born. . . .

48. Since the birth of the K-Cup and GMCR's acquisition of Keurig in 2006, the Company has billed itself as "sitting on top of magnificent technology" with "a host of patents." GMCR management has even touted, "We are the iPod of coffee." Specifically, the Company now sells dedicated coffee machines that exclusively use K-Cup coffee packs, and manufactures and sells K-Cup coffee packs to users of those machines.

49. Indeed, sales of K-Cups and Keurig brewing systems have been the predominant drivers of the Company's growth over the last five years—with GMCR's revenues growing at a 57% compound annual growth rate between 2006 and 2010. The Company's rapid revenue growth put GMCR on the map as a high-growth company and sparked the investing community's interest.

## B.  GMCR'S "AT-HOME" DISTRIBUTION CHANNEL

50. To foster the robust revenue growth of the Company's K-Cup and Keurig brewing systems, GMCR manages its U.S. operations through two business segments, the Specialty Coffee Business Unit ("SCBU") and Keurig, Inc. ("Keurig"). SCBU markets and sells K-Cup portion packs for use in the Keurig system. SCBU sells some products directly to Keurig for resale to retailers (*e.g.*, supermarkets and grocery stores), and sells other products directly to retailers. The Keurig unit sells single-cup brewers, coffee, tea, and hot cocoa in K-Cups produced by a variety of roasters, including SCBU, and related accessories mainly in domestic

12

wholesale and retail markets and also directly to consumers. Keurig earns royalty income from the sale of K-Cups from all coffee roasters licensed to sell K-Cups.

51.     Although GMCR sells its Keurig systems and K-Cups through both an "At-Home" channel and an "Away-From-Home" channel, more than 95% of Keurig brewers shipped by GMCR in fiscal 2010 and 2011 were sold through the At-Home channel. Significantly, the majority of U.S. sales orders for GMCR's single-cup business, which accounted for 97% of the fiscal 2010 revenues, are processed through MBlock. Receivables from MBlock comprised approximately 51% and 43% of GMCTR's consolidated accounts receivable balance in fiscal 2010 and 2011, respectively.

52.     According to GMCR's fiscal 2010 Annual Report, which was filed before the Class Period on December 9, 2010, the Company purports to "recognize[ ] revenue when the fulfillment entities [such as MBlock] ship the product based on the contractual shipping terms, which generally are upon product shipment, and when all other revenue recognition criteria are met."

## C.     PRE-CLASS PERIOD FINANCIAL RESTATEMENTS AND THE PURPORTED EXONERATION OF GMCR'S RELATIONSHIP WITH MBLOCK

53.     On September 28, 2010, approximately three months before the start of the Class Period, GMCR disclosed that it was the subject of an SEC inquiry with which the Company was "cooperating fully." GMCR explained that the SEC's inquiry concerned revenue recognition practices as well as the Company's relationship with its key fulfillment vendor—MBlock.

54.     On November 19, 2010, less than two months after disclosing the SEC inquiry (and approximately two months prior to the start of the Class Period), GMCR issued a press release announcing that investors "should no longer rely upon" the Company's previously issued financial statements for fiscal 2007-2009 and the first three quarters of 2010, because they were

materially misstated and included errors.

55.     In announcing this multi-year restatement, GMCR emphasized that "none of the financial statement errors are related to the Company's relationship with M.Block & Sons, the fulfillment vendor through which the Company makes a majority of the at-home orders for the Keurig business unit's single-cup business sold to retailers." Shortly thereafter, on December 9, 2010, when GMCR filed its Annual Report for fiscal 2010 with the SEC, the Company reiterated its previously issued misstated financials as disclosed on November 19, but also stated that fiscal 2006 financial results should not be relied upon. Significantly, however, GMCR maintained that none of those financial misstatements were related to MBlock. Given GMCR's vigorous and repeated denials of MBlock's connection to any of its identified financial accounting errors, the preliminary findings of the SEC's inquiry appeared to exonerate the Company's relationship with MBlock. With this dark chapter ostensibly in GMCR's rear view, the Company and financial community shifted focus back to the bull market for GMCR's products.

### D.     GMCR ANNOUNCES FIRST-QUARTER 2011 RESULTS AND ISSUES 2011 GUIDANCE

56.     On February 2, 2011, GMCR announced first-quarter 2011 results (the "February 2 Press Release"). The February 2 Press Release provided strong results and even stronger outlook. Total net sales were up 67%, and net sales from K-Cup portion packs totaled $332.9 million, up 89%, or $156.7 million, over the same period in 2010. In fact, GMCR represented that demand for its Keurig and K-Cup products was so strong that the Company was capacity constrained. On a conference call held to discuss the Company's first-quarter 2011 results (the "February 2 Earnings Call"), Defendant Larry Blanford, GMCR's CEO, stated: "We are definitely being stretched . . . . [D]emand is definitely stretching our ability to supply. And we've not quite caught up with that demand curve yet."

14

57.     Indeed, during the Class Period, the market was led to believe that the GMCR growth story was still in the early innings.  The February 2 Press Release reinforced this message with bullish estimates for the Company's second-quarter and full 2011 fiscal year.  GMCR estimated total second-quarter consolidated net sales growth of 92-97% and non-GAAP EPS in the range of $0.38-0.42 per diluted share.  The February 2 Press Release also provided guidance estimates for the full fiscal 2011 year: total consolidated net sales growth guidance of 75-80% and non-GAAP earnings per diluted share range of $1.19-1.29.

58.     The next day, the Company filed its Quarterly Report with the SEC on a Form 10-Q (the "Q1'11 10-Q"), substantially reiterating the results announced in the February 2 Press Release.

59.     In response to positive statements made in the Company's February 2 Press Release, the Q1'11 10-Q, and on the February 2 Earnings Call, GMCR's stock price increased from a closing price of $32.96 on February 2 to a closing price of $37.78 on February 3.

60.     The February 2-3 statements enumerated in ¶¶ 56-58 were materially false and misleading when made.  Defendants fraudulently overstated GMCR's revenues based on falsified sales orders and ghost shipments to nowhere.  These inflated revenues caused a ripple effect throughout GMCR's financial statements, distorting numerous operating statistics reported to the investing public and the Class.  As a function of the overstatement of revenues, the Company's gross profits were also materially overstated.  Defendants' misconduct also caused the EPS disclosed to be materially overstated.  In addition, Defendants also fraudulently overstated GMCR's assets in proportion to the Company's fictitious revenues.  As the Company consistently recognized fraudulent revenues and profits, the false proceeds from this non-existent business were carried as assets on the Company's balance sheet.  In addition, the Company's

claims of increasing Keurig and K-Cup demand leading to capacity constraint were false and misleading when made, because they failed to disclose that demand for GMCR's products was being propped up by excessive production schedules and fictitious inventory transfers between GMCR and MBlock.

**E.      GMCR ANNOUNCES BETTER-THAN-EXPECTED SECOND-QUARTER 2011 RESULTS**

61.      On May 3, 2011, GMCR announced better-than-expected second-quarter 2011 results (the "May 3 Press Release"). The May 3 Press Release, entitled "Green Mountain Coffee Roasters, Inc. Reports Second Quarter Fiscal 2011 Results—Strong Consumer Adoption Powering Keurig Single-Cup Brewing System Sales," was filed with the SEC on a Form 8-K. In it, GMCR published an Unaudited Consolidated Statement of Operations and stated in part:

> Net sales for the second quarter of fiscal 2011 increased 101% to $647.7 million as compared to $322.0 million for the second quarter of fiscal 2010. Under Generally Accepted Accounting Principles (GAAP), net income for the second quarter of fiscal 2011 totaled $65.4 million, or $0.44 per diluted share, representing an increase of 172% as compared to GAAP net income of $24.1 million, or $0.17 per diluted share, for the second quarter of fiscal 2010. . . .

> Net sales from Keurig brewers and accessories totaled $116.2 million in the quarter, up 86%, or $53.8 million, from the prior year period.

> Supporting continued growth in K-Cup® demand, GMCR sold 1.2 million Keurig brewers during the second quarter of fiscal 2011. This brewer shipment number does not account for consumer returns to retailers. We estimate that GMCR brewer shipments represented approximately 91% of total brewers shipped with Keurig technology in the period.

> Second quarter fiscal 2011 gross margin was 37.5% of total net sales compared to 33.5% for the corresponding quarter in fiscal 2010. The Company increased its GAAP operating income by 198%, to $119.6 million, in the second quarter of fiscal 2011 as compared to $40.1 million in the year ago quarter. . . . Accounts receivable increased 77% year-over-year to $226.8 million at March 26, 2011, from $128.2 million at March 27, 2010, reflecting continuing sales growth.

> Inventories were $300.8 million at March 26, 2011 including $29.5 million of Van Houtte-related inventories. This compares to $262.5 million at September

25, 2010. . . . The acquisition of Van Houtte completed on December 17, 2010 contributed $100.5 million to consolidated net sales. . . .

62.     The May 3 Press Release also provided the Company's first estimates for the third quarter of 2011.   GMCR estimated total consolidated net sales growth of 90-95%, revenue guidance of $602-617 million, and non-GAAP EPS in the range of $0.34-0.38 per diluted share, excluding certain costs and expenses.

63.     The May 3 Press Release also provided increased guidance estimates for the full fiscal 2011 year.   The Company raised total consolidated net sales growth guidance of 82-87%, up from previous net sales growth guidance of 75-80%.   The Company also increased its 2011 non-GAAP earnings per diluted share range to $1.43-1.50 from $1.19-1.29, excluding certain costs and expenses.

64.     Later that day, the Company filed a Quarterly Report with the SEC on a Form 10-Q (the "Q2'11 10-Q"), substantially reiterating the results announced in the May 3 Press Release. The Company also held a conference call with investors and analysts to discuss its second-quarter 2011 results (the "May 3 Earnings Call").   On the May 3 Earnings Call, analysts were pleasantly surprised by the Company's results, and GMCR's executives were questioned about the driving factors of the better-than-expected growth.   In response, GMCR's senior executives clearly stated that the Company did not pull forward or otherwise strategically manage any sales, and that inventory was not building.

65.     Specifically, during the May 3 Earnings Call, Bryan Spillane, an analyst from Bank of America Merrill Lynch, asked how much, if any, in sales "actually might have been pulled forward."   In response, Michelle Stacy, President of GMCR's Keurig division, explained: "*We did not pull forward any sales at all.   The general demand is what we see.   We fill our customers' orders as they come in, and they were not building any excessive inventories at all*

17

*at retail.*"

66.     GMCR's John Whoriskey, General Manager of the Company's Keurig At-Home division, further responded to Spillane's question.   Whoriskey added, "there is no pulling forward of shipments to do anything, other than react to the demand and make sure we have adequate inventories in place to meet the demand for the period."   When Mr. Spillane (the analyst from Bank of America Merrill Lynch) pressed on about potentially mounting inventory levels given the significant increases in brewer shipments in the second quarter, Whoriskey stated, "I would say that I think the inventory certainly we are building a little bit more inventory to meet the demand, but it is not any substantial number that is affecting what we did in the quarter if that is the question."

67.     In response to the positive statements made in the Company's May 3 Press Release, Q2'11 10-Q, and on the May 3 Earnings Call, GMCR's stock price increased approximately 19.4%, from a closing price of $64.07 on May 2 to a closing price of $75.98 on May 3.

68.     The May 3 statements enumerated in ¶¶ 61-66 were materially false and misleading when made.   Defendants fraudulently overstated GMCR's revenues based on falsified sales orders and ghost shipments to nowhere.  These inflated revenues caused a ripple effect throughout GMCR's financial statements, distorting numerous operating statistics reported to the investing public and the Class.  As a function of the overstatement of revenues, the Company's gross profits were also materially overstated.  Defendants' misconduct also caused the EPS disclosed to be materially overstated.   In addition, Defendants also fraudulently overstated GMCR's assets in proportion to the Company's fictitious revenues.  As the Company consistently recognized fraudulent revenues and profits, the false proceeds from this non-existent

business were carried as assets on the Company's balance sheet.

69.     Further, as summarized in a May 9, 2011 Janney Capital Markets research report, the Company's unexpected upside in the second quarter was due to the fact that GMCR sold 1.3 million brewers, which exceeded market expectations by approximately 300,000 brewers.  In reality, however, this was not so.  The upside was fabricated.  Tellingly, according to the Einhorn Presentation (discussed in detail *infra*), this is the same quarter in which a former MBlock worker described 500,000 brewers that were fraudulently booked as sold to QVC but never shipped.  *See* ¶ 98.

70.     Additionally, in response to questions about the driving factors of the better-than-expected growth on the May 3 Earnings Call, GMCR's senior executives stated that the Company did not pull forward or otherwise strategically manage sales.  *See* ¶¶ 64-66.  These statements on the May 3 Earnings Call were false and misleading when made because they failed to disclose that the Company's purportedly strong results were achieved only as a result of the fact that Defendants were pulling sales in from nowhere (and shipping them to the same place) vis-à-vis its MBlock shell game.

71.     Similarly, on the May 3 Earnings Call, GMCR's senior executives stated that inventory levels were not building.  *See* ¶¶ 64-65.  These statements were also false and misleading when made.  GMCR's reported 156% year-over-year spike in inventory is telling.  The falsity of these statements is further demonstrated by the fact that this is the same quarter in which, as the Einhorn Presentation noted, people "visited MBlock and saw its warehouses filled to the rafters with K-cups."  Accounts of "cross shipping" and sham and circular inventory transfers between MBlock warehouses and GMCR further evidence the falsity of these statements.  In sum, Defendants failed to disclose that they systematically manipulated and

managed the Company's revenues by using MBlock to harbor excessively manufactured, expired, or otherwise unsold product.

### F.   GMCR'S MAY 2011 SECONDARY STOCK OFFERING

72.   On May 3, 2011, concurrent with the release of GMCR's surprisingly strong second-quarter results, the Company announced that it would sell 7.1 million shares in a secondary common stock offering (the "May 2011 Offering"). The May 2011 Offering was eventually priced at $71.00 per share.

73.   In addition to the 7.1 million shares being issued by GMCR, certain inside stockholders also seized the opportunity to sell off 410,456 common stock shares in the May 2011 Offering. GMCR did not receive proceeds from the sale of the selling stockholders' common stock.

74.   The selling stockholders included Defendants Stiller, Blanford, Davis, and Moran, each of whom reaped the proceeds detailed below:

| Selling Stockholder Defendant | Shares Sold | Gross Proceeds |
|---|---|---|
| Robert Stiller | 310,000 | $22,010,000 |
| Lawrence Blanford | 51,573 | $3,661,683 |
| William D. Davis | 40,000 | $2,840,000 |
| David E. Moran | 8,883 | $630,693 |

75.   In connection with the May 2011 Offering, GMCR filed a May 3 Preliminary Prospectus Supplement and May 5 Prospectus Supplement (both Forms 424B7), which supplemented an August 3, 2009 Automatic Shelf Registration Statement (Form S-3ASR) and its accompanying Prospectus (Form 424B5) (collectively, the "2011 Offering Materials").

76.   The May 2011 Offering Materials expressly incorporated by reference the Q2'11

10-Q and were signed by the Officer Defendants and the Director Defendants.

77.     The May 2011 Offering was underwritten by the Underwriter Defendants, defined *supra* at ¶¶ 34-43.   Merrill served as Sole Book Runner and SunTrust served as Co-Lead Manager.   Pursuant to an underwriting agreement, each of the underwriters agreed severally to purchase from GMCR and the selling stockholders the amount of GMCR common stock set forth below:

| Underwriter | # of Shares |
| --- | --- |
| Merrill | 4,730,000 |
| SunTrust | 860,000 |
| William Blair | 430,000 |
| Canaccord | 430,000 |
| Janney Montgomery | 430,000 |
| Piper Jaffray | 430,000 |
| RBC | 430,000 |
| Wells Fargo | 430,000 |
| Rabo | 215,000 |
| Santander | 215,000 |

78.     The May 2011 Offering closed on May 11.  Ultimately, GMCR offered 9,479,544 shares of common stock (which included 1,290,000 shares purchased by the Underwriter Defendants pursuant to an overallotment option), and the selling stockholders sold 410,456 shares.  GMCR and the selling shareholder Defendants raised net proceeds of more than $680 million.

79.     The May 2011 Offering Materials, which incorporated by reference the Q2'11 10-Q, were materially false and misleading when made for the reasons enumerated *supra*.

### G.    GMCR ANNOUNCES BETTER-THAN-EXPECTED THIRD-QUARTER 2011 RESULTS

80.    On July 27, 2011, GMCR issued a press release announcing better-than-expected third-quarter 2011 results (the "July 27 Press Release"). The July 27 Press Release, entitled "Green Mountain Coffee Roasters, Inc. Reports Third Quarter Fiscal 2011 Results—Spring Advertising and Brand Promotion Raise Awareness of the Keurig Single-Cup Brewing System and Brew Over Ice Beverages," was filed with the SEC on a Form 8-K. In it, GMCR announced that net sales revenues came in at $717 million, which included $485 million of K-cup sales. This $717 million was **$108 million higher** than analysts' consensus estimates, and even **$100 million more** than GMCR's own May 3 revenue guidance of $602-617 million.

81.    Later that day, GMCR held a conference call with investors and analysts to discuss the Company's third-quarter 2011 results (the "July 27 Earnings Call"). On the July 27 Earnings Call, Defendant Blanford stated:

> I am thrilled to report we delivered net sales of $717.2 million, a growth rate of 127% over the same period in fiscal 2010. Our non-GAAP earnings per diluted share increased 140% to $0.49 in the third quarter of fiscal 2011, up from $0.21 in the third quarter of fiscal 2010, and *exceeded our guidance range largely as a result of stronger than anticipated portion pack driven revenue growth in the quarter.*

82.    Defendant Rathke, GMCR's CFO, similarly claimed on the July 27 Earnings Call that GMCR management was "surprised [by] the upside on the strength of the portion pack (K-cup) sales." Rathke further ascribed the $100 million revenue outperformance to a combination of the following factors: (1) continued strong consumer adoption of Keurig single-cup brewing systems coming off a holiday season; (2) higher advertising and retail merchandising; (3) catch-up from prior periods (*i.e.,* more K-cups sold in the June quarter as a result of adding additional capacity and filling pent-up customer demand from December and March quarters); (4) customer pull-forward from future periods (*i.e.,* more K-cups sold in the June quarter as a result of retailers

purchasing K-cups in advance of a K-cup price increase that took effect at the end of the June quarter).

83.    Notably, in response to a question about "channel fill" and inventory builds from a Longbow research analyst, Defendant Rathke also stated on the July 27 Earnings Call:

> . . . . I think *coming off of Q2 we definitely had shortages or outages of certain products*. So I do know we had a backlog that we fulfilled in Q3 on—so that was a piece of it. So I feel what we've been seeing and hearing from all of our accounts is that *during Q3 we got back into a place where we knew we had appropriate inventory levels, and they felt comfortable they were getting appropriate inventory levels for the products. So I think we're in good shape.*"

84.    In response to the positive statements made in the Company's July 27 Press Release and on the July 27 Earnings Call, GMCR's stock price increased from a closing price of $88.11 on July 27 to a closing price of $102.57 on July 28.

85.    On August 3, 2011, the Company filed a Quarterly Report with the SEC on a Form 10-Q (the "Q311 10-Q"), substantially reiterating the results announced in the July 27 Press Release.

86.    The July 27 and August 3 statements were materially false and misleading when made. Defendants fraudulently overstated GMCR's revenues based on falsified sales orders and ghost shipments to nowhere. These inflated revenues caused a ripple effect throughout GMCR's financial statements, distorting numerous operating statistics reported to the investing public and the Class. As a function of the overstatement of revenues, the Company's gross profits were also materially overstated. Defendants' misconduct also caused the EPS disclosed to be materially overstated. In addition, Defendants also fraudulently overstated GMCR's assets in proportion to the Company's fictitious revenues. As the Company consistently recognized fraudulent revenues and profits, the false proceeds from this non-existent business were carried as assets on the Company's balance sheet.

23

87.     Further, Defendant Blanford again attributed outperformance to "stronger than anticipated portion pack" demand in the quarter.  So too did Defendant Rathke.  *See* ¶¶ 81-83.  However, as was the case with the Company's first-quarter and second-quarter results, this was not so.  The upside was still fabricated.  The Company's revenues were still based on falsified sales orders and sham shipments to nowhere.

88.     Additionally, Defendant Rathke's statements that there was still strong demand for GMCR products leading to product shortages and that GMCR had "appropriate inventory levels for the products" such that the Company was "in good shape," *see* ¶ 83,  were also false and misleading when made for the same reasons enumerated *supra*.

## H.     GMCR'S CORRESPONDENCE WITH THE SEC ABOUT MBLOCK

89.     On March 29, 2011, on behalf of GMCR, Defendant Rathke sent a letter, which was publicly filed (the "March 29 Response Letter"), responding to a comment letter that the SEC had sent to GMCR on March 2, 2011, inquiring into the sufficiency of the Company's MBlock-related disclosures (the "March 2 Comment Letter").  The March 2 Comment Letter was sent by SEC Assistant Director H. Roger Schwall to Defendant Rathke, and stated in relevant part:

[COMMENT 4]

*We note that you rely on a single order fulfillment entity, M.Block & Sons, Inc. ("MBLock") in the U.S. to process the majority of the sales orders for your AH single-cup business.*  You also indicate that MBLock "generally" accepts all credit risk on sales to these retailers.  Tell us the circumstances under which MBlock would not assume the credit risk, quantify the amount of sales channeled through MBlock where you retained the risk of collection for each of the years presented, and *describe your revenue recognition policy for these sales transactions.*

Tell us your sales return policy for all types of transactions reflected in your financial statements and explain why this policy is not apparent in your

disclosure. Please also quantify the amount of sales returns that occurred in each period.

*     *     *

[COMMENT 9]

We note your disclosure regarding *the importance of your relationship with M.Block & Sons, Inc.*, the order fulfillment entity through which the company makes a majority of the at-home orders for the Keurig business unit's single-cup business sold to retailers. *Please tell us how you concluded that filing your contract documentation would not be required to comply with Item 601(b)(10) of Regulation S-K.* . . .

90.     With regard to Comments 4 and 9, GMCR's March 29 Response Letter stated in

relevant part:

Historically, MBlock accepted all credit risk on sales to retailers through MBlock, with the exception of one retailer, QVC. QVC sales processed through MBlock accounted for approximately $16.1 million in, or approximately 1.2% of, sales for fiscal 2010. . . .

With respect to non-TSV event sales to QVC, the Company has historically recognized revenue upon shipment, although there may be a right of return. The Company recognized revenue upon shipment because the amount of these sales is smaller than for the TSV events and, based on historical rates or return being very low, the risk for return is minimal. As disclosed in Note 2, Restatement of Previously Issued Financial Statements, of the Notes to Consolidated Financial Statements under the heading Other Adjustments, the Company recently determined, based upon review of its contract with QVC that the risk of loss does not transfer under the contract until the product is sold through to the end customer. The Company does not have visibility into QVC's shipment status, but based on the historical timing of payments from QVC, management has estimated that products shipped from the Company to QVC are sold and shipped by QVC within 60 days. Therefore, as part of the restatement, the Company has deferred the recognition of revenue on non-TSV sales by 60 days since inception of selling products to this customer.

In addition to QVC, starting in the second quarter of fiscal 2011, the Company began assuming the credit risk for the retailer BJ's Wholesale Club. BJ's Wholesale Club continues to send its sales orders to MBlock to be fulfilled, however, the invoices and associated accounts receivable are now directly between the Company and BJ's Wholesale Club (not MBlock). Title to the product is with the Company and only passes to BJ's Wholesale Club upon shipment from MBlock's warehouses based on the contractual shipping terms.

RESPONSE TO COMMENT 9

As disclosed in the Fiscal 2010 Form 10-K, *MBlock performs an administrative function in processing the majority of sales orders for the Company's at-home single-cup business with retailers in the United States*. Similarly, the Company relies on a single order fulfillment entity similar to MBlock to process the majority of sales orders for its at-home single-cup business with retailers in Canada, which accounted for less than 3% of the Company's consolidated net sales in fiscal 2010.

*These fulfillment entities do not sell the Company's products but rather receive and fulfill sales orders and invoice retailers and maintain the Company's inventory.* The Company notes that even though approximately 43% of its consolidated net sales were processed by MBlock in fiscal 2010, the substance of MBlock's relationship with the Company is administrative and procedural and not as a purchaser or consumer of the Company's products. Instead, retailers, and the consumers purchasing brewers and K-Cup portion packs from those retailers, initiate demand for at-home brewers and are the Company's primary customers.

*Because these functions are primarily administrative and these vendors do not constitute a customer relationship or drive purchases of the Company's products, the Company has concluded that it is not substantially dependent on these contractual relationships and could either perform these functions internally or find a suitable replacement vendor if the need arises.* Instead, the Company believes that these vendor relationships may be material to investors only to the extent that it faces potential credit risk with respect to its accounts receivable from these vendors, and it has disclosed this risk in its periodic reports, including in the risk factors found in its Fiscal 2010 Form 10-K.

91.    Thus, in the March 29 Response Letter, just as it did when the SEC last inquired into the Company's key strategic relationship with MBlock, GMCR continued to deny that its MBlock-related disclosures were in any way inadequate.

92.    GMCR's statements in the March 29 Response Letter to the SEC were materially misleading when made. As to "Comment 4," *see* ¶¶ 89-90, in describing the Company's revenue recognition policy for certain sales transactions with MBlock, the Company neglected to explain the ways it deceptively exploited the very policy contours being described.    The Einhorn Presentation, however, connected the dots and detailed the Company's use of sham-QVC

transactions to circumvent a general policy of accepting all credit risk on sales to retailers through MBlock.

93.     GMCR's statements in the March 29 Response Letter regarding "Comment 9," *see* ¶¶ 89, 91, were also materially false and misleading when made.  GMCR's claim that MBlock "do[es] not sell the Company's products but rather receive[s] and fulfill[s] sales orders and invoice[s] retailers and maintain the Company's inventory" is belied by the Company's own prior statements.  Indeed, in the Company's 2009 Annual Report, GMCR stated: "We sell a significant number of brewers and K-cups to this third party fulfillment company for re-sale to certain retailers."

94.     Moreover, the Company's claim that MBlock does "not constitute a customer relationship or drive purchases of the Company's products," is directly contradicted by the detailed accounts in the Einhorn Presentation.  Given the "unusual" puppet/master relationship between GMCR and MBlock, and the "shell game" revealed by the Einhorn Presentation, it defies credibility that the Company could readily "find a suitable replacement" for MBlock.

## I.     THE TRUTH ABOUT DEFENDANTS' SCHEME IS DISCLOSED

95.     On October 17, 2011, at the seventh annual Value Investing Conference, the truth about GMCR's misconduct began to emerge.  As referenced above, David Einhorn, a prominent investor in GMCR, undertook a lengthy and in-depth analysis of GMCR's financial reporting and relationship with MBlock.  The Einhorn Presentation cited expert analysis of detailed information gleaned from numerous sources, not all of which were readily available to the public.  In assembling the Einhorn Presentation, Einhorn and his staff conducted substantial field research and interviewed former GMCR and MBlock employees who told consistent stories— each painting an "unflattering picture" of the companies' interactions that indicated pervasive fraud by the Company and its senior officers

96.     As set forth herein, the Einhorn Presentation provided original insight and shocking details that revealed GMCR's improper practices and fraudulent scheme with MBlock. *First*, the witnesses interviewed in Einhorn's field research described an "unusual" and "peculiar" relationship between GMCR and MBlock. According to Einhorn's sources, "*[i]t was clear that Keurig and Green Mountain control MBlock*." Another Einhorn source employed by MBlock stated that it "felt like they worked for Keurig [*i.e.*, GMCR]" more than MBlock, adding, "I really never even had a boss while I was at MBlock." Einhorn's sources further explained that "[n]obody in that [MBlock] warehouse can tell you what [product] is MBlock's, what is Keurig['s], what is Green Mountain's, nobody can tell you that." This statement supports the inference that GMCR "parked" inventory at MBlock, booking its shipments as sales to boost profits. Likewise, another witness provided that whenever GMCR visited MBlock, GMCR was "not treated like clients as the other customers were," which was considered "so weird."

97.     *Second*, the Einhorn Presentation described frequent "cross-shipping" between GMCR and MBlock. GMCR products were transferred from one facility to another (often multiple times) for no apparent reason. One witness advised Einhorn, "We would do more transferring of inventory than we physically did shipping. . . . Keurig would ship stuff to themselves, I mean truckloads of stuff they'd ship [from MBlock] to themselves." The Einhorn Presentation further describes how "the deliberate overproduction of K-cups" and a "refusal to ship from multiple locations gave cover for a shell game that Green Mountain was playing across all its facilities." Einhorn's sources also advised of "odd material movements" between GMCR and MBlock, noting that such "irregularities" frequently took place during MBlock's external inventory audits. One source recalled that, prior to an MBlock inventory audit, MBlock

warehouses would be partially cleared leaving only a "skeleton inventory of approximately 50%." Another source recalled an occasion on which *500,000 brewers were inventoried and processed as an order for QVC immediately prior to an audit at MBlock. These 500,000 brewers, however, were never shipped, and after the audit the inventory was simply restocked at MBlock*. Another former MBlock employee cited in the Einhorn Presentation recalled: "We would remove product and preload trailer trucks to ship to retailers because we didn't have room on the floor. Then we'd load more product on trailer trucks to nowhere." Yet another witness cited in the Einhorn Presentation detailed an account of a "Kenco trucker" who reported "delivering [GMCR] merchandise to Kenco, picking it up later on, sealing the truck, and delivering it 10 bay doors down at the same warehouse."

98.     *Third*, the Einhorn Presentation detailed systemic excess production practices at GMCR. In one field interview, Einhorn was advised that a "manager of demand planning" consistently wrote internal e-mails that "would talk about how far over the demand forecast actual production was." This excess production led to a "significant problem with expired coffee" being shelved and housed at MBlock. "MBlock received truckloads of expired coffee directly from Green Mountain" just so that "plant managers" could continue to "say[] they have space taken up by the inordinate amount of expired coffee." One witness estimated that "at least one third of [MBlock's] warehouse is more than likely expired coffee," deceptively taking up space and generating fake product demand.

99.     The Einhorn Presentation caused GMCR's stock price to decline and sparked a chain reaction in the financial community. Specifically, as a result of revelations in the Einhorn Presentation leaking into the market after the Value Investor Conference on Monday October 17, the price of GMCR's shares fell approximately 10%, from a closing price of $92.09 on (Friday)

29

October 14 to a close of $82.50 on October 17, on unusually heavy trading volume.

100.    Then, on October 19, 2011, the Einhorn Presentation was more widely distributed. *The Wall Street Journal* published an article called "Here's the Einhorn Presentation that Killed Green Mountain Shares." As a result of this additional disclosure, the price of GMCR's common stock declined approximately 15%, from a closing price of $82.11 on October 18 to a closing price of $69.80 on October 19, on unusually heavy trading volume.

101.    Less than one month after the Einhorn Presentation, on November 9, 2011, GMCR shocked investors when the Company missed sales estimates for the first time in more than eight quarters, and failed to beat profit expectations after five quarters. Not only did GMCR announce disappointing earnings results, but the Company also disclosed skyrocketing inventory levels—up 156% year-over-year, by nearly $410 million. That disclosure appeared to corroborate Einhorn's allegations that the Company had been dumping inventory on MBlock to artificially boost revenues. In the November 9 earnings conference call held later that day, Mark Astrachan, an analyst at Stiefel Nicolaus, aptly questioned:

> So, it was up 156% year-on-year, which was ahead of the sales growth, *especially considering the previous commentary, you talked about it being capacity constrained. So I guess I'm trying to figure out why inventories are building when you've talked about running your equipment basically 24/7.*

102.    In response to Astrachan's question, Defendant Rathke admitted that "inventories were up significantly" and that approximately $273 million of the $436 million inventory increase was attributable to "finished goods . . . coming from K-Cup portion packs on-hand and . . . [on] the brewer's side." Subsequently, although the Company sought to blame its disappointing earnings on a sudden change in customers' buying habits, as noted by top hedge fund manager Whitney Tilson of T2 Partners LLC, "*the GMCR growth story looks like it was pumped up by shenanigans.*" As reported by CNBC, Tilson added:

There are many big questions here. . . .   But the biggest is probably that inventories were up 356% year over year. *And they don't really provide a satisfactory explanation in the earnings release. . . .   This smells to me like channel stuffing . . . .   It looks to me like they pulled a lot of demand forward last quarter, stuffed the channel. . . .   [A sign] that [the] game has come crashing down. This company may be in real trouble*.

103.   Indeed, following the release of GMCR's shocking fourth-quarter results, The Wall Street Journal published an article entitled "Green Mountain Earnings: Big Revenue Miss," noting:

Green Mountain shares are getting crushed in after-hours trading after the coffee roaster posted much lower-than-expected revenue.  Shares are sinking about 27% in late trading.  Green Mountain posted $711.9 million in sales for the fourth quarter . . . the average of analyst estimates was revenue of $760.5 million. . . .

Canaccord Genuity said in a research note that the results will "lead to a hearty correction tomorrow. The Q4 brewer sales growth trailed the measured growth at retail by NPD during the quarter, *which we can't explain*."

104.   Similarly, an article published The Guardian on November 9, reported:

Keurig coffee machine maker Green Mountain Coffee Roasters missed Wall Street's quarterly sales estimates, knocking off a third of its market value, *at a time when [Einhorn] is questioning the company's business practices and growth potential*. . . .  The company missed sales estimates for the first time in more than eight quarters, and failed to beat profit expectations after five quarters. On the analyst call, CEO Blanford admitted that sales missed the company's own estimates. . . .

105.   As a result of the forgoing news and the reverse-course from GMCR regarding demand and inventory levels, GMCR's shares plummeted 40%, from a close of $67.02 on November 8 to $40.89 on November 9, on extremely heavy trading volume.

## V.   ADDITIONAL EVIDENCE OF SCIENTER – EXCHANGE ACT CLAIMS

106.   As alleged herein, the Officer Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or

acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Officer Defendants, by virtue of their receipt of information reflecting the true facts regarding GMCR, their control over, and/or receipt, and/or modification of GMCR's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning GMCR, participated in the fraudulent scheme alleged herein.

107.    The alleged improprieties noted herein enabled the Officer Defendants to exercise and sell the following suspicious amounts of their GMCR shares during the Class Period:

| Defendant | Date | Price | # of Shares | Proceeds |
|---|---|---|---|---|
| Robert Stiller | 05/05/11 | $68.34 | 310,000 | $21,184,625 |
| | 08/04/11 | $107.43 | 500,000 | $53,716,650 |
| | | | **810,000** | **$74,901,275** |
| | | | | |
| Frances Rathke | 08/05/11 | $96.87 | **337,500** | **$32,692,613** |
| | | | | |
| Lawrence Blanford | 05/05/11 | $68.34 | 51,573 | $3,524,370 |
| | 08/16/11 | $99.62 | 45,000 | $4,482,734 |
| | 09/20/11 | $111.43 | 45,000 | $5,014,206 |
| | 10/18/11 | $80.21 | 45,000 | $3,609,459 |
| | | | **186,573** | **$16,630,768** |

108.    Prior to these sales, there had not been significant insider trading activity since May 2009.

## VI.    LOSS CAUSATION – EXCHANGE ACT CLAIMS

109.    For purposes of the Exchange Act claims alleged herein, the Exchange Act Defendants' unlawful conduct alleged herein directly caused the losses incurred by Plaintiff and the Class.  Throughout the Class Period, the price of GMCR common stock was artificially

inflated as a direct result of the Exchange Act Defendants' materially false and misleading statements and omissions. The false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public. The true facts became known by investors and the market through a series of partial corrective disclosures. By making contemporaneous additional misstatements in connection with these partial disclosures or by failing to reveal the falsity of all statements at one time, artificial inflation remained in the prices of GMCR common stock throughout the Class Period.

110. As the true facts became known and/or the materialization of the risks that had been concealed by the Exchange Act Defendants occurred, the price of GMCR common stock declined as the artificial inflation was removed from the market price of the securities, causing substantial damage to Plaintiff and the members of the Class.

111. On Monday October 17, 2011, the truth about GMCR's misconduct began to emerge. The Einhorn Presentation provided original insight that revealed GMCR's improper practices. Indeed, shocked investors learned of: (a) the "unusual" and "peculiar" relationship between GMCR and MBlock pursuant to which GMCR effectively controlled and exploited MBlock; (b) regular "cross-shipping" between GMCR and MBlock whereby product was transferred from one facility to another (often multiple times) for no apparent reason; (c) "odd material movements" between GMCR and MBlock such that employees inventoried and processed orders that were never shipped and later restocked; (d) systemic excess production practices at GMCR to generate fake perceived demand for Company products.

112. The Einhorn Presentation and associated analyst and media commentary on October 17 and 19 concerning GMCR's misconduct caused GMCR's stock price to decline and sparked a chain reaction in the financial community. Specifically, as a result of news of the

Einhorn Presentation leaking into the market after the Value Investor Conference, the price of GMCR's shares fell approximately 10%, from a closing price of $92.09 on (Friday) October 14 to a close of $82.50 on October 17, on unusually heavy trading volume.

113.    Then, on October 19, 2011, the Einhorn Presentation was more widely distributed. *The Wall Street Journal* published an article called "Here's the Einhorn Presentation that Killed Green Mountain Shares," which provided a link to the Einhorn Presentation. The article further noted:

> On Monday, investor David Einhorn laid out in 110 PowerPoint slides outlining his concerns about the health of Green Mountain Coffee. The presentation from Einhorn, known for his eventually true suspicions about Allied World and Lehman Brothers, drove down Green Mountain shares by 10% on Monday.

114.    As a result of these additional disclosures, the price of GMCR's common stock declined approximately 15%, from a closing price of $82.11 on October 18 to a closing price of $69.80 on October 19, on unusually heavy trading volume.

115.    On October 31, 2011, Sequence Inc. issued a damning report summarizing the critical facts in the Einhorn Presentation, calling GMCR a "house of cards" and explaining away the Company's would-be rebuttals.  This news caused Green Mountain's stock to fall an additional 8%, from a close of $70.99 the prior trading day (Friday, October 28) to $65.02 on October 31, on unusually heavy trading volume.

116.    Finally, on November 9, 2011, GMCR shocked investors when it issued a press release announcing disappointing fourth quarter and full fiscal year results for the period ending September 24, 2011.  GMCR also disclosed skyrocketing inventory levels in stark contrast to the Company's prior representations, which baffled analysts.  GMCR's shares plummeted 40%, from a close of $67.02 on November 9 to a close of $40.89 on November 10, on extremely heavy trading volume of more than 47 million shares.

117.    For purposes of the Exchange Act claims, it was entirely foreseeable to GMCR and the Officer Defendants that failure to disclose the scheme alleged herein would artificially inflate the price of GMCR common stock during the Class Period.

118.    It was similarly foreseeable that the ultimate disclosure of this information would cause the price of these securities to drop significantly as the inflation caused by Defendants' earlier misstatements was removed by the corrective disclosures set forth herein.

119.    Accordingly, the conduct of the Exchange Act Defendants as alleged herein proximately caused foreseeable losses under the Exchange Act for Plaintiff and members of the Class who purchased or otherwise acquired GMCR common stock during the Class Period and were damaged thereby.

## VII.   APPLICABILITY OF FRAUD ON THE MARKET PRESUMPTION

120.    At all relevant times, the market for GMCR common stock was an efficient market that promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

       a.     GMCR stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

       b.     GMCR met the requirements of a seasoned issuer to file registration statements under Form S-3; in addition, as a regulated issuer, GMCR filed periodic public reports with the SEC and NASDAQ;

       c.     GMCR regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

       d.     Securities analysts and the business press followed and published research reports regarding GMCR that were publicly available to investors;

e.     The market price of GMCR common stock reacted promptly to the dissemination of public information regarding the Company;

f.     The average daily trading volume for GMCR common stock during the Class Period was approximately 4.6 million shares traded; and

g.     The Company's market capitalization was approximately $10.4 billion on November 10, 2011.

## VIII.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

121.    The PSLRA's statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

122.    None of the statements complained of herein were forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about GMCR's then-existing financial condition.

123.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants statements regarding GMCR's financial condition and the payments of accelerated, discretionary bonuses to Merrill's executives and employees. Given the then-existing fact contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

124.    To the extent that the statutory safe harbor may apply to any of these false statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker actually knew the statement

36

was false, or the statement was authorized and/or approved by an executive officer of GMCR who actually knew that the statement was false.

## IX.   CLASS ACTION ALLEGATIONS

125.    Plaintiff brings this action on its own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities (the "Class") who purchased or acquired GMCR common stock during the period from February 2, 2011 through and including November 9, 2011 (the "Class Period") and suffered damages as a result.

126.    Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of each of the Defendants; (iii) any person who was an executive officer and/or director of GMCR during the Class Period; (iv) any person, firm, trust, corporation, officer, director, or any other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

127.    The members of the Class, purchasers of GMCR common stock, are so numerous that joinder of all members is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, if not higher. As of July 27, 2011, GMCR reported that it had 153,092,273 shares of common stock issued and outstanding. Plaintiff's claims are typical of the claims of members of the Class.

128.    Plaintiff and all members of the Class sustained damages as a result of the conduct complained of herein.

129.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained court-appointed counsel competent and experienced in class and securities

litigation. Plaintiff has no interests that are contrary to or in conflict with those of the members of the Class that Plaintiff seeks to represent.

130. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

131. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a.   Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.   Whether documents, including the Company's SEC filings, press releases, and other public statements made by Defendants, during the Class Period contained misstatements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

c.   Whether the market price of GMCR common stock during the Class Period was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

d.   With respect to Plaintiff's claims under Section 10(b) of the Exchange Act, whether the Exchange Act Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

e.   With respect to Plaintiff's claims pursuant to Section 20(a) of the Exchange Act, whether the Exchange Act Defendants named in those counts are controlling persons of the Company; and whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the appropriate measure thereof.

132. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

133.    The names and addresses of the record owners of GMCR common stock purchased during the Class Period are obtainable from information in the possession of the Company's transfer agent(s).  Notice can be provided to such record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## X.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT I

#### For Violations Of § 11 Of The Securities Act
#### (Against The Securities Act Defendants)

134.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against the Securities Act Defendants.

135.    The Offering Materials were inaccurate and misleading, contained untrue statements of material facts regarding the health of GMCR's business and the accuracy of its financial statements and omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

136.    The Defendants named in this Count were responsible for the contents and dissemination of the Offering Materials issued in connection with the May 11, 2011 offering of common stock described above, and caused them to be filed with the SEC.  With the exception of the Underwriter Defendants, each of the Defendants named in this Count signed the Registration Statement pursuant to which the stock for the May 2011 Offering was issued and/or the Q2'11 10-Q that was incorporated by reference into the 2011 Offering Materials.  By incorporating the Q2'11 10-Q into the 2011 Offering Materials, the Defendants named in this Count assumed the duty to provide all material information about GMCR's financials and operations.

137. As the issuer of the common stock in the May 2011 Offering, GMCR is liable to the members of the Class who acquired the common stock pursuant to the false and misleading Offering Materials, under Section 11 of the Securities Act.

138. Class members acquired the common stock described above pursuant to the Offering Materials without knowledge of the truth of any misrepresented fact or omission.

139. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true and without omissions of any material facts and were not misleading. Each of the Defendants named in this Count acted negligently in issuing the Offering Materials.

140. The Defendants named in this Count issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Offering Materials, which misrepresented or failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct herein alleged, each Defendant named in this Count violated Section 11 of the Securities Act.

141. At the times they acquired the common stock described above, Plaintiff was without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

142. This Count has been brought within one year after the discovery of the untrue statements or omissions, or after such discovery could have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

## COUNT II

### For Violations Of § 12(a)(2) Of The Securities Act
(Against Defendants GMCR, Stiller, Blanford, Davis,
Moran, And The Underwriter Defendants)

143.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

144.    This Count is brought by Plaintiff pursuant to § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, on behalf of themselves and all other members of the Class who acquired the common stock in the May 2011 Offering described above, pursuant to the Offering Materials, against the Defendants named in this Count.  This claim does not sound in fraud and should be read to exclude any reference in the preceding paragraphs to recklessness, fraud, or intentional acts by the Defendants named in this Count.

145.    The Defendants named in this Count were sellers and offerors of the common stock offered pursuant to the Offering Materials.

146.    The Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed but failed to disclose material facts.   The actions of the Defendants named in this Count included solicitation or participation in the preparation of the false and misleading Offering Materials.

147.    The Defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Offering Materials, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  The Defendants named in this Count, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Materials as set forth above.

148.    Members of the Class acquired the common stock from the May 2011 Offering

pursuant to the defective Offering Materials.   These investors did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Materials.

149.   By reason of the conduct alleged herein, the Defendants named in this Count violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act. Accordingly, class member are entitled to damages pursuant to Section 12(a)(2).

150.   This Count has been brought within one year after the discovery of the untrue statements or omissions, or after such discovery could have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

## COUNT III

### For Violations Of § 15 Of The Securities Act
### (Against The Officer Defendants And Director Defendants)

151.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

152.   This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o against the Officer Defendants and Director Defendants.

153.   The Officer Defendants and Director Defendants exercised direct control over GMCR, acting as day-to-day managers of the Company, and by virtue of their positions as Officers and/or Directors of the Company.   As a result of their actual control over the Company's day-to-day operations, financial statements, public filings and their intimate involvement and control over the Offering Materials the Officer Defendants and the Director Defendants had the power, and exercised the same, to cause GMCR to engage in the violations of law complained of herein and were able to and did control the contents of the Offering Materials.

154.    As a result of their control over GMCR, the Officer Defendants and the Director Defendants are jointly and severally liable with and to the same extent as GMCR to Plaintiff and the Class.

## XI.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT IV

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against The Exchange Act Defendants)

155.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

156.    This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Plaintiff and all other members of the Class, against the Exchange Act Defendants.

157.    Throughout the Class Period, the Exchange Act Defendants individually, and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce, the mails and the facilities of a national securities exchange, employed devices, schemes and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, and engaged in acts, practices and a course of business which operated as a fraud and deceit upon Class members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

158.    Defendants' false and misleading statements and omissions were made with scienter and were intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiff and the other members of the Class; (ii) artificially create, inflate and maintain, the market for and market price of the Company's common stock; and (iii) cause Plaintiff and the other members of the Class to purchase GMCR's common stock at inflated

prices.

159.   By failing to inform the market of their fraudulent scheme with MBlock, and making other false statements and material omissions, these Exchange Act Defendants presented a misleading picture of GMCR's finances and prospects.  This caused and maintained artificial inflation in the trading prices of GMCR's publicly traded securities throughout the Class Period and until the truth came out.

160.   The Exchange Act Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading and/or making direct statements to the investing public on the conference calls detailed herein.

161.   During the Class Period, the Exchange Act Defendants occupied executive level positions at GMCR and were privy to non-public information concerning the Company.  Each of them knew or recklessly disregarded the adverse facts specified herein and omitted to disclose those facts.

162.   As described herein, the Exchange Act Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and other members of the Class who purchased GMCR common stock during the Class Period.   Throughout the Class Period, the Exchange Act Defendants had a duty to disclose new, material information that came to their attention, which rendered their prior statements to the market materially false and misleading. There is a substantial likelihood that the disclosure of these omitted facts would have been viewed by the reasonable investor as having significantly altered the total mix of information available about

the prospects of the Company.

163. The Exchange Act Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities.

164. In ignorance of the false and misleading nature of the Exchange Act Defendants' statements and/or upon the integrity of the market price for GMCR common stock, Plaintiff and the other members of the Class purchased GMCR stock at artificially inflated prices during the Class Period. But for the fraud, they would not have purchased the securities at artificially inflated prices.

165. The market price for GMCR common stock declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Defendants, as described above.

166. Plaintiff and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of GMCR securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

167. This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

168. By virtue of the foregoing, the Exchange Act Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiff and the members of the Class, each of whom has been damaged as a result of such violation.

## COUNT V

### Violations of Section 20(a) of the Exchange Act
### (Against The Officer Defendants)

169. Plaintiff repeats and re-alleges each and every allegation above as if set forth fully herein. This Claim is brought pursuant to Section 20(a) of the Exchange Act against the

individual defendants on behalf of Plaintiff and all members of the Class who purchased GMCR common stock during the Class Period.

170. As alleged herein, GMCR is liable to Plaintiff and the members of the Class who purchased GMCR stock based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

171. Throughout the Class Period, the Section 20(a) Defendants were controlling persons of GMCR within the meaning of Section 20(a) of the Exchange Act, and culpable participants in the GMCR fraud, as detailed herein.

172. Each of the Section 20(a) Defendants exercised control over GMCR during the Class Period by virtue of, among other things, their executive positions with the Company, the key roles they played in the Company's management, and their direct involvement in its day to day operations, including its financial reporting and accounting functions.

173. In addition to the allegations set forth above, the following allegations demonstrate the Section 20(a) Defendants' control over GMCR during the Class Period.

174. Given their individual and collective responsibilities for managing GMCR throughout the Class Period, the Section 20(a) Defendants were regularly presented to the market as the individuals who were responsible for GMCR's day-to-day business and operations, as well as the Company's strategic direction. These Section 20(a) Defendants accepted responsibility for presenting quarterly and annual results, setting guidance for future periods and assuring the market about the state of, and prospects for the Company. No one else at GMCR exercised that degree of responsibility for, or control over, the Company's activities and public statements.

175. As a result of the false and misleading statements and omissions alleged herein,

the market price of GMCR common stock was artificially inflated during the Class Period. Under such circumstances, the presumption of reliance available under the "fraud on the market" theory applies, as more particularly set forth above. Plaintiff and the members of the Class relied upon either the integrity of the market or upon the statements and reports of the Section 20(a) Defendants in purchasing common stock at artificially inflated prices.

176.    This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

177.    By virtue of the forgoing, each of the Section 20(a) Defendants are liable to Plaintiff and the Class, each of whom has been damaged as a result of GMCR's underlying violations.

### **PRAYER FOR RELIEF – Applicable To All Claims**

178.    WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d.    As to the claims set forth under the Securities Act (Sections 11, 12(a)(2) and/or 15), awarding rescission or a recessionary measure of damages; and

e.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND – Applicable To All Claims

179.    Plaintiff hereby demands a trial by jury.


Dated:  November 29, 2011


                                        **LYNN, LYNN & BLACKMAN, P.C.**

                                        Robin A. Freeman, Jr., Esq.
                                        76 St. Paul Street, Suite 400
                                        Burlington, Vermont 05401
                                        Telephone: (802) 860-1500
                                        Facsimile: (802 860-1580

                                        *Liaison Counsel for Plaintiff
                                        and the Proposed Class*



                                        **BERNSTEIN LITOWITZ BERGER
                                          & GROSSMANN LLP**
                                        Gerald H. Silk (*pro hac* application forthcoming)
                                        Avi Josefson (*pro hac* application forthcoming)
                                        Stefanie J. Sundel  (*pro hac* application forthcoming)
                                        1285 Avenue of the Americas
                                        New York, New York 10019
                                        Telephone: (212) 554-1400
                                        Facsimile: (212) 554-1444

                                        *Attorneys for Plaintiff
                                        and the Proposed Class*

48