**UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 NOV -5  PM 1:30

CLERK

BY_____
DEPUTY CLERK

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, SJUNDE AP-FONDEN, BOARD OF TRUSTEES OF THE CITY OF FORT LAUDERDALE GENERAL EMPLOYEES' RETIREMENT SYSTEM, EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT OF THE VIRGIN ISLANDS, AND PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>      v.<br><br>GREEN MOUNTAIN COFFEE ROASTERS, INC., LAWRENCE J. BLANFORD and FRANCES G. RATHKE<br><br>             Defendants. | No. 2:11-CV-00289-WKS<br><br>CLASS ACTION<br><br>**CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................1

II. JURISDICTION AND VENUE .................................................................6

III. PARTIES ..............................................................................................6

    A.  Lead Plaintiffs ..............................................................................6

    B.  Defendants ...................................................................................8

        1.  The Company.........................................................................8

        2.  The Executive Defendants .....................................................8

        3.  Related Non-Party M.Block....................................................9

IV. SUBSTANTIVE ALLEGATIONS .............................................................10

    A.  GMCR Embarks On A Period Of Unprecedented Reported Growth ....10

    B.  The Fraudulent Scheme ................................................................15

        1.  Defendants' Inventory Fraud: Defendants Falsely Tell Investors
             That The Company Is Straining Its Production Capacity To Keep
             Up With Demand ..................................................................16

        2.  Defendants Use Their Captive Relationship With M.Block To
             Deceive Investors Regarding The Number Of Keurig Coffee Brewers
             The Company Shipped In The Critical Second Quarter 2011 ........28

    C.  Defendants Take Advantage Of GMCR'S Soaring Stock Price To Reap
        Millions In Insider Stock Sale Proceeds And Foist A Secondary Offering
        On Unsuspecting Investors ............................................................33

        1.  Insider Selling .....................................................................33

        2.  May 2011 Secondary Stock Offering .......................................38

    D.  The Truth Is Revealed...................................................................38

    E.  Defendants' False And Misleading Class Period Statements.................42

|  | 1. | February 2, 2011 Conference Call | 43 |
|  | 2. | First Quarter 2011 Form 10-Q | 44 |
|  | 3. | May 3, 2011 Conference Call | 44 |
|  | 4. | Second Quarter 2011 Form 10-Q | 46 |
|  | 5. | July 27, 2011 Conference Call | 47 |
|  | 6. | Third Quarter 2011 Form 10-Q/A | 48 |

F.   Additional Allegations Of Scienter........................**Error! Bookmark not defined.**

   1.   Defendants' Financial Disclosure Controls Remediation Plan Demonstrates Their Actual Knowledge of the Improprieties Alleged Herein ...........................................**Error! Bookmark not defined.**

   2.   The Defendants' Communications With The SEC Regarding Their Relationship With M.Block Demonstrates Their Actual Knowledge Of The Improprieties Alleged Herein ........................................51

   3.   Corporate Scienter ......................................................52

V.   LOSS CAUSATION/ECONOMIC LOSS ........................................................53

VI.   APPLICABILITY OF FRAUD ON THE MARKET PRESUMPTION........................566

VII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ........................................................57

VIII.   CLASS ACTION ALLEGATIONS ........................................................58

IX.   CLAIMS FOR RELIEF ........................................................600

Co-Lead Plaintiffs, Louisiana Municipal Police Employees' Retirement System ("LAMPERS"), Sjunde AP-Fonden ("AP7"), Board of Trustees of the City of Fort Lauderdale General Employees' Retirement System ("Fort Lauderdale"), Employees' Retirement System of the Government of the Virgin Islands ("Virgin Islands"), and Public Employees' Retirement System of Mississippi ("Mississippi PERS") (collectively, "Lead Plaintiffs"), by their undersigned counsel, bring this action for violations of the federal securities laws on behalf of themselves and all other similarly situated persons or entities (the "Class," as defined in ¶ 143 herein), who purchased or otherwise acquired common stock issued by Green Mountain Coffee Roasters ("GMCR" or the "Company") from February 2, 2011 through November 9, 2011 (the "Class Period"), and were damaged by the conduct asserted herein.

## I.      INTRODUCTION

1.      GMCR is a manufacturer of specialty coffee and coffee-related products. The Company's principal product is its Keurig single-cup brewing system, which uses "K-Cup" portion packs to brew single servings of coffee and other beverages. Throughout the Class Period, Defendants told investors that the Company was straining its production capacity in an effort to meet skyrocketing consumer demand for its Keurig and K-Cup products, and it was ***"not building any excess inventories at all at retail."***[1] These and similar statements to investors were designed to create the false impression that GMCR was a strong business that was well positioned to continue to experience significant future growth.

2.      Bolstered by Defendants' "growth story," the price of GMCR's stock soared to record heights during the Class Period. From February 2, 2011, the first day of the Class Period, to September 19, 2011, GMCR's stock price nearly quadrupled from $32.96 per share to $111

---

[1] Unless otherwise noted, all emphases are added.

per share.  During this time, GMCR was frequently described as one of the hottest stocks listed on NASDAQ (which declined by 2.4% during the same time period), and it outperformed its competitors by multiples of ten.

3.     As would later be revealed, however, the phenomenal growth in GMCR's stock price was not the result of legitimate business practices or an insatiable demand for GMCR's products.  Unbeknownst to investors, and contrary to Defendants' statements that they were barely able to ship orders as they came in, GMCR's warehouses were overflowing with unused and expiring coffee products that were not being sold to consumers, and in many instances were being given away or thrown out and destroyed.  Indeed, during the Class Period, GMCR's inventory ballooned to record levels even as Defendants claimed that GMCR's revenue was exceeding their own internal expectations and the Company's production facilities could barely keep up with demand.

4.     Numerous former employees of GMCR and other persons with first-hand knowledge have confirmed that, contrary to Defendants' statements to the market that the Company could barely produce enough product to keep up with demand, during the Class Period, GMCR's warehouses were "stuffed to the rafters" with unsold and expired products, that "inventory was backed up," and that GMCR was building up such an excess of K-Cup inventory that employees were simply throwing out "pallet after pallet after pallet."  These former employees have also confirmed that Defendants intentionally concealed from both investors and the Company's auditors the fact that GMCR was producing far more product than was required to meet demand.  For instance, numerous witnesses have stated that inventory would routinely be loaded onto trucks and driven around the block while auditors were at a facility, only to be returned again when the auditor had left.  This practice – which serves no legitimate business

purpose – was observed time and time again by multiple individuals at several facilities where GMCR inventory was made or stored.

5.      GMCR also used an order fulfillment company called M.Block & Sons, Inc. ("M.Block") to conceal the true extent of its overproduction and excess inventory. During the Class Period, M.Block was the primary order fulfillment entity that the Company used to process the majority of its U.S. sales orders for its K-Cup and Keurig products. Former GMCR and M.Block employees have stated that M.Block was essentially a captive tool of GMCR, and that M.Block played a key role in GMCR's efforts to deceive investors. Among other things, GMCR engaged in multiple instances of cross-shipping whereby inventory was moved between the Company and M.Block, often multiple times, for no legitimate reason, and that these intentional, odd material movements involving huge quantities of the Company's products frequently took place during inventory audits of M.Block's facilities.. Further, in the second quarter of 2011 – just as GMCR was preparing to sell more than $680 million in stock to investors in a secondary offering – Defendants used M.Block to facilitate a phony shipment of nearly 500,000 brewers to QVC, which allowed GMCR to exceed analyst expectations and keep touting its false "growth story" to investors..

6.      The truth about GMCR began to be revealed on October 17, 2011, when David Einhorn, an investor well-known for helping to bring the financial fraud at Lehman Brothers to light, made a presentation to analysts at the seventh annual Value Investing Conference (the "Einhorn Report"). The Einhorn Report described a scheme whereby GMCR was engaged in a "variety of shenanigans that appear designed to mislead auditors and to inflate financial results," including engaging in systemic excess production practices leading to "inventory and spoilage problems," and a "significant problem with expired coffee" and other products.

3

7.     The Einhorn Report caused a sharp decline in GMCR's stock price.  As news of the presentation began leaking into the market on October 17, 2011, GMCR's shares fell from $92.09 to $82.50, on unusually heavy trading volume.  On October 18, 2011, aware that investors were on the verge of learning the truth behind GMCR's purported growth story, Defendant Lawrence J. Blanford promptly sold 45,000 shares of his GMCR stock at a price of $80.21, for total proceeds of approximately $3.6 million.  The very next day, on October 19, 2011, *The Wall Street Journal* published an article that widely disseminated the Einhorn Report, and GMCR's stock price declined an additional 15% from approximately $80.21 to $69.80, on unusually heavy volume.

8.     With the Einhorn Report now in the public domain, it was no longer possible for Defendants to continue their scheme.  On November 9, 2011, GMCR shocked the market when it announced that it had failed to meet sales and revenue expectations for the first time in eight quarters, falling $50 million short of analyst estimates.  Without meaningful explanation, GMCR announced that its inventory levels had skyrocketed – increasing *61% from the prior quarter* and 156% year-over-year – in sharp contrast to prior statements that the Company was not building any excess inventories and was "maintaining optimum inventory levels."  GMCR also revealed a huge jump in its reserve for obsolete inventory to $5.6 million, up 47% from the prior quarter and 186% year over year.

9.     Analysts and market observers reacted with alarm to these revelations, with one analyst asking "why inventories are building when you've talked about running your equipment basically 24/7."  Whitney Tilson, a top hedge fund manager, said "this smells to me like channel stuffing . . . it looks to me like they pulled a lot of demand forward last quarter" and "the GMCR growth story looks like it was pumped up by shenanigans."  The disclosure of the Company's

true state of affairs caused GMCR's shares to plummet by nearly 40%, from a close of $67.02 per share on November 8, 2011 to close on November 9, 2011 at $40.89 per share – down almost 300% from its Class Period high (it is currently trading at less than $25 per share).

10.     Notably, before GMCR's stock price collapsed at the end of the Class Period, Defendants engaged in massive insider selling and reaped for themselves millions of dollars in proceeds.  At the same time Defendants were assuring investors that GMCR was striving to keep its production in pace with soaring demand for its products, and that the future growth potential of the Company was unlimited, Defendants altered the Company's insider trading rules to permit the Executive Defendants (defined below) to immediately sell vast quantities of their own holdings of GMCR stock.  Between May 2011 and September 2011 – when GMCR stock was trading at or near all-time highs – the Executive Defendants sold huge percentages of their personal holdings in GMCR and reaped over *$49 million* in proceeds.  These trades far exceeded the insiders' previous sales (indeed, Defendant Frances G. Rathke, GMCR's Chief Financial Officer, sold *nearly 90%* of her holdings during a six month period during the Class Period) and typically occurred just days after GMCR would announce positive results to the market.

11.     Defendants also took advantage of GMCR's soaring stock price to conduct a massive secondary offering of GMCR common stock in May 2011, which raised $680 million from unsuspecting investors.  This offering took place after GMCR's stock price had nearly doubled in just three months, and was used by Defendant Blanford as an opportunity to sell even more of his GMCR holdings.  While the Executive Defendants made millions of dollars from their Class Period sales of GMCR stock, investors suffered billions of dollars in losses when the truth was revealed and GMCR's stock price collapsed.  Lead Plaintiffs bring this action to

5

recover for themselves and on behalf of the class the substantial damages that resulted from Defendants' wrongful conduct.

## II.    JURISDICTION AND VENUE

12.    The claims on behalf of the Class (defined in ¶ 143 below) arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) ("Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331 and 1337.

13.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c) and (d). GMCR maintains its corporate offices in this District and many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

14.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, interstate telephone communication, and the facilities of a national securities market.

## III.    PARTIES

### A.    Lead Plaintiffs

15.    Plaintiff AP7, the Seventh Swedish Pension Fund, began investing in 2000 as part of Sweden's new national pension system.  AP7 has approximately $15 billion in assets under management.  On April 27, 2012, AP7 was appointed by Order of the Court to serve as Co-Lead Plaintiff in this Action. *See* D.E. 30.

16.     Plaintiff Fort Lauderdale provides retirement benefits to eligible employees of the City of Fort Lauderdale, Florida. It has approximately $330 million in assets under management. On April 27, 2012, Fort Lauderdale was appointed by Order of the Court to serve as Co-Lead Plaintiff in this Action. *See id.*

17.     Plaintiff LAMPERS is a public pension system established and maintained by the government of the State of Louisiana. LAMPERS provides retirement allowances and other benefits for full-time municipal police officers and employees in the state of Louisiana, secretaries to chiefs of police, and LAMPERS' employees. LAMPERS has approximately $1 billion in assets under management. On April 27, 2012, LAMPERS was appointed by Order of the Court to serve as Co-Lead Plaintiff in this Action. *See id.*

18.     Plaintiff Mississippi PERS provides retirement, disability, and survivor benefits to employees of the state of Mississippi public school districts, municipalities, counties, community colleges, state universities, and such other public entities as libraries and water districts. Mississippi PERS had approximately $20 billion in assets under management.   On April 27, 2012, Mississippi PERS was appointed by Order of the Court to serve as Co-Lead Plaintiff in this Action. *See id.*

19.     Plaintiff Virgin Islands provides retirement, disability, and other benefits to officials and employees of the government of the Virgin Islands.   Virgin Islands has approximately $1 billion in assets under management.   On April 27, 2012, Virgin Islands was appointed by Order of the Court to serve as Co-Lead Plaintiff in this Action. *See id.*

**B.     Defendants**

### 1.     The Company

20.     Defendant GMCR produces and sells specialty coffee and coffee makers.   The Company sources, produces, and sells approximately 200 varieties of coffee, cocoa, tea, and other beverages in K-Cup portion packs and coffee in traditional packaging.   The Company operates in three segments: the Specialty Coffee business unit ("SCBU"), the Keurig business unit ("KBU") and the Canadian business unit ("CBU").   GMCR is incorporated in the State of Delaware, and maintains its corporate headquarters at 33 Coffee Lane, Waterbury, Vermont 05676.

### 2.     The Executive Defendants

21.     Defendant Blanford has served as President, Chief Executive Officer, and Director of the Company since May 2007.   Blanford signed the Company's 2010 Form 10-K, and each of the Company's quarterly reports on Forms 10-Q for the first, second, and third quarters of 2011, and also certified the accuracy of those reports.   Blanford sold 51,573 of his own Company shares in a secondary offering of GMCR common stock in May 2011 (the "May 2011 Offering") for proceeds of $3,524,370, net of applicable underwriting discounts, and sold an additional 135,000 shares of stock during the Class Period for further proceeds of $13,106,399.

22.     Defendant Rathke has served as Chief Financial Officer, Secretary and Treasurer of GMCR since October 2003, and as Interim Chief Financial Officer of the Company since April 2003.   Rathke signed the 2010 Form 10-K, and each of the Company's quarterly reports on Forms 10-Q for the first, second, and third quarters of 2011, and also certified the accuracy of

those reports. Rathke sold 337,500 shares of stock during the Class Period for proceeds of $32,692,613.

23.    Defendants Blanford and Rathke are referred to collectively herein as the "Executive Defendants."

24.    GMCR and the Executive Defendants are referred to collectively herein as the "Defendants."

### 3.    Related Non-Party M.Block

25.    M.Block is a warehousing and distribution outsourcing company headquartered in Bedford Park, Illinois. M.Block provides companies with warehousing, distribution, logistics, sales and marketing, information technology, customer service and finance services.

26.    At all relevant times, M.Block served as GMCR's primary order fulfillment entity in the United States, processing the majority of GMCR's orders for its at-home, single-cup business from retailers, department stores and mass merchants in the United States, and receiving and fulfilling sales orders and invoicing customers. Indeed, the overwhelming majority of U.S. sales orders for GMCR's single-cup business, which accounted for 97% of GMCR's fiscal 2010 revenues, were processed through M.Block. Further, receivables from M.Block comprised approximately 51% and 41% of GMCR's consolidated accounts receivable balance in fiscal 2010 and 2011, respectively. According to GMCR's SEC filings, GMCR retained ownership of all inventories maintained at M.Block's fulfillment locations until M.Block processed the orders and shipped the product to the customers.

27.    As more fully set forth below, based upon the magnitude and importance of GMCR's business to M.Block, GMCR effectively controlled M.Block's activities, which GMCR exploited to facilitate its inventory manipulation scheme. This inventory manipulation was

accomplished in a variety of ways, including a series of questionable shipments to nowhere, as well as frequent cross-shipping between GMCR and M.Block, and GMCR's subsidiaries.

## IV. SUBSTANTIVE ALLEGATIONS

### A. GMCR Embarks On A Period Of Unprecedented Reported Growth

28.    Three months prior to the start of the Class Period, on September 28, 2010, GMCR disclosed that it was the subject of an SEC inquiry concerning revenue recognition practices and the Company's relationship with its key fulfillment vendor, M.Block. Within two months of disclosing the SEC's inquiry, GMCR concluded an internal investigation and announced a restatement of previously-issued financial statements for fiscal years 2006 through 2009 and the first three quarters of 2010. The impact of the errors for the restatement periods reduced GMCR's cumulative net income by approximately $6.1 million. Significantly, in issuing that restatement, the Company vehemently denied M.Block's connection to any of the identified accounting errors, telling investors that "none of the financial statements errors are related to the Company's relationship with M.Block & Sons." GMCR further assured investors that they were working diligently to fix the internal control issues that had caused the restatement.

29.    With the restatement and any question about M.Block ostensibly in GMCR's rearview mirror, the Company portrayed itself to the investing public as a healthy and growing business that was experiencing increasing consumer demand, which was straining the Company's production capacity to its limits.

30.    Defendants told investors that GMCR was struggling to keep up with demand for the Company's Keurig and K-Cup products and that the Company was even experiencing inventory shortages in certain products. For instance, in prepared remarks attached to a Form 8-

10

K and filed with the SEC in advance of a February 2, 2011 conference call with investors to discuss the Company's first quarter 2011 results, Defendants stated that "we remain focused on increasing production to fulfill unmet demand and achieving and maintaining optimum inventory levels." Moreover, Defendants told the market that demand for GMCR's products was so high that "we experienced and continue to see some spot portion pack shortages." On February 2, 2011, the first day of the Class Period, when an analyst from Canaccord Genuity asked Defendants during a conference call with investors for more specifics relating to the inability of supply to meet increasing demand, Defendant Blanford responded:

> I would say that in the first quarter and so far in our second quarter of our fiscal year, we are definitely being stretched .... demand is definitely stretching our ability to supply. And we've not quite caught up with that demand curve yet[.]

31.    Analysts focused on these statements because they indicated that GMCR was a strong business with the potential for significant future growth. For instance, an analyst from Janney Montgomery Scott asked "was there any demand that was pulled forward ... Have you estimated what that might be?" John Whoriskey, the General Manager for GMCR's Keurig at Home, responded by stating "the demand for K-Cups hasn't caught up ... we are in a bit of a catch-up mode in that regard from a K-Cup standpoint." Defendant Blanford added that "we haven't quite caught the rabbit yet."

32.    Analysts were quick to praise the Company's results and were particularly excited by GMCR's growth story. For example, in a report issued on February 3, 2011, Roth Capital Partners highlighted GMCR's "enormous growth potential" and raised its recommendation to "buy." On the same day, Janney Capital Markets reiterated its "buy" rating on the Company, stating that "we believe the fundamentals of the GMCR story have never been better." Janney Capital Markets expressly noted its view that GMCR's "***inventory drives strong share growth***," stating that "Management believes it exited Q1 with appropriate inventory levels to restock

11

shelves post-holiday (though still a bit stretched for 1H11)." Another report issued by William Blair & Company stated "with demand strong, Green Mountain continues to invest in capacity – including roasting and K-Cup packaging lines – across its production network. Management also noted it is increasing capacity to support new products."

33.    The purported good news continued for the Company in the second quarter of 2011. Defendants continued to tout their story that the Company was straining its capacity to meet demand. In prepared remarks filed with the SEC on a Form 8-K on May 3, 2011, Defendants stated:

> [W]e continue to add capacity across all of our production locations ... as a result, our on-shelf product availability has improved, though we continue to experience some spot outages. We expect to continue to install equipment and capacity over the remainder of the year to enable us to meet demand.

34.    During the Company's May 3, 2011 conference call, Defendants once again emphasized that increasing consumer demand for its K-Cups, brewers, and other products was straining capacity. Defendant Blanford reiterated that "on-shelf product availability has improved, though we continue to experience some spot outages ... we continued to install equipment and capacity to meet demand." When an analyst for Banc of America asked whether the Company had "pulled forward" any sales into the quarter, a GMCR spokesperson responded "We did not pull forward any sales at all. The general demand is what we see. We filled our customer's orders as they come in and *we are not building any excess inventories at all at retail*." Another spokesperson for the Company elaborated by telling investors that "there is no pulling forward of shipments to do anything, other than react to the demand and make sure we have adequate inventories in place to meet the demand for the period."

35.    Indeed, throughout the Class Period, GMCR's inventory levels were an important consideration for analysts and investors alike because if the Company's production levels were

outstripping demand (as opposed to struggling to barely keep up with it), it would signal to the market that GMCR's growth story was coming to an end, and inventory levels would start rising while sales and revenue growth leveled off or declined.

36.     As Defendants knew they would, analysts again reacted favorably to Defendants' second quarter 2011 statements.  A May 4, 2011 report from KeyBanc stated that "GMCR's 2Q11 was an impressive quarter in our view," and rated the Company as a "buy."  KeyBanc expressly noted that GMCR had "increased its capital spending guidance given its need for additional capacity, and said it will need additional sites over the next couple of fiscal years in order to accommodate its anticipated demand growth."  A William Blair & Company analyst report similarly stated:

> [T]he company continues to add capacity at all production facilities and achieved record production levels in recent weeks.  As a result, on-shelf availability of K-Cups has improved.  Additional equipment and capacity will be installed to help facilitate demand for new offerings.

37.     A May 6, 2011 report from SunTrust Robinson Humphries went even further, stating "The story is far from over" and "we believe the story is only in the early innings."

38.     The price of GMCR's stock skyrocketed in response to these disclosures.  In just a single day from May 3, 2011 to May 4, 2011, GMCR's stock price increased nearly 20% from $64.07 to $75.98.  From February 2, 2011, the first day of the Class Period, to May 4, 2011 — just three months — GMCR's stock price more than doubled, adding $6 billion in market capitalization to the Company.

39.     On July 27, 2011, GMCR held a conference call with investors to discuss its third quarter 2011 results.  On that call, Defendant Blanford stated: "We're not necessarily the little company from Vermont any longer," and continued to stress that GMCR was straining capacity to meet the unprecedented demand for its products. Defendant Blanford told investors that:

13

> We saw a bit of catch-up effect from Q1 and Q2 in our fiscal Q3. As we have continued to add portion pack production capacity in Q3, we were able to fulfill customer demand that had pent up in the system over the prior two quarters ...

40.     In his comments, Blanford stressed that the "growth story" was not over, assuring investors that "we will need to continue addition portion pack production capacity at a rapid clip." In prepared remarks filed with the SEC on a Form 8-K on July 27, 2011, GMCR reiterated this point, stating that "we continue to add capacity across all of our production locations. As a result of the growth we've experienced thus far this year ... we will need to deploy more portion pack production capacity in 2012 than previously anticipated to support consumer demand."

41.     During the July 27, 2011 conference call, analysts repeatedly questioned Defendants as to whether the large increase in revenues during the quarter was the result of "channel fill" by the Company. This was an important consideration for analysts because if the Company had "pulled forward" sales into the third quarter 2011, then it would be reasonable to expect that demand and sales in subsequent quarters could decline significantly and inventories would increase. Defendants repeatedly assured analysts that this was not the case. For instance, Defendant Rathke stated::

> During Q3 we got back into a place where we knew we had appropriate inventory levels, and they [customers] felt comfortable they were getting appropriate inventory levels for the products. So I think we're in good shape.

Defendant Blanford also reiterated that "our customers are at appropriate inventory levels [and] we're at appropriate inventory levels."

42.     Defendants' statements had the desired effect. On July 28, 2011, Canaccord Genuity issued an analyst report stating that "The story isn't over yet for investors, despite a stock chart that would probably intimidate the best rock climbers from Utah to Vermont." Canaccord Genuity attributed GMCR's success to "added capacity from a rapidly accelerating capital expenditure plan [which] allowed pent-up demand to be serviced in the quarter."

14

43.     An analyst from Dougherty & Company LLC issued a report on July 28, 2011 that stated "Wow! ... Demand for GMCR products exploded," and noted that "GMCR attributed a portion of the K-Cup acceleration to replenishment of lean inventories in the retail channel." SunTrust Robinson Humphrey characterized GMCR's as having a "blow-out 3q" and stated "Management indicated that it has been racing to meet retailer demand since the 2010 holidays."

44.     With the announcement of a third straight quarter of seemingly exceptional results, and consistent assurances to investors that GMCR's "growth story" was still in its "early innings," GMCR's stock price soared. From February 2, 2011 to August 3, 2011 – less than six months – the price of GMCR's stock rose a staggering 236%, nearly quadrupling from $32.96 to $111 per share.

45.     As discussed in more detail below, Defendants took full advantage of this unprecedented growth to sell huge percentages of their personal holdings in GMCR's stock at all-time highs.  When the truth was finally revealed on November 9, 2011, GMCR's stock price dropped below $40, erasing in the blink of an eye nearly all of the increases that had occurred during the Class Period.  GMCR's stock is currently trading at less than $25 per share, and investors who were duped by Defendants' fictitious "growth story" have lost billions of dollars.

**B.     The Fraudulent Scheme**

46.     Contrary to Defendants' representations, and unbeknownst to investors, GMCR was not facing any "capacity constraints" during the Class Period.  Instead, GMCR was building inventory at an alarming rate that cannot be reconciled with the "growth story" that Defendants sold to investors.  As discussed below, Defendants were engaged in a fraudulent scheme whereby they deliberately misled investors regarding GMCR's success, while using the Company's "captive relationship" with M.Block to deceive investors into thinking that the demand for the Company's products was continuing to skyrocket (which, among other things,

15

permitted them to conduct the May 2011 secondary offering and sell millions of dollars of their own holdings of GMCR stock).

> **1.   Defendants' Inventory Fraud: Defendants Falsely Tell Investors That The Company Is Straining Its Production Capacity To Keep Up With Demand**

47.   During the Class Period, Defendants deliberately created a false impression that GMCR was far more successful than it actually was and that demand for its products was growing at such a remarkable pace that the Company was "capacity constrained" and its inventory levels were barely sufficient (and in some cases not sufficient) to meet demand. Investors and analysts closely monitored Defendants' statements regarding GMCR's production capacity and inventory levels because these metrics indicated that the demand for GMCR's products was growing and that GMCR's "growth story" was well-poised to continue. Indeed, analysts regularly asked the Company questions on quarterly conference calls regarding GMCR's inventory levels and whether GMCR's shipments reflect demand for GMCR's products.   Believing that Defendants' statements regarding GMCR's production levels and inventory were true, analysts were increasingly bullish on the Company, which they believed was managing its inventory well and had substantial potential for future growth.  For example, in a February 3, 2011 report, Janney Capital Markets made clear that GMCR's "*inventory drives share growth*," noting that "[m]anagement believes its efforts to build inventory ... more aggressively than in prior years ahead of the 2010 holiday season paid off."

48.   GMCR's reality was quite different.   First, throughout the Class Period, the Company was experiencing a massive build-up of unsold and/or expired inventory, and was actively concealing this inventory build-up from investors and auditors, including through the use of its captive relationship with M.Block.   Second, GMCR's demand models were well-

known within the Company to be inaccurate.  Finally, GMCR was never actually functioning at full production capacity.

49.     During the Class Period, the Company was experiencing a massive build-up of unsold and expired inventory.  For example, Confidential Witness ("CW") 1, who worked in production as a Machine Operator at a GMCR facility from 2006 to 2012, explained that after the Company bought new machinery in 2010, production increased dramatically and the distribution center began to run out of room.  According to CW1, who was responsible for generating new product, packaging, and roasting, inventory was up to the rafters, with "inventory backed up into various departments," and even stored in operators' work spaces.  When CW1 questioned this practice, CW1 was simply told to build the inventory.  CW2, a former Production Planning Manager for M.Block from 2010 through 2011, recalled that the Tennessee facility was opened because they "needed more space" to store increasingly stockpiled inventory, but the coffee just sat there rather than being shipped out or sold.

50.     These observations were corroborated by CW3, a GMCR maintenance technician from 2009 to 2011.  CW3 stated that there were rows of outdated coffee stacked up the length of the warehouse, many of which would then simply be discarded because of the "best-by-date."  CW4, a machine operator involved in producing K-cups from 2009 through mid-2012, similarly stated that there was "no question" that GMCR had excess K-Cup inventory.  CW4 stated that he was told that GMCR did not want the employees to keep track of the amount of product that was being discarded even though they were throwing out "pallet after pallet after pallet."  The significant increase in the Company's inventories – which was not fully revealed until the end of the Class Period, and even then was not adequately explained – cannot be squared with GMCR's repeated public statements regarding its purported capacity constraints.

51.     The Einhorn Report corroborates the information provided by these confidential witnesses.  For example, the Einhorn Report states that one of GMCR's managers of demand planning described how internal company emails "would talk about how far over the demand forecast actual production was."  The Einhorn Report also notes that there was a significant problem with expired coffee, with at least one former GMCR employee stating that at least one-third of an M.Block warehouse was full of expired coffee.

52.     Two metrics that companies commonly use to measure the rate at which a company's inventory is being sold – "inventory turnover ratio" and "average days to sell inventory" – also demonstrate that Defendants' Class Period statements that GMCR was "capacity constrained" were false.  Inventory turnover ratio, which is calculated as Cost of Goods Sold[2] divided by Average Inventory,[3] measures how many times a company's inventory is sold and replaced in a period – *i.e.*, turnover.  If sales are booming and production is struggling to keep pace – as Defendants here repeatedly claimed – then the inventory turnover ratio should increase because products are flying off the shelves.  On the other hand, if the pace of production is outstripping sales, that the inventory turnover ratio will decrease because the company is building inventory at a rate faster than sales.

Tellingly, while GMCR did not publicly disclose its inventory turnover ratio, for each of the quarters during the Class Period, GMCR's inventory turnover ratio ***decreased,*** as reflected in the following chart:

---

[2] Cost of goods sold is calculated as beginning inventory plus purchases minus ending inventory.

[3] Average inventory is calculated as beginning inventory plus ending inventory divided by two.

| Financial Period | Inventory Turnover Ratio for 2010 | Inventory Turnover Ratio for 2011 | Percentage Decrease of Ratio Compared to Same Period in Prior Year |
|---|---|---|---|
| First Quarter | 2.00 | 1.62 | 19% |
| Second Quarter | 1.89 | 1.42 | 24.9% |
| Third Quarter | 1.40 | 1.26 | 10% |
| Fourth Quarter | 1.16 | 0.84 | 27% |

53.     Average Days to Sell Inventory, which is calculated by taking average inventory divided by cost of goods sold, and then multiplying by the number of days in a reporting period (*i.e.,* 91 days in a quarter), measures how long it takes for a Company to sell its products to customers. If GMCR was truly capacity constrained and struggling to meet customer demand during the Class Period as it claimed, then it would be natural to expect that its Average Days to Sell Inventory would be decreasing, or at least remaining constant throughout the Class Period. Instead, while GMCR did not publicly disclose its Average Days to Sell Inventory, during the Class Period, GMCR's Average Days to Sell Inventory *increased*, as reflected in the following chart:

| Financial Period | Average Days To Sell Inventory 2010 | Average Days to Sell Inventory 2011 | Percentage Increase Compared to Same Period in Prior Year |
|---|---|---|---|
| First Quarter | 45.43 | 56.18 | 23.65% |
| Second Quarter | 48.23 | 64.06 | 32.82% |
| Third Quarter | 64.89 | 72.12 | 11.14% |
| Fourth Quarter | 78.64 | 108.31 | 37.73% |

54.     These movements are simply inconsistent with the tale that Defendants were carefully crafting to tell investors.  If demand was truly straining GMCR's capacity to its limits, then inventory turnover should have been increasing while average days to sell inventory should have been decreasing.  Even more remarkable – and inexplicable – for the first three quarters of the Class Period, GMCR actually *exceeded* the maximum revenue guidance that it gave to investors prior to each quarter close, as reflected in the following chart:

| Financial Period | Revenue Guidance | Reported Revenues |
|---|---|---|
| First Quarter | $535 million – $570 million | $574 million |
| Second Quarter | $618 million – $634 million | $648 million |
| Third Quarter | $602 million –  $617 million | $717 million |

55.     According to Defendants, GMCR's sales were even higher than they had internally anticipated.  If these numbers were correct, then the sales should have put an even greater pressure on GMCR's production capacity and a further drain on GMCR's inventory levels because the sales exceeded even the Defendants' expectations.  This, in turn, should have increased GMCR's inventory turn rate even further because the Company was pushing its product out the door faster to meet unexpected demand from its customers.  Yet, as shown above, GMCR's inventory was taking longer to sell, and its plants were not even working at full capacity, which lead to the massive inventory buildup that Defendants were forced to hide from the market.

56.     GMCR's demand models were also inaccurate.  According to CW9, GMCR's Production and Maintenance Manager in Knoxville from 2009 to 2011, GMCR's demand models and forecasts were "absolutely wrong," had "no rhyme or reason," and were "out of whack" with the sales orders.  There were weekly conference calls with Don Holly, GMCR's

20

Director of Operations and Director of Roasting and Quality, and Jonathan Wettstein, GMCR's Vice President, General Operations that CW9 participated in to discuss the problems with the demand models, but the problems were never fixed.

57.     In addition, far from straining capacity to meet demand, GMCR never ran at full capacity during the Class Period. CW3, a maintenance technician at a GMCR facility from 2009 to 2011, stated: "I don't think we were at full capacity ever," adding that there would be three or four machines down at times. CW5, who was a materials specialist in GMCR's Castroville plant from 2011 to 2012 and responsible for inventory control and performing inventory transactions associated with receiving and shipping in the Company's internal computer systems, echoed those statements. CW5 stated that the Castroville plant was only running at 60-70% capacity, and still had excess inventory that would be stored in the warehouse or in a nearby distribution site. Similarly CW9, GMCR's Production and Maintenance Manager, confirmed that GMCR was not running at full capacity. While the machines should have been running at 400-500 cups per minute, they were running at 350 cups per minute. Certain of Plaintiffs' confidential witnesses, including CW6, a Machine Operator at GMCR in 2011, could not understand why the Company was adding machines to its production line when they already had so much product on hand already that was not moving. And CW7, a former maintenance technician at GMCR's Knoxville, Tennessee plant from 2011 to 2012, stated that the cocoa line at that facility was shut down for a month because they had so much overstock for that product.

58.     Thus, according to Plaintiffs' sources, GMCR was not capacity-constrained and, contrary to what Defendants were telling the market, did not need to continually build capacity. In reality, Defendants' statements to that effect, coupled with their statements about suffering from spot outages of product at certain locations, were deliberately intended to mislead the

market into believing that demand for GMCR's products was much higher than it actually was. GMCR had significantly more inventory than they could possible sell given the demand for its products and, therefore, Defendants participated in a shell game to hide this massive buildup of its products.

59.     In order to hide GMCR's outpaced, growing inventory from investors, Defendants discarded and gave away product and hid inventory from the Company's outside auditors.  For example, CW7, a former maintenance technician at GMCR's Knoxville facility from 2011 to 2012, stated that the Company moved product out of the facility when outside audits were conducted and then brought it back after the audit was completed.  According to CW7, the product would be packed onto 18 wheelers, moved offsite, and then moved back in after the audit was over.  CW2, a former Production Planning Manager for M.Block from 2010 through 2011, observed, "[t]hey [GMCR] are not really selling what they say they are selling.  There is no possible way … [They are] constantly transferring and [I] don't know the logic behind it." CW9 similarly stated that GMCR had to constantly "scrap" many pallets of K-Cups, and that there were always discussions regarding the fact that GMCR is "making it [the products] and they are not going anywhere."  Although the Company would say demand was high, given the amount of product constantly being destroyed, employees thought they were just being told this "so that they would not be worried about losing their jobs."

60.     Likewise, CW4, a machine operator in two of GMCR's Vermont K-Cup production plants from 2009 to 2012, personally observed repeated occasions, prior to an inventory count or audit, when bags and bags of coffee would be loaded onto trucks.  Some trucks would leave temporarily and some would just sit behind the facility full with product. CW4 also stated that in 2009, inventory would be done once a month, then inventory would only

22

be done once a quarter, and finally, from approximately the summer of 2011 through when CW4 left the company in July 2012, CW4 does not recall inventory ever being counted at the Williston plant. Also according to CW4, when employees escorted auditors through the facility, auditors would not be permitted beyond a point blocked off by black plastic, where GMCR inventory was hidden. Moreover, CW4, who was a member of GMCR's "inventory control panel" in 2009, recalled that every time CW4 did an inventory count, there would be product set aside by the Company not to be counted. CW4 stated that ultimately CW4 was simply provided with a number by the GMCR plant manager or an even more senior-level GMCR officer to put in for inventory. In fact, CW4 recalls that on several occasions, the Vice President of Vermont Operations came to the plant and told the crew to do whatever their bosses said as it pertains to inventory or numbers, and they should just "follow the lead with your supervisors."

61.    Notably, by hiding its excess inventory from its auditors during cycle counts, GMCR was able to avoid disclosure of its obsolete inventory because defendants did not book charges to reflect the existence and disposition of stockpiles of unsalable inventory that GMCR actually possessed. For example, CW9 stated that at the Knoxville plant, every week GMCR was throwing out more than 15 bags of coffee, with a value totaling from $6,000 to $90,000 per week, depending on the type of beans involved, and also discarding multiple pallets of K-Cups. Indeed, according to CW4, between 2009 and 2012, employees *at GMCR's Essex Junction and Willston plants alone* were throwing away at least $50,000 to $100,000 in finished K-Cup products two to three times per week. At a minimum, this would equate to approximately $100,000 per week (or $5.2 million per year), and could amount to as much as $300,000 per week ($15.6 million per year) in finished K-Cup product being thrown away *at just these two facilities*. However, according to GMCR's 2011 Form 10-K, *companywide*, in 2009, GMCR

added only $1.801 million ($34,635 per week), in 2010, $4.668 million ($89,769 per week), and in 2011, only $8,723,000 ($167,750 per week) to its reserves for obsolete inventory *at all of its facilities*. As a result, at the beginning of fiscal year 2011, GMCR's reserve for obsolete inventory was substantially less than it should have been. More importantly, however, throughout the Class Period, GMCR failed to take charges for the amounts of actual obsolete inventory that the Company was hiding or secretly discarding, and, as a result, its reported earnings were thereby overstated. In fact, based solely on numbers provided by CW4 for just two facilities of GMCR's many facilities, GMCR understated its inventory obsolescence reserve — because the financial statements did not reflect required charges to account for GMCR's actual obsolete and non-salable inventory — in each quarter of fiscal year 2011.

62.     The Einhorn Report corroborates the information provided by these confidential witnesses. Specifically, the Einhorn Report details how Defendants concealed the enormous amounts of their excess and obsolete inventory by utilizing the Company's "multiple locations[, to] g[i]ve cover for a shell game that GMCR was playing across all its facilities." For example, the Einhorn Reports states that truck drivers would deliver merchandise only to be later instructed to pick it up, seal the truck and deliver it just 10 bay doors down at the same warehouse. Similarly, the Einhorn Report details how prior to an inventory audit, GMCR would "load [] product on trailer trucks to nowhere to move it off the floor." The Einhorn Report also details how prior to an audit, the warehouses would be partially cleared leaving a skeleton inventory of less than 50%. Inventory would be "loaded onto trucks which sat in the docks and was never counted." After the audit, "the product would simply be moved back into the warehouse."

63.     Defendants also covered-up GMCR's excessive inventory buildup by exploiting GMCR's unique relationship with M.Block. As discussed above, Lead Plaintiffs' Counsel's investigation has revealed that M.Block was essentially a captive entity of GMCR, and taken as a whole, the testimony of numerous confidential witnesses contacted by Lead Plaintiffs' Counsel also strongly suggests that M.Block played an invaluable role in GMCR's efforts to deceive investors.

64.     For instance, CW2, a former Production Planning Manager for M.Block from 2010 through 2011, who was responsible for the shipping, receiving, and inventory control for Keurig coffee machines at M.Block facilities, stated that Keurig products made up 95 or 97% of M.Block's Bedford Park, Illinois facilities, 97% of its California facility, and 100% of its Tennessee facility. CW2 said that M.Block was essentially a "holding warehouse" of expired coffee for GMCR. Indeed, according to CW2, approximately a third of the coffee that M.Block received from GMCR was already expired. CW2 noted, however, that no one at M.Block ever expressed surprise or concern about the amount of expired coffee M.Block was receiving.

65.     CW2 also explained that the computer systems used to track inventory and sales were integrated between Keurig and M.Block. CW2 stated that M.Block's system, which includes all of its sales information, is linked directly with Keurig's. CW4 stated that GMCR processed a lot of Internet orders through M.Block, but the Internet orders did not "add up." According to CW4, the Internet orders that M.Block processed from day to day varied so greatly that they did not make sense.

66.     The special relationship between M.Block and GMCR is corroborated by several of the sources cited in the Einhorn Report as well. These sources similarly described an "unusual" and "peculiar" relationship between GMCR and M.Block. According to Einhorn's

25

sources, "[i]t was clear that Keurig and GMCR control M.Block." Another Einhorn source employed by M.Block stated that it "felt like they worked for Keurig [*i.e.*, GMCR]" more than M.Block, adding, "I really never even had a boss while I was at M.Block." Einhorn's sources described how GMCR "parked inventory" at M.Block, booking its shipments to boost results, explaining that "[n]obody in that [M.Block] warehouse can tell you what [product] is M.Block's, what is Keurig['s], what is GMCR's, nobody can tell you that. I honestly don't think the owner of M.Block can tell you that." Likewise, another Einhorn witness provided that whenever GMCR visited M.Block, GMCR was "not treated like clients as the other customers were," which was considered "so weird."

67. GMCR took full advantage of this relationship with M.Block in order to facilitate its inventory manipulation scheme through a series of systematic sham shipments and shipments to nowhere, as well as frequent cross-shipping between GMCR and M.Block, and GMCR's subsidiaries. For instance, CW2, the former Production Planning Manager for M.Block from 2010 through 2011, noted that there were more shipments between M.Block facilities than shipments to retailers, and that M.Block was "always moving product back and forth between warehouses." CW2 recalls transfers of whole truckloads of product between M.Block's three facilities in Bedford Park that would make it look like one facility ordered and received coffee and the other facilities delivered the order for coffee. CW2 stated, "We would always ship stuff to California, and vice versa, California would ship to us. We would put it on a rail." He said that there was no reason for the products to be transferred between facilities in this way, and that in his entire career working in warehouses, he had "never seen anything like what M.Block was doing." CW2 added: this seemed "intentionally done," and that to him, it appeared as though GMCR and M.Block were "falsifying the numbers."

68.     CW2 also confirmed that M.Block cleared out a "floor loaded" full warehouse immediately before GMCR's auditors visited the facility to conduct their inventory count and audit procedures.  Seemingly, this was done in order to hide the product from the auditors.  CW2 noted that senior-level officers from Keurig and GMCR would be there for the audits with M.Block's President and owners, but that all other M.Block employees would be told to go home a half hour before the auditors came.  CW2 added that GMCR consistently shipped expired coffee into all of M.Block's warehouses, and that CW2 personally disposed of expired coffee at the direction of CW2's superiors at M.Block.  CW2 recalled in certain instances, GMCR shipping expired coffee to Kenco, as well as shipments of expired coffee to GMCR's test facility in China.  In one particular instance that occurred in November or December 2010, CW2 recalls receiving a shipment of 60 full skids of Gloria Jean Hazelnut coffee that were past their expiration dates by two to three months when it got to M.Block, and the inventory was then shipped to China.  Similarly, CW10, a Collection Specialist in M.Block's Accounts Receivable department between January 2009 and October 2010, stated that the amount of warehouses M.Block purchased to house GMCR product was not justified by the amount of sales GMCR was receiving for its products.

69.     Again, the Einhorn Report corroborates these statements from the Plaintiffs' confidential witnesses, describing frequent "cross-shipping" between GMCR and M.Block whereby products were transferred from one facility to another, often multiple times, for no apparent reason.  According to the Einhorn Report, one witness advised Einhorn, "We would do more transferring of inventory than we physically did shipping [to customers] .... Keurig would ship stuff to themselves, I mean truckloads of stuff they'd ship [from M.Block] to themselves." Another former M.Block employee cited in the Einhorn Report recalled: "We would remove

product and preload trailer trucks to ship to retailers because we didn't have room on the floor. Then we'd load more product on trailer trucks to nowhere to move it off the floor." Yet another witness cited in the Einhorn Report detailed an account of a "Kenco trucker" who reported "delivering [GMCR] merchandise to Kenco [a fulfillment entity], picking it up later on, sealing the truck, and delivering it 10 bay-doors down at the same warehouse."

70.     Einhorn's sources also observed "odd material movements" between GMCR and M.Block, noting that such "irregularities" frequently took place during inventory audits of M.Block's facilities.   One source recalled that, prior to an inventory audit at M.Block, its warehouses would be partially cleared, leaving only a "skeleton inventory of approximately 50%" of actual inventory.

> **2.    Defendants Use Their Captive Relationship With M.Block To Deceive Investors Regarding The Number Of Keurig Coffee Brewers The Company Shipped In The Critical Second Quarter 2011**

71.     In addition to falsely stating that the Company was capacity constrained during the Class Period, Defendants also misled investors regarding the number of Keurig coffee brewers the Company sold in the second quarter of 2011.   The second quarter of 2011 was a critical quarter for GMCR because, as described above, on the same day that GMCR announced its results of operations for this quarter, it also announced that it was going to conduct an extremely large secondary offering of common stock (the May 2011 Offering).   Further, as discussed herein, Defendant Blanford planned to sell millions of dollars worth of his own personal holdings in GMCR stock as part of the May 2011 Offering.

72.     In order for the May 2011 Offering to be a success, it was extremely important to Defendants that GMCR report good results for the second quarter of fiscal 2011.   On May 3, 2011, GMCR announced its results of operations for the second quarter, and reported revenues of

28

$647 million. This exceeded the Company's previously-issued maximum revenue guidance by more than $13 million, and also far exceeded analyst expectations. While consensus analyst expectations for the quarter were that the Company's earnings per share ("EPS") would be $0.38, with $647 million in revenue, GMCR reported $0.43 per share.

73.    Defendants also announced that GMCR had sold 1.2 million Keurig coffee brewers compared with 730,000 sold for the same period in 2010. This news was particularly well-received by analysts, who had predicted brewer sales to be around 900,000 for the quarter. The unexpected sale of so many additional Keurig-branded coffee brewers was a stroke of double good fortune for the Company – not only did the sales exceed expectations for the number of brewers that would be shipped that quarter, it seemingly boded very well for the Company's future. This is because the more brewers that GMCR was able to sell, the more K-Cup sales it was likely to sell in the future. As an analyst from William Blair & Company stated in a report issued on May 4, 2011, brewer sales were a *"key growth driver"* for GMCR and the 1.2 million brewers purportedly sold in the second quarter of 2011 represented "15.3% of all coffeemakers sold in the United States from January 2011 to March 2011 ... and Keurig branded brewers were No. 1 in dollar share."

74.    As discussed above, following GMCR's announcement of its second quarter results, the stock price rose nearly 20% from $64 to approximately $76 per share in a single day, and analysts uniformly praised the Company's results. Importantly for Defendants, GMCR's strong results enabled Defendants to increase the size and price of the May 2011 Offering of GMCR common stock. While GMCR initially announced that it was going to sell 7.1 million shares in the May 2011 Offering, after the release of the Company's surprisingly strong second quarter results, an additional 2.5 million shares were added to the offering and sold to investors

at a price of approximately $71 per share.  Defendant Blanford also increased the number of shares that he sold on the offering, from an initial plan to sell 45,000 as noted in the preliminary prospectus supplement filed with the SEC on May 5, 2011, to a final sale of 51,573 shares when the sale was consummated on May 11, 2011.

75.      Unbeknownst to investors, however, in order to pump up their "growth story" to the market in advance of the May 2011 Offering, Defendants had intentionally inflated GMCR's reported brewer sales for the second quarter of 2011.  Lead Plaintiffs' Counsel's investigation has revealed that Defendants manipulated GMCR's relationship with M-Block in order to artificially inflate its "brewer sales" numbers for the critical second quarter of 2011.

76.      CW10, a M.Block employee who was responsible for the QVC account stated that they had an unusual number of QVC orders occur right before the end of a quarter.  After the quarter was over, CW10 explained that a lot of the product would be returned and placed back into stock.  CW2, an employee of M.Block, similarly stated that QVC is one of M.Block's biggest customers and that many of GMCR's brewers are sold through M.Block to QVC.  CW2 witnessed numerous instances where GMCR took advantage of its relationship with M.Block to manipulate its sale results for product shipped to QVC.  For instance, CW2 stated QVC always had big orders just before GMCR audits – indeed, CW2 claimed that nearly every QVC order during the Class Period came through right before an audit, and *each time* several truckloads of product would be returned after the audit.  CW2, a former M.Block employee, similarly observed that nearly every QVC order during the Class Period came through right before an audit, and that immediately following the audit, approximately 30-40% of the entire QVC order would come back to M.Block.

77.    CW2 recounted that in the second quarter of 2011 right before an audit, GMCR sold the largest order ever during his tenure with M.Block to QVC.  This order was for approximately 500,000 brewers.  He specifically recalled this large second quarter 2011 QVC order because M.Block packaged fresher coffee than was typical with the brewers and he thought it was unusual that such a large order would come in right before a quarter-end audit.  CW2 stated that despite the purported sale of these 500,000 brewers to QVC, after being packaged up, "most of the brewers never even left the dock."  Instead, the product was "taped off, not to inventory."  The entire order "was [then] put back in stock after the auditors left."  CW9 similarly recounted that GMCR's plan was to "shop stuff close to expiration to our outside vendors [M.Block and Kenco] just so we could book the orders prior to quarter-end."  He thought this practice was "shady," and was regularly referred to as "quarter-end loading" within the Company.  CW9 confirmed that this practice was done to "make the balance sheet look good for the quarter."

78.    The information provided by CW2 is corroborated by specific information provided in the Einhorn Report.  For instance, the Einhorn Report states that in the second quarter 2011 Defendants inventoried and processed 500,000 brewers as an order for QVC, and cleared them from the warehouse.  According to the Einhorn Report, this order was processed immediately prior to an audit; and after the audit was concluded, the 500,000 brewers were immediately restocked on the shelf and never shipped.  The processing of this order enabled Defendants to process the shipment of 500,000 brewers that were never sold — or even shipped — to QVC and, in fact, remained in GMCR's inventory.

79.    It is highly suspicious that such a huge order for the Company's Keurig coffee brewers — representing nearly *40%* of all Keurig coffee brewers reportedly sold in the second

quarter of 2011 — would be processed as an order and immediately returned. There is no possible business justification for placing such a vast quantity of coffee brewers on a truck, processing the order to QVC, and immediately returning them to M.Block's warehouse. It strongly suggests that GMCR was deliberately inflating the number of brewers that were "sold" during this quarter and attempting to keep investors from learning that GMCR's "growth story" was false. This inference is particularly strong given that GMCR purportedly shipped nearly 40% more coffee brewers than analysts were expecting in the second quarter of 2011. The chart below shows the material overstatement that this supposed shipment caused regarding the number of brewers that GMCR shipped in the second quarter of 2011:

| Market Expectations | Reported Results | Actual Results If Potential Revenues From 500,000 Brewers Excluded | Impact on Reported Results |
|---|---|---|---|
| Analysts expected Brewer sales of 900,000 | 1.3 million | 800,000 | GMCR would have been 11.11% below analyst expectations for number of brewers sold |

80.    In short, the highly suspicious "order" for 500,000 brewers to QVC in the second quarter of 2011 conveniently ensured that Defendants did not miss market expectations for number of brewers sold, and instead allowed them to exceed those expectations by 40%, a key part of the growth story that Defendants were telling the market. If GMCR's brewer sales had been accurately reported, the Company's "growth story" would have been revealed as false, and the massive May 2011 Offering would have been a failure.

81.    Although GMCR does not specifically disclose how much revenue it makes on each brewer sale, analysts have estimated that each brewer sale results in $97 in revenue for GMCR. Thus, the purported sale of 500,000 brewers to QVC potentially allowed GMCR to

book nearly $47 million of revenue for the quarter and falsely claim that they exceeded market expectations. The chart below sets forth the impact that this "shipment" of 500,000 brewers to QVC would have had on the Company's financial statements in the second quarter of 2011 if GMCR booked this shipment as revenue, contrary to their public statements:

| Market Expectations | Reported Results | Actual Results If Potential Revenues From 500k Brewers Excluded | Impact on Reported Results |
|---|---|---|---|
| Revenue (Guidance of $618 million - $634 million) | $648 million | $601 million | GMCR would have been 2.91% below minimum revenue guidance |

82.      As discussed in more detail below in Section IV.F, when the truth regarding GMCR was revealed on November 9, 2011, GMCR's sales fell approximately $50 million short of analysts' consensus estimates for that quarter. Notably, the amount of this revenue miss is nearly identical to the $47 million of revenue that the Company would have recorded for the sale of 500,000 brewers purportedly shipped to QVC in the second quarter 2011, and creates a strong inference that Defendants booked the revenue from the purported sale of the 500,000 Keurig brewers at the time they were shipped in the second quarter of 2011, and then had to reverse that revenue when their scheme unraveled in the fourth quarter of 2011.

**C.      Defendants Take Advantage Of GMCR'S Soaring Stock Price To Reap Millions In Insider Stock Sale Proceeds And Foist A Secondary Offering On Unsuspecting Investors**

**1.      Insider Selling**

83.      In order to capitalize on the dramatic increase in Green Mountain's stock price during the Class Period, certain executives, including Defendants Blanford and Rathke, entered into 10b5-1 plans on May 4, 2011 – one day before the May 2011 Offering – that made it easier for them to sell their GMCR stock. The disclosure of the 10b5-1 plans was buried in the

Company's July 27, 2011 Form 8-K announcing GMCR's third quarter 2011 financial results. With respect to the plans, the Company stated:

> As a result of events at the Company over the last several years, including acquisitions and offerings, a number of our senior executives and board members have not had the opportunity to diversify their holdings of the Company's common stock. Accordingly, a number of our executives and board members, in conjunction with the May 2011 equity offering, have executed 10b5-1 plans pursuant to which they will be able to effect sales going forward.

84.     As a result of the new 10b5-1 plans, the Executive Defendants were able to immediately cash in on the Company's artificially inflated stock price by selling more than a half of their shares of GMCR securities for proceeds of over *$49 million* during the nine month Class Period. Specifically, on August 5, 2011, Defendant Rathke exercised 337,500 options that she had acquired in 2003 at $1.59 per share, leaving her with 390,859 total shares of GMCR stock. On the very same day, Rathke then sold all of her recently-acquired shares, amounting to 86% of her total holdings at the time, at $96.87 per share, for total proceeds of approximately *$32.7 million*. Significantly, according to public filings, this is the *first* sale of Company stock that Defendant Rathke had affected since her tenure with Green Mountain began in 2003.

85.     Defendant Blanford also capitalized on GMCR's artificially inflated stock prices to reap millions of dollars in proceeds during the Class Period. For instance, on May 5, 2011, Blanford exercised 51,573 options that he acquired in 2008 at $6.09 per share, and sold all 51,573 shares for more than $68 per share the same day in the May 2011 Offering, for total proceeds of over $3.5 million. Blanford also made three additional lucrative stock sales during the Class Period. On August 16, 2011, Blanford exercised 45,000 options that he acquired in 2007 at $5.24 per share, and sold all 45,000 shares, the same day for over $99 per share, for total proceeds of nearly $4.5 million. Blanford exercised another 45,000 of the same options on September 20, 2011, and sold all 45,000 shares, the same day for over $111 per share, for total

proceeds of over $5 million.  And finally, on October 18, 2011, Blanford exercised another

45,000 options, and again sold all 45,000 shares the same day for over $80 per share, for total

proceeds of over $3.6 million.

86.     The following chart details the Executive Defendants' Class Period stock sales:

| Name | Date of Sale | Shares Sold | Price Per Share | Resulting Shares | Percent of Then Current Holdings Sold | Total Sale |
|---|---|---|---|---|---|---|
| Frances Rathke | 8/5/2011 | 337,500 | $96.867 | 53,359 | 86% | $32,692,613 |
| **Total** | | **337,500** | | | | **$32,692,613** |
| Lawrence Blanford | 5/5/2011 | 51,573 | $68.3375 | 61,751 | 46% | $3,524,370 |
| | 8/16/2011 | 45,000 | $99.6163 | 61,751 | 42% | $4,482,734 |
| | 9/10/2011 | 45,000 | $111.4268 | 61,751 | 42% | $5,014,206 |
| | 10/18/2011 | 45,000 | $80.2102 | 61,751 | 42% | $3,609,459 |
| **Total** | | **186,573** | | | | **$16,630,769** |
| **Grand Total** | | **524,073** | | | | **$49,323,382** |

87.     Based on a review of Form 4s filed with the SEC prior to the Class Period, these

sales were highly unusual and contrary to Defendants Rathke's and Blanford's prior trading

activity.  In fact, Defendant Rathke had no other sales of GMCR stock for the entirety of her

tenure, and Defendant Blanford only had two other small sales.  Specifically, he sold 8,087

shares on May 27, 2009 and 8,088 shares on June 4, 2009.  Thus, the Executive Defendants'

sales were highly unusual and unprecedented in terms of both their size and frequency; particularly as compared to the same Defendants' pre-Class Period transaction histories.

88.      In addition to the magnitude and unusualness of the Executive Defendants' stock trades, the timing of the sales of GMCR stock by these Executive Defendants during the Class Period was also highly suspicious and probative of scienter. *First*, the Executive Defendants purportedly entered into the new 10b5-1 plans on May 4, 2011, one day before the May 2011 Offering, and right in the middle of the Class Period when GMCR's stock was steadily on the rise. It was only one day later, on the heels of this increase and following a May 3, 2011 press release in which GMCR's announced stellar financial results for the fiscal 2011 second quarter, with triple digit increases in net sales, net income, and operating income, that Defendant Blanford sold 51,573 shares in the May 2011 Offering for over $3.5 million in proceeds. Significantly, both in the May 3, 2011 press release and during the conference call held the same day, Defendant Blanford made numerous statements regarding, among other things, increasing consumer demand for K-Cups, the necessity to expand capacity to meet demand, and the fact that the Company was actually experiencing spot outages of its products, thus contributing directly to the artificially inflated stock price.

89.      Second, a similar pattern of suspicious stock sales occurred in August 2011, shortly after GMCR reported its financial results for the third fiscal quarter of 2011. On July 27, 2011, GMCR issued a press release again announcing triple digit growth in net sales, operating income, and net income, far surpassing both analysts' and internal Company guidance. GMCR also held a conference call that day during which Defendants Rathke and Blanford made very positive statements about, among other things, increasing consumer demand for the Keurig brewing system and the need to continue to build capacity to meet that demand. The Company's

results were repeated in its Form 10-Q that was filed on August 3, 2011, sending the stock up to a high of $110.96 that day. It was only two days after the 10-Q was filed and nine days after the conference call — during which Rathke specifically denied filling the channel and told investors the Company was at "appropriate inventory levels" — that Defendant Rathke made her only sale of GMCR stock in the nine years she has been with the Company, selling 337,500 shares for gross proceeds of nearly $32.7 million. Also within two weeks of the third quarter 10-Q, on August 16, 2011, defendant Blanford sold 45,000 shares for total proceeds of nearly $4.5 million. This was followed by Blanford's sale of another 45,000 shares a month later on September 20, 2011 for over $5 million in proceeds, which came just one day after GMCR's stock reached its Class Period high of $111.62.

90. Third, the timing of Defendant Blanford's next and final Class Period sale is also highly suspicious. Specifically, his October 18, 2011 sale came just one day after Einhorn made his presentation to a select group of investors, and one day before that presentation went public, driving GMCR stock down 15% in a single trading day. Blanford quickly sold ahead of this drop, dumping another 45,000 shares on October 18 at $80 per share for $3.6 million in proceeds, just before the stock started its tumble culminating in the revelations of November 9. Thus, in addition to continuing to conceal the fraud so that the Company would not have to come clean about the true state of its affairs, the Executive Defendants had powerful personal motives to maintain GMCR's stock prices at artificially inflated levels throughout the Class Period, so that they personally could gain *over $49 million* from their own sales of Green Mountain stock. Not only were these sales completely out of line with their prior trading activity since joining the Company, but the timing of the sales were highly suspicious in light of Company disclosures and other events, and the bulk of the sales were made pursuant to the 10b5-1 plans into which the

37

Executive Defendants suspiciously entered into in the middle of the Class Period that purportedly made it easier for them to "effect sales going forward."

### 2.     May 2011 Secondary Stock Offering

91.     In addition to reaping over $49 million in insider sale proceeds, the Executive Defendants took advantage of GMCR's staggering increase in purported value to foist a secondary offering on unsuspecting investors.  On May 3, 2011, concurrent with the release of GMCR's surprisingly strong second-quarter results, the Company announced that it would sell 7.1 million shares of common stock in the May 2011 Offering.  Based on the strong second-quarter financial results, which caused the Company's stock to rise from $64.07 on May 3, 2011 to $75.98 on May 4, 2011, the Company announced on May 5, 2011 that it had priced its public offering at a price to the public of $71.00 per share.

92.     The May 2011 Offering closed one week later, on May 11, 2011.  During that week, the size of the offering was increased nearly 30% to 9.5 million shares, raising total proceeds from investors of more than $680 million for the Company.  Notably, Defendant Blanford, along with three of the Company's directors, ultimately sold 410,456 shares in the May 2011 Offering for gross proceeds of more than $29 million.  Defendant Blanford alone used the May 2011 Offering as an opportunity to sell an additional 51,573 of his own shares in GMCR (46% of his then total holdings of GMCR stock), and reap a personal profit for himself of more than $3.6 million.

### D.     The Truth Is Revealed

93.     The truth about GMCR's misconduct began to emerge on October 17, 2011 at an investor conference held by the Value Investing Congress, a two-day, $5,000 per attendee gathering of "serious, sophisticated value investors" who "meet and learn from one another and achieve even greater investment success."

38

94.     During the Value Investing Congress conference, David Einhorn, CEO of hedge fund Greenlight Capital, relayed the results of his company's investigation into GMCR that concluded that GMCR was exploiting its incestuous relationship with M.Block to manipulate its financial results.  Specifically, Einhorn described an "unusual" and "peculiar" relationship between GMCR and M.Block that, according to Einhorn's sources, made it "clear that Keurig and GMCR control[led] M.Block."  Moreover, Einhorn's sources described how GMCR "parked inventory" at M.Block, booking its shipments to boost results and was engaged in a "shell game" where the Company "would do more transferring of inventory than we physically did shipping ... Keurig would ship stuff to themselves, I mean truckloads of stuff they'd ship [from M.Block] to themselves."  Einhorn also described a similar situation between GMCR and another distributor, Kenco, stating that a "Kenco trucker allegedly reported delivering merchandise to Kenco, picking it up later on, sealing the truck, and delivering it ten bay doors down at the same warehouse," as well as distribution plant managers' reports of "inordinate" amounts of expired coffee.

95.     GMCR's stock price declined as Einhorn's findings reached the market.  Immediately following the Value Investing Congress conference, GMCR's share prices dropped over 10% to $82.50 per share at close on October 17 and $82.11 per share at close on October 18, compared to a closing price of $92.09 on Friday October 14, on unusually heavy trading volume.  Two days after the conference, on October 19, 2011, the *Wall Street Journal* reprinted Einhorn's Value Investing Congress presentation in an article entitled "Here's the Einhorn Presentation that Killed GMCR Shares," sending GMCR's share price tumbling another 15%, from a closing price of $82.11 on October 18 to a closing price of $69.80 on October 19, on unusually heavy trading volume.

96.    Then, on November 9, 2011, GMCR shocked investors when the Company missed sales targets for the first time, and failed to beat profit targets for the first time in five quarters. The Company's revenue and earnings numbers also fell fall far short of expectations. Specifically, GMCR disclosed, for the first time since the start of the Class Period, skyrocketing inventory levels of $672.2 million, up $254.7 million over the prior quarter, and nearly $410 million – or 156% – year-over-year. According to the Company's November 9 press release, that year-over-year inventory increase was attributable in large part to a $273.3 million, or 126%, increase in finished goods inventory with approximately half of that increase due to K-Cup portion packs and the other half due to Keurig single cup brewers and accessories. Moreover, Defendants attempted to cover-up its understatement of obsolete inventory reserves in prior periods by making a substantial increase in its inventory reserves. Specifically, GMCR revealed a huge jump in its reserve for obsolete inventory to $5.6 million, up 47% from the prior quarter and 186% year over year. These disclosures were consistent with the information provided by Plaintiffs' confidential witnesses and corroborated by Einhorn's report that the Company had been concealing excess and obsolete inventory by throwing product away.

97.    On a conference call with analysts held that same day, the Company also announced skyrocketing inventory, as well as large increases in its reserves for obsolete inventory and charges related to obsolete inventory, in sharp contrast to prior statements about inventory being in "good shape." Defendants also reported the Company's quarterly sales miss, falling approximately $50 million short of analysts' consensus estimates. Notably, as discussed above, the amount of this revenue miss is nearly identical in amount to the $47 million of revenue that the Company would have recorded for the sale of 500,000 brewers purportedly shipped to QVC in the second quarter 2011.

40

98.     For the first time, Defendants also disclosed a drop in K-Cup portion pack demand.  Defendants feigned surprise at the huge quarterly increase in inventory.  Defendant Blanford conceded that "with success comes scrutiny, and at times, skepticism," even as "[w]e have just completed celebration of the 30th year of our Company's founding."

99.     The response to the disclosure of this information confirmed that analysts believed that they, and the market that relied upon their analyses, had been deceived by the Defendants' prior statements that had painted a very different picture of the Company's condition and performance.  For example, during the November 9 earnings call, Mark Astrachan, an analyst at Stifel Nicolaus, questioned:

> So, it was up 156% year-on-year, which was ahead of the sales growth, especially considering the previous commentary, you talked about it being capacity constrained.  So I guess I'm trying to figure out why inventories are building when you've talked about running your equipment basically 24/7.

In response to Astrachan's question, Defendant Rathke admitted that "inventories were up significantly" and that approximately $273 million of the $436 million inventory increase was attributable to "finished goods ... coming from K-Cup portion packs on-hand and ... [on] the brewer's side."

100.    Subsequently, top hedge fund manager Whitney Tilson of T2 Partners LLC, noted in a report that "the GMCR growth story looks like it was pumped up by shenanigans."  As reported by CNBC, Tilson added:

> There are many big questions here ... But the biggest is probably that inventories were up [1]56% year over year.  And they don't really provide a satisfactory explanation in the earnings release ....  This smells to me like channel stuffing ....  It looks to me like they pulled a lot of demand forward last quarter, stuffed the channel ....  [A sign] that [the] game has come crashing down.  This company may be in real trouble.

101.    Following the release of GMCR's shocking fourth-quarter results, *The Wall Street Journal* published an article entitled "Green Mountain Earnings: Big Revenue Miss," noting:

41

Green Mountain shares are getting crushed in after-hours trading after the coffee roaster posted much lower-than-expected revenue. Shares are sinking about 27% in late trading. Green Mountain posted $711.9 million in sales for the fourth quarter … the average of analyst estimates was revenue of $760.5 million ….

Canaccord Genuity said in a research note that the results will 'lead to a hearty correction tomorrow. The Q4 brewer sales growth trailed the measured growth at retail by NPD during the quarter, which we can't explain.'

102.    Similarly, an article published *The Guardian* on November 9, reported:

Keurig coffee machine maker GMCR Coffee Roasters missed Wall Street's quarterly sales estimates, knocking off a third of its market value, at a time when [Einhorn] is questioning the company's business practices and growth potential …. The company missed sales estimates for the first time in more than eight quarters, and failed to beat profit expectations after five quarters. On the analyst call, CEO Blanford admitted that sales missed the company's own estimates …

103.    As a result of the forgoing news and the revelations from GMCR regarding demand and inventory levels, GMCR's shares plummeted 40%, from a close of $67.02 on November 8 to $40.89 on November 9—a far cry from the stock's Class Period high of $111.62 per share on September 19, 2011—on extremely heavy trading volume.

### E.    Defendants' False And Misleading Class Period Statements

104.    In addition to the statements set forth above, Defendants repeatedly made materially false and misleading statements during the Class Period relating to GMCR's production capacity, inventory, shipments of coffee brewers and other products, and inventory obsolesce reserve. Contrary to Defendants' assurances to investors that the Company was straining its production capacity to meet ever-increasing demand for its products, in reality its warehouses were stuffed to the rafters with unused and expiring products that was being discarded on a regular basis, GMCR was using M.Block to hide the stockpiled inventory from its auditors and to otherwise manipulate the Company's reported results, and inventory was skyrocketing to unprecedented levels.

### 1.    February 2, 2011 Conference Call

105.    On February 2, 2011 the Company held a conference call to discuss its first-quarter 2011 results (the "February 2 Conference Call") during which Defendant Blanford stated that demand for the Company's Keurig and K-Cup products was so strong that the Company was capacity constrained.  Specifically, he stated:

> I would say in the first quarter and so far in our second quarter of our fiscal [year], we are definitely being stretched.  We are setting production records, it seems pretty frequently at individual plants and in total but demand is definitely stretching our ability to supply.  And we've not quite caught up with that demand curve yet.  We are hoping to build a little bit of a cushion going forward, supply versus demand ...

106.    This same sentiment was echoed in the "Prepared Remarks for First Quarter Fiscal 2011 Results Issued February 2, 2011" ("First Quarter Prepared Remarks") that GMCR filed with the SEC on February 2, 2011 in a Form 8-K, together with a February 3 press release.  Under the heading "Scaling Our Business to Meet Demand," the First Quarter Prepared Remarks provided:

> As we mentioned last quarter, despite our efforts to ensure adequate capacity ahead of the holiday season, we experienced and continue to see some spot portion pack shortages.  We remain focused on increasing production to fulfill unmet demand and on achieving and maintaining optimum inventory levels to provide better customer service.

107.    The statements made in the February 2, 2011 Conference Call and the First Quarter Prepared Remarks enumerated in ¶¶ 95-96 were materially false and misleading for the reasons set forth herein, including that:

    a.    Defendants were not maintaining optimum inventory levels, but instead were producing far more product than necessary to meet demand, understating the excessive amount of inventory in the Company's warehouses and otherwise misleading investors regarding the Company's inventory, as evidenced by among other things,

43

Defendants' practice of hiding inventory from its auditors, making sham shipments to nowhere, and suspect cross-shipping and inventory transfers between GMCR and M.Block. *See* ¶¶ 45-83.

b. Moreover, Defendant Blanford's statement that demand was "stretching our ability to supply" was false because Keurig's and M.Block's warehouses were filled to capacity with K-Cup portion packs, a significant portion of which was expired. *See* ¶¶ 45-83.

### 2. First Quarter 2011 Form 10-Q

108. In the Company's First Quarter 2011 Form 10-Q filed with the SEC on February 3, 2011 ("1Q 2011"), GMCR reported an obsolescence reserve for the quarter ending December 25, 2010 of $3.2 million. The 1Q 2011 was signed by Defendants Blanford and Rathke. This statement was materially false and misleading because, based solely on the amount of product being destroyed at just two of GMCR's facilities between 2009 and 2011 as discussed above in ¶62 above, GMCR's obsolescence reserve for the quarter ending December 25, 2010 was materially understated by approximately $13.288 million, or 315%. According to the information provided by CW4, prior to the start of fiscal 2011, GMCR was already under-reserved by millions, and in the first quarter of 2011, GMCR's understatement of its reserve for its inventory obsolescence grew by at least $256,000.

### 3. May 3, 2011 Conference Call

109. On May 3, 2011 the Company then held a conference call with investors and analysts to discuss its second-quarter 2011 results (the "May 3 Conference Call"). During the call, Defendant Blanford repeatedly emphasized that continued consumer demand for the Keurig system was straining capacity. He stated:

We have already begun working with our contract manufacturer to ensure we will have manufacturing capacity to support anticipated brewer demand ... In terms of our K-Cup portion pack production capacity, on shelf product availability [h]as improved though we continued to experience some spot outages. We continued to install equipment and capacity to meet demand including ramping production for our new relationships. In fact in recent weeks we have repeatedly hit new records of portion pack production.

Defendant Blanford further commented on the Company's "continued production capacity," introducing Scott McCreary, the Company's Chief Operating Officer, who added: "We have made good progress over this last quarter on catching up on our customers' demand so we are feeling good about our preparation going into the fall and that is where the significant portion of that capital will go to continue to prepare us for another good holiday season."

110.    BofA Merrill Lynch analyst Bryan Spillane asked whether the Company's sales had been "pulled forward" into the quarter, a charge that Keurig President, Michelle Stacy ("Stacy"), flatly denied:

> ***We did not pull forward any sales at all.*** The general demand is what we see. We fill our customers' orders as they come in, and they were not building any excessive inventories at all at retail ...

Stacy asked Keurig's General Manager, John Whoriskey, to elaborate, which he did, stating: "our performance . . . is indicative of our shipment results." He added:

> [T]he nature of the acceleration of adoption of the product is really with what we are seeing, there is no pulling forward of shipments to do anything, other than react to the demand and make sure we have adequate inventories in place to meet the demand for the period.

111.    BofA Merrill Lynch analyst Bryan Spillane stated that Defendants had been creating an impression that retailers would be carrying more inventory in order to sell more, another charge that Whoriskey flatly denied: "No .... [C]ertainly we are building a little bit more inventory to meet the demand, but it is not any substantial number that is affecting what we did

in the quarter ..." Jumping in before Whoriskey could elaborate, Stacy had the following final colloquy with analyst Spillane on the subject:

> MICHELLE STACY: I am sorry, Bryan. What I would say if I was to build on that is that retailers are keeping a consistent week's supply or week's forward coverage on the business. Obviously as our business grows retailers are continuing to grow their inventory to keep about the same number of weeks forward coverage. We don't see a substantial increase in the weeks forward coverage that our retailers are carrying.

> BRYAN SPILLANE: Got it. *So the shipments more or less reflect where demand is right now?*

> MICHELLE STACY: *Absolutely.*

112. The statements made in the May 3, 2011 Conference Call enumerated in ¶¶ 99-101 were materially false and misleading for the reasons set forth herein, including that:

      a.     Defendants were not maintaining optimum inventory levels, but instead were producing far more product than necessary to meet demand, understating the excessive amount of inventory in the Company's warehouses and otherwise misleading investors regarding the Company's inventory, as evidenced by among other things, Defendants' practice of hiding inventory from its auditors, making sham shipments to nowhere, and suspect cross-shipping and inventory transfers between GMCR and M.Block. *See* ¶¶ 45-83. Defendants failed to disclose that they systematically manipulated and managed the Company's inventory levels by using M.Block to harbor excessively manufactured, expired, or otherwise unsold product. *See* ¶¶ 45-83.

### 4.     Second Quarter 2011 Form 10-Q

113. In the Company's Second Quarter 2011 Form 10-Q filed with the SEC on May 3, 2011 ("2Q 2011"), GMCR reported an obsolescence reserve for the quarter ending March 26, 2011 of $2.3 million. The 2Q 2011 was signed by Defendants Blanford and Rathke.

114.    This statement was materially false and misleading because, based solely on the amount of product being destroyed at just two of GMCR's facilities between 2009 and 2011 as discussed above in ¶ 62 above, GMCR's obsolescence reserve for the quarter ending December 25, 2010 was materially understated by approximately $13.545 million, or 589%.  According to the information provided by CW4, prior to the start of fiscal 2011, GMCR was already under-reserved by millions, and in the second quarter of 2011, GMCR's understatement of its reserve for its inventory obsolescence grew by at least $256,000.

### 5.    July 27, 2011 Conference Call

115.    On July 27, 2011, GMCR held a conference call with investors and analysts to discuss the Company's third-quarter 2011 results (the "July 27 Conference Call").  On the call, Longbow Research analyst Alston Stump asked a question on the Company's "kick of acceleration," seeking information on any "channel fill" by the Company, which Defendant Rathke denied, stating: "On portion packs, [and] also brewers ... we got a lot of space, demos, advertising .... [I]t wasn't necessarily channel fill, ... it was to support an advertising campaign and demos ..."  She further assured analysts on the call:

> I think coming off of Q2 we definitely had shortages or outages of certain products.  So I do know we had a backlog that we fulfilled in Q3 on — so that was a piece of it.  So I feel what we've been seeing and hearing from all of our accounts is that during Q3 we got back into a place where we knew we had appropriate inventory levels, and they felt comfortable they were getting appropriate inventory levels for the products.  So I think we're in good shape.

116.    The statements made during the July 27, 2011 Conference Call were materially false and misleading when made for the following reasons:

a.    Defendants were not maintaining optimum inventory levels, but instead were producing far more product than necessary to meet demand, understating the excessive amount of inventory in the Company's warehouses and otherwise misleading

47

investors regarding the Company's inventory, as evidenced by among other things, Defendants' practice of hiding inventory from its auditors, making sham shipments to nowhere, and suspect cross-shipping and inventory transfers between GMCR and M.Block. *See* ¶¶ 45-83.

      b.     Defendant Rathke's statements that in the third quarter GMCR had fulfilled a backlog from the second quarter when it had shortages or outages of certain products, such that it now had "appropriate inventory levels for the products" and was "in good shape," *see* ¶ 105, were also untrue or materially misleading when made.  In fact, the Company was continuing to hide the fact that inventory levels were excessively high causing vast quantities of inventory to become expired and obsolete. *See* ¶¶ 45-83.

### 6.    Third Quarter 2011 Form 10-Q/A

117.    In the Company's Third Quarter 2011 Form 10-Q/A filed with the SEC on August 8, 2011 ("3Q 2011"), GMCR reported an obsolescence reserve for the quarter ending June 25, 2011 if $3.8 million.  The 3Q 2011 was signed by Defendants Blanford and Rathke.

118.    This statement was materially false and misleading because, based solely on the amount of product being destroyed at just two of GMCR's facilities between 2009 and 2011 as discussed above in ¶ 62 above, GMCR's obsolescence reserve for the quarter ending December 25, 2010 was materially understated by approximately $13.801 million, or 363%.  According to the information provided by CW4, prior to the start of fiscal 2011, GMCR was already under-reserved by millions, and in the third quarter of 2011, GMCR's understatement of its reserve for its inventory obsolescence grew by at least $256,000.

F.      **Additional Allegations Of Scienter**

       1.      **Defendants' Financial Disclosure Controls Remediation Plan Demonstrates Their Actual Knowledge of the Improprieties Alleged Herein**

119.    Prior to the Class Period, GMCR disclosed in its Annual Report on Form 10-K for the fiscal year ended September 25, 2010, that management was "actively engaged in the planning for, and implementation of, remediation efforts to address the material weaknesses [in its internal controls, which were identified in the restatement], as well as another identified areas of risk" (the "Remediation Plan"). The Remediation Plan, which GMCR's audit committee purportedly directed the Executive Defendants to develop, included the review, development and evaluation of accounting processes, procedures and policies. The 2010 Form 10-K further stated that, based on the evaluation of these material weaknesses, Defendant Blanford and Defendant Rathke "concluded that the Company's disclosure controls and procedures were not effective" during **prior** periods. Notably, the 2010 Form 10-K stated that the Executive Defendants had personally assumed responsibility for "efforts to remediate the material weaknesses in internal control over financial reporting," and were closely involved in conducting "an evaluation of the effectiveness of the design and operation of [the Company's] disclosure controls and procedures," as defined in rules 13a-15(e) and 15d-15(e) of the Exchange Act.

120.    As the Executive Defendants knew, investors closely monitored the Company's purported progress in fixing the internal controls issues identified in the December 2010 restatement. Indeed, Defendants recognized the importance of these issues to investors and repeatedly updated investors on the progress that the Company was making in implementing its Remediation Plan. In so doing, the Executive Defendants took care to assure investors that they were closely involved in these efforts and personally: (a) reviewed the processes and procedures used in the Company's intercompany accounting, (b) made specific changes at the Keurig

business unit to establish and implement prudent accounting practices, and (c) ensure the Company's adherence to generally accepted accounting principles. Among the issues that the Executive Defendants learned about due to their direct participation in the Remediation Plan was that the Company was experiencing difficulties in arriving at "consistent valuation of brewers and K-Cup portion packs in ending inventories." Notably, although Defendants did not disclose these weaknesses until after they were purportedly cured, Defendants personally assured investors that these issues had been corrected by the second quarter of 2011.

121.    Accordingly, as a result of their direct involvement in the Remediation Plan, Defendants were on notice of the material weaknesses in disclosure controls and the accounting improprieties involving the Company's inventory, as alleged herein. They also possessed actual knowledge about the financial reporting and disclosure controls weaknesses and accounting improprieties involving the Company's inventory, as alleged herein.

122.    This conclusion is underscored by the fact that Defendants Blanford and Rathke certified in Forms 10-Q for the first, second, and third fiscal quarters of 2011 that they had adequately assessed the Company's disclosure controls and controls over financial reporting and stated that those internal controls were effective. Their signed certifications in each of these quarters specifically attests to the facts that Defendants Blanford and Rathke were "responsible for establishing and maintaining disclosure controls and procedures ... and internal control over financial reporting" for GMCR, and that Defendants Blanford and Rathke designed, or supervised the design, and "[e]valuated the effectiveness," of GMCR's disclosure controls and procedures and internal control over financial reporting. As a result of their direct participation in maintaining, designing, or supervising the design of, and evaluating the effectiveness of GMCR's disclosure controls and procedures and internal control over financial reporting,

including those controls related to the Company's inventory, the Executive Defendants knew, or were reckless in not knowing, about the Company's improper inventory controls as alleged herein, which resulted in the false or misleading disclosures and financial reporting alleged herein.

> 2.     **The Defendants' Communications With The SEC Regarding Their Relationship With M.Block Demonstrates Their Actual Knowledge Of The Improprieties Alleged Herein**

123.   On March 2, 2011, the SEC sent GMCR a comment letter, addressed to the Company's CFO, Defendant Rathke, inquiring into the sufficiency of the Company's disclosures in the 2011 First Quarter 10-Q (the "SEC Letter"). The SEC Letter specifically asked, *inter alia*, about GMCR's use of fulfillment companies to maintain inventory, as well as its practices relating to returning of inventory. The SEC Letter was sent by SEC Assistant Director H. Roger Schwall to Defendant Rathke at her Waterbury, Vermont office address.

124.   On behalf of the Company, Defendant Rathke responded to the SEC on March 29, 2011 (the "Response Letter"). The Response Letter specifically acknowledged Defendant Rathke's, and thus the Company's, awareness of the important role that fulfillment entities play in how the Company manages and reports inventory:

> [M.Block and] a single order fulfillment entity similar to M.Block … process the majority of sales orders for its at-home single-cup business with retailers in Canada … do not sell the Company's products, but rather receive and fulfill sales orders and invoice retailers and maintain the Company's inventory.

With respect to the Company's policies and procedures for accepting product returns from its retailers, the Response Letter noted that "the Company accepts returns for defective or non-saleable product" and specifically stated:

> the Company guarantees shipment of K-Cup portion packs to retailers at least six months prior to the 'Best Used By' date printed on the packaging. If K-Cup portion packs are shipped to a retailer less than six months prior to the Best Used

51

By date, retailers may deem such K-Cup portion packs as non-saleable product and may return that inventory and be eligible for credit.

125. The SEC Letter and the Response Letter demonstrate that Rathke and the Company were aware of the SEC's concerns and had a working knowledge of both GMCR's use of M.Block and the Company's practices addressing stale or expired inventory, both of which were important to the fraudulent scheme outlined above.

### 3. Corporate Scienter

126. GMCR actively oversaw a business model based on improper business practices. The pervasiveness and magnitude of the fraud, the documented conscious misbehavior and recklessness of various corporate employees, and the complicity of the Company in the illegal acts all serve to establish that GMCR was aware of or recklessly disregarded the fraud.

127. The information provided by the confidential witnesses and corroborated by the Einhorn Report shows that management-level employees knew of and approved the fraudulent business practices alleged herein. For instance, CW8, who was a Distribution Resource Planning Manager, North America, from 2009 to 2010, had several conversations with senior managers, including GMCR's Director of Operations, Don Holly, and Vice President of Operations, John Weinstein, about the massive overproduction of K-Cups and the improper method of inventory counting that the Company employed, all to no avail. CW8 reported that these Company employees consciously used methods for counting obsolete and excess inventory that were unheard of in the food industry. Moreover, CW8 also reported that even GMCR's Business Unit Vice President of Finance was a member of the management team for which such improprieties were an "ingrained ... mindset."

128. GMCR's scienter is also inferred from the facts establishing that both of the Executive Defendants acted with the requisite scienter, as alleged herein. As a corporation,

GMCR is charged with the scienter of its directors, officers, employees or agents who, in the course of their engagement, made, approved or authorized the statements that contained untrue or materially misleading representations or omissions, particularly when the persons who made, approved or authorized these statements were senior officers or executives of the Company. Moreover, the remarks of Michelle Stacy, Keurig's president, as well as those of John Whoriskey, General Manager, Keurig At Home, and T.J. Whalen, Vice President, Marketing, Specialty Coffee, particularly in the context of their emphatic denial of any wrongdoing during conference calls with analysts when the facts set forth herein indicate to the contrary, constitute acts of GMCR further indicative of corporate scienter.

129.    Finally, it is not necessary that the particular corporate directors, officers, employees or agents who made, approved or authorized the allegedly false and misleading statements be the same individuals associated with the Company who had the personal knowledge concerning how these statements were untrue or materially misleading in order to establish GMCR's scienter.  On the contrary, GMCR is properly charged with scienter even if the individual or individuals at the Company who had the requisite scienter were not the same persons at the Company who made, approved or authorized the untrue or materially misleading statements.

## V.    LOSS CAUSATION/ECONOMIC LOSS

130.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.  As Plaintiffs will establish by expert opinion, the market prices of GMCR common stock were artificially inflated by the false and misleading statements made by Defendants, as identified above.  For instance, GMCR's stock price increased from a closing price of $32.96 on February 2, 2011 to close at $37.78 on

53

February 3, 2011, after GMCR announced its first quarter 2011 financial results after the close of the market on February 2, 2011, when the price of its stock shot up 15% on unusually heavy trading volume. Then, after announcing its second quarter results on May 3, 2011, the Company's stock increased another 19% to close at $75.98 on May 4, 2011. And when the Company announced its third quarter 2011 results on July 27, 2011, its stock price increased 17% to close at $102.57 on July 28, 2011, which was over $70 higher than the stock price at the beginning of the Class Period.

131.    The false and misleading statements and material omissions detailed herein caused GMCR's common stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high closing price of $111.62 per share on September 19, 2011. As a result, Plaintiffs and the Class purchased GMCR securities at artificially inflated prices during the Class Period.

132.    Ultimately, disclosures revealed to the market the fraudulent nature of the Defendants' statements and material omissions and, as a result, the price of GMCR stock fell dramatically, causing substantial losses to investors.

133.    The first of the partial corrective revelations were included in the Einhorn Report on October 17, 2011. The market reacted immediately and negatively to this news. When the revelations made in the Einhorn Report hit the market after the Value Investor Conference on Monday October 17, 2011, the price of GMCR's shares fell approximately 10%, from a closing price of $92.09 on Friday October 14 to a close of $82.50 on Monday October 17, 2011, on unusually heavy trading volume. Then, on October 19, 2011, when the presentation was more widely reported and analyzed and the facts contained therein became the subject of discussion

54

among market commentators, GMCR common stock lost another 15% of its value, falling from $82.11 to $69.80 on October 18, 2011.

134.    Then, on November 9, 2011, the final day of the Class Period, GMCR reported highly disappointing results for the fourth fiscal quarter of 2011.   Notably, the Company announced skyrocketing inventory levels, up 61% quarter-over-quarter and 156% year-over-year, as well as increasing charges related to obsolete inventory.   GMCR also revealed a huge jump in its reserve for obsolete inventory to $5.6 million, up 47% from the prior quarter and 186% year over year.   In addition, GMCR further disclosed, among other things, that it had missed sales estimates for the first time in more than eight quarters, and fell approximately $50 million short of analysts' consensus revenue estimates.    On this news, GMCR's shares plummeted 40%, from a close of $67.02 on November 9, 2011, to $40.89 on November 10, 2011, on extremely heavy trading volume.

135.    These price declines directly and proximately resulted from the above discussed disclosures, which revealed the truth about the false and misleading statements and disclosed facts that had been previously concealed by the Defendants' wrongful conduct.   These price declines were not caused by market conditions, industry news, randomness, or by GMCR-related information unrelated to the alleged fraud.   Each of the above referenced disclosures partially corrected the false and misleading information previously provided to the market for which the Plaintiffs, on behalf of themselves and the Class, seek to be compensated.

136.    As a result of their purchases of GMCR common stock during the Class Period at artificially inflated prices, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws, when subsequent disclosures removed the inflation from such common stock.

## VI.    APPLICABILITY OF FRAUD ON THE MARKET PRESUMPTION

137.    At all relevant times, the market for GMCR common stock was an efficient market that promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the prices of the Company's common stock. Throughout the Class Period:

a.      GMCR stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.      GMCR met the requirements of a seasoned issuer to file registration statements under Form S-3, and during the Class Period issued an offering of common stock pursuant to a prospectus filed under Form S-3;

c.      As a regulated issuer, GMCR filed periodic public reports with the SEC and NASDAQ;

d.      GMCR regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e.      Several securities analysts and the business press followed and published research reports regarding GMCR that were publicly available to investors;

f.      The market price of GMCR common stock reacted to the dissemination of public information regarding the Company;

g.      The average daily trading volume for GMCR common stock during the Class Period was approximately 4.6 million shares traded; and

56

h.      The Company's market capitalization was approximately $10.4 billion on November 10, 2011.

## VII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

138.    The Private Securities Litigation Reform Act's statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue and misleading statements pleaded in this Complaint.

139.    None of the statements that form the bases for liability, as complained of herein, were forward-looking statements.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about GMCR's then-existing financial condition.

140.    To the extent that any of the false or misleading statements alleged herein as a basis for liability can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding GMCR's financial condition.  Given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

141.    To the extent that the statutory safe harbor may apply to any of the false statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker actually knew the statement was false, or the statement was authorized and/or approved by an executive officer of GMCR who actually knew that the statement was false.

## VIII.   CLASS ACTION ALLEGATIONS

142.   Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or acquired GMCR common stock during the period from February 2, 2011 through November 9, 2011 and who suffered damages as a result (the "Class"). Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each of the Defendants; (iii) any person who was an executive officer and/or director of GMCR during the Class Period; (iv) any person, firm, trust, corporation, officer, director, or any other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

143.   The members of the Class, purchasers of GMCR common stock, are so numerous that joinder of all members is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, if not higher. As of September 24, 2011, GMCR reported that it had approximately 154 million shares of common stock issued and outstanding. Plaintiffs' claims are typical of the claims of members of the Class.

144.   Plaintiffs and all members of the Class sustained damages as a result of the conduct complained of herein.

145.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained court-appointed counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are contrary to or in conflict with those of the members of the Class that Plaintiffs seek to represent.

58

146.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

147.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members.    Among the questions of law and fact common to the Class are:

        a.    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

        b.    Whether documents, including the Company's SEC filings, press releases, and other public statements made by Defendants during the Class Period contained misstatements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

        c.    Whether the market price of GMCR common stock during the Class Period was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

        d.    With respect to Plaintiffs' claims under Section 10(b) of the Exchange Act, whether the Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases, and other public statements;

e.      With respect to Plaintiffs' claims pursuant to Section 20(a) of the Exchange Act, whether the Executive Defendants named in those counts are controlling persons of the Company; and

f.      Whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the appropriate measure thereof.

148.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

149.    The names and addresses of the record owners of GMCR common stock purchased during the Class Period are obtainable from information in the possession of the Company's transfer agent(s).  Notice can be provided to such record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## IX.    CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against All Defendants)

150.    Lead Plaintiffs repeat and reallege each and every allegation set forth in ¶¶ 1-149 above as if fully set forth herein.

151.    This Claim is brought pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) on behalf of Lead Plaintiffs and all other members of the Class, against the Defendants.  The Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of GMCR common stock by disseminating materially untrue and misleading statements and/or concealing material adverse facts, which caused Lead Plaintiffs and other members of the Class to purchase GMCR common stock at artificially inflated prices.

60

152.    Throughout the Class Period, the Defendants individually, and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce, the mails and the facilities of a national securities exchange, employed devices, schemes and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, and engaged in acts, practices and a course of business which operated as a fraud and deceit upon Class members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

153.    The Defendants' false and misleading statements and omissions were made with scienter and were intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiffs and the other members of the Class; (ii) artificially create, inflate and maintain, the market for and market price of the Company's common stock; and (iii) cause Lead Plaintiffs and the other members of the Class to purchase GMCR's common stock at inflated prices.

154.    By failing to inform the market of their fraudulent scheme with M.Block, and making other false statements and material omissions, the Defendants presented a misleading picture of GMCR's finances and prospects.  This caused and maintained artificial inflation in the trading prices of GMCR's publicly traded securities throughout the Class Period and until the truth came out.

155.    The Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading and/or making direct statements to the investing public on the conference calls detailed herein.

156.    During the Class Period, the Executive Defendants, as senior executive officers and/or directors or GMCR, had access to material adverse non-public information concerning GMCR, its operations, finances, financial condition, and present and future business prospects. Because of their positions with GMCR, the Executive Defendants were privy to confidential and proprietary information, and information about GMCR's business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Executive Defendants knew or recklessly disregarded that the adverse facts specified therein had not been disclosed to, and were being concealed from, the investing public.

157.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Defendants had a duty to promptly disseminate accurate and truthful information with respect to GMCR's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of GMCR common stock would be based upon truthful and accurate information. The Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

158.    The Defendants are liable as direct participants in the wrongs complained of herein. As described herein, the Defendants made the false statements and omissions knowingly

and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Lead Plaintiffs and other members of the Class who purchased GMCR common stock during the Class Period. Throughout the Class Period, the Defendants had a duty to disclose new, material information that came to their attention, which rendered their prior statements to the market materially false and misleading. There is a substantial likelihood that the disclosure of these omitted facts would have been viewed by the reasonable investor as having significantly altered the total mix of information available about the prospects of the Company.

159.    The Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's common stock.

160.    In ignorance of the untrue and misleading nature of the Defendants' statements and/or upon the integrity of the market price for GMCR common stock, Lead Plaintiffs and the other members of the Class purchased GMCR stock at artificially inflated prices during the Class Period. But for the fraud, they would not have purchased the common stock at artificially inflated prices.

161.    The market price for GMCR common stock declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Defendants, as described above.

162.    Lead Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of GMCR common stock at artificially inflated prices and the subsequent decline in the price of that common stock when the truth was disclosed.

163.    This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

164.    By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and are liable to Lead Plaintiffs and the members of the Class, each of whom has been damaged as a result of such violation.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against The Executive Defendants)

165.    Lead Plaintiffs repeat and reallege each and every allegation set forth in ¶¶ 1-149 above as if set forth fully herein.

166.    This claim is brought pursuant to Section 20(a) of the Exchange Act against the Executive Defendants on behalf of Lead Plaintiffs and all members of the Class who purchased GMCR common stock during the Class Period.

167.    As alleged herein, GMCR is liable to Lead Plaintiffs and the members of the Class who purchased GMCR stock based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

168.    Throughout the Class Period, the Executive Defendants were controlling persons of GMCR within the meaning of Section 20(a) of the Exchange Act, and culpable participants in the GMCR fraud, as detailed herein.

169.    The Executive Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Executive Defendants were able to and did, directly or indirectly, control the conduct of GMCR's business. Each of the Executive Defendants exercised control over GMCR during the Class Period by virtue of, among

64

other things, their executive positions with the Company, the key roles they played in the Company's management, and their direct involvement in its day to day operations, including its financial reporting and accounting functions.

170.    The Executive Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and, through them, to the investing public.  The Executive Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Executive Defendants had the opportunity to commit the fraudulent acts alleged herein.

171.    Given their individual and collective responsibilities for managing GMCR throughout the Class Period, the Executive Defendants were regularly presented to the market as the individuals who were responsible for GMCR's day-to-day business and operations, as well as the Company's strategic direction.  The Executive Defendants accepted responsibility for presenting quarterly and annual results, setting guidance for future periods and assuring the market about the state of, and prospects for the Company.

172.    As a result of the false and misleading statements and omissions alleged herein, the market price of GMCR common stock was artificially inflated during the Class Period. Under such circumstances, the presumption of reliance available under the "fraud on the market" theory applies, as more particularly set forth above.  Lead Plaintiffs and the members of the Class relied upon either the integrity of the market or upon the statements and reports of the Section 20(a) Defendants in purchasing common stock at artificially inflated prices.

173.   This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered in favor of Plaintiffs and the proposed Class and against Defendants, as follows:

a.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.      Granting such additional or different relief as the Court may deem just and proper or as the interests of justice or equity may require.

### JURY TRIAL DEMAND
### Applicable To All Claims

Plaintiffs hereby demand a trial by jury.

Dated: October 29, 2012                                  Respectfully submitted,

**LYNN, LYNN & BLACKMAN, P.C.**
Robin A. Freeman, Jr.
76 St. Paul Street, Suite 400
Burlington, VT 05401
Telephone: (802) 860-1500
Facsimile: (802) 860-1580

*Liaison Counsel*

66

**BARRACK, RODOS & BACINE**
Daniel E. Bacine
Mark R. Rosen
Jeffrey A. Barrack
Lisa M. Lamb
3300 Two Commerce Square
2001 Market Street
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

**KESSLER TOPAZ MELTZER**
    **& CHECK, LLP**
Michael K. Yarnoff
John A. Kehoe
John J. Gross
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
John C. Browne
Laura H. Gundersheim
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

*Attorneys for Lead Plaintiffs and the Class*