UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

|  |  |  |
|---|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, SJUNDE AP-FONDEN, BOARD OF TRUSTEES OF THE CITY OF FORT LAUDERDALE GENERAL EMPLOYEES' RETIREMENT SYSTEM, EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT OF THE VIRGIN ISLANDS, AND PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI on behalf of themselves and all others similarly situated, | : : : : : : : : : : : : : |  |
| Plaintiffs, | : : | Case No. 2:11-cv-289 |
| v. | : : |  |
| GREEN MOUNTAIN COFFEE ROASTERS, INC., LAWRENCE BLANFORD and FRANCES G. RATHKE, | : : : : |  |
| Defendants. | : |  |

OPINION AND ORDER

Five employee retirement systems ("Plaintiffs") bring this putative securities fraud class action on behalf of themselves and all similarly situated persons and entities.  The Plaintiffs seek damages from Green Mountain Coffee Roasters ("GMCR" or "the Company") and two of its executives, Lawrence Blanford and Frances Rathke (the "Individual Defendants"), for representations about GMCR's inventory that they claim were fraudulent.  The Plaintiffs bring suit against all of the

Defendants under Section 10(b) of the Exchange Act and SEC Rule 10b-5(b), and against the Individual Defendants under Section 20(a) of the Exchange Act, which creates separate liability for "controlling persons." This action focuses on the time between February 2, 2011, and November 9, 2011 (the "Class Period"). Before the Court are motions by both GMCR and the Individual Defendants to dismiss the Corrected Consolidated Class Action Complaint. The Defendants seek dismissal of the complaint on two grounds. First, Defendants argue that the Plaintiffs have failed to allege a false statement or omission of material fact. Second, Defendants argue the Plaintiffs failed to plead a strong and compelling inference of scienter, either under a motive to defraud or a "conscious misbehavior or recklessness" theory. For the reasons stated below, the Court **grants** the Defendants' motions to dismiss, ECF Nos. 79 and 80.

## FACTS[1]

GMCR is a Delaware corporation headquartered in Waterbury, Vermont, that sells specialty coffee, coffee brewers, and

---

[1] In setting out the facts, the Court must assume the truth of the factual allegations in the complaint, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), unless they conflict with "the plain language of the publicly filed disclosure documents." *In re Optionable Sec. Litig.*, 577 F.Supp.2d 681, 692 (S.D.N.Y. 2008) (internal citation and quotation omitted). The Court may also consider, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322. This includes public disclosure documents filed with the SEC as required by law, as well as documents "possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The Court is also permitted to take judicial notice of stock prices. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 n. 8 (2d Cir. 2000).

related beverage products.  It encompasses three departments:
Keurig, which it acquired in 2006; the Specialty Coffee Business
Unit ("SCBU"); and the Canadian Business Unit.  Keurig sells a
patented "Keurig" brewing device that uses "K-Cups," single-
serving portions of coffee, tea, and related products, to make
ready-to-drink beverages.  The SCBU produces and sells over two
hundred types of beverages in K-Cup and non-K-Cup formats.  In
recent years, the Company has experienced rapid growth, with its
annual net sales nearly doubling between Fiscal Year ("FY") 2011
and FY 2012, from $1.36 billion to $2.65 billion.  GMCR
drastically expanded its scale of operations in response to this
growth; by 2011, the Company was operating twenty-three
different manufacturing and distribution facilities.

Plaintiffs' suit is premised on the allegation that
throughout the Class Period the Defendants created a false
"growth story" by telling investors that GMCR's production
capacity was straining to meet demand and that it was ramping up
production without building excess inventories.  At the same
time, GMCR's stock soared.  From February 2, 2011, to September
19, 2011, GMCR's stock price nearly quadrupled from
approximately $33 per share to a peak of $111 per share; during
the same period, the NASDAQ declined by 2.4 percent.  Compl. ¶
2.  While GMCR's share prices were inflated, both of the
Individual Defendants sold stock options, but in the fall of

3

2011, GMCR's position in the market began to unravel.  On
October 17, 2011, David Einhorn, an investor and stock analyst,
made a presentation suggesting that GMCR had been engaging in a
scheme to mislead auditors and to inflate financial results.
Immediately following Einhorn's presentation, there was a sharp
drop in GMCR's share price from $92.09 to $82.50 per share and
the price continued to fall as the report received more
publicity.  *Id*. ¶ 11.  On November 9, 2011, GMCR announced that
its inventory levels had increased 61 percent from the prior
quarter and 156 year over year and that it was increasing its
reserve for obsolete inventory to $5.6 million, up 47 percent
from the prior quarter and 186 percent year over year.  *Id*. ¶ 8.

GMCR also announced that it had failed to meet sales and
revenue expectations for the first time in eight quarters:
revenues were up 91% year over year instead of the projected
100-105%.  At the Motion to Dismiss hearing, Defendants
indicated that revenue growth actually *exceeded* expectations in
Q1 of FY 2012.

## I.    Statements by the Defendants During the Class Period

Plaintiffs allege that statements pertaining to GMCR's Q1,
Q2, and Q3 performance in 2011 were fraudulent.  The statements
are from conference calls in which GMCR representatives
discussed consumer demand, GMCR's inventory, and GMCR's plans to
increase production, as well as GMCR's quarterly statement of

its obsolescence reserves on the Form 10-Qs it filed at the end
of each quarter.

### A.   Q1 Statements

The beginning of the Class Period coincides with a February
2, 2011, Conference Call held by GMCR to discuss its Q1 2011
results.   During the discussion, Blanford stated that demand for
GMCR's Keurig and K-Cup products was so strong that the
Company's production capacity was constrained.   In Blanford's
words,

> . . . in the first quarter and so far in our second
> quarter of our fiscal [year], we are definitely being
> stretched.  We are setting production records, it
> seems pretty frequently at individual plants and in
> total but demand is definitely stretching our ability
> to supply. And we've not quite caught up with that
> demand curve yet.  We are hoping to build a little bit
> of a cushion going forward, supply versus demand . . .

*Id*. ¶ 105.  GMCR also released a set of prepared remarks on
February 2, which stated in part,

> As we mentioned last quarter, despite our efforts to
> ensure adequate capacity ahead of the holiday season,
> we experienced and continue to see some spot portion
> pack shortages. We remain focused on increasing
> production to fulfill unmet demand and on achieving
> and maintaining optimum inventory levels to provide
> better customer service.

*Id*. ¶ 106.  Additionally, GMCR disclosed on its first quarter
2011 Form 10-Q that its obsolescence reserve for the quarter
ending December 25, 2010, totaled $3.2 million.  *Id*. ¶ 108.

### B.   Q2 Statements

On May 3, 2011, GMCR hosted a conference call in which Blanford gave the following update:

> We have already begun working with our contract manufacturer to ensure we will have manufacturing capacity to support anticipated brewer demand . . . . In terms of our K-Cup portion pack production capacity, on shelf product availability [h]as improved though we continued to experience some spot outages. We continued to install equipment and capacity to meet demand including ramping production for our new relationships. In fact in recent weeks we have repeatedly hit new records of portion pack production.

*Id*. ¶ 109.  Blanford then introduced Scott McCreary, GMCR's Chief Operating Officer, who added, "We have made good progress over this last quarter on catching up on our customers' demand so we are feeling good about our preparation going into the fall and that is where the significant portion of that capital will go to continue to prepare us for another good holiday season." *Id*.

Michelle Stacy, Keurig's President, rejected an analyst's suggestion that brewer sales had been "pulled forward":

> We did not pull forward any sales at all.  The general demand is what we see.  We fill our customers' orders as they come in, and they were not building any excessive inventories at all at retail . . . .

*Id*. ¶ 110.  When asked by Stacy to elaborate, Keurig General Manager John Whoriskey stated that GMCR's "performance . . . is indicative of our shipment results." *Id.*  Whoriskey added, "the nature of the acceleration of adoption of the product is really with what we are seeing, there is no pulling forward of

6

shipments to do anything, other than react to the demand and make sure we have adequate inventories in place to meet the demand for the period." Whoriskey also denied the suggestion that GMCR had been creating the impression that retailers would be carrying more inventory. *Id.* ¶ 111. Stacy added color to that comment by explaining that retailers "are keeping a consistent week's supply or week's forward coverage on the business. Obviously as our business grows retailers are continuing to grow their inventory to keep about the same number of weeks['] forward coverage." *Id.* But, she concluded, "[w]e don't see a substantial increase in the weeks forward." *Id.* Finally, GMCR reported in its Q2 2011 Form 10-Q that its obsolescence reserve for the quarter ending March 26, 2011, was $2.3 million. *Id.* ¶ 113.

### C.   Q3 Statements

On July 27, 2011, GMCR held another conference call, this one to discuss the Company's third quarter 2011 results. An analyst again asked about the possibility of "channel fill" by the company, but Rathke denied that suggestion, stating, "On portion packs, [and] also brewers . . . we got a lot of space, demos, advertising . . . . [I]t wasn't necessarily channel fill, . . . it was to support an advertising campaign and demos . . . ." *Id.* ¶ 115. Rathke then provided additional assurances:

I think coming off of Q2 we definitely had shortages
or outages of certain products.  So I do know we had a
backlog that we fulfilled in Q3 on—so that was a piece
of it.  So I feel what we've been seeing and hearing
from all of our accounts is that during Q3 we got back
into a place where we knew we had appropriate
inventory levels, and they felt comfortable they were
getting appropriate inventory levels for the products.
So I think we're in good shape.

*Id.*  On its third quarter 2011 Form 10-Q/A, GMCR reported an

obsolescence reserve of $3.8 million.  *Id.* ¶ 117.

### D.   Q4 Statements

On November 9, 2011, GMCR disclosed that the Company had

missed sales targets and had failed to beat profit targets for

the first time in eight quarters.  *Id.* ¶ 96.  Revenues were up

91% year over year rather than 100-105% as projected.  GMCR also

disclosed that inventory levels had increased to $672.2 million,

up $254.7 million from the prior quarter and nearly $410 million

above the year before.  *Id.*  Finally, GMCR announced that it had

increased its reserve for obsolete inventory by 47 percent to

$5.6 million, and that K-Cup portion back demand had dropped.

*Id.* ¶¶ 96-98.

## II. Allegations of Scienter

Plaintiffs advance two theories of scienter.  First, they

argue that stock sales by the Individual Defendants and a May

2011 secondary stock offering provided a motive for the

fraudulent behavior.  Second, Plaintiffs allege that the

Defendants engaged in conscious recklessness by issuing the

aforementioned statements because in actuality, GMCR was
producing far more product than was necessary to meet demand and
inventory levels were skyrocketing.  Plaintiffs also allege that
GMCR's obsolescence reserve disclosures vastly understated the
amount of product it was destroying based on the amount it was
destroying at two of its facilities.

### A.   *Stock Sales*

Between May and August 2011, Defendants Blanford and Rathke
made significant sales of stock.  On May 4, 2011, both
Defendants entered into 10b5-1 plans[2] to sell stock in the
following months, and GMCR disclosed that a number of its
executives and board members had executed such plans in its Q3
2011 Form 8-K.  *Id*. ¶ 83.  Pursuant to these plans, Rathke
exercised 337,500 stock options that she had acquired in 2003
and that were scheduled to expire in 2013.  *Id.* ¶ 84; SEC Form
4, ECF No. 80-22.  All of Rathke's options were sold on August
5, 2011, for a total of $32.7 million.  According to the public
filings, this was Rathke's first sale of GMCR stock since she
began working for the Company in 2003.  Compl. ¶ 84.

Blanford engaged in four stock sales during the Class
Period.  The first sale, on May 5, 2011, was not made pursuant

---

[2] 10b5-1 trading plans provide a way for individuals with inside corporate
information to sell stock without any subsequent influence over how, when, or
whether to effect purchases or sales of stock.  *Warchol v. Green Mountain
Coffee Roasters, Inc.*, No. 10-cv-227, 2012 WL 256099 at *2 n. 3 (D. Vt. Jan.
27, 2012).

to a 10b5-1 plan and involved the sale of 51,573 shares for $3.5 million.  The other three sales were made pursuant to the 10b5-1 plan: on August 16, 2011, Blanford sold 45,000 shares for $4.5 million; on September 20, 2011, he sold 45,000 shares for $5.0 million; and finally, on October 18, 2011, he sold 45,000 shares for $3.6 million.  In sum, Blanford sold a total of $16.6 million in shares during the Class Period.  *Id*. ¶ 86.

The Complaint also notes that, concurrent with the disclosure of its strong second quarter financials on May 3, 2011, GMCR announced that it would sell 7.1 million shares of common stock that month.  The offering closed a week later on May 11 and the size of the offering was increased to 9.5 million shares.  The company raised more than $680 million in the offering.  *Id*. ¶¶ 91-92

### B.   *GMCR's Production Levels and Inventory*

The Complaint lays out several reasons why GMCR and its executives should have known that the statements above were fraudulent.  Plaintiffs' primary allegation is that there was a massive buildup of unsold and expired inventory during the Class Period.  *Id*. ¶ 49.  Plaintiffs also contend that GMCR's demand models were inaccurate and that GMCR was never operating at full capacity.  *Id*. ¶ 56-57.  Each of these claims is supported by statements from Confidential Witnesses ("CWs").

### 1.   Buildup of Unsold and Expired Inventory

According to the Complaint, CW1, a machine operator at a
GMCR facility from 2006 to 2012, stated that after the purchase
of new equipment in 2010, production increased dramatically and
inventory backed up. *Id*. ¶ 49.  CW1 states that inventory
"backed up in various departments," but when CW1 questioned this
practice, CW1 was simply told to build up inventory. *Id.* CW2,
a former production planning manager for M.Block[3] from 2010 to
2011, noted that a facility in Tennessee was opened because
M.Block needed more space to store increased inventory. *Id.*
CW3, a GMCR maintenance technician from 2009 to 2011, stated
that there were rows of outdated coffee stacked the length of
the warehouse, many of which were discarded because of their
"best-by-date." *Id*. ¶ 50.  CW4, a machine operator involved in
producing K Cups from 2009 through mid-2012, corroborated that
account by stating that there was "no question that GMCR had
excess K-Cup inventory." *Id.*  CW4 also stated that he was told
that GMCR did not want to keep track of the amount it was
discarding even though they were getting rid of "pallet after
pallet after pallet." *Id.*[4]

---

[3] M.Block is an outsourcing company that serves as GMCR's primary order
fulfillment entity.  Compl. ¶¶ 25-26.

[4] The Complaint uses the Einhorn presentation to corroborate this and other
factual assertions.  In *Horowitz v. Green Mountain Coffee Roasters*, No. 2:10-
cv-227, 2013 WL 1149670 at *9 (D. Vt. March 20, 2013), this Court refused to
consider the information contained in the Einhorn presentation because it
relied on confidential sources without disclosing the basis for their
knowledge of the facts asserted.  Because the allegations pertaining to the

Plaintiffs also calculate two metrics—inventory turnover ratio and average days to sell—and suggest that both should have made GMCR aware that production was outstripping demand. *Id*. ¶¶ 52-53. GMCR's inventory turnover ratio decreased significantly for each of the quarters in the Class Period when compared with the respective quarter a year prior. *Id*. ¶ 52. The average number of days it took GMCR to sell its inventory in each of those quarters increased correspondingly. *Id*. ¶ 53. Plaintiffs also note that GMCR exceeded its revenue guidance for each of the first three quarters of 2011, which suggests that it was selling more product than it expected. *Id*. ¶ 54. Accordingly, Plaintiffs infer, inventory levels should have been dropping not increasing if the Company was selling more than it expected.

Plaintiffs further allege that GMCR and M.Block regularly transferred product between facilities to circumvent inventory audits. They note that CW7 stated that the Company moved product offsite when outside audits were conducted but would bring the product back in after the audits were completed. *Id*. ¶ 59. CW4 also witnessed "bags and bags of coffee" being moved prior to inventory audits at two of GMCR's Vermont K-Cup production plants sometime between 2009 and 2012. *Id*. ¶ 60. CW4 also stated that inventory audits became less frequent at

Einhorn presentation are just as unreliable here, they are not incorporated into this factual summary.

those facilities: in 2009, inventory was counted once a month,
but GMCR shifted to once a quarter before stopping altogether in
the summer of 2011.  *Id.*

Plaintiffs also suggest that GMCR's close relationship with
M.Block allowed it to use M.Block to deceive investors about
inventory levels.  *Id.* ¶ 63.  CW2, a production planning manager
for M.Block from 2010 to 2011, recalls transfers of product
between its facilities that appeared to have no other purpose
than to falsify inventory numbers.  *Id.* ¶ 67.  CW2 provides no
date for the event but contends that M.Block cleared out a fully
loaded warehouse of GMCR product immediately before GMCR's
auditors visited the facility to conduct an inventory check.
*Id.* ¶ 68.  CW10, a collection specialist in M.Block's accounts
receivable department, added that the amount of warehouses
M.Block purchased to house GMCR product was not justified by
GMCR's sales figures; however, CW10 was only working in that
capacity between January 2009 and October 2010, a period that
does not overlap with the Class Period.  *Id.*

In addition, Plaintiffs allege that GMCR destroyed obsolete
inventory without booking changes to reflect the amount of
unsalable inventory.  CW9, a production and maintenance manager,
stated that GMCR was discarding more than 15 bags of coffee
every week at its Knoxville plant, a value of $6,000 to $90,000
per week depending on the type of beans.  *Id.* ¶ 61.  CW4

estimated that employees at GMCR's Essex Junction and Williston plants threw away at least $50,000 to $100,000 in finished K-Cup products two to three times per week.  *Id.*  Plaintiffs argue that GMCR's reserve for obsolete inventory was substantially less than it should have been because the amount of inventory being discarded at these facilities would have exceeded GMCR's reserve for the entire company.  *Id.*  The CWs do not actually state whether the coffee they observed being destroyed was properly booked as obsolete inventory or not.

Finally, Plaintiffs allege that GMCR used its relationship with M.Block to deceive investors regarding the number of brewers shipped during Q2. *Id.* ¶ 71.  CW10, an M.Block employee, reported that QVC placed a large order for 500,000 brewers right before the second quarter audit in 2011; however, according to CW2, another M.Block employee, most of the brewers were restocked and never actually shipped.  *Id.* ¶ 77.  Plaintiffs allege that these sales helped GMCR meet its sales and revenue expectations for the second quarter. *Id.* ¶¶ 80-81.  However, neither CW states whether the shipment was actually booked as revenue.

### 2.  GMCR's Demand Models

In a single paragraph, Plaintiffs note that CW9, a production and maintenance manager at GMCR's Knoxville plant from 2009 to 2011, stated that the company's demand models and

14

forecasts were "absolutely wrong," had "no rhyme or reason," and were "out of whack" with the sales orders. *Id.* ¶ 56.

### 3. GMCR Production

The Plaintiffs also allege GMCR production was never at or near full capacity during the Class Period. CW3, a maintenance technician from GMCR facility from 2009 to 2011, stated that his or her facility never ran at full capacity. *Id.* ¶ 57. CW5, a materials specialist at GMCR's Castroville plant from 2011 to 2012, added that that facility was only running at sixty to seventy percent capacity and still carried excess inventory in a nearby warehouse. *Id.* CW9 also stated that the company's machines were running below capacity; while they could produce 400-500 cups per minute, they were running at 350. *Id.* CW6, a machine operator at GMCR in 2011, noted that it did not make sense that GMCR was adding machines to its production line when there was already a lot of product that was not moving. *Id.* Finally, CW7, a technician at GMCR's Knoxville plant in 2011 and 2012, stated that the cocoa line at the facility was shut down for a month because of overstocked product. *Id.*

### C. *Additional Allegations of Scienter*

Plaintiffs provide two additional reasons that Defendants knew about the allegedly fraudulent scheme. First, Plaintiffs contend that Rathke and Blanford's participation in the Remediation Plan (which concerned remediation efforts to address

weaknesses in internal controls over financial reporting) that the Company effected in 2010 establishes that they knew or should have known of the falsity or inaccuracy of their statements. *Id*. ¶¶ 119-122. Second, the Complaint cites Rathke's correspondence with the SEC regarding GMCR's use of fulfillment companies to maintain inventory, and argues that this correspondence demonstrates her "working knowledge" of stale or expired inventory practices. *Id*. ¶¶ 123-125.

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Generally, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). Plaintiffs' complaint must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Further, it is subject to Federal Rule of Civil Procedure 9(b), which sets out special requirements for pleading fraud. Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state

with particularity the circumstances constituting fraud or
mistake.").

   To state a claim under Rule 10b-5 for misrepresentations,
"a plaintiff must allege that the defendant (1) made
misstatements or omissions of material fact, (2) with scienter,
(3) in connection with the purchase or sale of securities, (4)
upon which the plaintiff relied, and (5) that the plaintiff's
reliance was the proximate cause of its injury." *ATSI Commc'ns,
Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007)
("ATSI").  Both GMCR and the Individual Defendants have filed
motions to dismiss the Complaint.  In their motions, Defendants
argue that the Plaintiffs have failed to plead a false statement
or omission of material fact.  Defendants also argue the
Plaintiffs failed to plead a compelling inference of scienter,
either under a motive to defraud or a "conscious recklessness"
theory.

## I.   Failure to Allege a False Statement or Omission of Material Fact

   The Defendants first seek dismissal of the Complaint on the
grounds that the Plaintiffs have not explained how any of the
alleged misstatements were fraudulent.  In the securities fraud
context, Rule 9(b) requires the complaint "(1) specify the
statements that the plaintiff contends were fraudulent, (2)
identify the speaker, (3) state where and when the statements

were made, and (4) explain why the statements were fraudulent."
*Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir. 2004).
"Allegations that are conclusory or unsupported by factual
assertions are insufficient." *ATSI,* 493 F.3d at 99.  The
Plaintiffs may rely on confidential sources in addition to other
facts; however, the confidential sources must be "described in
the complaint with sufficient particularity to support the
probability that a person in the position occupied by the source
would possess the information alleged." *Novak v. Kasaks*, 216
F.3d 300, 314 (2d Cir. 2000).

    The Complaint identifies two types of statements alleged to
be false: (1) qualitative remarks from conference calls and
other end-of-quarter materials and (2) the dollar amounts GMCR
listed for its obsolescence reserve for each of the first three
quarters in 2011.

### A.    *Qualitative Remarks*

    The identified qualitative statements were made during
several conference calls over the course of 2011.  At the end of
the first quarter, Blanford and GMCR stated that the Company's
production capacity was constrained, that demand was stretching
the Company's ability to supply, and that there were some spot
shortages for some of the Company's portion packs.  See Compl.
¶¶ 105-06.  Blanford expressed GMCR's desire to "build a little
bit of a cushion going forward." *Id.* ¶ 105.  The Company

further stated that it was "focused on increasing production to fulfill unmet demand and on achieving and maintaining optimum inventory levels . . . ." *Id.* ¶ 106. At the end of the second quarter, Blanford reported that the Company had improved its K-Cup portion pack production capacity and on-shelf product availability, though there were still some shortages. *Id.* ¶ 109. McCreary and Stacy provided further support to Blanford's representations, adding that the Company had made progress catching up to consumer demand for brewers and denying that any sales had been pulled forward to meet sales targets. *Id.* ¶¶ 110-11. Finally, when GMCR released its third quarter results, Rathke denied the notion that the Company was engaging in channel fill; instead, she insisted that in the second quarter, there had been shortages in specific products and that in the third quarter, there was a backlog to fill. *Id.* ¶ 115. Rathke asserted that in the third quarter, the Company had attained "appropriate inventory levels." *Id.*

In the Complaint, Plaintiffs allege that Defendants' Class Period statements created a growth story that was belied by the actual status of demand, inventory levels, and the amount of product the Company was discarding. Plaintiffs are certainly correct that "[w]hen managers deliberately make materially false statements concerning inventory with the intent to deceive the investment community, they have engaged in conduct actionable

19

under the securities laws." *Novak*, 216 F.3d at 312.  However,
Plaintiffs fail to provide facts demonstrating that any of the
above statements were actually false.  At no point does the
Complaint allege that GMCR's financial disclosures understated
the amount of unsold inventory held by the Company.  Instead,
Plaintiffs argue that these statements were inconsistent with
the buildup in inventory observed by the CWs, by the dramatic
rise in inventory levels reported in Q4, and by the inventory
turnover ratio and days to sell metrics.  Even if all of these
facts are accepted as true, however, they do not demonstrate
that any of Defendants' statements were false.

Throughout 2011, GMCR represented that it was building
production capacity as well as product inventory in the face of
strong demand.  Accordingly, the buildup in inventory—
particularly during the third and fourth quarters of 2011—does
not contradict and is in fact consistent with GMCR's
representations.  Moreover, the dramatic rise in inventory
reported in Q4 does not render these previous statements false;
instead, the Q4 disclosures are also consistent with the
qualitative statements in which GMCR expressed that production
levels were increasing.  Finally, the metrics calculated by
Plaintiffs—the decrease in the inventory turnover ratio and the
increase in the average days to sell—are both entirely
harmonious with the Class Period statements that the Company had

gone from facing shortages to building "a little bit of a
cushion going forward."

At the hearing, Plaintiffs highlighted comments made by
Michelle Stacy during the Q2 conference call in which she stated
that "[customers] were not building any excessive inventories at
retail." Compl. ¶ 110.  They argued that this statement was
false or misleading because the CWs reported seeing excess
inventory buildup.  However, when reviewed in context, this
statement specifically refers to brewer inventories (as opposed
to K-Cup inventories); all of the CW statements regarding
inventory buildup refer to K-Cup inventory or do not specify
product at all.  Furthermore, the statement expressly regards
inventory at *retail*; the CW statements all refer to inventory
buildup at GMCR and M.Block facilities.  The Complaint therefore
fails to demonstrate that there was anything fraudulent about
Stacy's Q2 statements.

Plaintiffs also cite to multiple CWs who stated that
various components of GMCR's production apparatus were never
running at full capacity; however, neither GMCR nor either of
the Individual Defendants represented that the Company had ever
reached full production capacity.  To the contrary, the
statements listed by Plaintiffs indicate that the Company was
experiencing spot shortages with some of its products and that

it wanted to increase its capacity to avoid similar shortages in the future.

Thus, the facts as alleged by the Plaintiffs are not inconsistent with Defendants' Class Period statements.  However, even if they were, Plaintiffs' argument would be undone by the insufficient specificity of the CW accounts.  The CW observations are not linked to a specific timeframe and therefore cannot demonstrate the falsity of the class period statements.  *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (finding that where CW allegations are "pegged to an indefinite time period," it "renders the task of matching CW allegations to contrary public statements all but impossible").  While Plaintiffs argue that the majority of CW statements must apply to the class period because this is when the CWs were employed by M.Block or GMCR, this is still insufficiently specific because the statements vary across quarters—the Q1 statements, for example, indicate the need to catch up with demand, while the later statements indicate that shortages have been "caught up" with.  For the CW accounts to prove the falsity of the Class Period statements, they would need to be specifically "pegged" to the quarters referred to in the statements, which they are not.

Furthermore, even if the CW accounts did specify a time period, they still fail to show the statements were false

because the Complaint does not demonstrate that the CWs were in a position to know whether inventory was misstated. *Novak*, 216 F.3d at 314 (requiring confidential sources to be described with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"). The Complaint provides statements from only two CWs, CW8 and CW9, alleged to have knowledge about inventory management at GMCR. CW8 is described as a former "Distribution Resource Planning Manager," who states that he had conversations with senior managers about "massive overproduction of K-Cups and the improper method of inventory counting that the Company employed." Compl. ¶ 127. However, CW8 left GMCR before the Class Period, and therefore cannot speak to whether the Class Period statements were false or misleading.[5] The facts provided by CW9 are similarly unhelpful. CW9, a "Production Manager" at the Knoxville plant, describes GMCR's demand models and forecasts as "absolutely wrong" with "no rhyme or reason" but provides no information to explain or support these opinions. Thus, CW9's statements are not sufficiently particularized to meet the *Novak* standards.

---

[5] Plaintiffs argue that pre- and post-class period information can be relevant when it "sheds light on whether class period statements were false or materially misleading." *In re Scholastic Corp. Secs. Litig.*, 252 F.3d 63, 72(2d Cir. 2001). However, pre-Class Period information is unhelpful in this case due to GMCR's rapid growth over the years before and after the Class Period. For example, reported inventory increased *156%* year over year in Q4 FY 2011; in the context of such rapid change, CW8's inventory observations before the Class Period cannot accurately shed light on the state of inventory during the Class Period.

Other than CW8 and CW9, the remainder of the CWs work in low-level positions at GMCR (such as maintenance technicians, machine operators, and materials specialists), or, in a few cases, work at M.Block.  While the Complaint provides information about their positions, locations, and years of employment, it never alleges that the CWs are familiar with accounting practices or that they have any idea how what they observe affects company-wide inventory and obsolescence reporting.  This lack of knowledge of company-wide practices is particularly significant given the size of GMCR's operations. The CWs work at only four disclosed GMCR locations; as of 2011, GMCR had twenty-three manufacturing and distribution facilities. As GMCR argues in its motion to dismiss, it is "unclear how a machine worker at one of those facilities could provide data contravening public statements concerning inventory and manufacturing capacity across the multi-billion dollar enterprise."  Mot. Dismiss 35.  The CW statements therefore fail to meet the *Novak* standard for confidential sources and cannot demonstrate the falsity of the Class Period statements.

### B.  *Obsolescence Reserves*

Plaintiffs also allege that the obsolescence reports, which were provided on the First, Second, and Third Quarter Form 10-Qs and signed by Defendants Blanford and Rathke, were fraudulent. On the forms, GMCR reported an obsolescence reserve of $3.2

million, $2.3 million, and $3.8 million, respectively.  The
Plaintiffs argue that this constituted a false statement based
on the statements made by CW4, which allege that GMCR was
destroying coffee at a rate of up to $300,000 per week at just
two facilities.  Compl. ¶ 61.  Based on the CW estimates,
Plaintiffs calculate that the 10-Qs understated the obsolescence
reserves by over $13 million, or over 300%.  They also argue
that the falsity of the 10-Q forms is further indicated by the
fact that reported obsolescence reserves rose significantly in
Q4 of FY 2011.  *Id.*

Plaintiffs fail to demonstrate that the 10-Q forms provide
false information for several reasons.  The allegation that the
obsolescence reserves were understated rests primarily on
information provided by CW4, a machine operator at two of GMCR's
K-Cup production plants from 2009-2012, who personally observed
employees at two plants "throwing away at least $50,000 to
$100,000 in finished K-Cup products two to three times per
week."  *Id.* ¶ 61.  Plaintiffs therefore extrapolate that this
constituted $5.2 million per year at a minimum that was being
thrown away without being included in the obsolescence report.
*Id.* ¶ 61.  However, the Complaint does not allege that the CW
has any knowledge regarding what went into the obsolescence
calculations or inventory accounting.  Furthermore, CW4's
account does not allege that the product he or she observed was

25

not accounted for in the obsolescence reports.  Finally, CW4's
observations are not pinned to any specific timeframe (other
than his range of employment of 2009-2012) so even if the
Complaint demonstrated that CW4 had the requisite knowledge,
CW4's observations cannot speak to the falsity of the
obsolescence reports because his or her statements can be tied
to the time of the alleged misstatements.

In addition to CW4's statements, Plaintiffs allege that the
falsity of the obsolescence reports is demonstrated by the Q4
releases, in which the reported obsolescence reserves rose
significantly—by nearly 50% over the prior quarter.  Plaintiffs
allege that this spike in obsolescence reserves creates a strong
inference that the numbers reported in the previous three
quarters were false.  Compl. ¶ 96.  However, any such inference
is contradicted by the fact that obsolescence reserves as a
percentage of inventory remained relatively constant across all
quarters of 2011, and actually *decreased* from Q3 to Q4.  GMCR's
Mot. Dismiss 12.

Plaintiffs also cite the Einhorn Report to demonstrate the
falsity of the obsolescence reporting and qualitative remarks.
Compl. ¶ 62.  However, the Court has already determined that the
Einhorn Report failed to satisfy the *Novak* standard for
confidential witness allegations.  *See Horowitz*, 2013 WL 1149670
at *9.  It therefore provides no support for Plaintiffs' theory

that Defendants made fraudulent statements during the Class
Period.

In conclusion, the Complaint does not provide facts
demonstrating that either the qualitative statements or the
obsolescence reports were fraudulent.  As a result, it does not
meet the requirements for stating a claim under Rule 10b-5 that
the defendant "made misstatements or omissions of material fact"
nor does it meet the pleading requirements of 9(b) that the
Complaint explain why the identified statements were fraudulent.
Defendants' motions to dismiss are therefore granted on this
basis.

## II.  Failure to Plead Cogent and Compelling Inference of Scienter

The Complaint also fails for a second reason: Plaintiffs'
failure to adequately plead scienter.  In 10b-5 actions, a
plaintiff must plead "that in connection with the purchase or
sale of securities, the defendant made a false representation as
to a material fact . . . and acted with scienter." *S. Cherry
St., LLC v. Hennessee Group, LLC*, 573 F.3d 98, 108 (2d Cir.
2009).  As a check against abusive litigation, Congress enacted
the Private Securities Litigation Reform Act ("PSLRA"), Section
21(D)(b)(2) of which mandates that such complaints "shall, with
respect to each act or omission alleged to violate this chapter,
state with particularity facts giving rise to a strong inference

27

that the defendant acted with the required state of mind." 15
U.S.C. § 78u-4(b)(2)(A). "To qualify as 'strong' within the
intendment of § 21D(b)(2), . . . an inference of scienter must
be more than merely plausible or reasonable—it must be cogent
and at least as compelling as any opposing inference of
nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Dismissal is
required where a complaint fails to meet this standard. 15
U.S.C. § 78u-4(b)(3)(A); *ATSI*, 493 F.3d at 99. Plaintiffs may
demonstrate Individual Defendants' or GMCR's[6] scienter by a
showing of either (1) "both motive and opportunity to commit the
fraud" or (2) "strong circumstantial evidence of conscious
misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Defendants
argue in their motions to dismiss that the Complaint fails to
adequately show motive or conscious recklessness.

### A. *Motive*

"Motive . . . [can] be shown by pointing to 'the concrete
benefits that could be realized' from one or more of the

---

[6] To plead scienter on behalf of GMCR, the Complaint must plead scienter on
the part of the Company's senior employees. "A corporate defendant's
scienter is necessarily derived from its employees." *In re Marsh & Mclennan
Companies, Inc. Sec. Litig.*, 501 F.Supp.2d 452, 481 (S.D.N.Y. 2006). "While
there is no simple formula for how senior an employee must be in order to
serve as a proxy for corporate scienter, courts have readily attributed the
scienter of management-level employees to corporate defendants." *Id.* at 481.
To plead GMCR's scienter, Plaintiffs may allege facts creating a "strong
inference that someone whose intent could be imputed to the corporation acted
with the requisite scienter," even if that person is not an Individual
Defendant. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital
Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Therefore, Plaintiffs may plead
scienter with respect to GMCR even "in the absence of successfully pleading
scienter as to an expressly named officer." *Id.* at 196.

allegedly misleading statements or nondisclosures." *S. Cherry St.*, 573 F.3d at 108 (quoting *Shields v. Citytrust Bancorp, Inc.*, 35 F.3d 1124, 1130 (2d Cir. 1994)). Plaintiffs may meet this burden by alleging that "corporate insiders . . . misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." *Novak*, 216 F.3d at 308. However, merely alleging goals possessed by virtually all corporate insiders "such as the desire to maintain high credit rating for the corporation or otherwise sustain the appearance of corporate profitability" is insufficient to plead motive. *S. Cherry St.*, 573 F.3d at 109.

## 1. Stock Sales

Plaintiffs' primary motive argument rests on the stock sales made by the Individual Defendants Rathke and Blanford during the Class Period, which collectively amounted to nearly $50 million. An inference of scienter can only be drawn from insider trading activity where the activity is "unusual." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). A trade is "unusual" if it occurs "in amounts dramatically out of line with prior trading practices and at times calculated to maximize personal benefit from undisclosed inside information." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (internal quotations omitted). This inquiry is

29

highly context specific, *see Russo v. Bruce*, 777 F. Supp. 2d

505, 517 (S.D.N.Y. 2011), but may consider

> (1) the amount of net profits realized from the sales;
> (2) the percentages of holdings sold; (3) the change
> in volume of insider defendant's sales; (4) the number
> of insider defendants' selling; (5) whether sales
> occurred soon after statements defendants are alleged
> to know to be misleading; (6) whether sales occurred
> shortly before corrective disclosures or
> materialization of the alleged risk; and (7) whether
> sales were made pursuant to trading plans such as Rule
> 10b5-1 plans.

*Golesorkhi v. Green Mountain Coffee Roasters, Inc.*, 2:12-CV-91,

2013 WL 5406227 at *9 (D. Vt. Sept. 26, 2013) (quoting *Glaser v.*

*The9, Ltd.,* 772 F.Supp.2d 573, 587 (S.D.N.Y.2011)).  When all of

these factors are considered together, Blanford and Rathke's

sales are not unusual enough to support an inference of

scienter, particularly when compared to the innocent inference

of nonfraudulent intent.

Plaintiffs identify two admittedly suspicious elements to

Rathke and Blanford's Class Period stock sales.  The first is

their size.  Rathke made over $30 million in one day and

Blanford netted $16 million over four sales across the Class

Period.  Compl. ¶86.  The magnitude of stock sales is an

important consideration in demonstrating scienter.  *See*

*Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)

(finding $3.5 million stock sale by CEO indicative of scienter);

*Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171, 200

(S.D.N.Y. 2010) (stock sales of $5.7 and $5.9 million supported finding of scienter). The other fact that raises suspicion is that this was Rathke's first sale in her almost ten years at GMCR, and that Blanford had made very few sales before 2011. Compl. ¶¶ 84-85.

These two factors are more than outweighed by the multitude of factors counting against a finding of motive. First of all, while the sales were large, courts in this circuit have found even bigger sales to not support an inference of motive. *See In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 382 (E.D.N.Y. 2003) (finding that insider sales aggregating to $58 million did not raise an inference of scienter where other factors "militate[d] against" such a finding). Furthermore, the sales represented (particularly in Blanford's case) a relatively small percentage of Individual Defendants' overall holdings.[7] Blanford sold only 18% of his holdings during the Class Period, retaining 82% of his stock and options, while Rathke sold 38%. Courts have found no inference of scienter in cases involving equal and even greater percentages of sales. *See Gildan*, 636 F. Supp. 2d

---

[7] There is some disagreement within the Circuit on whether stock options should be included when determining the percentage of holdings sold. While the Second Circuit has not spoken explicitly on this question, "it appears that the weight of the authority. . . lends credence to the position that options are to be taken into account in comparing the volume of an insider's sales to his shareholdings." *Gildan*, 636 F. Supp. 2d at. This Court has therefore included "options and stock in the denominator when calculating the relative magnitude of an insider's sales." *Warchol*, 2012 WL 256099 at *7 n. 11; *Golesorkhi*, 2013 WL 5406227 at *10 n.10 (quoting *Warchol*).

at 271 n.5 (finding that Plaintiffs would not have adequately
pled trades to be "unusual" even if represented 53% of
holdings); *see also Ronconi v. Larkin*, 253 F.3d 423, 435-36 (9th
Cir. 2001) (finding sales representing 69% to 98% of holdings to
not be "unusual" in light of circumstances).

Perhaps most importantly, the timing of the stock sales in
relation to the negative disclosures was neither suspicious nor
unusual.  Rathke's single sale took place several months before
the Q4 financial disclosures, which counts against an inference
that the sales were "calculated to maximize personal benefit
from insider information."  *Gildan*, 636 F. Supp. 2d at 270; *see
also Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 at *4 (2d
Cir. 1999) (unpublished opinion) (affirming district court's
finding that "sales would have to be much closer in time to the
alleged misstatements to give rise to a suspicion of fraud"
where insider sales and misstatements were months apart); *In re
Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 344-45
(W.D.N.Y. 2008) (finding sales not "unusual" where occurred at
least two months before negative disclosures; "such timing does
not suggest that the individual defendants meant to realize
profits immediately prior to an expected and dramatic fall in
the stock's price"); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d
at 154 n.24 (D. Conn. 2007) (finding stock sales not indicative
of scienter where they were made "more than two months before

32

the announcement" in question); *City of Brockton Ret. Sys. v.
Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) (noting
that "[insider] did not sell his stock at the end of the
putative class period, when insiders would have 'rushed to cash
out' before the financial statements were restated." (quoting *In
re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444-45 (S.D.N.Y.
2005)).  None of the transactions cited took place near the
dates on which the officers were likely to profit on the basis
of insider knowledge.  While Blanford made one sale very close
to the peak trading price, this sale was executed pursuant to a
10b5-1 trading plan made over four months before the actual
stock sale.  Thus, the timing of Rathke and Blanford's sales do
not indicate that they were looking to profit right before an
anticipated drop in share prices.

Furthermore, the proximity of the sales to the allegedly
fraudulent statements does not support a finding of motive
because Plaintiffs do not demonstrate that the Individual
Defendants actually knew about the alleged fraud.  Contrast this
with *Freudenberg*, for example, where the Southern District of
New York found that sales made contemporaneously with alleged
misstatements supported an inference of scienter in part because
the defendants had "knowledge of the fraud and access to
information belying their public statements."  712 F. Supp. 2d
at 200.  In that case, the plaintiffs pled that defendants knew

or had access to information that demonstrated that their public statements were not accurate by referring to sixteen CWs who provided accounts of "what they told [d]efendants, what [d]efendants knew, and/or what was discussed internally that is alleged to be contrary to Class Period statements." *Id.* at 197. As is discussed in more detail below in the "conscious recklessness" analysis, Plaintiffs here do not provide any facts demonstrating that Rathke or Blanford knew about the alleged falsity of their Class Period statements.

Finally, the fact that all but one of the sales were executed pursuant to a 10b5-1 trading plan also counts against a finding of scienter. *Glaser*, 772 F. Supp. 2d at 592 ("It is well established that trades under 10b-5-1 plan do not raise a strong inference of scienter." (quoting *Gildan*, 636 F. Supp. 2d at 272)); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007) ("Because [defendant's] sales were part of a periodic divestment plan [*i.e.,* at 10b5-1 sales plan], the timing and amount of sales do not raise a strong inference of scienter.").

Plaintiffs rightly state that some courts have found that the defensive value of a 10b5-1 trading plan is diminished when the plan is entered into *during* the Class Period, as was the case here.  For example, courts within this Circuit have found that where 10b-1 plans are "entered into—or strategically

34

amended—to take advantage of an inflated stock price or insider information . . . they are not a cognizable defense to scienter allegations on a motion to dismiss." *George v. China Automotive Systems, Inc*., No. 11 Civ. 7533(KBF), 2012 WL 3205062 at *9 (S.D.N.Y. 2012)(internal quotations omitted); *see also Freudenberg*, 712 F. Supp. 2d at 171 (finding that a 10b5-1 trading plan may support an inference of scienter because "a clever insider might maximize their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan" (internal quotation omitted)).  This case is distinguishable, however, because there was nothing suspicious or unusual about the timing of Rathke and Blanford's 10b5-1 plans in relation to the negative disclosures made toward the end of the Class Period. As a result, even though the trading plans were executed during the Class Period, the Complaint does not demonstrate that the trading plans were executed to "take advantage of an inflated stock price or insider information."

    In sum, the Complaint fails to make a cogent and compelling showing that Rathke and Blanford's stock sales provided a motive to issue fraudulent statements during the Class Period. Moreover, the proffered fraudulent inference is not as "cogent and compelling" as the innocent inference of nonfraudulent intent: that the Individual Defendants made their sales and

35

10b5-1 plans to take advantage of a rare trading window after
several years of acquisitions that had prevented insiders from
diversifying their holdings.  Compl. ¶ 83.  This is further
supported by the fact that Rathke's options were set to expire
in 2013.  The Complaint thus fails to plead the strong inference
of scienter required by *Tellabs*, 551 U.S. at 324, based on the
Class Period stock sales.

### 2. May 2011 Offering

In addition to Rathke and Blanford's stock sales,
Plaintiffs cite the May 2011 secondary stock offering as a
motive for the alleged fraud, stating that GMCR wanted to ensure
that the offering would be a "success."  Compl. ¶¶ 91-92.  The
Second Circuit has found that "motive to maintain the appearance
of corporate profitability, or of the success of an investment"
is "not sufficiently concrete for purposes of inferring
scienter."  *Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2d
Cir. 1996); *see also Acito*, 47 F.3d at 54 (explaining that "[i]f
scienter could be pleaded on that basis alone, virtually every
company in the United States that experiences a downturn in
stock price could be forced to defend securities fraud
actions"); *In re Bristol-Meyers Squibb Sec. Litig.*, 312 F. Supp.
2d 549, 560 (S.D.N.Y. 2004) (declining to infer motive based on
"allegations of ordinary corporate desire").  Thus, courts in
this circuit have found that stock offerings as a purported

motive "fit[] comfortably within the set of universal corporate motivations that are inadequate to sustain a securities fraud complaint." *Russo*, 777 F. Supp. 2d at 520 (refusing to infer motive based on stock offerings during the Class Period). The Plaintiffs therefore cannot demonstrate motive based on the mere fact that GMCR made a public offering during the Class Period.[8]

**B.   *Conscious Misbehavior or Recklessness***

Where the complaint fails to plead a motive to commit fraud, a plaintiff must make a "correspondingly greater" showing of strong circumstantial evidence of recklessness. *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation omitted)). To meet this standard, a plaintiff must allege conduct that "'is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)). Plaintiffs must show that the Defendants "knew facts or had access to information suggesting their public statements were not accurate" or "failed to check information

---

[8] The Plaintiffs cite a Second Circuit case, *Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000), to suggest that a stock offering might provide a motive to support an inference of scienter. However, in that case, the Second Circuit found motive where the stock price was artificially inflated *specifically* in order to make acquisitions, and not just for a general stock offering to raise cash. *See id.* at 93.

that they had a duty to monitor." *Novak*, 216 F.3d at 311; *see also Warchol*, 2012 WL 256099 at *10 ("Plaintiffs must adequately plead that Defendants had access to contrary facts and specifically identify the reports or statements containing this information." (internal quotations omitted)).

In this case, any conscious misbehavior or recklessness showing is foreclosed by the fact that Plaintiffs have failed to allege a false statement. Because the Complaint fails to adequately allege that the Defendants' statements were false, it "obviously fails to allege facts constituting circumstantial evidence of recklessness or conscious misbehavior on the part of the defendants in making the statements." *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 813 (2d Cir. 1996); *see also Fishbaum*, 189 F.3d 460 at *5 (same). The Court will nonetheless address Plaintiffs' conscious misbehavior or reckless arguments as an alternative ground for dismissal.

Even if the Complaint did allege a false statement, the facts as alleged in the Complaint fail to show that GMCR or the Individual Defendants knew or should have known about any of the issues raised by the CWs. In such actions, plaintiffs must "specifically identify the reports or statements that are contradictory to the statements made or must provide specific instances in which Defendants received information that was

38

contrary to their public declarations." *Glaser*, 772 F. Supp. 2d
at 587-88 (internal quotations omitted).  Here, the Complaint
fails to identify any reports or statements that would or should
have made Defendants aware of the falsity of their public
statements.  The Complaint does nothing to connect the CW
observations to the individuals making the public statements.
Their high-level positions, without more, are not enough to
impute knowledge of conflicting information.  *See In re PXRE
Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 538 (S.D.N.Y.
2009) (finding that allegations that "Defendants *must have known*
of [falsity] due to their positions . . . fail to support an
inference that Defendants knew, or had access to" the
conflicting information"); *Steinberg v. Ericsson LM Tel. Co.,*
No. 07-CV-9615, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008)
(finding allegations insufficient to establish scienter where
Complaint failed to identify any reports or conversations that
provided Defendants with information inconsistent with their
public statements).

Plaintiffs' two supplemental allegations of scienter—Rathke
and Blanford's participation in the Remediation Plan and
Rathke's SEC correspondence—do not alter this conclusion.  The
Remediation Plan specifically regarded "internal control over
financial reporting" and the Complaint does not challenge any of
the Company's financial disclosures.  Thus, the Complaint does

not demonstrate that Rathke and Blanford's participation in the
Remediation Plan constitutes a "specific instance[] in which
Defendants received information that was contrary to their
public declarations." *Glaser*, 772 F. Supp. 2d at 587-88.
Similarly, the SEC correspondence merely confirms that GMCR uses
fulfillment agencies in inventory management; this alone does
not demonstrate that Rathke should have been aware of the
observations of the CWs cited here.  As a result, the Complaint
"contains no particularized allegations showing that GMCR knew
or should have known that its public statements were false."
*Horowitz*, 2013 WL 1149670, at *8.

Perhaps recognizing the dearth of statements or reports
supporting an inference of conscious misbehavior or
recklessness, Plaintiffs suggest in their Opposition that "if
facts that contradict a high-level officer's public statements
were available when the statements were made, it is reasonable
to conclude" that the speaker knew or should have known of those
facts.  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).  This conclusion
relies on the core operations doctrine, which permits an
inference that high-level officers and directors have knowledge
of facts of critical importance to the "core operations" of a
company.  *See Cosmas v. Hassett*, 886 F. 2d 8, 13 (2d Cir. 1989).

The Second Circuit has yet to consider the viability of the core operations theory following the passage of the stricter pleading requirements under the PLSRA.  Courts in this circuit have suggested that "the future of the doctrine may be tenuous," considering that the PLSRA's requirement that scienter inferences be "stated with particularity" would conflict with the general allegations regarding core operations.  *In re Wachovia*, 753 F. Supp. 2d at 353.  Thus, courts have considered such allegations to constitute "supplementary but not independently sufficient means to plead scienter," *id.*, and the Second Circuit has noted this approach with approval, *see Celestica*, 455 F. App'x at 14 (finding that "allegations of a company's core operations . . . can provide supplemental support for allegations of scienter, even if they cannot establish scienter independently").  Moreover, this Court has found that the core operations doctrine "does not dispose of the general requirement that Plaintiffs allege facts available to Defendants that would have illuminated the falsities." *Warchol*, 2012 WL 256099, at *11 n. 13.  Thus, the core operations doctrine cannot support an inference of scienter on its own.

Furthermore, as in the fraudulent statement analysis, the weaknesses in the CW reports are fatal to Plaintiffs' case.  The Complaint does not demonstrate that the speakers are knowledgeable about inventory, production, or demand.  Just as

41

their statements cannot support a showing that the Class Period statements were false, their accounts also cannot support an inference that GMCR knew or should have known about the supposed falsity of the statements.

Finally, even if the Court were to find that these allegations amounted to a colorable inference of conscious recklessness, another layer of analysis is required; that is, the inference of scienter must be "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  In their motions to dismiss, Defendants offer the following inference of nonfraudulent and nonreckless intent: first, that the Company invested heavily in manufacturing capacity, increased production levels, and were left (unsurprisingly) with rising levels of inventory, which GMCR disclosed.  This innocent inference is far more cogent and compelling than the fraudulent scheme put forth by Plaintiffs. Therefore, the Court finds that Plaintiffs have not made the strong showing of conscious recklessness necessary to support an inference of scienter.

## III. Failure to State a Section 20(a) Claim Against Individual Defendants

To state a claim under Section 20(a) for control person liability, the plaintiff must show a "primary violation" of the securities laws.  *ATSI*, 493 F.3d at 108.  Plaintiffs have failed

to allege a materially false statement or scienter; therefore, the Complaint fails to establish the necessary violation. Without such a violation, Plaintiffs cannot sustain their Section 20(a) claim against the Individual Defendants.

**CONCLUSION**

Because the Complaint fails to adequately identify a false statement, much less raise a cogent and compelling inference of scienter, the Court hereby GRANTS Defendants' motions to dismiss with prejudice.

Dated at Burlington, in the District of Vermont, this 20th day of December, 2013.

/s/William K. Sessions III
William K. Sessions III
U.S. District Court Judge