```
1

2                      UNITED STATES DISTRICT COURT
                          DISTRICT OF VERMONT
3

4     _____

5  LOUISIANA MUNICIPAL POLICE        )
   EMPLOYEE'S RETIREMENT SYSTEM
6          VS                        )   CASE NO: 2:11-CV-289

7  GREEN MOUNTAIN COFFEE ROASTERS, )
   INC., ET AL
8  _____) MOTIONS TO DISMISS HEARING

9

10  BEFORE:   HONORABLE WILLIAM K. SESSIONS, III
                DISTRICT JUDGE
11

12  APPEARANCES:  MARK R. ROSEN, ESQUIRE
                      Barrack, Rodos & Bacine
13                    3300 Two Commerce Square
                      2001 Market Street
14                    Philadelphia Pennsylvania   19103
                      Representing The Plaintiff
15

16               MICHAEL K. YARNOFF, ESQUIRE
                      Kessler Topaz Meltzer & Check, LLP
17                    280 King of Prussia Road
                      Radnor, Pennsylvania   19087
18                    Representing The Plaintiff

19                    (Appearances Continued)

20

21  DATE:        December 12, 2013

22            TRANSCRIBED BY:  Anne Marie Henry, RPR
                          P.O. Box 1932
23                      Brattleboro, Vermont   05302

24

25
```

```
 1                    APPEARANCES CONTINUED:

 2   JOHN C. BROWNE, ESQUIRE
                Bernstein, Litowitz, Berger & Grossman, LLP
 3              1285 Avenue of Americas, Floor 38
                New York, New York   10019
 4              Representing the Plaintiff

 5

 6   PIETRO LYNN, ESQUIRE
                Lynn, Lynn & Blackman, P.C.
 7              76 St. Paul Street, Ste.400
                Burlington, Vermont   05401
 8              Representing the Plaintiff

 9

10   RANDALL W. BODNER, ESQUIRE
     ANNE J. PALMER, ESQUIRE
11   MARK D. VAUGHN, ESQUIRE
                Ropes & Gray, LLP
12              Prudential Tower
                800 Boylston Street
13              Boston, Massachusetts   02199
                Representing the Defendant
14

15   MATTHEW B. BYRNE, ESQUIRE
     ROBERT B. LUCE, ESQUIRE
16   MATTHEW S. BORICK, ESQUIRE
                Downs Rachlin & Martin, PLLC
17              P.O. Box 190
                Burlington, Vermont   05402
18              Representing the Defendants

19

20

21

22

23

24

25
```

```
 1

 2                 (The Court opened at 1:30 p.m.)

 3                 THE CLERK:  This is Case Number 11-289, Louisiana

 4     Municipal Police Employees' Retirement System versus Green

 5     Mountain Coffee Roasters.  Present in the courtroom on

 6     behalf of the plaintiffs are Attorneys Mark Rosen, Michael

 7     Yarnoff, John Browne, Pietro Lynn.  Also present on behalf

 8     of the defendant are Anne Palmer, Mark Vaughn, Matthew

 9     Borick, Randall Bodner, Robert Luce and Matthew Byrne.  The

10     matter before the Court is a hearing on the motions to

11     dismiss.

12                 THE COURT:  There have been motions to dismiss

13     filed in regard to all of the defendants.  And whose going

14     to argue on behalf of the defendants?

15                 MR. BODNER:  I'll argue on behalf of Green

16     Mountain, Your Honor.

17                 MR. BYRNE:  And I'm arguing on behalf of Miss

18     Rathke and Mr. Blanford.

19                 MR. BODNER:  And we had conferred before Your

20     Honor I'll take the labor in the argument --

21                 THE COURT:  Okay.

22                 MR. ROSEN:  -- in terms of any allocation of time.

23                 THE COURT:  All right.

24                 MR. BODNER:  May it please the Court, as Your

25     Honor is well aware this is the second of three lawsuits
```

1    against Green Mountain Coffee Roasters over a relatively

2    short period of time with sequential class periods.  And

3    while this is the second --

4              THE COURT:  This is chronologically the second.

5              MR. BODNER:  This is chronologically --

6              THE COURT:  It's the third in fact that have been

7    filed.

8              MR. BODNER:  You are ahead of me, Your Honor.

9    That's exactly right.  Chronologically the second.  Argument

10   had to be delayed frankly for my own.  And thank you for

11   that.

12             THE COURT:  Sure.

13             MR. BODNER:  Things are fine.  But chronologically

14   in the second, but the third in terms of its disposition

15   because as this Court is well aware the other two have been

16   dismissed.  And, in fact, we submit both in our briefs and

17   we'll argue today that this third, like the other two,

18   should be dismissed for very much the same reasons that this

19   Court has applied to the other two cases.

20             And indeed because Your Honor --

21             THE COURT:  Knowing full well that the other two

22   cases are now before the U.S. Court of Appeals in New York.

23             MR. BODNER:  Only half right, Your Honor.

24             THE COURT:  Oh, really?

25             MR. BODNER:  In fact, the Horowitz, the Warchol

1    case the plaintiffs withdrew their appeal and that case is

2    dead, buried and gone.

3              THE COURT:  Oh, really?

4              MR. BODNER:  And the third action, which I think

5    of as the Fifield action --

6              THE COURT:  Did they ever send in a note saying

7    that I did a great job in granting the dismissed motion?

8              MR. BODNER:  We just read, we just read the

9    appellate's brief last night, Your Honor.  And my impression

10   is I think you did a great job.

11             THE COURT:  I'm sure that you do in light of the

12   fact that you'll be relying both on Fifield and Horowitz,

13   but I appreciate that.

14             MR. BODNER:  But at any rate, Your Honor, so

15   anyways I'll dispense with, you know, unlike we did the last

16   time walking through Tellabs, Novak, Your Honor is quite an

17   expert at it and that will dispense with the preliminaries.

18             What I would like to do though for this case is to

19   step back a little bit.  And before we get into some of the

20   details of the non-detailed conclusory allegations I would

21   like to put before the Court just to set the stage the

22   inferences that the plaintiff would have this Court believe

23   and which we submit are far from cogent and compelling under

24   the Tellabs standard.

25             Essentially the plaintiff's claim that for the

1    first three quarters of fiscal 2011 the defendants, Green

2    Mountain and the two individual defendants, attempted to

3    perpetrate what, and these are using their words, a

4    fraudulent growth story, but that that false story of growth

5    came crashing down, the truth was magically revealed in the

6    fourth quarter of 2011.

7              Now that's a strange theory, Your Honor, because

8    how can the defendants be liable for fraud, for a false

9    growth story when by the plaintiff's own admission Green

10   Mountain Coffee Roasters, Green Mountain's net sales grew

11   year over year by 91 percent in the very quarter in which

12   the plaintiff's claim that this false story of growth was

13   revealed.

14             THE COURT:  Well, but their expectation was in

15   that fourth quarter that the growth would be somewhere in

16   the vicinity of 110 percent.

17             MR. BODNER:  No, Your Honor, actually, the

18   guidance and, again, their claim is not so much forward

19   looking statements, they are not claiming, because then you

20   would be hearing arguments about the safe harbor that this

21   Court is very well aware from the Golaskorski case.

22             They are talking about historical false

23   statements, not false forward looking statements.  And if

24   they are, we'll talk about the PSLRA's safe harbor provision

25   that this Court is very well aware of, because it was the

1  basis of the --

2          THE COURT:  No, I mean their, I appreciate the

3  fact that they are not relying upon the fact that there was

4  supposed to be 110 percent growth, it was only 91 percent

5  growth.  They are using that as an example, as I understand

6  their pleadings, to say that there was this plan in place

7  over the first, second, third quarter, going into the fourth

8  quarter, to begin to expand inventory, to make sure that

9  there is a growth going, their production levels increased,

10  their obsolescence levels increased and as a result they

11  could show to the marketplace that this, in fact, is a

12  company which continues to grow as evidenced by their

13  production figures.  I assume that that's right.  That's

14  their scheme.

15          MR. BODNER:  Well, that's the alleged scheme.  My

16  only point, Your Honor, and then we'll get to the rest of

17  their theory, is that it is still odd nonetheless to say

18  that this was a false growth story when the very quarter in

19  which the truth was supposedly revealed growth was 91

20  percent year over year.

21          And indeed, and the plaintiffs are quick to

22  support the idea that you can talk about post-class things

23  where events, were they irrelevant that what happens during

24  the class period.  If you look at their theory in Q1 of 2012

25  the very next quarter growth was 102 percent where the

1    company had projected growth of 85 to 90 percent.

2              THE COURT:  So that's why they stopped the class

3    period at the fourth quarter as opposed to go to the fifth?

4              MR. BODNER:  Well, Your Honor, it's their

5    pleadings.  And what they do is they say that the truth was

6    somehow revealed that it was a false growth story with 91

7    percent growth.  And if this was so false one would expect

8    the wheels to be coming off in subsequent quarters as well

9    and indeed quite the opposite.  Growth in Q1 of 2012 was

10   102 percent when the company had projected 85 to 90 percent.

11             Second point is that we submit, Your Honor, that

12   that is a very odd, strange theory, not a strong compelling

13   inference, but it gets even stranger because the plaintiffs

14   claim that the defendants lied to the public during the

15   class period, that Green Mountain was straining, they lied

16   that it was straining to produce enough K-Cups to meet the

17   increase in demand.

18             And I'll get a little later into what was actually

19   said during the class period because as we lay out in our

20   briefs what was actually said versus what the plaintiffs

21   allege were said are two completely different things.  I'm

22   not sure they are even on speaking terms.

23             But nonetheless their theory is that Green

24   Mountain lied during the class period that it was straining

25   to keep up with demand when in reality they say that Green

1    Mountain was actually drowning in inventory.  That in

2    reality they say there was a massive surplus of excess in

3    expired product flooding their company's warehouses, but the

4    plaintiffs do not challenge nor could they, Your Honor, that

5    Green Mountain disclosed and did in fact spend hundreds of

6    millions of dollars during the class period and before and

7    after the class period, hundreds of millions of dollars to

8    increase manufacturing capacity.

9              So to believe the plaintiffs one has to accept the

10   inference that Green Mountain to continue the mirage so they

11   say of being a growth company that the company actually

12   spent hundreds of millions of dollars, again a figure they

13   don't contest, hundreds of millions of dollars to build more

14   production capacity, to produce more perishable product that

15   it could not sell, indeed it could not even sell the

16   products that it had on hand.

17             THE COURT:  I had one factual question.

18             MR. BODNER:  Yes, Your Honor.

19             THE COURT:  I think probably you are the best to

20   answer.  CW1 I think is Knoxville, I think CW1 was in

21   Knoxville, indicated that the increase in inventory began in

22   the first quarter of 2011 after a number of new machines

23   were purchased to increase essentially production, inventory

24   and production; is that right?  Was there in 2010 a

25   significant investment, late 2010 a significant investment

1    from Green Mountain Coffee Roasters into production,

2    machinery, brand new machines, brand new production plans

3    and efforts?

4              MR. BODNER:  Your Honor, investment into new

5    machinery from Green Mountain I believe was in 2010, 2011

6    and into 2012.  I mean I believe the figures are even in

7    2012 it was close to a half a billion dollars in terms of

8    2012, not this class period, of additional manufacturing

9    capacity that they were investing in.

10             I mean to put this in perspective, Your Honor, in

11   the year before 2011 they had sold two billion, two billion

12   K-Cups.  In 2011 it was four billion with a B, four billion

13   K-Cups, I mean the amount -- in North America.  The amount,

14   the volume is staggering.

15             And it takes a lot of lines.  The lines are about

16   half the length of this room, the individual lines.  There

17   are a lot of lines that are required in order to go from two

18   billion to four billion in a very short period of time.

19             So back to the point in the inference the

20   plaintiffs would have this Court believe that even though it

21   was purportedly drowning in inventory and it could not sell

22   what it already had it continued to invest hundreds of

23   millions of dollars in producing more perishable product

24   that it purportedly could not sell.

25             That is not only not a cogent and compelling

 1    inference it is a non-sensical one for were it true, were

 2    there a fiction of that scale, and had there been such

 3    incredible investment in needless, useless build up of

 4    capacity to service some phantom demand why haven't the

 5    wheels come off this company in the two years since the

 6    class period has ended?

 7             And indeed, Your Honor, as you can take notice of

 8    the stock price yesterday closed at around $75 per share.

 9    It just doesn't add up.

10             Furthermore, to step back from the larger view and

11    into the complaint --

12             THE COURT:  Just bring up the last few years.  In

13    2012 it was 102 percent the first quarter.  So has the, has

14    the increase in sales continued on this particular pace that

15    is somewhere between 90 and a hundred percent?

16             MR. BODNER:  No.  It started to level off

17    somewhat.  I think the last figures I saw was somewhere

18    60 percent growth, which is still the envy, I mean find a

19    company since 2008 that would have 60 percent growth year

20    over year and that would be pretty amazing.  But as you can

21    imagine as the numbers get larger, as you go from two

22    billion to four billion there begins to be a leveling off.

23    You know, the magnitude of the product is still huge but as

24    one would expect --

25             THE COURT:  Interesting.  Just as an aside

1      Starbucks has developed this product which competes with

2      K-Cups.  Has that had a significant impact?

3              MR. BODNER:  I'm not an expert.

4              THE COURT:  Yeah, right.

5              MR. BODNER:  I'm not an expert, but I sure as heck

6      drink Green Mountain Roaster Coffee.

7              THE COURT:  You do?

8              MR. BODNER:  Yeah, for a number of reasons.

9              But, Your Honor, to, to turn to the, to the

10     complaint here it's important to point out that an

11     additional reason besides just the frankly nonsensical

12     inferences that they would have this Court draw is the

13     plaintiffs really do not challenge at least in any

14     meaningful non-conclusory way the company's financial

15     statements.

16             The complaint fails to establish even a false

17     statement let alone a cogent compelling inference of

18     scienter.  Stripped of its nefarious fin in its conclusory

19     allegations the complaint fails to reveal false anything

20     that Green Mountain or any of the defendants said that it

21     had done, was doing or would do during the class period.

22             The defendants clearly disclosed that from the

23     first quarter through the third quarter of 2011 that it was

24     investing, as I've already said, significantly in increased

25     production capacity.  There's no allegation that that

1    capital expenditure or those future estimates of large

2    capital expenditures were in any way false.  They don't take

3    any issue with that.  They don't claim that.

4          There's also no meaningful challenge to the

5    quarterly net sales results that were disclosed by the

6    company.  Indeed, to that point, it would be somewhat, to

7    that very point, nonsensical to claim that Green Mountain

8    spent hundreds of millions of dollars to increase production

9    capacity to make K-Cups it could not sell but still manage

10   extraordinary year over year sales throughout the class

11   period.

12         And indeed, as we cite in our brief, during the

13   class period, in the first quarter of 2011 net sales grew

14   67 percent.  In the second quarter of 2011 year over year

15   sales grew 101 percent.  In the third quarter of 2011

16   127 percent.  The fourth quarter 91 percent.  And then in

17   the first quarter, as I mentioned of 2012, sales grew

18   102 percent.  Hardly a company where the wheels are coming

19   off.  And the plaintiffs make no serious attempt in any way

20   to challenge those sales results.

21         They also don't have any meaningful challenge in

22   the complaint consistent with what's required under the

23   PSLRA to meaningfully challenge the inventory accounting,

24   the numbers that were reported.  Either the inventory

25   numbers or the obsolescent reserves were never restated.

```
 1   Not then, not now, not ever, during or after the class
 2   period.
 3           Nor have the plaintiffs provided any
 4   particularized facts, any facts to establish that they
 5   should have been.  The CW's that they put forward about the
 6   excess unreported inventory do not satisfy the Novak
 7   standard, a standard that this Court is very familiar with.
 8   They were low-level operational people.  Their allegations
 9   that they attribute to them, there is no probability
10   whatsoever that any of those low level workers had any
11   incite into the enterprise level of accounting for
12   inventory, obsolescence reserve or any other reported number
13   at Green Mountain.
14           And they are anecdotes, and that's all they are,
15   they are anecdotes from their confidential witnesses that
16   are utterly untethered to any timeframe, let alone a quarter
17   or quantity.
18           And there is no identification whatsoever, and the
19   Court can read this complaint forwards, backwards and
20   sideways to find that there were ever any reports, any
21   claims of inventory crisis, any issues with the obsolescence
22   reserves in any way, shape or form during the class period
23   or after that was ever presented to Mr. Blanford, the CEO,
24   Miss Rathke, the CFO, or any other officer or anybody else
25   at Green Mountain.  Unlike what's required in Novak and the
```

1    other cases, and indeed as this Court has cited in its own

2    decisions, there's nothing in this complaint.

3            THE COURT:  Let me just ask you, just taking you

4    back to 2010.  In 2010 as a result of a re-statement of

5    their profit-loss statement --

6            MR. BODNER:  Yes.

7            THE COURT:  -- they acknowledged that there was a

8    problem with their controls, with their demand controls,

9    with the demand system to be able to actually assess what

10   the demands are going to be in the future, but also problems

11   with their inventory control.  And as a result I think that

12   Mr. Blanford and Miss Rathke then took on the responsibility

13   of controlling the remediation plan that was set in 2010,

14   which suggests that they must have been extraordinarily

15   sensitive to inventory issues from that point forward, that

16   they should be following it because they've got the

17   responsibility to actually follow through with this

18   remediation plan.

19           So then from the plaintiff's perspective they see

20   these instances of warehouses being filled with product,

21   oftentimes product being no longer saleable because they've

22   expired.  And I appreciate the fact that there is some

23   debate even though the numbers go up that the percentages to

24   inventory don't go up.  But basically there's, there seems

25   to be an undercurrent of stocking up inventory, letting

1    product expire, problems with an inventory system which
2    theoretically Mr. Blanford and Miss Rathke should be aware
3    because they are particularly sensitive to inventory because
4    of the remediation plan.  And also they clearly stated to
5    investors that they are on top of the inventory situation.
6    So how do you respond to that?
7              MR. BODNER:  A number of ways, Your Honor.  And
8    with all due respect, the restatement in 2010 did not have
9    anything to do with demand forecast, nothing whatsoever.
10   Demand forecasting became an issue of focus disclosed to the
11   market more when you got into 2000 -- the first two quarters
12   of 2012 after this class period.
13             THE COURT:  That's interesting because that was
14   very much a part of, it was a part of the Horowitz decision
15   because there were a number of individuals, I think one of
16   the, one of the CW's I think was, I think it was CW2, which
17   I think is CW8 in this case, is somebody who said they have
18   no way of predicting reliably what the demand is going to be
19   in the future and that was a part of the problem that was in
20   the Horowitz case.
21             MR. BODNER:  Your Honor, to be, with all due
22   respect --
23             THE COURT:  Tell me -- no, you don't have to say
24   with all due respect.  If I'm wrong I'm wrong and tell me
25   that.  That's fine.

1          MR. BODNER:  No, you're half right.

2          THE COURT:  Oh.

3          MR. BODNER:  The restatement --

4          THE COURT:  Which half?

5          MR. BODNER:  The restatement in 2010 had nothing

6    to do with demand forecasting whatsoever.  In fact, it was a

7    relatively small restatement that had a lot of accumulated

8    problems.  And the only thing that was inventory related

9    actually had to do with inter-company valuations because

10   when you do your -- you roll up your financials and while

11   you report sales between subsidiaries and amongst

12   subsidiaries, when you report those numbers out to the

13   public you consolidate that and you don't record as a sale

14   even for internal purposes.  While you record for a sale

15   from one subsidiary to another you would never record that

16   as a sale to the public because it's within the company.

17          THE COURT:  Sure.  Now, that I appreciate.

18          MR. BODNER:  So as part of that consolidation a

19   lot of the restatement inventory there were certain errors.

20   And that's all they were, they were errors that had to do

21   with inventory valuation not maintenance, not excess

22   inventory, not obsolete inventory, none of the issues they

23   are claiming are in play here.

24          None of them had anything to do with the

25   restatement.  There was not -- they didn't find a bunch of

1    obsolete product that should have been written off and

2    wasn't.  It had nothing to do with the 2010 restatement.

3              You are right though that there was a CW, an

4    anonymous source in Horowitz, as there is, and we think it's

5    the same one in this case, where they say --

6              THE COURT:  CW8.

7              MR. BODNER:  The CW8.  In 2010 he had purportedly

8    had conversations about inventory.

9              THE COURT:  I thought it was a she.

10             MR. BODNER:  No, I think that is -- oh, it could

11   be a she.  I think you may be right, Your Honor.  But I

12   think you're right.  You're right.  But had conversations

13   with Mr. Wettstein and Holly in 2010, but as this Court held

14   in Horowitz and, frankly, we submit as it should hold here,

15   that was outside the period.  She left long before the class

16   period and there's no particularity about what she was even

17   talking about anyway.

18             THE COURT:  But she was saying at that time.  I

19   mean she left in 2010, but she was saying at that time that

20   there was a significant problem with managing inventory,

21   with understanding inventory as well as predicting or

22   forecasting demand.

23             I thought that was her thrust.  And as a result it

24   was not because of the restatement, I take your word for it

25   their re-statement was not dealing with this issue, but it

```
 1    was or the underlying problems at that point with Green

 2    Mountain Coffee Roasters' financial structure for a lay

 3    person's definition.  And so basically Mr. Blanford and

 4    Miss Rathke took on the responsibility of this remediation

 5    plan which included much more broad questions about demand

 6    structure and demand forecasting and inventory issues.

 7            And then I think the plaintiffs would be saying,

 8    you know, they have really taken on this responsibility of

 9    making sure that the inventory systems are in place and

10    reliable and here we have a pattern of, admittedly from,

11    from low-level employees describing these abuses of

12    inventory.

13            You know, whether they've got sufficient evidence

14    to show that product is being moved out of MBlock around the

15    block while the auditors are there and then come back and

16    put it back in I, you know, that's another question.  But at

17    least isn't that part of their theory?

18            MR. BODNER:  Your Honor, again, the remediation

19    plan was geared at the restatement which did not have to do

20    with the, you know, any issue that was supposed to exist in

21    terms of obsolete or excess inventory which seems to be the

22    thrust of what they are claiming here.

23            THE COURT:  So you don't think the fact that they

24    were involved in the remediation plan puts them on notice

25    that there may be significant problems with inventory
```

1    controls?

2              MR. BODNER:  Well, again, Your Honor, there's,

3    there's no allegation of any link to Mr. Blanford or

4    Miss Rathke of any problems.  And, furthermore, putting

5    aside CW8 during 2010 there's no allegation in this

6    complaint whatsoever of there being any class period problem

7    with the accounting for inventory, either in terms of having

8    excess inventory that was never recorded or obsolete

9    inventory or the obsolescence reserve was improperly

10   calculated.  There is no allegation at all during the class

11   period.  And Your Honor has held that CW8 was before the

12   class period, no incite to what happened in the class

13   period.  Even what little bit she says and doesn't describe

14   even what the problems presumably were, there is nothing,

15   nothing in this complaint that talks about problems.

16             And whether Mr. Rathke or Mr. Blanford were

17   focused on inventory, I'm sure they were focused on a lot of

18   things, there is absolutely nothing consistent with Novak,

19   consistent with this Court's own decisions, and nothing even

20   approaching the decision cited by the plaintiffs on the

21   other side, that would in any way indicate that there was

22   this growing problem or an awareness of a problem of excess

23   and unreported obsolete, unusable inventory beyond what was

24   already being disclosed to the markets.

25             There is none of that type of, of evidence

1    allegation of fact in this complaint as there needs to be

2    for them to establish that somehow the reports in the

3    financial statements, any of the numbers attributed to

4    inventory was wrong.  They need much more than the anecdotes

5    of low-level employees that they provide here.  And they

6    have none of that.  None of that.

7           Your Honor, just sort of very quickly to move into

8    the motive allegations, and I'll defer to my brother for the

9    individuals more on that, but in terms of the motive

10   allegations there are five challenged sales.  Four of those,

11   I'll be very quick here, four of those challenged sales were

12   pursuant to 10B 5-1 plans that had been put in place.  I'm

13   sorry, 10b 5-1 plans, that were put in place very early in

14   the alleged class period and there's nothing magical about

15   the class period other than looking for the low, looking for

16   the high, and alleging that that's when the alleged fraud

17   took place.  But there is no indication when these plans

18   were entered on May 5th of 2011 there were any known adverse

19   facts other than conclusory allegations to Mr. Blanford and

20   Miss Rathke.  No discretion as to timing or amount for the

21   four sales.  The fifth sale a day later by Mr. Blanford um,

22   again, there is nothing to call into question that those

23   sales were in any way based on any knowledge of insider

24   trading.

25           THE COURT:  Well, I mean the fact is from, just

1    taking Miss Rathke, she started in the company, as I

2    understand it, in 2003.  She had not cashed in any of her

3    options or stock until that point.  And she then sells

4    337,000 shares and she makes 32 million dollars plus which

5    in Vermont standards is, is a lot of money.

6              MR. BODNER:  Your Honor, in Boston that's a lot of

7    money.

8              THE COURT:  Right.  That's a lot of money.

9              MR. BODNER:  It is a lot of money.

10             THE COURT:  And so does the fact that there's a

11   lot of money being earned by Miss Rathke, and she never

12   cashed in anything before, suggest to you that there might

13   have been some thought or some plan, you know, I appreciate

14   that a lot of what she sold was back to 2003 and was going

15   to expire, but still a lot of money.

16             MR. BODNER:  It is a lot of money, Your Honor.

17   But that's why I appreciate Your Honor who isn't just going

18   to look at that and stop doing any analysis as was frankly

19   took place in Fifield when you looked at Mr. Stiller's

20   66 million dollars in sales.  And size doesn't control here

21   because more of that is required.

22             THE COURT:  Well, it was a little different in

23   regard to Mr. Stiller.  Mr. Stiller's role was quite a bit

24   different.  He also had actually disclosed the fact that he

25   was, well in advance he was going to want to get rid of or

1    sell, not get rid of, sell two million shares and so he sold
2    one million shares.  So it's part of a larger context.  But
3    that's, that was 66 million dollars.  Yeah, that's, that's
4    --
5              MR. BODNER:  That's a lot of money.
6              THE COURT:  That's a lot of money.
7              MR. BODNER:  Your Honor, but, again, as you're
8    well aware, as you have said, and in fact quoting The Second
9    Circuit, I believe context matters.  And when you look at
10   the context here there was a plan, but it was not a
11   nefarious plan.  And it's important to understand the
12   context.
13             Yes, she had not sold shares since 2003, but
14   remember there was a very, and this came up in Horowitz, a
15   very prolonged period when they could, senior officers could
16   not trade because they went through four acquisitions and a
17   number of strategic investments so they could not trade.
18             And when she sold her shares remember the
19   operative date is May 4th of 2011, not August of 2011 when
20   the shares were sold.
21             THE COURT:  Can I just ask a purely legal
22   question?
23             MR. BODNER:  Yes, Your Honor.
24             THE COURT:  We're on a motion to dismiss.  We're
25   essentially looking at the complaint to determine whether it

```
1    satisfied the legal standards essentially.  And I appreciate
2    that this is unique because it's a securities fraud --
3              MR. BODNER:  Right.
4              THE COURT:  -- and it has these unique
5    responsibilities, unique, well, responsibilities basically.
6    But when you start throwing out well of course there were
7    all these, there was this period of time in which they could
8    not sell because of all of the purchases that Green Mountain
9    Coffee Roasters were engaged in, is that something that the
10   Court can consider?
11             MR. BODNER:  Well, there are a couple of things.
12   Yes, I think the Court can consider it.  There are --
13             THE COURT:  Why is that because that's essentially
14   a defense and that is not in the complaint?
15             MR. BODNER:  Well, let me start with this.  The
16   Court can certainly consider 10b 5-1 plans.  The law is very
17   clear about that.  The Court can look at the Form 4's and
18   decide whether 10B 5-1 plans apply or not.  That's exactly
19   what this Court did in both Horowitz and the Golaskorski
20   case.  So the Court can look to that.
21             Furthermore, under Tellabs in assessing, in
22   assessing whether or not there is a cogent and compelling
23   inference the Court is not just allowed it is required to
24   look not just at the four corners of the complaint, but it
25   is also permitted, required to look at judiciably noticeable
```

1   facts.  We submit that --

2            THE COURT:  Judiciably.

3            MR. BODNER:  Judiciable facts that the Court can,

4   can notice as a matter of law.  And in an instance in which

5   it is clear undisputed --

6            THE COURT:  Can I do that then?  Can I actually

7   take her representation that or your representation that she

8   could not sell her shares or exercise her options during

9   many years up until 2011 when the window opened?

10           MR. BODNER:  Well, Your Honor, what you can do is

11  you can look at documents that are referenced in the

12  complaint.  Tellabs says that.  And in the disclosures that

13  are referenced in the complaint about these sales the

14  company itself discloses that on March 4th of 2011 it wasn't

15  just Mr. Rathke -- Miss Rathke or Mr. Blanford, it was eight

16  other directors and officers.

17           THE COURT:  Right.  There were 10.

18           MR. BODNER:  There were 10.

19           THE COURT:  Right.  And that is in the complaint.

20  In other words, there's a reference in the complaint to a

21  document which shows that the window has been opened up --

22           MR. BODNER:  That a number of --

23           THE COURT:  -- and 10 people went through.

24           MR. BODNER:  There's a disclosure that a number of

25  officers have and directors have entered 10B 5-1 plans.

1    And, frankly, the reason companies make those types of

2    disclosures is that if they see insider selling people start

3    to get nervous because does that mean something bad is going

4    to happen coming down the pike.  So they want to provide

5    explanations.

6              And so I think that because, you know, those sales

7    have been referenced the Court can take that, that type of

8    evidence into consideration.

9              And what I can say is certainly you've read the

10   decisions as well as I have.  A lot of courts, you know,

11   take cognizance of whether there are open windows or not.

12   Again, it's a data point.  It's a data point.  We don't say

13   it's the dispositive point.  We think there are lots of

14   dispositive points.  It's a data point.

15             So, Your Honor, on, you know, moving from the

16   motive allegations, again, which if you have more detailed

17   questions I can answer now, later or --

18             THE COURT:  Mr. Byrne will be speaking to that.

19   That's fine.

20             MR. BODNER:  Thank you.  But let me now move to

21   the innocent inference that we feel and submit under Tellabs

22   is much, much more compelling than frankly what we submit is

23   the nonsensical inference that the plaintiffs are trying to

24   sell to this Court.

25             Green Mountain was a dynamic growth company with a

relatively new innovative product.  Fiscal year of 2011 was
a period of extraordinary rapid expansion, both in terms of
the demand for its product and the sale of its product.
Going from two to four billion, were a B, K-Cups.

There was a huge expansion of its production
capacity that was invested to the hundreds of millions of
dollars leading into the class period, during the class
period and following the class period.

The defendants told the market that it was
increasing production capacity in order to increase
inventory in order to meet the increased demand.  They told
the market that.

When demand in the fourth quarter fell beneath
what it had expected it was only, and I really do mean the
quote marks around only, that the demand for the fourth
quarter in this high flying jet machine of breaking new
territory with a new novel product that was growing hand
over fist when year over year growth and the fourth quarter
was only, in quotes, 91 percent as opposed to the projected
100 to 105 percent, Green Mountain experienced a brief
increase in its inventory.  No surprise there.  No fraud
there.  Perfectly logical.  The markets, had they been
watching, knew that.  Is it a gray fact, you know, in terms
of an investor?  Not necessarily so.  Is it fraud?
Absolutely not.  Some demand didn't, didn't --

1          THE COURT:  All right.  So you think the increased

2     amount of inventory was because you didn't read, meet the

3     projections that you had set?

4          MR. BODNER:  No, Your Honor.  No.  I think --

5          THE COURT:  Because I thought the, in the, in the

6     first statement from Mr. Blanford back in the first quarter,

7     the first quarter statement what, or maybe this was during

8     the interview, I guess this was maybe during the interview,

9     he had said that they are going to try to build up the

10    inventory to give them a cushion for the fourth quarter when

11    the holidays hit and that that was -- this was all a

12    projected plan to increase inventory so that they've got

13    some money in the bank.

14          MR. BODNER:  Your Honor, you are very close to the

15    facts.  And I, and I appreciate that.  And you're right.

16    There are two things going on here.  The predominant, the

17    way you get to that level of inventory, and I'll get to that

18    in a second, is it was part of a plan.  They absolutely

19    where building inventory.  They were building inventory in

20    order to serve growing demand.

21          At the same time they had projected as best they

22    could that demand in Q4 would be, Miss Rathke said in a

23    conference call, high 90's to 100, 105 percent.  And the

24    guidance they gave to the market for Q4 it was 100 to

25    105 percent.  It came in at 91 percent.

1          So clearly there could be some uptick in inventory

2     attributable to that, but really the elephant of inventory,

3     the huge part of it was absolutely part of, as they said in

4     Q1 we're capacity constrained, we need to build more

5     manufacturing capacity.  In Q2 they said, we're catching up.

6     And in Q3 we've caught up.  Why?  Because they are putting

7     more lines online in order to produce coffee in order to

8     build inventory.  That was the ramp up in inventory.

9          In Q1, which is the holiday season under the

10    fiscal year for Green Mountain, that demand, which was, you

11    know, projected, some demand projected to 100, 105 in Q4, it

12    comes in at 91 in Q2, well, again, the world doesn't work by

13    fiscal quarters.

14         In the holiday season, Q1 of 2012, the company had

15    projected I believe 85 to 90 percent.  Growth came in at

16    102 percent.  So, you know, again, as part of the flow of

17    the business, particularly this high growth business, it is

18    not only an innocent explanation it makes the most sense and

19    it no way leaves room for any cogent or compelling inference

20    of fraud that somehow there was a false story either as to

21    inventory or as to, or as to the growth of the company.

22         And, in fact, to talk about excess and expired

23    inventory or any of it being hidden look at what the company

24    reported and disclosed throughout Q1, throughout the class

25    period, the alleged class period.

1          In the first quarter it disclosed inventory of 269

2    million dollars.  In the second quarter the company

3    disclosed inventory of 309 million dollars.  And in the

4    third quarter it disclosed inventory of 417 million.

5    Clearly a disclosed ramp up of inventory.

6          And that ramp up in inventory is consistent as

7    your Court, as Your Honor noted with what the executives had

8    been telling the market.  That they were capacity

9    constrained in Q1.

10          And look at our brief and look at the disclosures.

11    When they really talk about capacity constraints and

12    struggling to catch up with capacity they say that in Q1.

13    They clearly say it and they embark in order to address it

14    to get ready for the holiday season, Q3 and Q4.

15          In the second quarter they tell the market that

16    they are catching up to demand in Q2 due to more

17    manufacturing capacity coming online.  And indeed if you

18    look not at the way the plaintiffs spin it or allege it, we

19    think mischaracterize it, but you look at what was actually

20    said in Q3 is that they had caught up to short-term demand.

21          Did they think that they were going to have to add

22    more production capacity to get demand in the next year and

23    the year beyond that?  Yes.  Were there plans disclosed to

24    do that?  Yes.  But in terms of meeting this holiday demand

25    in their disclosures for Q3 they said we think we're there.

1   We've got enough capacity online.

2          And all of the discussions and the conversations

3   with analysts, unlike the cases that are mostly cited by the

4   plaintiffs, is not a concern, geese, do you guys have too

5   much inventory?  Are your optimal inventory levels or your

6   inventories, are you sure you are not too much inventory, is

7   this aging inventory a problem.  All of the questions were

8   are you going to have enough, will you have enough

9   inventory.  And every answer was geared at from the

10  perspective of you've been capacity constrained in the past

11  are you still capacity constrained, will you have enough

12  inventory.

13         So, again, the disclosures, the disclosures that

14  were actually made, not as characterized, are perfectly

15  consistent with the disclosures of the ramp up of inventory

16  throughout.

17         Now, because they don't have any hard facts the

18  plaintiffs resort to these CW accounts of lots of inventory.

19  And those are, for reasons I've already covered, they are

20  insufficient.  They are anecdotal.  Nowhere do they plead

21  that there was a misstatement of the financials with any

22  sufficiency to show that this build up of inventory, again,

23  where they are selling four billion K-Cups a year somehow

24  was not properly recorded.

25         There's no specificity as is required as to

1   timeframe, as to quantity.  There's an obvious explanation

2   for the buildup and the ramp up of inventory that people are

3   observing.  It's part of the plan.  It's what they need to

4   do.  It's what they are telling the market they are going to

5   do.

6          And, in fact, to quote Your Honor, as you said in

7   Horowitz, the disposal of significant quantities of expired

8   product is hardly surprising for a company that produces

9   massive quantities of perishable goods.  And those massive

10  quantities of perishable goods were even greater during this

11  class period than during the Horowitz class period.

12         Now the plaintiffs have alluded to this.  They

13  resort to limited allegations about product that was

14  supposedly moved from facilities in advance of audits.  And

15  the implication somehow from that is that this is improper

16  conduct that was hidden and not disclosed.

17         But they supply through these anecdotes none of

18  the particularity that's required to establish a false

19  statement let alone any type of false statement in, in the

20  financial statements.

21         There is no timeframe in any way, shape or form

22  what quarter that any of these so-called pre-audit movements

23  relate to.  And that's actually very important.  And let me

24  spend one minute there.

25         The class period is Q1, Q2, Q3.  They are

1    challenging statements made and contained in quarterly

2    filings, 10 Q's.  And as the 10 Q's state on their face

3    those are non, unaudited financial statements.  Green

4    Mountain, like every other public company I am certainly

5    aware of, do not audit their quarterly financial statements.

6    Their audits are for their annual financial statements.  And

7    audits are conducted in connection with and leading up to

8    the close of the fiscal year not the fiscal quarter.

9           And so in these complaints when they don't give

10   time periods, they don't give quantity, there's nothing

11   attributes into the quarter, that's important in part,

12   again, a data point, is that what audits are they even

13   referring to.  Because the face of the, of the financial

14   statements themselves that are in issue here are unaudited.

15   They are not audited.

16          Specificity is required under the PSLRA as a

17   filter to keep out strike suits for a reason.  And, and here

18   that filter when applied doesn't work because their

19   allegations, they are anecdotal, they are unspecified and

20   they don't add up, they don't make sense.  I don't even know

21   what audits they could possibly be referring to.

22          In fact, CW's 2 and 7 that they use for that they

23   don't even say what product they are talking about; brewers,

24   K-Cups, coffee bags.  No reference to that in any way, shape

25   or form.  And their CW's certainly --

```
1            THE COURT:  Well, the full financial audit is

2    different than the inventory audit I assume.  What you are

3    suggesting is that even inventory audits, that's the

4    determination as to what the size of the inventory is only

5    happens once a year?

6            MR. BODNER:  Well, I can't --

7            THE COURT:  Is that right?

8            MR. BODNER:  I can't represent to Your Honor when

9    inventory audits, but what their reference is about outside

10   auditors, outside audits in many of their allegations.  And

11   when they are talking about outside audits it would be odd

12   for there to be, if not unheard of, to have an outside audit

13   of inventory in Q1 when the audit would be of the entire

14   year's financial statements.

15           And, in fact, actually, Your Honor --

16           THE COURT:  But that's, isn't that apples and

17   oranges?  I mean you're talking about an audit of a

18   financial statement.  You are not going down to production

19   facilities and trying to count what the inventory quantity

20   is, you're taking figures that have been determined by

21   others.

22           I would assume, I thought this was almost, when

23   they were talking about audits it was somebody trying to

24   figure out what kind of inventory existed.

25           MR. BODNER:  But, Your Honor, they make reference
```

```
 1    at various points to outside auditors.

 2            THE COURT:  Oh, all right.

 3            MR. BODNER:  And so that's what, I'm only, again,

 4    Your Honor, I am, you know, I'm not trying the case.  I'm

 5    arguing to dismiss the complaint.  So I'm going in part what

 6    they are saying in the complaint.  And they are saying about

 7    outside audits.  You know, they refer to outside auditors.

 8    And all I'm saying is to the extent they are referring to

 9    outside auditors it doesn't make any sense.

10            THE COURT:  Can I just move you to a different

11    topic?

12            MR. BODNER:  Yes.

13            THE COURT:  Because there is 500,000 brewers that

14    were being sent to, is it QVC?

15            MR. BODNER:  Yes.

16            THE COURT:  Can you just tell me, you know, just

17    summarize what, what is the situation there?  You are

18    suggesting that if there were 500,000 of these things that

19    were kept somewhere around, first of all, there's no proof

20    that necessarily this was registered as a sale, but more

21    than that, if there's 500,000 of these around you filled I

22    think it was countless numbers of trailers or mobile homes.

23            MR. BODNER:  I think it's hundreds, Your Honor.  I

24    mean to put that in perspective, I'm sorry, --

25            THE COURT:  Yeah, I'm just interested.  What, is
```

1    that right?  I mean --

2           MR. BODNER:  Yes.  We actually, if you look at our

3    brief, Your Honor, the way we -- the way we put it in our

4    brief is that, you know, if you take the -- if you take the

5    size of the brewer box and you multiply that times -- if you

6    multiply that times 500,000 and you divide that by a

7    40-foot, was it a 42-foot 18 wheeler tractor-trailer, you

8    come up with hundreds of tractors and trailers.  I mean this

9    would be moving an Army of brewers.

10          To put it in perspective, again, a company that is

11   selling four billion K-Cups you sell a lot of brewers in

12   order to sell four billion K-Cups on an annual basis.

13          And the, the purported 500,000 brewers that were

14   supposed to just go to QVC constitute, would constitute,

15   have constituted 40 percent, 40 percent of all brewer sales

16   that were reported for that period.

17          THE COURT:  Isn't this very simple to find out

18   whether it ever happened?

19          MR. BODNER:  It did not happen.  Your Honor, I

20   mean I'm arguing on a motion to dismiss.

21          THE COURT:  Right.

22          MR. BODNER:  And what I am saying is that as the

23   principal legal argument, the principal legal argument, Your

24   Honor, is that, the legal argument, is that the -- it fails

25   on the face of the complaint.  Why?  Because even the

1   plaintiffs, even the plaintiffs put it in conditional, maybe

2   if, maybe this, possibly potential language.

3           They don't even say that it happened.  And they

4   say it never left the dock.  And as this Court is well

5   aware, you know, the two hours I spent in oral argument in

6   the Horowitz case explaining the published -- and this

7   period there's no question about the disclosed revenue

8   recognition policy.  It has to leave the dock, it has to be

9   shipped from MBlock before revenue is recognized.

10          The plaintiffs in their own allegations say it

11  didn't even leave the dock.  So there was no revenue

12  recognition event.  And they plead no facts with no one who

13  satisfies the Novak standard that somehow the company failed

14  to abide by its revenue recognition policy.

15          So for the very same reasons this Court dismissed

16  Horowitz is exactly applies here as a legal matter.  But if

17  your Court is asking did this happen, the answer is no.  And

18  I would assume that the SEC who opened an investigation in

19  2010 would have been like hell, fire and brimstone on this

20  company had it actually happened.

21          THE COURT:  As you remember in the Horowitz case

22  the SEC investigation was still pending.  Is it still

23  pending?

24          MR. BODNER:  It's pending so far as we can tell.

25  It has nothing to do with MBlock in any way, shape or form.

1    It's hard to tell what they are doing because it's been

2    sitting out there.  They haven't closed the file.

3            THE COURT:  So it still exists?

4           MR. BODNER:  It still exists, but, Your Honor,

5    they are not in the habit of telling us what they are going

6    to do or not going to do.

7            THE COURT:  Really?  Okay.

8           MR. BODNER:  But at any rate so if you're asking

9    about, you know, I'm not up here arguing as a factual matter

10    it didn't happen.  I don't think that the Court need go that

11    far in terms of kicking this claim out.  What I am saying is

12    a legal basis, just like Horowitz, there's no revenue

13    recognition event because that's the allegation um, that on

14    the face of the complaint they themselves say it didn't

15    leave the dock, they themselves put it in very tentative

16    terms.  But, furthermore, it is, it is a logical and

17    logistical nonsensical proposition.

18            THE COURT:  Impossibility.

19           MR. BODNER:  Impossibility.  Especially you would,

20    you would have a lot more confidential witnesses out there

21    than you would now than one person from N. block talking

22    about 500,000 brewers that supposedly were specially packed

23    and unpacked and moved back.  Um, it just, it just doesn't

24    make sense, it doesn't add up.

25           Your Honor, if you would like, I know I've been

1    going on for quite a while, I feel unless you feel that

2    there's not an issue address their allegations concerning

3    the obsolescence reserve because that is contained within

4    their, within their complaint.

5              THE COURT:  Sure.  You can address that.

6              MR. BODNER:  The plaintiffs challenge the reported

7    obsoletion reserves as somehow being underreported during

8    the class period.  And they do that based almost exclusively

9    on CW4 who, again, is identified as a machine operator.  You

10   know, not anyone that has anything to do with accounting by

11   any stretch of the imagination and indeed is at a, you know,

12   a respectable, but nonetheless, a low-level, you know,

13   hourly position.

14             THE COURT:  Well, they extrapolate from what he, I

15   guess it's a he, observed to its logical extension.  This

16   would have meant numbers far in excess of what is reported

17   in the obsolescence figures that you've submitted; right?

18   That's basically what --

19             MR. BODNER:  Well, you know, extrapolated in an

20   enigma, you know, wrapped in a speculation, to completely

21   destroy the quote from Winston Churchill, this is a pure

22   speculation, you know, an extrapolation based on pure

23   speculation.

24             And, in fact, you know, just to take a small

25   example, Your Honor, there's no -- first, this is a machine

```
 1   operator who has absolutely no incite, possibility of

 2   incite, let alone probability of incite, into any enterprise

 3   accounting.  But there's not even -- they don't even talk

 4   about, well, are you talking about the product from a

 5   revenue perspective what it would get or from a cost

 6   perspective which is how it would be calculated which is why

 7   you can't rely -- why Novak requires more than certainly

 8   what these plaintiffs have offered here.  But, furthermore,

 9   we're talking about an obsolescence reserve.  And that has a

10   special place in The Second Circuit which is, you know,

11   obviously as the Court has -- it's a very sophisticated

12   court and it knows what reserves are all about.

13           And the law around whether or not a false

14   statement can be plead with regard to reserve it's treated

15   more like an opinion.  And in the Wachovia case it is, you

16   know, it makes clear that if, if plaintiffs are going to

17   succeed in challenging a reserve, and as the company itself

18   has disclosed, there is a lot of intense judgment or to

19   quote the company significant judgment that is applied to

20   setting the reserves.

21           And in order -- in The Second Circuit this Court

22   defined a false statement as to reserve that's adequately

23   plead under the PLSRA they have to plead not only that the

24   obsolescence reserve was wrong.  They haven't even done

25   that.  They have to plead that it wasn't believed at the
```

1    time, that there was -- they didn't have faith in it, that

2    the opinion which was at root, the judgment did not hold.

3             THE COURT:  Well, they are using CW4 to say that

4    the figures were wrong despite the fact that they actually

5    don't necessarily confront the figures themselves.  They

6    don't necessarily say that the obsolescent figures are wrong

7    in their pleadings.  They are suggesting that CW4, if you

8    take logically what he observed, and you extrapolate to its

9    logical conclusion, then it must have been wrong, but

10   there's no proof of that.

11            MR. BODNER:  Well, but, Your Honor, not only is

12   there PSLRA sufficient pleading of that because if that held

13   then the Court in The Second Circuit would suffer from a

14   plethora of reserve challenges where they can get a floor

15   worker to say something and then extrapolate enterprise-wide

16   on a multi-billion dollar company.  To extrapolate that the

17   reserves were wrong I think any fidelity to The Second

18   Circuit decisions on what's really required in order to

19   challenge a reserve through the filter of the PSLRA for more

20   is required in extrapolation based on speculation,

21   particularly unspecified speculation, about what dollar

22   figures are they really even talking about.

23            THE COURT:  Okay.

24            MR. BODNER:  So in that regard, furthermore, Your

25   Honor, you have to understand that in terms of the

1    obsolescence reserve look at what this company faced.  I
2    mean this was a dynamic environment of not declining demand,
3    huge increasing demand, trying to manufacture inventory to
4    keep up with mind numbingly large numbers of increasing
5    demand for a perishable product.  I mean that is not an easy
6    job to do.  And you know what?  They did a pretty good job
7    of it.
8          As we've argued in, in our brief if you look the
9    variation of the obsolescence reserve is actually remarkably
10   good.  It varies some as one would expect, but there's no,
11   the, the fourth quarter when the plaintiffs purport that the
12   truth was revealed the obsolescence reserve goes down.  It
13   goes from point nine to point eight.
14         They try to make much out of the fact that, you
15   know, in absolute terms it doubles when you get into Q1 of
16   2012 that trend up is, actually matches the trend up in, in
17   Q1 of 2010.  There's a blip, not a huge blip, and when you
18   compare that to the huge number of sales, the 102 percent
19   growth in sales in Q1, it hardly is a case like
20   Scholasticate, Atlas or any of the other cases where the
21   wheels were coming off of a business or, or the Novak case
22   involving Anne Taylor where product that was clearly
23   obsolescent and should have been recorded as such during the
24   class period is revealed later by huge massive writeoffs and
25   admissions that it was old product.

1          There's none of that.  There's not even a hint of

2  that here.  And they certainly don't have the witnesses

3  under Novak that could anywhere get close to making that

4  pleading requirement as required under, under the law in The

5  Second Circuit.

6          THE COURT:  All right.  So maybe we should, do you

7  have something else quick because --

8          MR. BODNER:  No, Your Honor, --

9          THE COURT:  -- Mr. Byrne is --

10          MR. BODNER:  I think I've said my peace.  I very

11  much appreciate your patience and apologize for the length,

12  but thank you.

13          THE COURT:  You don't have to apologize for the

14  lenth.  I would say I am guilty of contributory negligence.

15          MR. BYRNE:  Good afternoon.

16          THE COURT:  Good afternoon, Mr. Byrne.

17          MR. BYRNE:  I'm primarily going to address the

18  state of mind issues related to Miss Rathke and

19  Mr. Blanford.  And before I get into those, you know, there

20  was some discussion about CW8 in your colloquy with

21  Mr. Bodner.  And there's three points, actually four points

22  that I would like to make about that.

23          The first is CW8 the allegation, as far as I can

24  tell when I was flipping through the complaint, comes out of

25  Paragraph 127.  And that relates to corporate scienter.

1    There's no connection at all as there is with any witness

2    here to, that shows any sort of knowledge on behalf of Ms.

3    Rathke or Mr. Blanford.  And the plaintiffs themselves

4    recognize that that doesn't go to that because they put it

5    in the corporate scienter.

6         THE COURT:  Right.  I think that that is true in

7    this particular case.  I thought if CW8 is the same as CW2

8    or 3 in the earlier, the Horowitz case, there's some

9    allegation that in fact CW8 had direct connection with

10   Stacy, is it Stacy, Holly and Wettstein who then were very

11   close with your clients.  And there was some argument that

12   there should be some expectation that their recitation of

13   the things that CW8 said would have been shared with your

14   clients.  But you're right that's not in this class period,

15   it's not in this case.

16        MR. BYRNE:  Which gets to what was going to be the

17   third point, which I'll now make the second point, is that

18   this sort of allegation is one of these must have known

19   allegations which clearly under The Second Circuit law is

20   not something that's permissible.  You can't, you know,

21   plead out a bunch of facts and say based on that they must

22   have known.  So, you know, --

23        THE COURT:  Well, there is that core, there's the

24   core doctrine which still exists, although I guess it's

25   under attack, but theoretically the base of that doctrine,

```
 1    if it's still applicable, is if you are in a particular
 2    position in a company you are expected to know what is going
 3    on under those things which are of particular concern.  And
 4    so that's why I bring up, you know, the whole question of
 5    the remediation agreement because your clients were
 6    responsible for the remediation plan and to enforce it.  And
 7    is there something analogous to the core doctrine there
 8    which suggests that they should have known what was going on
 9    with inventory?
10              MR. BYRNE:  Well, and that was the second point,
11    which is now my third point, is that in paragraph --
12              THE COURT:  Your second point or your third point?
13              MR. BYRNE:  My third point is that the restatement
14    is not something that's mentioned in Paragraph 127.  And
15    that's, you know, it's, again, getting -- and it's also, as
16    Mr. Bodner pointed out, it's factually much different than
17    what the allegations here are.  And Mr. Bodner did a good
18    job going through that.
19              But more generally I wanted to get back to the
20    scienter part of this.  And it's clear that the plaintiffs
21    have failed to show either motive and opportunity or
22    conscience recklessness.
23              There's no motive in this case.  And I want to
24    start with Mr. Blanford.  There's just no way that his stock
25    sales could be unusual.  And there's three points here.  I
```

```
1    think the most important one is that these stock sales
2    occurred on the third Tuesday of every month in about the
3    same amount, the final three stock sales.
4              THE COURT:  And they extended into the following
5    year, as I recall, --
6              MR. BYRNE:  Yes.
7              THE COURT:  -- into the beginning of the next
8    fiscal year 2010 -- 2012.
9              MR. BYRNE:  Right.
10             THE COURT:  And it always was approximately 50,000
11   shares.
12             MR. BYRNE:  It was approximately about that
13   amount.
14             THE COURT:  I mean it's a lot of money.  Don't
15   you, I mean, I don't mean to be overwhelmed here, nor do I
16   mean to suggest that I'm naive, but your argument is, well,
17   this is a relatively small amount, he only made 16 million.
18   Well, pretty soon you're getting into real money.
19             I appreciate if you, if you take what I've said
20   about considering options as well as the actual stock you
21   own, including that, his percentages is relatively low, less
22   than 20 percent.  So, you know, I appreciate your argument
23   in that respect.  It's just, I guess this is just a
24   different world.
25             MR. BYRNE:  Yeah.  Well, as far as context goes my
```

1    first job I made two dollars an hour and my uncle took out

2    all the food that I ate.  So what I currently make now is,

3    would be a lot of money compared to what I made when I was a

4    kid.

5            THE COURT:  Great.  So let's see I didn't know

6    that you were that old.  You must be 90, 95?

7            MR. BYRNE:  Well, you know, it's on the farm.  I

8    think the wage regulations were a little different there.

9    But, in any event, I think it's really crucial.  What that

10   point brings out is that the context is critical to any sort

11   of inquiry.

12           And when you're talking about numbers in an

13   absolute sense what you really should be looking at is how

14   it fits into the context of the entire thing.  And as the

15   Mr. Blanford sale was that he retained 88 percent of his

16   holdings.  And it makes no economic sense for him to go for

17   the quick buck here.

18           What he's really doing is, is concern about the

19   long-term growth of the company.  And there would be no

20   reason for him to do this.

21           And the third point here is that he had, you know,

22   as you recognized, they had stock sales both before the

23   class period and after the class period which indicates that

24   there's a regularity.  But if Mr. Blanford's stock sales are

25   viewed, you know, as unusual there's really no corporate

1    executive anywhere that could ever sell stock.

2            I mean this is on a very regular pattern.  It's

3    happening every third Tuesday of the month.  And as you

4    noted in the Fifield decision it's over a much longer period

5    of time and there's regularity that's been established.

6            For Miss Rathke's stock sales, again, they are not

7    unusual.  And there's three points that I have here.

8            The first is that this 10B 5 trading plan was set

9    more than three months before the sale.  And there's no

10   allegation in the complaint that she entered into the plan

11   with any sort of knowledge as, knowledge of what was

12   actually alleged to have been going on in this complaint.

13           And the stock sales took place -- the second point

14   is that the stock sales took place more than two months

15   before the disclosure of any alleged negative information.

16   And, you know, at a certain level of generality when you

17   start to try to compare inferences there's, there's a

18   fundamental inconsistency with what the plaintiffs are

19   saying here.

20           At one level they are saying that the company

21   cannot see into the future because of this demand planning

22   issue, but on the other hand they are saying that

23   Miss Rathke has near clairvoyance with being able to predict

24   the stock price that's three months in advance even though

25   there's external forces out there that are acting on the

1    stock price.  Like, like, you know, the Ihorn (ph)

2    presentation and the short sellers out there.

3            So that it just doesn't hold -- that sort of story

4    just doesn't hold together that somebody would be able to

5    predict the stock price three months in advance with as much

6    uncertainty that was out there with short sellers.  As we

7    said in our brief this is a short seller's dream.  It just,

8    the story just doesn't make sense.

9            And the final thing I think we -- the final point

10   on Miss Rathke's stock sales is that it should include the

11   options.  And when you do include the options it's, it's

12   35 percent when all the options are included or 38 percent

13   when you're talking about, when you are excluding the

14   un-exercisable options.

15           Again, you are in the same sort of economic

16   position where it makes more sense, if you are holding onto

17   that much stock it makes more sense that you're invested in

18   the long-term.

19           And the other point about the options is that

20   there is --

21           THE COURT:  Would it be fair to say then by a, by

22   just calculating 33 million it's only 35 percent of her

23   entire holdings, her holdings are close to a hundred million

24   dollars in stock?

25           MR. BYRNE:  I think that's, I think the math is

```
 1    correct, although I'm not always great at doing math on the
 2    spot.  I think you're correct.
 3              THE COURT:  And she had been working there eight
 4    years at that point?
 5              MR. BYRNE:  Yes.
 6              THE COURT:  That's pretty good pay.
 7              MR. BYRNE:  Right.  And I think that's --
 8              THE COURT:  It's pretty good pay anyway.  I'll get
 9    over this at this point, but --
10              MR. BYRNE:  But I think it is a important point
11    when you said the eight years that she had been working
12    there.  You know, the reason that the company was even in
13    the position that it was in was due to the, you know, the
14    hard work of all of the people that worked at the company.
15              And when you look at economic motives even at the
16    pre-sale, the pre-class period sale price she certainly had
17    motives to exercise the options because even, and I think my
18    math is correct on this, even at the pre-class period sale
19    price it was 20 percent, it was 20 times what the option
20    strike price was.
21              And as the case that the plaintiffs pointed out
22    looking at the, looking at the option strike price and
23    seeing what the sale price would be is sufficient to give a
24    non-culpable explanation of why they would go out and do
25    this.
```

1          And in this case it makes perfect sense.  If the

2    strike price is a buck 59 and the price is 20 times that

3    there's adequate non-fraudulent reasons to go out into the

4    market and do this.

5          Two points on the scienter for both of them.  The

6    first point is that the participation in the remediation

7    plan and the public disclosure, instead of indicating that

8    they were engaged in some sort of state of mind for a

9    fraudulent intent, that actually shows that it cuts against

10   that.

11         And the cases that we've cited in our brief show

12   that when they are engaged in this public disclosure and

13   remediation that is actually that you draw the inference the

14   other way.

15         And the final, the final point on this, on the

16   motive and opportunity that there are really no facts

17   alleged, no specific facts that are alleged in the complaint

18   that connect either Miss Rathke or Mr. Blanford to any sort

19   of the alleged fraud that's occurring here.

20         I want to touch briefly to the conscience

21   recklessness.  And there's two points here.  One is that

22   there's no confidential witnesses that had any contact with

23   Mr. Blanford or with Miss Rathke.  And that's, that is

24   significant.  You know, they are trying to create a story,

25   but none of the story goes to Mr. Blanford or Miss Rathke.

1          And the second thing is that the plaintiffs do not

2    specifically identify any sort of report or conversation

3    that would have alerted Blanford or Rathke to the falsity of

4    their statements.  And I think that's telling in a lot of

5    ways.  You know, when you are trying to put together a

6    complaint I understand that you're trying to artfully draft

7    it, but the things that are missing are often determinative

8    of, you know, what, the way this motion should be decided.

9          And the things that are frankly missing in this is

10   that there are no comp, there's no contact with either Mr.

11   Blanford or Miss Rathke.  And there's no reports that

12   specifically identify -- there's no report or conversation

13   that's specifically identified by the plaintiff that would

14   have alerted them to the, to the alleged falsity of their

15   statements.

16            THE COURT:  All right.  Okay.

17            MR. BYRNE:  Thank you.

18            THE COURT:  I appreciate it.  Let's take a 15

19   minute recess at this point so you can prepare your

20   arguments.  And we can take a brief break and be back in 15

21   minutes.

22            (The Court recessed at 2:38 p.m. and resumed at

23   2:55 p.m.)

24            THE COURT:  Whose going to argue on behalf of the

25   plaintiff?

1              MR. LYNN:  Mr. Rosen, Your Honor.

2              THE COURT:  Okay.  Good afternoon.

3              MR. ROSEN:  Good afternoon, Your Honor.  Thank you

4    for giving me the privilege of being here.  I'm Mark Rosen

5    for the plaintiffs.  I'm joined by my friends and colleagues

6    Mr. Browne from Bernstein Litowitz firm, Mr. Yarnoff from

7    the Kessler Topaz firm and most importantly one of our

8    client representatives Mr. George Neville and Assistant

9    Attorney General from the State of Mississippi.

10             THE COURT:  Okay.

11             MR. ROSEN:  Your Honor, has --

12             THE COURT:  This must be an adjustment as far as

13   the temperature outside.  Do you like it?

14             MR. ROSEN:  I think he's -- I think he's ready to

15   go home, Your Honor.

16             Your Honor, I don't want to assume facts not in

17   evidence.  And I don't want to assume your state of mind,

18   but it appears you have a good grasp of some of the issues

19   that are involved in the two prior cases in your colloquy

20   with defense counsel.

21             So what I'd like to do, unless Your Honor has any

22   issues with it, is I'd like to talk briefly about why this

23   case isn't like the Green Mountain one and why it's not like

24   Green Mountain three.  I'm going to refer to them that way

25   because in some of those cases you have one name on a

1   complaint and another name on the opinion as I recall be it

2   Warchol or Horowitz or Fifield or whatever so I --

3              THE COURT:  Well, they are totally different class

4   periods.  One is 2010.  The other one is 2012.  And you're

5   right in the middle, 2011.  So you can refer to them as the

6   year I suppose.

7              MR. ROSEN:  Well, you know, I think we're the

8   Goldilocks case; not too hot, not too cold, just right.

9              THE COURT:  Just right.

10             MR. ROSEN:  Just right.

11             THE COURT:  That's great.

12             MR. ROSEN:  Your Honor, --

13             THE COURT:  I never heard that argument before.

14  We are just right.

15             MR. ROSEN:  Thank you.  I hope Your Honor reaches

16  that conclusion at the end of the process.

17             THE COURT:  Right.

18             MR. ROSEN:  Your Honor, these cases, although they

19  involve the same corporation, are very, very different.  And

20  let me just spend a moment explaining why we think they are

21  different.

22             Case one, the earliest case, the 2010 case I

23  guess, involved a claim of revenue recognition.  Our claim

24  in our case Green Mountain two involves a case of inventory.

25  Revenue recognition because it's an accounting concept,

1   obviously there's a serious question, Your Honor was not

2   satisfied that low-level confidential witnesses knew how

3   revenue was being recorded and therefore had a basis for

4   saying that the revenue was improperly recorded.

5        Our case is not an accounting case in that

6   respect.  Our case focuses on inventory.  And as Your Honor

7   noted in your colloquy with Mr. Bodner a low-level employee

8   on the, on the line, so to speak, can certainly observe

9   massive quantities of inventory piling up to the rafters,

10  massive quantities of inventory being disposed of.  That's

11  the first distinction.

12       The second distinction from Green Mountain one in

13  that case there was this very smell of insider selling.  And

14  it was, in terms of individuals it was by non-defendant

15  officers or senior leaders.  And Your Honor rightly did not

16  attribute insider selling by persons who were not defendants

17  to the individual defendants or the corporation.

18       In our case there's I believe roughly 49 million

19  dollars of inside selling by not low-level people, but by

20  defendants, the CEO and the CFO.  And I'll talk more about

21  that at length, but that, that was, as Your Honor's colloquy

22  with Mr. Bodner indicated, that's, A., a very significant

23  amount of money dollar-wise, and, B., the circumstances were

24  very unusual.  And I'll be glad to talk about that in a

25  moment.

1              The third distinction is the allegations in our

2     case were in a sense corroborated by the end of the class

3     period because one of the things that happened in our case

4     is that the defendants felt -- defendant, the company, fell

5     short of expected revenue by 50 million dollars and yet it

6     reported a 250 million dollar jump in inventory.

7              Now, think about it for a minute.  I'm not a

8     businessman, I've never been a businessman, but if I'm going

9     to have a dollar of revenue presumably it's not going to be

10    based upon a five dollar item being sold for a dollar.  I'm

11    going to have some -- the cost of the goods sold, as I

12    learned in the one accounting course I ever took, is going

13    to be some fraction hopefully of that dollar in order for me

14    to have a profit.

15             So it is very difficult for defendants to

16    reconcile a shortfall in the expected revenue of 50 million

17    corresponding to the sudden jump in inventory by 250 --

18             THE COURT:  Right.  I was actually thinking about

19    it as I asked Mr. Bodner about whether he says that the

20    increase in inventory amount in the fourth quarter was

21    because of the, not reaching the expectation of 105 million

22    dollars, etcetera, in light of the statement that was made

23    by Mr. Blanford at quarter 1 in which he said they are going

24    to try to increase inventory so that they don't have these

25    shortfalls in the future and is that the reason why there

1    was an increased amount in the fourth quarter.  Because you

2    made a strong point that, well, this makes no sense, 250

3    million dollars and, in fact, you know, their shortfall was

4    only 50.  So that doesn't justify the increase in inventory.

5          Well, the increase in inventory was, in fact, at

6    least in part, if you take literally what Mr. Blanford said

7    in quarter 1, and I'd like you to respond to that, he

8    basically said, you know, we don't want to be in this

9    situation again, we want to start to increase inventory so

10   that we can meet expectations as we go into the next --

11         MR. ROSEN:  In the future.

12         THE COURT:  Yes.

13         MR. ROSEN:  Let me address it this way, Your

14   Honor.  There is no problem with increasing production

15   capacity.  There's no problem with increasing inventory.

16   The problem is in essence an issue of disclosure.  This

17   company was characterized as growth stock.  Mr. Bodner and

18   his client justifiably take pride in its high rate of growth

19   which obviously induced the market to a very high

20   appreciation of the stock.

21         During our seven month class, approximately seven

22   or nine month class period, the price of the stock

23   quadrupled.  So the market obviously viewed it as a good

24   sign.

25         One of the most obvious metrics for the market

1   viewing a company like this as, it's still a growth company,

2   it's not resulted into a mature company with a much lower

3   growth rate is that inventory is being bought, not only

4   being produced, but is being consumed.

5         So if I were in a business of let's say selling

6   pet rocks and I say I think the business is going to

7   quadruple and therefore I'm going to dig up so many more pet

8   rocks and I think it's going to sell and I say to the market

9   I'll quadruple my supply of pet rocks, I think it's going to

10  sell, that's not a problem.  The problem is if it's not

11  selling and I don't tell the market that.

12        And so the issue is they had to not only increase

13  capacity but they had to show the market that the capacity

14  was being absorbed.  And you have statements throughout the

15  class period.  An example is a statement made in May,

16  May 3rd at a conference call for investors in which they

17  said we're not building any excess inventories at all.  That

18  was said by the president of one of the subsidiaries.  Not

19  the defendant, but the president of one of the subsidiaries.

20  And that was Paragraph 110 of the complaint.

21        And then one week later the company had its

22  secondary offering and sold nine and a half million shares

23  and raised 81 million dollars.

24        So what we say in effect, when Mr. Bodner or his

25  colleagues say how is this rational, how does the underlying

```
 1   theory of our claim make sense it's this, defendants had a
 2   growth company, they represented it to the world as a growth
 3   company.  And so they decided that they wanted to continue
 4   to grow and say we continue to increase capacity.  If it
 5   sold, great, the company would continue to be profitable and
 6   they would have significant profits, but if it didn't sell
 7   they would use the announcements about the inventory and the
 8   lack of disclosures that it was building up as time to cash
 9   out and make very significant profits, as Your Honor noted
10   in your colloquy with my brothers at the bar, about the tens
11   and millions of dollars that were pulled out.
12           So it's sort of a heads I win tails you lose
13   position.  Either we're going to build up inventory and sell
14   the inventory and we'll have all the profits.  Or in the
15   case of Miss Rathke, she was with the company for nine
16   years, never sold a dollar's worth of stock, all of a sudden
17   says I'm going to take a very significant portion of my
18   holdings and sell them out so I'll gain that way.
19           THE COURT:  Just go back a little bit to your
20   reference to that other statement that was made about
21   increasing inventory.  It was -- that, frankly, was
22   confusing to me.  It was by the head, Stacy --
23           MR. ROSEN:  Michelle Stacy I think.
24           THE COURT:  Yeah, okay.  Michelle Stacy in which
25   she indicated, at least it seemed to me that she was
```

1    indicating that they were not in fact building up inventory.

2              MR. ROSEN:  Correct.

3              THE COURT:  That it was being sold right away.

4    And this was at what, quarter 2, is that when she made the

5    statement?

6              MR. ROSEN:  It was May 3rd I believe.  So it was

7    three months into the class period.

8              THE COURT:  Okay.  So then is that not, in fact, a

9    statement inconsistent with what Mr. Blanford said at

10   quarter 1 in which he said we're going to try to build up

11   inventory by increasing production so that we can satisfy

12   the, the needs of the future?

13             MR. ROSEN:  Well, I interpret them as both being

14   consistent in this sense; in both cases they are saying

15   there is significant demand for our product.  The earlier

16   statement by Mr. Blanford said we'll respond to that demand

17   by ramping up production capacity and Miss Stacy saying the

18   flip side of that and all of that capacity is being absorbed

19   because we're not building up any excess inventory.

20             If Mr. Blanford said we're building up capacity

21   and then three months later or some other time during the

22   class period Miss Stacy or anyone else said it's ballooning

23   in the warehouse the market price of the stock would not

24   have quadrupled during the class period as reflected by the

25   very significant drop in stock price at the end.

```
 1              THE COURT:  Issue number one, what's the false
 2    statement?  What are you saying literally is the false
 3    representation or omission which is at the heart of your
 4    complaint?
 5              MR. ROSEN:  The false statement in this case is
 6    not an income statement, it's not a revenue recognition
 7    statement, it is that the, the inventory, the excess
 8    inventory is not accumulated.  We're saying we are not --
 9              THE COURT:  So the heart of your fraud is in fact
10    what she said, Michelle Stacy said?
11              MR. ROSEN:  The heart of our fraud is the
12    statements throughout the class period in which they said we
13    don't have an excess inventory problem.  And --
14              THE COURT:  Okay.
15              MR. ROSEN:  And what happened toward the end of
16    the class period is there was the Einhorn report.  We can
17    debate its significance or lack of significance.  I remember
18    when I was in law school -- and defendants say, well, he's a
19    notorious short seller and he has an incentive and I'm sure
20    he does.
21              When I was in law school one day, I didn't have
22    the gray hair I have right now, I was waxing poetic to one
23    of my classmates about the press and what a wonderful job
24    they do preserving our freedoms.  And my classmate who was
25    wiser than his years turned to me and said, you think they
```

1  do that on purpose.  And he was right.  You know, of course

2  Mr. Rineheart has an incentive.  But, nonetheless, the

3  things that he said forced the company to come clean a month

4  later and basically confirmed these statements in the sense

5  that there was, in fact, a mass amount of excess inventory.

6        And between Mr. Einhorn's statement and the

7  disclosures at the end of the class period there was a very

8  substantial drop in the company's stock price.

9        So those are the principal differences.

10        THE COURT:  So when you are in your, I just asked

11  you that specific question, what's the false statement.  It

12  isn't necessary the literal false statement that

13  Mr. Blanford made in quarter 1 and it is clearly a

14  misstatement that Miss Stacy made because I didn't see that

15  in your pleading.

16        MR. ROSEN:  Well, I apologize if I wasn't clear,

17  Your Honor.  And I'll accept responsibility for that.

18        THE COURT:  Okay.  So that comes as a, comes as a

19  little bit of a surprise it's like, well --

20        MR. ROSEN:  Well, let me amend that slightly.

21        THE COURT:  Because that's the first thrust of

22  their, of their claim.  No, no fraudulent statement.  And

23  now you are suggesting that when she said that there's no

24  excess capacity, meaning no extra inventory, so that she is

25  essentially representing to would be investors or soon to be

1    investors, you know, we're selling everything that we

2    produce, that is the heart of your fraud claim?

3              MR. ROSEN:  That is.  And just to modify my

4    comment slightly, Your Honor.  When you said there's no

5    false statement at the beginning, you know, cases can be

6    viewed as misrepresentation cases or omission cases and

7    sometimes it's two sides of the same coin.

8              From my perspective if you announce we are

9    embarked or have already embarked on a massive increase in

10   inventory production and you don't say in the next breath

11   and it's filling the warehouses that can be viewed as an

12   omissions case for not having said the second half of that

13   or it can be viewed as a misrepresentation case.  But

14   clearly as the class period progressed and they are making

15   statements that we do not have excess capacity, we are

16   solely producing to meet existing needs, I respectfully

17   submit that that's not a complete and truthful statement.

18             THE COURT:  So then how, how can you show that Mr.

19   Blanford, when he made that statement, knew that, in fact,

20   the warehouses were being filled?

21             MR. ROSEN:  There are, there are at least two

22   answers, Your Honor.  Your Honor spoke about the core

23   operations doctrine which in one of Your Honor's prior

24   opinions in, I think it was Green Mountain one.

25             THE COURT:  Avoided addressing the issue.

1        MR. ROSEN:  Well, as I recall Your Honor saying,

2  Second Circuit has not resolved whether it's still viable

3  doctrine, but both sides, at least in that case, or

4  presumably the defendants in our case, agreed that it's a

5  factor to be considered.

6        So that obviously ties also into Miss Rathke and

7  Mr. Blanford's responsibilities in light of the change in

8  the inventory controls and all that issue.  So it's clearly

9  something that ought to have been in front of them.

10        Certainly when, as we've alleged, so many

11  different confidential witnesses at so many different

12  locations saw the massive build up in inventory.  That is

13  certainly a basis for it.

14        THE COURT:  But I thought the person who started

15  talking about the warehouses being overflowing --

16        MR. ROSEN:  Correct.

17        THE COURT:  -- was CW2 I think it was.

18        MR. ROSEN:  Your Honor, I'm sorry, I've reached

19  the point in my life where I can't remember one versus

20  another.  But I certainly --

21        THE COURT:  Well, I'll tell you in a second

22  because I wrote it down.

23        MR. ROSEN:  Thank you, Your Honor.

24        THE COURT:  Yup.

25        MR. ROSEN:  But there's a second part of my

1    response to Your Honor's question.

2         THE COURT:  The point was that this didn't, I

3    guess it was CW1.  The machinery was bought in 2010 and then

4    production began to increase.  So it was in 2011 when all of

5    a sudden you start to see more and more inventory.  In fact,

6    that's the, that's consistent with the statistics of the

7    inventory.  It begins to build in 2011.  Is there any

8    indication that somebody spoke to Mr. Blanford or

9    Miss Rathke and told them, you know, we're building up

10   inventory here?

11        MR. ROSEN:  Your Honor, if the question is do I

12   have an informant who is Mr. Blanford's executive assistant

13   or his golfing partner the answer is no.  If the question is

14   did they have access to information, and that's, as I

15   understand it, the defendants used that line in their brief.

16   And it caught my attention because that, in fact, is the

17   standard in The Second Circuit.  Know or have access to

18   information.  They clearly had access to information about

19   the inventory situation.

20        The second half of my answer to Your Honor's prior

21   question about how did they know is the metrics issue.  We

22   talk not just about the 50 million shortfall in sales

23   resulting in 250 million excess of inventory, which as I

24   respect, would respectfully suggest I would suggest they

25   were either very bad businessmen and businesswomen if they

were planning on selling five dollars of inventory for one

dollar in sales that they didn't make or that the numbers

don't make sense.  But the other metrics we talked about are

talking about the turn over ratio and the average case to

sell.  We set forth those in the complaint.  And we showed

how the trend in both of those calculations is inconsistent

with their representations that they were not building up

excess inventory.

In short, and I'm not an accountant, but in short

what they are saying is if you are constrained in terms of

your inventory and it's not building up the average days to

sell should not be going up.  And, in fact, they were.

And if you're constrained in your inventory and

it's, and you don't have excess inventory your inventory

turn over ratio should be going down.  And it went, you

know, or -- so those two things are off.

So between 50 versus 250 million, the inventory

turn over ratio and the days to sell ratio, all those

indicate that it doesn't make sense.  You add in Miss Rathke

and Mr. Blanford's responsibilities in light of the prior

restatement and you add in the core operations doctrine,

this obviously was a core factor to the company.

I mean this is a company that sells K-Cups more

than anything else.  And let me just make the record clear.

There's nothing wrong with K-Cups and there's nothing wrong

1   with Keurig machines.  I have one in my home.  I have one in

2   my office.  And I use one or the other almost every day and

3   I'm very grateful for it.  But it's a question about

4   misrepresentations about inventory.

5          But let me just spend a moment explaining why we

6   don't think this is like Green Mountain three as well.

7   Green Mountain three -- as I said Green Mountain one was a

8   revenue recognition case.  Green Mountain three was a

9   forward looking statement case.  Mr. Bodner correctly

10  pointed out that that's governed by the safe harbor

11  provisions of the PSLRA and Your Honor concluded they had

12  given appropriate warnings.

13         THE COURT:  And that was the heart of the

14  decision.  You're right.

15         MR. ROSEN:  Our case involves false statements of

16  present fact.  Not false projections.

17         And another significant factor that bedeviled the

18  plaintiffs in that case is they had only three confidential

19  witnesses.  At least two of them had left the company two

20  years before the class period.  And Your Honor correctly

21  said how can I infer that someone who left the company in

22  2010 knows what was going on in 2012.

23         Now, on the issue of candor we had one, perhaps

24  two of our nine confidential witnesses who had left the

25  employ of either Green Mountain or MBlock, the inventory

1   fulfillment company, before the class period.

2          THE COURT:  Yeah, but one of your primary ones.  I

3   mean I thought you had 10.  I thought there were two who

4   held management kinds of positions.

5          MR. ROSEN:  Right.

6          THE COURT:  CW8 was I thought the most significant

7   witness that you had.  And I thought it was a woman and she

8   left in 2010.  And then --

9          MR. ROSEN:  Well, Your Honor, --

10          THE COURT:  -- you know, maybe I'm getting

11   confused about cases.  They all sort of blend together.  But

12   she, you know, clearly said that she had a conversation with

13   someone who was also still present at Green Mountain and

14   they hadn't changed their inventory controls.

15          MR. ROSEN:  Correct.  Correct.  And in terms of

16   whether it was a man or a woman all I can tell Your Honor is

17   when we drafted the complaint we had real names and we took

18   them out and put in the CW, CW1, CW2. I made sure in the

19   drafting process we never indicated gender because I didn't

20   want to do anything further on it.  So my memory is it's

21   like you turn off the computer the memory bank clears.  I

22   don't remember which ones were men and which ones were

23   women.

24          THE COURT:  It's not important.  CW8, wasn't CW8

25   somebody who was, who really was the only person who could

1    actually talk about the methods of inventory control and,

2    but she was gone by the middle of 2010?

3            MR. ROSEN:  I believe Your Honor is correct, but

4    when I, before I retire from the podium I would just confer

5    with my counsel to see if they have a better memory.

6            The third big difference between Green Mountain

7    three and our case is the trading plan adopted in Green

8    Mountain three had been adopted before the start of the

9    class period.  We provided Your Honor with citation to

10   authorities that said adopting a trading plan during the

11   class period is not a defense.  In fact, it gives rise to

12   some basis for scienter precisely for that issue.

13           And there's another issue about trading plans I

14   wanted to make before I forgot because I've got a lot on my

15   plate here.  The regulation itself that adopts 10B 5 dash 1

16   plans specifically references that one of the elements to a

17   10B 5-1 plan as a defense is the party's good faith.

18           And we cited to Your Honor in our brief, and I

19   would be glad to give Your Honor those citations if needed,

20   the fact that good faith is a factual question.  And for

21   that reason I respectfully submit that Your Honor may have

22   overstepped where you should have been in the prior case in

23   granting a dismissal on the adoption of a 10B 5 plan at the

24   motion to dismiss stage.  It's an affirmative defense.

25           And one of the concerns I have in this case Your

Honor noted PSLRA is sort of a weird duck and it's unlike
other motions to dismiss.  And in Your Honor's colloquy with
Mr. Bodner you asked what about this fact, what about that
fact.  And I would respectfully suggest Your Honor that they
are sort of putting Your Honor at risk of creating errors by
going beyond the record.

They can certainly cite to public filings to say
this is what was disclosed to the market.  They cannot cite
the public filings as proof of what they are saying.

And that's what they did in their discussion of
how many, how much space would be taken up by half a million
brewers.

Also they -- Your Honor can't be asked to accept
factual assertions in the brief.  So the individual
defendant's reply brief at one point said plaintiffs
overlooked the many innocent reasons why Rathke did not sell
her stock earlier including she was focused on her
responsibilities at Green Mountain.  And that was at Page 14
footnote 9, 19 of their reply brief.  They can't do that,
Your Honor.

I remember years ago hearing a comedian talking
about how he had a near death experience and his life
flashed in front of him.  And it wasn't until a moment later
he realized it was the wrong life.  And that's sort of how I
feel right here in this situation.

1          THE COURT:  Wrong life or wrong wife?

2          MR. ROSEN:  Your Honor, I have to go home in two

3    days so I would plead the Fifth Amendment on that.

4          THE COURT:  Well, that's, so that, you are

5    absolutely correct.  I'm sensitive to trying to, to figure

6    out what facts actually can be relied upon.

7          MR. ROSEN:  Correct.

8          THE COURT:  And of course the defendants said that

9    if you take a look at the complaint you see the documents

10   that were relied upon in the, in the complaint essentially

11   adopted by reference or at least relied upon in some

12   significant way then those facts are a part of the

13   complaint, you can rely upon them.  It's a delicate line.

14         MR. ROSEN:  Right.  And to tell the back story of

15   that doctrine, Your Honor, there was a time when some

16   plaintiffs would file a complaint that misleadingly quoted

17   from a passage in a securities filing.  And the defendants

18   would want to quote the other passage in the securities

19   filing that told the rest of the story.  And plaintiff's

20   counsel said, no, you can't consider it.

21         And the Courts starting I guess with The Second

22   Circuit, which is another court of securities litigation in

23   general said, no, you can't do that.  If you quote Page 1 of

24   the 10K they can quote Page 20 of the 10K.  That's the

25   doctrine as I understand it.  But you can't quote Page 20 in

1    the 10K to establish the truth of what's written on Page 20.

2    You can only show this is what the market knew or was told

3    in the 10K.  And that's, that's a problem that they have.

4              And that leads me to a more general sense that

5    much of what is --

6              THE COURT:  But that does sound like it's more of

7    a hearsay.

8              MR. ROSEN:  Well, it's not just hearsay.  You

9    know, the first part of the 10K is hearsay too.  What it

10   really relates to is there are factual issues present here.

11   There's a factual issue as to was the trading plan adopted

12   in good faith.  There's a factual issue in terms of, you

13   know, what happened with the brewers, things like that, that

14   require the development of a factual record.  And that makes

15   it -- Mr. Bodner may very well prevail on a summary judgment

16   motion, but that's not what we're here for today.  What

17   we're here for is a motion to dismiss.  And I would

18   respectfully suggest that they haven't met that requirement.

19             Now, one point that's significant, Your Honor, and

20   defendants really don't have an answer to as I heard

21   Mr. Bodner and his colleague, I apologize, I forgot his

22   name.

23             THE COURT:  Mr. Byrne.

24             MR. ROSEN:  Mr. Byrne.  And as I read their four

25   briefs, their opening briefs and their reply briefs, is they

don't really give any explanation for hiding inventory.  We
have alleged that they taped off areas of the warehouses
where the auditors could not go, let me turn back to that in
a second to address the auditor's role in this, and that
they shipped it around the corner to N. block and back to
California and back, all those things, to keep the inventory
from being counted.  That's the essence of our case.

They didn't want to report the actual ballooning
of inventory.  They made statements to the opposite, that
inventory had not ballooned.  That it, you know, they were
just, you know, they were just up to their nose in terms of
the water.

If they said that that wasn't the situation the
market would have responded appropriately.  And I
respectfully submit the price wouldn't have quadrupled in
those seven months.

There is no -- Your Honor under the various cases,
including Tellabs, has to decide what's a more -- what's a
reasonable inference.  The standard isn't it is proven, the
standard isn't, is not is it more likely that the inference
is in favor of the plaintiffs or in favor of the defendants.
All we need to show is it's equally likely.  And as a number
of courts have said, and I appreciate this articulation as I
think of my favorite sport baseball, tie goes to the runner.

In other words, if the Court, and I've actually

 1   been in situations where the Court said plaintiff's

 2   inference, defendant's inference equally likely therefore

 3   the case is sustained.  And that's all we need to show.  We

 4   don't need to disprove their so-called innocent

 5   interpretation.  All we need to say is it is likely.

 6          And given the metrics, given the 50 million

 7   shortfall in revenue and the 250 million build up in

 8   inventory, given their ratios that I outlined earlier, the

 9   days to sell and the other it's simply, in our opinion, at

10   least equally likely that what they were doing is they were

11   building up inventory, they increased capacity, which is

12   fine, they were building substantial inventory, which is

13   fine, but it was piling up and they didn't disclose that and

14   that's what's not fine.

15          THE COURT:  Well, all right.  So the concern, one

16   of the concerns that I had in regard to reviewing your

17   reports from your confidential witnesses --

18          MR. ROSEN:  Yes, Your Honor.

19          THE COURT:  -- is the timeframe.  And there was

20   one that, that by implication suggested it must be 2011.  I

21   think that's CW1.  But the others talked about things

22   happening, you know, things being taken outside and run

23   around the block when the auditor arrives or even suggested

24   that something from N. block went to California and then

25   back.

1          MR. ROSEN:  Right.

2          THE COURT:  There's no time reference, there's no

3     timeframe.  I mean is this within the class period?  I, I

4     will say that I agree with you completely that this is a

5     totally different case than in 2010 and 2012.  Totally

6     different issues.

7          There have been some findings that I made which

8     are relevant, for instance, in regard to Ms. Rathke's stock

9     or Mr. Blanford's stock.  I made that determination that

10    you, that you consider stock options.  That's the law now in

11    this circuit, but, or this district.  But generally speaking

12    I think it's totally, they are totally separate causes of

13    action.  But you've got to show that these kinds of things

14    were happening in 2011 as you begin to build this inventory

15    or are you just relying upon the fact that the inventory

16    went from what, let's see, 269,000 in quarter 1 to 672,000

17    in quarter 4?

18         MR. ROSEN:  Let me answer that in two parts.  With

19    respect to considering options, I just want to address that

20    now so I don't forget, Your Honor did rule in one of the

21    prior cases, or maybe both the prior cases, it blurs in my

22    mind as well, that the Court should consider both the stock

23    and the options in looking at what is the percentage of a

24    defendant's holdings that were sold.

25         We respectfully suggest that Your Honor should

1    only consider stock.  But even if Your Honor wants to

2    consider options we respectfully suggest the Court should

3    only consider vested options because the purpose of looking

4    at the percent of stock, of holdings that a party sells,

5    whether it's stock or stock and options, is the Court is

6    making some sort of judgment based upon what percentage of

7    what they could have sold did they sell.  Because they want

8    to say it is a small number.  And we obviously want to say

9    it's a big number because at some point it's a big enough

10   number that becomes one of the factors the Court considers

11   in inferring scienter.

12          If it's an unvested option they couldn't have sold

13   it anyway.  So I would respectfully suggest that that's

14   where defendants led Your Honor one step too far out on the

15   branch.  And Your Honor, respectfully, and I mean this in

16   all sincerity, should only at most count vested options

17   because if I have unvested options that I've got, I wish I

18   did, I respectfully submit it tells you nothing.

19          So I think you should only count vested options at

20   most.  If you do that it shows Miss Rathke sold 38 percent

21   of her holdings and Mr. Blanford sold 18 percent of his

22   holdings.

23          We cited, Your Honor, authorities in our brief,

24   and I'm sure Your Honor's law clerk can easily pull them up,

25   that said as low as 11 percent sales by a defendant can

1    support an inference of scienter.  Certainly when you are in

2    the neighborhood of 38 percent you can.

3            Now, they cited cases that say you don't --

4            THE COURT:  But you do agree though when you are

5    making that analysis the motive and opportunity you look at

6    all of the facts and surrounding circumstances and one of

7    the things that seems to be relevant in regard to

8    Miss Rathke is that a large percentage of the, of the

9    options and stock that she sold was from as early as 2003

10   and were soon to expire in 2013, which is a few years down

11   the road.

12           MR. ROSEN:  That's two years away, Your Honor.

13   And --

14           THE COURT:  Right.  But, --

15           MR. ROSEN:  If you had inside information and you

16   want to sell your securities you have two choices as I

17   understand the law.  You either disclose, wait for the

18   market to absorb that information and then sell or you have

19   to hold onto your securities and not sell.

20           In 2011 Miss Rathke -- no one put a gun to Miss

21   Rathke's head and said sell 32 million dollars worth of

22   options and stock, none of which will mature in less than

23   two years.  She could have gone to Mr. Blanford or gone to

24   the board and said I think we should disclose this build up

25   in inventory, the market would have done what the market

1    would have done and then no one could have criticized her.

2    But instead we respectfully submit that defendants adopted

3    the 10B 5-1 plan not in good faith, but precisely because

4    they had a situation where inventory was building up and

5    they wanted to take their chance to try and cash into a

6    substantial matter.

7          The fact that she didn't sell anything for nine

8    years does not excuse her from selling now.  And they say,

9    gee, they had very sensitive transactions and there were,

10   you know, periods where they couldn't trade.

11         We attached to our brief, the one brief we filed,

12   the declaration from my colleague Mr. Browne, which attached

13   the various securities disclosures from other senior

14   executives showing that during various times during that

15   past eight or 10 year period, whatever it was, they sold.

16         So, again, maybe they'll come back and say

17   Miss Rathke had access to certain information that no one

18   else did, but that's a factual issue that needs to be --

19   that needs to be developed and we need to be able to probe

20   it to precisely determine whether in fact they can show the

21   good faith that the regulation 10B 5 dash 1 calls for.  I

22   don't know if that answers your question.  I've gone on a

23   bit about that.

24         THE COURT:  I just want to go back to the initial

25   question I asked you about, the false statement.

1        MR. ROSEN:  Yes, Your Honor.

2        THE COURT:  And you're using Michelle Stacy.

3        MR. ROSEN:  Yes.  Among others.

4        THE COURT:  But I, and I did not see that in, in

5   your pleadings.  Did I miss it or was it not there and now

6   it's there?

7        MR. ROSEN:  Your Honor, can I confer with my

8   colleagues for a moment?

9        THE COURT:  Sure.

10       MR. ROSEN:  Your Honor, as an example I'm looking

11  at our consolidated complaint, corrected complaint I should

12  say because we had made some errors in filing.  And the

13  defendants were kind enough to let us file a corrected

14  complaint.  Looking at Page 43, Paragraph 105 we're talking

15  at the beginning of the class period, February 2nd, 2011.

16       The company held a conference call.  And at that

17  conference call Mr. Blanford said, demand is definitely

18  stretching our ability to supply.  So that's at the very

19  beginning of the class period.  We then quote the conference

20  call.

21       THE COURT:  And I thought that that's what you

22  were relying on.

23       MR. ROSEN:  We are.  We are.

24       THE COURT:  I thought, I thought you, I thought

25  that your theory was that this was essentially a plan to

```
 1    show that Green Mountain Coffee Roasters was stretched to

 2    the limit and was going to really be producing more

 3    inventory, the production figures would go up and that this

 4    is an extremely successful business and as a result the

 5    inventory was going to remain relatively constant.  And the

 6    fact is that they knew that ultimately at the fourth quarter

 7    after, in particular Mr. Einhorn's speech --

 8              MR. ROSEN:  Right.

 9              THE COURT:  -- that it would be disclosed.  And

10    then all of a sudden they disclosed the fact they had built

11    up all this inventory when in fact they had never sold it.

12    And I thought this was a plan related to Mr. Blanford and

13    Miss Rathke in particular.  I didn't know that you were

14    actually relying, at least in part, upon Miss Stacy's

15    statement, which I thought to be inconsistent with the

16    statement that, that basically Mr. Blanford made in quarter

17    1 in which she said there's no, there's going to be no build

18    up here, we're selling everything we can possibly make.

19              MR. ROSEN:  Well, I think they are consistent.

20    They are all sending a uniform message that demand is very

21    high and we can sell all we make basically.  And the proof

22    of that is that inventory is not building up.

23              THE COURT:  I thought that --

24              MR. ROSEN:  There's that -- remember that line

25    from the movie, another baseball movie, if you build it they
```

1    will come, they are saying if we make it they will come.

2              THE COURT:  You have to be careful.  Whenever you

3    bring up that movie I start to cry.  So I start to think

4    about playing baseball with my father.  And, I'm sorry, it

5    gets very emotional.

6              MR. ROSEN:  Your Honor, I'm a 1964 Phillies fan.

7    When they were 11 games out, they were leading the entire

8    season, Jim Bunning was one of their star pitchers before he

9    became a senator.  And they had 11 games left to the end of

10   the season.  And they would only lose the pennant if they

11   lost 10 of the last 11 games.  And they lost 10 of the last

12   11 games and the Cardinals won the pennant and it broke my

13   heart.  And if I ever met Your Honor in a tavern I could

14   recite the entire lineup of the '64 Phillies.

15             THE COURT:  I can tell you a lot about Brooklyn,

16   it goes to show you our relative ages, the Brooklyn Dodgers

17   in 1955.

18             Anyway, regardless.  I'm looking at the quote

19   actually.  Let me see if I've got it here.  From Mr.

20   Blanford quarter 1 in which he said, there's stretch -- the

21   demand is definitely stretching our ability to supply.

22   We're not quite caught up with that demand curve.  In quote,

23   we are hoping to build a little bit of a cushion going

24   forward.

25             Now, I thought that was the clear intention that

1    was expressed by him.  And that is inconsistent with someone

2    who says, oh, no, we're selling everything that we've

3    produced and there's no build up.

4          MR. ROSEN:  The way I interpret that, Your Honor,

5    and I'm not a psychoanalyst, but the way I interpret that is

6    we need to increase capacity and we need to increase

7    inventory because we don't have enough inventory to meet

8    existing demand and foreseeable demand.

9          And Miss Stacy, when she was saying, the comment I

10   quoted from May is in a sense a similar comment.  They are

11   both sending the message to the market this is still a high

12   growth company, an extremely high growth company.

13         THE COURT:  Well, that I agree with.  Can I just

14   ask you another question?  You are putting in your brief

15   some reference to some of the production facilities as being

16   only 60 percent, producing at a rate of 60 percent to

17   70 percent or whatever.

18         MR. ROSEN:  Right.

19         THE COURT:  Isn't that irrelevant?  I mean that's

20   not your claim.  Your claim is that there --

21         MR. ROSEN:  No, the claim isn't that -- we're not

22   claiming that they represented to every single production

23   facility it wasn't 100 percent and if wasn't 98 percent it's

24   fraud.  What I'm saying the fact that they were producing so

25   much less than their capacity was inconsistent with their

1   reputation that the water was up to the top of their nose.

2           And the representation that they needed every drop

3   of inventory that they could get to meet demand and yet they

4   are not, in fact, producing all the inventory they can make

5   the two are respectfully mutually inconsistent as I

6   interpret them.  Your Honor may, of course, make a

7   different --

8           THE COURT:  So what you are just basically saying

9   is they keep talking about being stressed to the limit.

10          MR. ROSEN:  Right.

11          THE COURT:  And, in fact, they are not stressed to

12   the limit.  And, but I, well --

13          MR. ROSEN:  Yeah.  That, that put it better than I

14   could, Your Honor.

15          THE COURT:  I don't exactly see how that fits into

16   your claim in regard to the oversupply of inventory which is

17   ultimately the cause of the problem according to you.

18          MR. ROSEN:  And the oversupply of inventory is the

19   disproof of the suggestion they made repeatedly that they

20   are stressed to the limit.

21          THE COURT:  Okay.  So this is more just a vague

22   impeachment about their claim and it's nothing related to

23   your allegation?  In other words, you've got no claim

24   related to the fact that they are not using all of the

25   machinery that they have.

1          MR. ROSEN:  Correct.  Correct.  Our claim, again

2     as I said at the beginning of my colloquy with Your Honor,

3     it's not a revenue recognition claim.  It's not a forward

4     looking statement claim.  It's you're telling the market

5     about inventory.  And the statements they are making to the

6     market about inventory during the class period respectfully

7     simply are not credible.  And given the balance of

8     inferences Your Honor is to make under Tellabs it is at

9     least equally likely, and I would respectfully submit, more

10    likely, that the repeated statements about inventory is so

11    high, inventory is barely meeting capacity is inconsistent.

12         One way of explaining, and I promise this will be

13    my last baseball analogy, if a baseball team, God willing my

14    favorite Philadelphia Phillies were publicly owned, but the

15    daily results of the games were secret, management of the

16    Phillies couldn't say we're in contention, we're in

17    contention, we're in contention and on September 15th say

18    we're 20 games out of first place.

19         And in essence that's what happened here.  They

20    were saying we're in contention, we're in contention, we're

21    in contention, we're, you know, we're grinding it out, the

22    inventory is not excessive, the inventory is not excessive

23    and then all of a sudden we have 250 million of excess

24    inventory.  That's simply inconsistent.

25         THE COURT:  That again is then, that's your claim

```
 1  because what you're saying is inventory is not excessive
 2  when, in fact, the claim that you, I thought, made in the
 3  complaint is that Mr. Blanford misrepresented the whole
 4  plan.  He, in fact, was saying we need to increase inventory
 5  and that's what he's saying in quarter 1.
 6           MR. ROSEN:  Right.
 7           THE COURT:   What you're focusing more on now is
 8  Michelle Stacy.  And I'm wondering whether that's in the
 9  complaint.
10           MR. ROSEN:  Your Honor, I didn't memorize the
11  complaint.  I'll be glad to check it.  I would certainly be
12  glad to amend it if I failed to allege it.  I'll certainly
13  plead guilty to mistakes in the complaint.
14           I know we referred at one point to Mr. Wettstein
15  as Mr. Weinstein.  And that was a mistake too.  And I
16  apologize to Mr. Wettstein and the company.  I of all people
17  should know that.  I apologize, Your Honor.
18           Your Honor, my colleague Mr. Browne pointed me to
19  Paragraph 110 on Page 45 of the corrected complaint which
20  refers to Miss Stacy's saying, we did not pull forward any
21  sales at all.  We fill our customer orders as they come in
22  and they were not building any excess, any excessive
23  inventories at all at retail.  So that is in the complaint.
24  I apologize if I misled Your Honor.
25           THE COURT:  All right.  Well, I guess is that the
```

1   gravamen of your complaint?

2          MR. ROSEN:  That's one I articulate, Your Honor.

3          THE COURT:  Okay.

4          MR. ROSEN:  Your Honor, there are a number of

5   other points I'd be glad to address if Your Honor has

6   questions about them.

7          THE COURT:  No.

8          MR. ROSEN:  Let me just talk briefly about a

9   couple of them.  I think the timing of the sales by the

10  defendants, especially with respect to Miss Rathke and Mr.

11  Blanford, they obviously are two defendants, the fact that

12  they adopted the plan and immediately followed it with the

13  secondary offering of stock, all that, we respectfully

14  suggest, undercuts the position that it is somehow a good

15  defense and, in fact, it's an issue as to good faith.

16         In terms of the defendant's recklessness, which as

17  Your Honor knows is sufficient for scienter, we plead, and

18  Your Honor pointed out in your colloquy with Mr. Bodner, the

19  involvement of the defendants with inventory as it related

20  to the prior restatement and the remedial plan.

21         And we quote in the complaint where the executives

22  were regularly speaking to investors about this topic.  It

23  was obviously important to the company.  And, you know, we

24  respectfully submit, an example is the Institutional

25  Investors versus Avaya case, a Third Circuit case, where the

```
1    Third Circuit in this respect makes it harder to plead

2    scienter than the Second Circuit.

3            The Third Circuit does not recognize motive and

4    opportunity.  The Second Circuit obviously does.  That you

5    raised a strong inference of scienter when the defendants

6    had access to information showing the statements were false.

7    And we obviously respectfully suggest that they did.

8            There's one other point that I would like to

9    address because we've said it in our brief, but it hasn't

10   been discussed so far, which is pursuant to The Second

11   Circuit's decision in Dynex, Dynex was the defendant, but

12   that's out.  Another Court could just trade as, people tend

13   to refer to cases by the name of the defendant not by the

14   name of the plaintiff.

15           Just as all these cases are referred to in the

16   vernacular as Green Mountain case and not Horowitz or

17   whatever.

18           Under the Dynex case and under the Public,

19   Pennsylvania Public School Employee's Retirement Systems

20   case versus Bank of America, where I'm the lead counsel

21   currently, pending before Your Honor's colleague in the

22   Southern District of New York, Judge Pauley, the Courts have

23   recognized that Your Honor can find scienter on behalf of a

24   corporate defendant even if Your Honor concludes no

25   individual defendant scienter has been established.
```

1          And just as appropriate, you know, I don't want to

2    get into politics are corporations people, the current law

3    obviously says they are people, but in this sense they are

4    chargeable with the knowledge of their various agents

5    including, but not limited to, the officers and the

6    defendants.  They are chargeable with knowledge of people

7    who are not defendants.

8          And even if Your Honor concludes that Ms. Rathke,

9    Mr. Blanford or both of them have not, we have not

10   adequately plead Scienters to them Your Honor can look at

11   the other allegations as to inventory build up, as to how

12   pervasive it was, as to all the confidential witnesses,

13   communications with Wettstein, Mr. Holly and the others,

14   that corporate scienter has been plead.

15         So that remains an option for Your Honor even if

16   Your Honor decides that the claim against those two

17   individuals should be dismissed.  I could ramble on but --

18         THE COURT:  Well, how about then how does that

19   translate to false statement?  How does that transfer to

20   that first burden that you have, and that is to show that

21   the statement was false and was knowingly made?

22         MR. ROSEN:  Let me answer that this way, Your

23   Honor.  If every statement was made by someone in investor

24   relations, and let's assume for purpose of discussion, this

25   is unfair to investor relations personnel, they know

1   nothing, they are simply like press secretaries you wind up

2   and you say go out and read this statement.  And there's

3   another group of people that know the fact and they are not

4   talking.   There's one person who is making the statements

5   and knows nothing.  The other people who know the facts and

6   say nothing that collectively, for the purpose of the

7   corporation, can make out scienter.  That's what Judge

8   Pauley held in the Bank of America case.

9           THE COURT:  So when Michelle Stacy makes a

10  statement that there is no inventory build up, no inventory

11  excess, they are selling everything, we're selling

12  everything that, that we are producing when, in fact,

13  there's somebody out there in the corporation who knows that

14  there's an inventory build up and that it's hitting the

15  rafters of various warehouses, is she then knowingly making

16  the statement when, in fact, she doesn't know anything about

17  it?

18          MR. ROSEN:  The answer is she is not, but the

19  corporation is.  If the corporation is the person, which was

20  settled by the Supreme Court in the 1860's, the post civil

21  war cases, slaughterhouse case I guess, if the corporation

22  is a person, which it is, and the corporation's agents make

23  a statement, and other personnel at the corporation know

24  that statement is false, she can have a pure heart and an

25  empty head and it doesn't look bad.

1          You know, one, one half could know, the other half

2    to speak, that supports scienter as to the corporation.  It

3    doesn't support it as to Miss Rathke or Mr. Blanford, but

4    for the corporation it does.  I just wanted to point that

5    out to Your Honor if that's where Your Honor is headed. I'm

6    not saying it should be, but I just wanted to underscore

7    that it's not an all or nothing proposition.

8          THE COURT:  Well, that's, that is a, that seems to

9    me I would really be willing to consider that, but that

10   seems to me to be a pretty unique approach to the word

11   knowingly.

12          I mean the obligation is to show that there was a

13   false statement, there was a false statement made and it was

14   made knowingly with a fraudulent intent.  Fraudulent intent

15   refers, I would think, to the speaker, the person who spoke.

16          To say that the speaker here can have an empty

17   head and is essentially a vessel for all of the information

18   that the corporation has and so that you have to say she

19   knows everything about the corporation when she makes that

20   statement, which may be totally inconsistent with what she

21   knew.  That, do you have some case law to suggest that

22   scienter is that broad?

23          MR. ROSEN:  Well, the PPERS case, Pennsylvania

24   Public Employee's Retirement System versus Bank of America,

25   in that case, and it's still going on, in the initial motion

1    to dismiss the judge dismissed all the individuals and kept

2    in the corporation.  It is not unheard of.  And The Second

3    Circuit --

4              THE COURT:  Well, I'm sure that that's correct.  I

5    mean I, I know that that's correct.  But that doesn't

6    necessarily say that the speaker, whoever the speaker was,

7    necessarily knew everything that the corporation, that all

8    of the members of the corporation knew.

9              I mean what that suggests is you may not have a

10   claim against any individual speaker, but you got a claim

11   against the corporation.

12             MR. ROSEN:  It does, Your Honor.

13             THE COURT:  And that's, that's true.  That's

14   absolutely true.  That's absolutely true.  But that doesn't

15   mean that necessarily when you're talking about fraudulent

16   intent as a speaker makes a statement that that speaker

17   didn't know that that statement was wrong.

18             MR. ROSEN:  Well, in the absence of that statement

19   how can a corporation ever have any intention because

20   corporations are made up of individuals.  And as I said when

21   I started this discussion corporations -- if that were not

22   the rule the corporation could hire as a press secretary a

23   22 year old straight out of college who is told go out and

24   read this statement to the investors, go out and be

25   interviewed on this or that.  And people back at the office

1    know that's not true, if that, if that were not the rule

2    then there would be no liability.

3            And, again, we're not excusing Miss Stacy of

4    wrongdoing.  We never sued Miss Stacy.  Just as, and I did

5    point this out, we never sued Mr. Stiller.  The claim

6    against Mr. Stiller in Green Mountain three, he was the

7    chairman, the founder of the company, God bless him,

8    chairman of the board, all well and good for him, but he

9    engaged in inappropriate conduct in the eyes of the Green

10   Mountain board when he made his 66 million dollar share sale

11   of stock, terminated as a board member and chairman the next

12   day.

13           And so the defendants are saying I think

14   rightfully we're not responsible for his conduct, don't

15   infer scienter about us based on in effect a rogue

16   character.  But in the case of someone who speaks for the

17   company, and when Miss Stacy is speaking at a conference

18   call for investors, she is speaking for the company with,

19   I'm sure, Miss Rathke and Mr. Blanford in the room when

20   she's having that conversation.  Then the company certainly

21   is chargeable with that knowledge, chargeable with the

22   falsity of that if Miss Blanford and Mr. Rathke or others

23   such as Mr. Wettstein and Mr. Holly or other senior leaders

24   know that is false.

25           I don't think we need to get into a debate, Your

1    Honor, that whether if somebody on the line knows it's false

2    and no one else does, if there's a rogue employee who is,

3    who says we're building up inventory but nobody knows but

4    me, I'm looking it in the closet, an argument could be made

5    in that case don't attribute the rogue employee sitting

6    there never sending the inventory, burying it in the

7    backyard, whatever he's doing, that that's not chargeable to

8    the corporation.

9            But we're not talking about rogue employees.  Miss

10   Stacy is a senior officer of the company otherwise she would

11   not be on the phone-call for a conference call for

12   investors.  And when you have that scienter can be found

13   when she speaks and someone else knows.   And that's what I

14   respectfully suggest, Your Honor.

15           Your Honor, I could ramble on.  I think Your Honor

16   has a good grasp of it.  I'd be glad to answer any questions

17   you have.

18           THE COURT:  I think that's fine.

19           MR. ROSEN:  Thank you very much, Your Honor.

20           THE COURT:  All right.  Can I get a reply?

21           MR. BODNER:  Yes, Your Honor.  A lot of talk about

22   Miss Stacy, let me address that.  Again, it's interesting to

23   hear and confirm that they are not saying that any of the

24   reported numbers in the financial statements, they are not

25   challenging that.  So that's out of the case.  Glad to hear

1    it because, Your Honor, the one point you made about

2    inventory staying constant, in fact, quite the opposite.  As

3    was disclosed during the class period inventory is

4    consistent with what Mr. Blanford said built and were

5    disclosed as building over the course of the class period.

6    That was sort of the point.  And it was disclosed.  So let's

7    put that to the side.  But now --

8              THE COURT:  So after each quarter you disclose the

9    fact that the inventory increased from what, 279 to 3 --

10             MR. BODNER:  To 400 something to 600 in Q4.

11             THE COURT:  That was all disclosed?

12             MR. BODNER:  So it was at least a couple hundred

13   build in the inventory disclosed quarter by quarter over the

14   period of the class period.  But this is -- and what the

15   plaintiffs say is, okay, we're not challenging the numbers

16   and what was disclosed and when they were disclosed.  They

17   are saying, to quote Mr. Rosen, the heart of the complaint

18   is we don't have an excess inventory problem and then when

19   pressed he referred to the Michelle Stacy statement in Q2.

20             THE COURT:  He said that that was false.

21             MR. BODNER:  And said that was false.  But, Your

22   Honor, and even Mr. Rosen I think would agree I'm not

23   leading you astray by getting into what's in the record for

24   you to consider because Mr. Rosen said that the very genesis

25   of the doctrine looking beyond the complaint is plaintiffs

1    lawyers in the old days before PSLRA would cherry pick a

2    statement and not give the full statement.  And the Second

3    Circuit said, well, that's not fair pool, baseball,

4    football, whatever sport analogy you want to use, you need

5    to put the full statement before the Court.

6         We have put the full statement before the Court

7    that what Miss Stacy really said.  And then I will show why

8    that is absolutely consistent, completely consistent with

9    what Mr. Blanford said in Q1.

10        THE COURT:  Well, first of all, did you see much

11   in the pleadings from the plaintiff that they were focused

12   so closely upon Miss Stacy's statement?

13        MR. BODNER:  What I saw is that they utterly

14   cherry picked and, frankly, mis-portrayed what she said.  I

15   did notice that.  And what this Court can take into

16   consideration is that what, what they allege Miss Stacy said

17   in, and they have the right paragraph, 110 in the complaint,

18   that needs to be put in context.  We've actually done that

19   in our brief.  But there, you know, there are so much

20   briefing here points can get lost.

21        So let me laser in on that particular point.  In

22   the Q2 earnings call, and this is at 80-20 in the docket for

23   the Court to consider, and it's the earnings call for Q2.

24   And I'm going to read it, but the highlight is what she's

25   being asked about and what she's answering about are

brewers.  And I'll get to why that's important.  But the
question by an analyst was to Miss Stacy, whose in charge of
the Keurig unit, they are the people who produce the brewers
as opposed to CSBU, the coffee unit that's head quartered up
-- and the brewers are headquartered, division is down in
Massachusetts.  The coffee K-Cup division is up here in
Vermont.  She runs the brewer part of the business.

          THE COURT:  So what you are suggesting is apples
and oranges?

          MR. BODNER:  Apples and --

          THE COURT:  The inventory figures of the, going
from 269 to 672 are essentially mostly coffee I assume?

          MR. BODNER:  A lot of it's coffee.  It's a lot of
things, but the point of the total consistency, not
irreconcilability between Blanford and Stacy is because of
the apples and oranges or razer razer blade, if you will,
which I'll explain in a second.

          The, again, the quote that they misquote is first
there's an analyst question that says, just to make sure I
understand, not the seasonality, but whether how much sales
actually might be pulled forward in a response to the spring
merchandising?  I think on brewer sales it looked like the
MPD data, which is sort of some fancy consumer data that
analysts like to rely to get an incite as to whether -- what
demand is.

1          MPD data was running at about a plus 60 percent or

2    so rate.  And I think your brewers sales in the quarter were

3    up over 80.  So is that an order of magnitude just maybe of

4    the difference in terms, of the differential in terms of try

5    to compare this last year to this year?  Does that extra

6    30 percent or so roughly account for a little bit of new

7    seasonal pattern because you're going to have some spring

8    merchandising?  Asking about brewer sales.  Brewer sales.

9    Her answer is, Michelle Stacy, there I think we will take

10   this together.  I will start, start it and John Whoriskey,

11   who reports to her at the Keurig brewer unit, will

12   follow-up.

13          First of all, one of the things to be cautious

14   about is the MPD database does not reflect all of the

15   customers.  In fact, several of our customers are not

16   included in that base so you can't really make those direct

17   comparisons from one base to the other.  Talking about

18   brewer sales.

19          Then she says, and this is what they quote

20   misquote, we did not pull forward any sales at all, talking

21   about brewers.  The general demand is what we see.  We will

22   fill our customer's orders as they come in.  And they were

23   not building any excessive inventories at retail.

24          What she's saying is that we're getting demand for

25   brewers from our retail customers.  And when she says

 1    inventory is not building at retail, meaning at their retail

 2    customers, not at -- she's not even talking about Green

 3    Mountain, she's talking about their customers, they are not

 4    seeing a build of brewers at the retail customers.  They are

 5    just servicing the demand.

 6            Why is that important?  Because Green Mountain

 7    publicly disclosed, everyone knew it, it's on a razer razer

 8    blade model.  You sell brewers out into the market the way

 9    you put a razer out to the market because what you really

10    want to sell are the razer blades, the K-Cups.

11            So the fact that they have brewers, again, she's

12    talking about brewers, not manning inventory at their

13    customer's, meaning they are satisfying that demand, it

14    means there's going to be even more demand for K-Cups coming

15    down the pike because you get a brewer then when you go

16    through the initial packs of K-Cups you get you go out and

17    you start buying brewers or start buying K-Cups.

18            So what she's saying has nothing to do with

19    anything that has to do with K-Cup inventory in any way,

20    shape or form.

21            Now, the brewers are made in China.  The brewers

22    are not manufactured at all by Keurig.  They are, they are,

23    they are by -- they are made in China.

24            The capacity that Mr. Blanford is referring to in

25    Q1 is about K-Cup production.  Not brewer production.  So

```
 1    first off Miss Stacy's quote, the heart of their case, has
 2    nothing to do with K-Cup demand or capacity.  In fact, it
 3    shows that, boy, there's more demand coming down the pike
 4    because look at the demand for our brewers.
 5              What Mr. Blanford is talking about is not
 6    production capacity to produce brewers.  They don't make
 7    brewers.  It's production capacity for K-Cups.
 8              THE COURT:  Well, all right.  So let me go to the
 9    second question that was raised with Mr. Rosen, in
10    particular to fraudulent intent by the speaker.  I mean I
11    appreciate the fact that you're, you're saying that she's
12    speaking about, about something totally different --
13              MR. BODNER:  Totally different.
14              THE COURT:  -- than what's going on with the
15    inventory control.  But, but this was, this is a unique
16    question.  And that is putting aside Mr. Blanford and Miss
17    Rathke is the speaker on behalf of the corporation burdened
18    with knowledge of everything that's going on with the
19    corporation or in the corporation for purposes of intent,
20    knowingly making a fraudulent statement?
21              MR. BODNER:  No.  I mean, Your Honor, I don't
22    think anybody can read Dynex as somehow creating a
23    collective scienter concept where you can have an empty head
24    clean heart speaker who has no idea -- that is charged with
25    knowledge down the organization.
```

1          THE COURT:  So under your theory you looked at the

2   misstatement, you then looked to the speaker of the

3   misstatement, and what is in that speaker's mind becomes the

4   relevant issue and if the speaker doesn't know something

5   that's going on behind the scenes even though the speaker is

6   speaking on behalf, not of the speaker, but of the

7   corporation, that is not fraudulent?

8          MR. BODNER:  Absolutely.  And I looked at Dynex,

9   Your Honor.  I mean if you look at the language of Dynex

10  what it first says is that a plaintiff must sufficiently

11  allege that an agent of the corporation committed a culpable

12  act with the requisite scienter and that the act and

13  accompanied mental state are attributable to the

14  corporation.

15         And then when you put that concept in the

16  securities law context, in Dynex the compliant failed.

17  Remember that's where the District Court denied the motion

18  to dismiss but granted interlocutory appeal to The Second

19  Circuit.  And The Second Circuit reversed the denial of the

20  motion to dismiss in Dynex.

21         And the reason the complaint in Dynex failed was

22  because no strong -- there was no strong inference that it

23  plead because, and to quote the court at 197, someone who

24  scienter -- it failed because someone whose scienter is

25  imputable to the corporate defendant and who was responsible

1    for the statements made was at least reckless.

2              They didn't, they didn't establish that.  So they

3    didn't establish an individual who was a defendant.  And

4    Dynex is clear, you don't have to, it's preferred, easier,

5    you don't have to have a named defendant who is deemed to

6    have, you know, been responsible for the statement with the

7    guilty mind.  It could be someone else.

8              THE COURT:  Upon which someone relied to make a

9    determination as to whether to purchase stock.

10              MR. BODNER:  Right.  So, and so, you know, the

11    idea that plaintiffs are somehow trying to say this has some

12    broad collective scienter is just beside the point.  And I

13    think you particularly can't get there, and Your Honor I

14    actually wrote a paper on this, and I won't bore you with

15    it, but after the Janus decision in terms of what it means

16    to have made or been responsible for making the statement

17    makes it very clear it's a very narrow concept of who can

18    make the statement on behalf of the corporation.  And,

19    therefore, that person has to be, I think, married with,

20    under Dynex, with the scienter.  They have to point to

21    somebody.

22              Now, what Dynex says is there could be some usual

23    situations where you actually don't identify even a specific

24    person that marries both responsibility for the statement

25    with scienter, but none the less get corporate scienter.

1    And they use as the example, for example, because, again,

2    you have to use some common sense in this world, is if, and

3    the example they use in Dynex is if General Motors made this

4    statement that we sold a million SUV's when in fact they

5    sold none, and they just bring a claim against the company,

6    and something that dramatic, to use their words, you know,

7    could be get your mind around that even identifying an

8    individual and there is corporate scienter, that is a far

9    throw by any stretch of the imagination here.

10          So on, on that issue it's just a dead ringer

11   there.  Way overreading Dynex beyond I think what any Court

12   in the country let alone the Second Circuit the way they've

13   read Dynex.

14          And then just to quickly step through the

15   remaining points, Your Honor.  My brother had said in the

16   beginning, well, how is it that you can have a 250 million

17   dollar increase in inventory in Q4 despite a 50 million

18   dollar miss.  And I think Your Honor gets it and understood

19   it, but just to repeat it, there's not a one for one

20   correlation here by any stretch of the imagination.  To be

21   sure if they are planning on some demand that didn't

22   materialize that could account for some of it.  But a big

23   part, as they have said throughout, and as you recognize,

24   was building this cushion.  You know, building inventory to

25   satisfy the continually increase year over year in demand.

1          So it's sort of false numbers.  And it's, it's a

2    misuse and it's, it's a empiric use of numbers that just

3    doesn't really add up or make any sense.

4          And it's the same, it's exactly the same, and they

5    said this in their brief, we addressed in our opposition,

6    and they just avoided it, or we said it in our opening state

7    or in our opening brief, and in their opposition they

8    avoided it, it's this whole point about there's something

9    magical or illustrative of fraud because the average days to

10   sale over the course of the class period actually increased

11   and the turn over decreased.  And he's saying and if they

12   were going off, if we were to constrain demand throughout

13   the class period that's utterly inconsistent with what we're

14   saying.

15         Well, there are a number of things wrong with

16   that.  The first thing, that is not what, as we really, you

17   know, if I'm earning my money at all today, you know, and if

18   we did our job in our brief, that's not what was said here.

19   And we're very clear in the record that this Court

20   absolutely can look to in terms of the earning calls as to

21   what was said.

22         In Q1 Larry Blanford said we were capacity

23   constrained and we're building for the holiday season Q3 or

24   Q4 and Q1, for the holiday season, to not be caught short

25   and to build K-Cup capacity.  He said that in 1.  In Q2 he

said and we're getting there, we're getting there, we're

catching up.  In Q3 he says for our short-term demand for

this holiday season that we were worried about in Q1 we feel

we're there, we feel that we've spent hundreds of millions

of dollars, we have the capacity, K-Cup capacity lines in

place and we're there.

Well, of course, if they are there and they are

building more K-Cup capacity they are accomplishing exactly

what they wanted to see.  Their average days to sale are

increasing because their inventories are increasing just as

they disclosed every quarter they are increasing.  And their

turn over is decreasing absolutely consistent with what they

have said.

So it's, it's, it's lost on me how somehow that

is, that is compelling evidence of fraud when, in fact, it's

quite the opposite.  It's far more compelling evidence that

what happened during this quarter is exactly as I said

earlier in my argument.  What they said they had done, what

they were doing, and what they were going to do was

perfectly consistent with what they said.

With 10B 5-1 plans he says that's an issue of

fact.  Well, he disagrees with The Second Circuit in, in the

Fishbaum case, which we cite in our brief, it's the Liz

Clairborne case.  It says, 10B 5 plans can be waived in the

scienter analysis.  That's the Second Circuit.

1          So you are not leading yourself by any stretch of

2     the imagine into error when you're relying on the Liz

3     Claairborne case in The Second Circuit for looking to 10B 5

4     cases along with the plethora of other cases in this, in

5     this circuit that have looked at 10B 5-1 plans and have not

6     required either summary judgment or a trial in order to do

7     so.

8          Then, at the risk, and I think it's fair argument

9     of going beyond the pleadings, but I was challenged by

10    plaintiff's counsel, that we have not come forward with any

11    innocent reasons for why there would be any hiding of

12    inventory.

13         And putting aside everything else I've already

14    argued, where were the audits when they were unaudited

15    financial statements there is a certain real world aspect.

16    And for anyone who has ever worked in a factory, and I have,

17    I did make more than two dollars an hour, but not much more

18    than two dollars an hour.  When you do an inventory count

19    you're trying in a dynamic environment, especially something

20    as dynamic as Green Mountain in the four billion K-Cups,

21    when you are doing a count you are trying to do a static

22    exercise in a dynamic environment.

23         And you, you need to try to not have deliveries

24    coming in while you're doing a count or have orders going

25    out either to be destroyed or to be sold, or whatever, in

1    order to make the count.  But life is not perfect,

2    particularly when you are dealing with four billion K-Cups.

3             And there are times when deliveries will be held

4    at the door or cordoned off because we need to bring down

5    the curtain to make a count in this dynamic environment.  Or

6    something has already been recorded for destruction, but it

7    hasn't been destroyed yet, well, you can't count that

8    because you'd be miscounting because it's already recorded

9    for destruction.

10            So there are plenty of innocent reasons why things

11   may be cordoned off if it even happened, but as to why that

12   would happened that's why you need to have confidential

13   witnesses to satisfy Novak who know what -- there's a

14   probability they know what they are talking about.  The

15   quality, with all due respect, the low quality of the CW

16   allegations here do not pass muster.

17            And with that Your Honor, unless you have any

18   other questions?

19            THE COURT:  No, I think that's it.

20            Mr. Byrne, do you need --

21            MR. BYRNE:  I have one quick point to make.

22            THE COURT:  Okay.

23            MR. BYRNE:  There was a brief discussion of the

24   core operations doctrine.  And I think the best way to make

25   my point is to refer you back to your own opinion that

1    talked about the core operations doctrine and scienter in

2    the Dynex opinion.  And what this Court has already said is

3    that the difficulties that the core operations doctrine does

4    not dispose of the general requirement that plaintiffs

5    allege facts available to defendants that would have

6    illuminated the falsities.

7              And I think it's very clear, especially given the

8    concessions that were made in oral argument, that there is

9    no specific identification of conversations or documents

10   that would have alerted the individual defendants to any of

11   the alleged improprieties.  That's all I have.  Thank you.

12             THE COURT:  All right.

13             MR. ROSEN:  Two minutes, Your Honor.

14             THE COURT:  Yes.

15             MR. ROSEN:  Maybe three if I try and slow down so

16   I don't burn the court reporter.

17             THE COURT:  Okay.

18             MR. ROSEN:  In terms of statements about the level

19   of inventory he said we told this quarter and that quarter

20   what the number was.  Implicit in each of those statements

21   is that the company is selling inventory at the rate it's

22   being produced.  It was not.

23             Mr. Bodner talked about the razors and the razer

24   blade analogy.  And on that issue, the short answer on that

25   if you are not selling brewers you won't be selling K-Cups.

1    So if there's a problem with the brewer sales that's

2    obviously implicated for the sale of K-Cups.

3            In terms of the knowledge of the corporate

4    spokesman, the best analogy I have for Your Honor is

5    political.  And that's back to the days of Kennedy and

6    Pierre Salinger when Pierre Salinger was getting ready to

7    brief the press, I don't know if it was some Cuban missile

8    crisis or something else and he said, don't tell me the

9    facts, I don't want to be accused of lying to the press.

10           And, you know, if it were a corporate situation

11   Pierre Salinger goes and says, speaks for Kennedy, Inc. and

12   McNamara or Kennedy knows the facts and Pierre Salinger

13   knows nothing except how to spin it then I would

14   respectfully suggest you could have corporate scienter.

15           THE COURT:  Well, does anyone go to Pierre

16   Salinger and say you have an obligation not only to, to

17   speak the truth, but then to go and conduct your own

18   investigation throughout a corporation that has 23 different

19   facilities to make sure that what you're saying is the

20   absolute truth?

21           MR. ROSEN:  Respectfully, Your Honor, I would flip

22   it around saying the people who are in the know have an

23   obligation not to have a person go out and speak at an

24   investor's conference call saying something they know is not

25   true.

1          Finally, Mr. Bodner, next to finally,

2     Mr. Bodner --

3          THE COURT:  That they just know is not true.  And,

4     and, but --

5          MR. ROSEN:  All right.

6          THE COURT:  Go ahead.

7          MR. ROSEN:  Mr. Bodner talked about Janus which is

8     a Supreme Court case dealing with who can be liable in 10B.

9     The defendants in the Bank of America case cited that to

10    Judge Pauley when they moved for reconsideration.  And in

11    that case it took four motions to get past the motions to

12    dismiss.

13         In the first motion to dismiss Judge Pauley

14    sustained the claim against Bank of America, dismissed all

15    the individual defendants.  Bank of America represented by

16    very competent counsel moved for reconsideration citing the

17    Janus case.

18         And I would be glad to send Your Honor's clerk the

19    citation to that.  And what Judge Paulie said is the Janus

20    case doesn't change that.  You can still have corporate

21    scienter and Janus doesn't change that.

22         Finally, Mr. Bodner was talking about the

23    inventory turn over ratio and the average days to sell

24    inventory.  Those are in Paragraph 52 and 53 of our

25    complaint, Pages 18 and 19.  And in that we show each

 1    quarter, each of the four quarters for 2010 and 2011 the

 2    changes.  And in each quarter we show significant decreases

 3    in the ratio for the inventory turn over ratio and

 4    significant increases in the average days to sell inventory.

 5    So in each of those quarters the trend existed.  It wasn't

 6    simply the final quarter.

 7            Finally --

 8            THE COURT:  And were those disclosed during,

 9    during and during --

10            MR. ROSEN:  Those were not disclosed.  Someone had

11    to go into the, into the public knowledge and take that

12    apart and do an analysis.

13            And the, there's something called, there is no

14    obligation for investors do complicated analysis, to hire a

15    C.P.A. to do complicated analysis of the company's

16    financials to say I suspect the company is lying to me when

17    they are saying we're not building up excess inventory, and

18    I'll go hire a C.P.A. to do, a forensic C.P.A. to look at

19    the inventory turn over ratio or the average days to sell.

20            So I would respectfully submit, Your Honor, and

21    this is my last comment, that for each of the quarters that

22    the data was inconsistent with the representation.

23            With that I thank Your Honor very much for your

24    patience and your attention.  You're obviously very well

25    prepared and I appreciate your hospitality.

1          THE COURT:  I appreciate it very much.

2          MR. BODNER:  Thank you, Your Honor.

3          (The Court recessed at 4:10 p.m.)

1          C E R T I F I C A T E

2

3          I, Anne Marie Henry, Official Court Reporter for

4   the United States District Court, for the District of

5   Vermont, do hereby certify that the foregoing pages are a

6   true and accurate transcription of my shorthand notes taken

7   in the aforementioned matter to the best of my skill and

8   ability.

9

10   _____

11              Anne Marie Henry, RPR
                Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25