14-199-cv
*Employees' Retirement System, et al. v. Green Mountain Coffee Roasters, et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————————

August Term 2014

(Argued:      December 1, 2014          Decided:      July 24, 2015)

Docket No. 14-199-cv

———————————————

EMPLOYEES' RETIREMENT SYSTEM OF GOVERNMENT OF THE VIRGIN ISLANDS, LEAD
PLAINTIFF, on behalf of itself and all others similarly situated, LOUISIANA
MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, LEAD PLAINTIFF, on behalf
of itself and all others similarly situated, BOARD OF TRUSTEES OF THE CITY OF FORT
LAUDERDALE GENERAL EMPLOYEES' RETIREMENT SYSTEM, LEAD PLAINTIFF, on
behalf of itself and all others similarly situated, PUBLIC EMPLOYEES' RETIREMENT
SYSTEM OF MISSISSIPPI, LEAD PLAINTIFF, on behalf of itself and all others
similarly situated, SJUNDE AP-FONDEN, LEAD PLAINTIFF, on behalf of itself and
all others similarly situated,

*Plaintiffs-Appellants,*

v.

LAWRENCE J. BLANFORD, GREEN MOUNTAIN COFFEE ROASTERS, INC.,
FRANCES G. RATHKE,

*Defendants-Appellees,*

BARBARA D. CARLINI, ROBERT P. STILLER, WILLIAM D. DAVIS, HINDA MILLER, JULES
A. DEL VECCHIO, MICHAEL J. MARDY, DAVID E. MORAN, MERRILL LYNCH, PIERCE,

FENNER & SMITH INC., SUNTRUST ROBINSON HUMPHREY, INC., WILLIAM BLAIR & COMPANY, L.L.C., CANACCORD GENUITY INC., JANNEY MONTGOMERY SCOTT LLC, WELLS FARGO SECURITIES, LLC, PIPER JAFFRAY & CO., RABO SECURITIES USA, INC., RBC CAPITAL MARKETS, LLC, SANTANDER INVESTMENT SECURITIES INC.,

*Defendants.*

───────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

───────────────

Before:

CHIN and CARNEY, *Circuit Judges*,
and SWEET, *District Judge*.[*]

───────────────

Appeal from a judgment of the United States District Court for the District of Vermont (Sessions, *J.*) dismissing plaintiffs-appellants' securities fraud claims.  The district court granted defendants-appellees' motions to dismiss, holding that plaintiffs-appellants failed to adequately allege a misleading statement or omission of material fact and scienter.

VACATED AND REMANDED.

───────────────

[*]     The Honorable Robert W. Sweet, of the United States District Court for the Southern District of New York, sitting by designation.

---

MARK R. ROSEN (Daniel E. Bacine, Jeffrey A. Barrack,
and Lisa M. Lamb, *on the brief*), Barrack, Rodos &
Bacine, Philadelphia, Pennsylvania; Michael K.
Yarnoff, Matthew L. Mustokoff, and Joshua E.
D'Ancona, Kessler Topaz Meltzer & Check, LLP,
Radnor, Pennsylvania; and John C. Browne and
Laura H. Gundersheim, Bernstein Litowitz Berger
& Grossmann LLP, New York, New York, *for
Plaintiffs-Appellants.*

RANDALL W. BODNER (Anne Johnson Palmer, Mark D.
Vaughn, and Douglas H. Hallward-Driemeier, *on
the brief*), Ropes & Gray LLP, Boston,
Massachusetts, and Washington, DC, *for
Defendant-Appellee Green Mountain Coffee Roasters,
Inc.*

MATTHEW B. BYRNE (Robert B. Hemley, *on the brief*),
Gravel & Shea PC, Burlington, Vermont, *for
Defendants-Appellees Lawrence J. Blanford and
Frances G. Rathke.*

---

CHIN, *Circuit Judge*:

In this putative securities class action, plaintiffs-appellants are five

employee retirement systems ("Plaintiffs") that purchased or otherwise acquired

common stock in Green Mountain Coffee Roasters, Inc. ("Green Mountain"), the

manufacturer of the Keurig single-cup brewing system.  Plaintiffs allege that

Green Mountain and certain of its executives ("Defendants") made fraudulent misrepresentations about Green Mountain's inventory, business performance, and growth prospects in a manner designed to mislead investors about the strength of Green Mountain's business, in violation of federal securities law.

The district court (Sessions, *J.*) granted Defendants' motions to dismiss Plaintiffs' Corrected Consolidated Class Action Complaint (the "Complaint") for failure to 1) allege a misleading statement or omission of material fact, and 2) plead a compelling inference of scienter.  Plaintiffs appeal. We hold that the Complaint pled sufficient facts to state a securities law violation.  Accordingly, we vacate and remand for further proceedings consistent with this opinion.

## *STATEMENT OF THE CASE*

**A.**    *The Facts*

The facts alleged in the Complaint are assumed to be true.  They may be summarized as follows:

**1.**    *Green Mountain's False "Growth Story"*

Green Mountain manufactures the Keurig single-cup brewing system, many varieties of the associated "K-Cup" portion packs to brew single

servings of coffee and other beverages, and other coffee-related products.

Between February 2, 2011 and November 9, 2011 (the "Class Period"), Plaintiffs

purchased or otherwise acquired Green Mountain common stock.  During the

Class Period, Defendants represented to investors, including Plaintiffs, that it

was straining to meet consumer demand for its Keurig and

K-Cup products and that the company was ramping up production without

accumulating excess inventory.  Accordingly, Green Mountain's stock price

soared to record highs during the Class Period, from $32.96 per share on

February 2, 2011 to a high of $111.62 per share on September 19, 2011.

Throughout the Class Period, Defendants continuously reassured

investors that its business was booming.  Green Mountain had weathered public

financial problems months before the start of the Class Period.  In September

2010, Green Mountain disclosed that it was the subject of an SEC inquiry

concerning its revenue recognition practices and its relationship with its primary

order fulfillment company, M.Block & Sons, Inc. ("M.Block").  After an internal

investigation, Green Mountain announced a restatement of its past financial

statements that reduced its net income by $6.1 million for fiscal years 2006 to

2009 and the first three quarters of 2010, but it assured investors that "none of the

financial statement[] errors are related to [Green Mountain's] relationship with

M.Block."  App. at 41.  Following this incident, and throughout the Class Period,

Green Mountain executives repeatedly reassured investors that business was

booming and it was maintaining inventory at appropriate levels.

   For example, Green Mountain held a conference call with investors

on February 2, 2011 to discuss first quarter 2011 results.  Green Mountain stated

that "we remain focused on increasing production to fulfill unmet demand and

achieving and maintaining optimum inventory levels."  *Id.* at 42.  Defendant

Lawrence Blanford -- President, Chief Executive Officer, and Director of Green

Mountain -- further stated that "demand is definitely stretching our ability to

supply.  And we've not quite caught up with that demand curve yet."  *Id.*  During

its second quarter conference call on May 3, 2011, Green Mountain stated "we are

not building any excess inventories at all at retail."  *Id.* at 43 (emphasis omitted).

In prepared remarks filed with the SEC the same day, Green Mountain

elaborated: "[W]e continue to add capacity across all of our production

locations[,] . . . though we continue to experience some spot outages.  We expect

to continue to install equipment and capacity over the remainder of the year to

enable us to meet demand."  *Id.*

Green Mountain held another conference call with investors on July 27, 2011 to discuss third quarter 2011 results.  Defendant Frances Rathke -- Chief Financial Officer, Secretary, and Treasurer of Green Mountain -- stated that during the third quarter, "we got back into a place where we knew we had appropriate inventory levels."  *Id.* at 45.  Blanford emphasized a need to increase production capacity at a "rapid clip" because "[a]s a result of the growth we've experienced thus far this year . . . we will need to deploy more portion pack production capacity in 2012 than previously anticipated to support consumer demand."  *Id.*  When investors expressed concern about over-producing, Blanford reiterated that "we're at appropriate inventory levels."  *Id.*

    **2.**     *Green Mountain's Production and Inventory Levels*

In fact, during the Class Period, Green Mountain was accumulating a significant overstock of expiring and unsold product.  The Complaint includes observations from numerous confidential witnesses ("CWs") -- Green Mountain employees from different tiers of the company -- detailing the company's increasing inventory buildup.

For example, CW1 -- a machine operator responsible for generating new product, packaging, and roasting in a Green Mountain facility from 2006 to

2012 -- reported that production increased dramatically in 2010 after Green

Mountain bought new machinery.  Inventory accumulated "up to the rafters,"

became "backed up into various departments," and was even being stored in

operators' work spaces.  *Id.* at 48.  Similarly, CW3 -- a maintenance technician

from 2009 to 2011 -- stated that the warehouse was crowded with rows of

outdated coffee, and much of it was simply discarded when the "best-by-date"

passed.  *Id.*  CW4 -- a machine operator for K-cup production from 2009 to mid-

2012 -- emphasized that there was "no question" that Green Mountain had excess

K-cup inventory, as warehouse workers were throwing away "pallet after pallet

after pallet."  *Id.*

    **3.**    ***Green Mountain's Efforts to Deceive***

        Faced with overflowing inventory, Defendants took steps to conceal

the overstock of inventory and overproduction of products.  Various former

employees reported that throughout the Class Period, Green Mountain, in

partnership with M.Block, "intentionally concealed from both investors

and . . . auditors" that its warehouses were "stuffed to the rafters" with "unused

and expiring coffee products that were not being sold to consumers," and it was

discarding "pallet after pallet after pallet."  *Id.* at 33.  As part of its efforts to

deceive investors, Green Mountain orchestrated "phony shipment[s]" to temporarily conceal excess products during inventory audits and utilized non-mainstream accounting practices to track its inventory.  *Id.* at 34.

The Complaint detailed statements from CWs regarding Green Mountain's inventory practices.  CW2 -- a production planning manager for M.Block from 2010 to 2011 -- recalled that Green Mountain opened a new facility in Tennessee because the company "needed more space" to store inventory.  *Id.* at 48.  CW2 also reported that Green Mountain made repeated phantom shipments to QVC (the home shopping network), one of M.Block's biggest customers and a frequent purchaser of Keurig machines.  According to CW2, nearly every QVC order came through right before an audit and each time 30-40% of the QVC order would be returned to M.Block after the audit.  *Id.* at 61.  He recalled a specific second quarter 2011 QVC order for 500,000 brewers right before an audit:  After packing, "most of the brewers never even left the dock," and instead they were "taped off, not to inventory."  *Id.* at 62.  After the auditors left, the entire order was "put back in stock."  *Id.*  Similarly, CW4 reported that on numerous occasions before an inventory count or audit, "bags and bags of coffee would be loaded onto trucks" that would either leave temporarily or just sit behind the facility

filled with product.  *Id.* at 53.  When employees escorted auditors through the

facility, they were not permitted "beyond a point blocked off by black plastic,"

where inventory was hidden.  *Id.* at 54.  CW9 -- Green Mountain's Production

and Maintenance Manager in Knoxville from 2009 to 2011 -- confirmed that

Green Mountain's plan was to "shop stuff close to expiration to our outside

vendors [including M.Block] just so we could book the orders prior to quarter-

end."  *Id.* at 52, 62.

      Other CWs stated that Green Mountain's senior managers

discouraged questions from employees about these suspicious practices.  CW4 --

a member of Green Mountain's "inventory control panel" in 2009 -- was told that

Green Mountain did not want employees to keep track of the amount of product

being discarded.  CW4 reported that the Vice President of Vermont Operations

visited the plant several times and told the crew to just "follow the lead with

your supervisors" and do whatever the managers said when calculating

inventory.  *Id.* at 54.

      The Complaint details similar reports from mid-level managers.

CW8 -- a North America Distribution Resource Planning Manager from 2009 to

2010 -- expressed concerns to his senior managers about Green Mountain's

overproduction of K-cups and its improper method of inventory counting, all to no avail.  According to CW8, Green Mountain's management was consciously using "methods for counting obsolete and excess inventory that were unheard of in the food industry." *Id.* at 83.  Similarly, CW9 was concerned that the company's demand models and forecasts had "no rhyme or reason" and were "out of whack" with sales orders.  *Id.* at 51.  CW9 discussed his concerns repeatedly on weekly conference calls with Green Mountain's Director of Operations and Vice President of General Operations, but the problems persisted.

>    **4.**    *Defendants' Stock Sales*

Immediately following the quarterly investor calls and throughout the Class Period, senior executives capitalized on their own pronouncements of Green Mountain's financial strength by selling their shares of company stock at peak stock prices, reaping a total of over $49 million in personal gain.  The stock sales began after May 4, 2011, when Rathke and Blanford entered into new 10b5-1 trading plans governing their sales of company stock.

For example, following its second quarter results call with investors on May 3, Green Mountain's stock price rose from $64.07 on May 3 to $75.98 per

share on May 4.  Green Mountain announced that it would sell 7.1 million shares of common stock at $71.00 per share in its May offering, and when it closed on May 11, the offering had increased to 9.5 million shares, raising a total of $680 million from investors.  During this offering, Blanford and three other directors sold 410,456 shares for gross proceeds of $29 million.  Blanford sold an additional 51,573 of his personal shares, reaping a personal profit of $3.6 million.

Similarly, on July 27, the same day it held its third quarter investor call, Green Mountain issued a press release announcing triple-digit growth in net sales, operating income, and net income.  Shortly thereafter, on August 3, Green Mountain's stock price reached $110.96 per share.  On August 5, Rathke -- who had assured investors of "appropriate inventory levels" during the third quarter call -- made her first and only sale of Green Mountain stock in the nine years she had been with the company, selling 337,500 shares for gross personal proceeds of nearly $32.7 million.  On August 16, Blanford sold another 45,000 shares for total proceeds of nearly $4.5 million.

These fortuitously timed stock sales continued throughout the Class Period.  On September 19, Green Mountain's stock price reached its Class Period high at $111.62 per share.  The next day, Blanford sold another 45,000 shares,

reaping over $5 million in proceeds.  Finally, on October 18, Blanford made a

final sale of 45,000 shares, for a profit of $3.6 million.  In sum, Rathke and

Blanford's sales of stock throughout the Class Period totaled over $49 million in

personal proceeds.

     **5.**     *Green Mountain's "Growth Story" Unravels*

As evidenced by its rising stock price, Green Mountain's purported

growth story led to an initially positive market response.  Canaccord Genuity's

July 28, 2011 analyst report stated that Green Mountain's "stock chart . . . would

probably intimidate the best rock climbers from Utah to Vermont."  App. at 45.

Dougherty & Company LLC's report from the same day stated:

"Wow! . . .  Demand for [Green Mountain] products exploded."  *Id.* at 46.

According to SunTrust Robinson Humphrey, Green Mountain's "[m]anagement

indicated that it has been racing to meet retailer demand since the 2010 holidays."

*Id.*

Green Mountain's growth story began to unravel, however,

following a presentation by an investor, David Einhorn, to analysts at the Value

Investing Conference on October 17, 2011 (the "Einhorn Report").  The Einhorn

Report stated that Green Mountain was engaged in a "variety of shenanigans that

appear designed to mislead auditors and to inflate financial results," including

systematic excess production leading to inventory and spoilage problems. *Id.* at

34. Among the specific allegations detailed in the Einhorn Report, Einhorn

corroborated CW2's allegations that Green Mountain had inventoried 500,000

Keurig machines for a QVC order in the second quarter of 2011, right before an

audit, but the machines were never actually shipped.

As news of the Einhorn Report leaked into the market, Green

Mountain's stock price fell from $92.09 to $82.50 per share. The day after

Einhorn's presentation, Blanford made his final sale of Green Mountain stock,

reaping proceeds of $3.6 million. On October 19, 2011, the Wall Street Journal

published an article disseminating the Einhorn Report, and Green Mountain's

stock declined an additional 15%, from approximately $80.21 to $69.80 per share.

Finally, on November 9, 2011, Green Mountain publicly announced

that it had failed to meet sales and revenue expectations for the first time in eight

quarters, falling $50 million short of analyst estimates. Green Mountain

admitted that, despite prior statements that year that it was "maintaining

optimum inventory levels," its total inventory and obsolete inventory levels had

skyrocketed 61% and 47%, respectively, from the prior quarter. *Id.* at 35.

**B.**      *Proceedings Below*

This putative class action was commenced on November 29, 2011. After their appointment as lead plaintiffs, Plaintiffs filed the Complaint on November 5, 2012.  Plaintiffs asserted claims for violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  On March 1, 2013, Defendants moved pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4, to dismiss the Complaint for failure to state a claim upon which relief could be granted, arguing that Plaintiffs failed to 1) allege a false statement of material fact, and 2) plead a compelling inference of scienter.  On December 20, 2013, the district court granted Defendants' motions to dismiss, entering judgment the same day.  *La. Mun. Police Emps.' Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, No. 2:11-cv-289, 2013 WL 6728869 (D. Vt. Dec. 20, 2013).

This appeal followed.

*DISCUSSION*

**A.    *Applicable Law***

We review the district court's grant of a motion to dismiss *de novo.*

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d

187, 196 (2d Cir. 2009).

**1.    *Pleading Standards***

**a.    *Rule 12(b)(6)***

"To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007)); s*ee ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87,

98 (2d Cir. 2007) (applying plausibility standard to securities fraud claim).

**b.    *The PSLRA and Rule 9(b)***

"Any complaint alleging securities fraud must satisfy the heightened

pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with

particularity the circumstances constituting fraud."  *ECA*, 553 F.3d at 196.  Prior

to the enactment of the PSLRA, the sufficiency of a complaint for securities fraud

was governed only by Rule 9.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

U.S. 308, 319 (2007).  The PSLRA builds on Rule 9's particularity requirement,

dictating the pleading standard for claims brought under the Exchange Act.

2.     *The Exchange Act*

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or

employ, in connection with the purchase or sale of any security[,] . . . any

manipulative or deceptive device or contrivance in contravention of such rules

and regulations as the Commission may prescribe as necessary or appropriate in

the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  SEC Rule

10b-5 implements this provision of the Exchange Act and explicitly prohibits

"mak[ing] any untrue statement of a material fact."  17 C.F.R. § 240.10b-5(b).  "To

state a claim under Rule 10b-5 for misrepresentations, a plaintiff must allege that

the defendant (1) made misstatements or omissions of material fact, (2) with

scienter, (3) in connection with the purchase or sale of securities, (4) upon which

the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of

its injury."  *ATSI Commc'ns*, 493 F.3d at 105.  Section 20(a) of the Exchange Act

provides that individual executives, as "controlling person[s]" of a company, are

secondarily liable for their company's violations of the Exchange Act.  15 U.S.C.

§ 78t(a); s*ee Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).

As relevant here, the PSLRA specifically requires a complaint to demonstrate that the defendant made "[m]isleading statements and omissions . . . of a material fact," 15 U.S.C. § 78u-4(b)(1), and acted with the "[r]equired state of mind" (the "scienter requirement"), *id.* § 78u-4(b)(2). *See ATSI Commc'ns*, 493 F.3d at 99. The parties in this case contest whether the Complaint adequately alleges these two elements.

     **a.**    *Misleading Statements or Omissions of Material Fact*

To satisfy the pleading standard for a misleading statement or omission under Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)) (internal quotation marks omitted). The PSLRA's requirements are similar, stating that the complaint must specify "the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).

- 18 -

As a general matter, the PSLRA does not require confidential

sources to be named in the complaint.  A complaint may rely on information

from confidential witnesses if "they are described in the complaint with sufficient

particularity to support the probability that a person in the position occupied by

the source would possess the information alleged."  *Novak v. Kasaks*, 216 F.3d 300,

314 (2d Cir. 2000).

**b.**     *Scienter*

To meet the scienter requirement in a 10b-5 action under the PSLRA,

a plaintiff must "state with particularity facts giving rise to a strong inference that

the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).

This "state of mind" requires a showing "of intent to deceive, manipulate, or

defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 188 (1976), or recklessness, *In*

*re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000).  The Supreme

Court has interpreted the PSLRA's "strong inference" requirement to involve

"tak[ing] into account plausible opposing inferences" and considering "plausible,

nonculpable explanations for the defendant's conduct, as well as inferences

favoring the plaintiff." *Tellabs*, 551 U.S. at 323-24.  A court, however, must assess

the complaint in its entirety, and not scrutinize each allegation.  *Id.* at 326.

We have held that the scienter requirement is met where the complaint alleges facts showing either: 1) a "motive and opportunity to commit the fraud"; or 2) "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99.  Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311) (internal quotation marks omitted).

A complaint will survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  While robust, this pleading standard does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is "unaided by discovery" at the motion to dismiss stage.  *Id.* at 324 n.5.

**B.**   *Application*

We conclude that Plaintiffs adequately pled both false statements of material fact and a compelling inference of scienter.

**1.**   *The Complaint Alleges Misleading Statements of Material Fact*

Plaintiffs allege that Green Mountain was hiding stockpiled and expiring coffee products from its auditors while it fraudulently continued to assure investors that it was straining to meet an increasing demand for its products, all in an effort to drive up its stock price.  The Complaint alleges (1) specific misleading statements by Defendants about the status of Green Mountain's inventory during the Class Period, the identity of the speakers, and where and when the statements were made, and (2) explains why these statements were fraudulent.  Specifically, Defendants' statements during the February 2, May 3, and July 27 quarterly results calls with investors about Green Mountain's growth contradict observations by CWs regarding Green Mountain's efforts to disguise increasing inventory buildup from auditors during the Class Period, particularly CW2's account of the second quarter QVC order.

### a.   *Specific Misleading Statements*

The Complaint quotes several statements by Rathke, Blanford, and other Green Mountain spokesmen, made on specific dates, indicating that Green Mountain was struggling to meet demand and had no excess inventory.  During the February 2 first quarter investor call, the Complaint quotes an executive reiterating Green Mountain's desire to "fulfill unmet demand."  App. at 42.  Similarly, during the May 3 second quarter investor call, the Complaint quotes a spokesperson as saying "we are not building any excess inventories."  *Id.* at 43.  During the July 27 third quarter investor call, the Complaint quotes Rathke and Blanford as stating that Green Mountain was at "appropriate inventory levels."  *Id.* at 45.  The Complaint is replete with statements from various top executives that Green Mountain was struggling to meet demand and business was booming throughout the Class Period.

The Complaint further alleges that Green Mountain's fourth quarter revenue gap is indicative of a "false growth story."  Green Mountain argues that it can explain its $50 million revenue gap and corresponding inventory spike from the end of November as a mere sales miss.  But a significant gap in fourth quarter sales tends to support Plaintiffs' claim that inventory was misleadingly

characterized throughout the Class Period.  *Cf. Novak*, 216 F.3d at 312-13.

Moreover, the explanation for the revenue gap and inventory spike that Green

Mountain offers is entitled to little weight at this stage of litigation, when we

must "accept all factual claims in the complaint as true and draw all reasonable

inferences in the plaintiff's favor."  *Simon v. KeySpan Corp.*, 694 F.3d 196, 198 (2d

Cir. 2012).  We therefore conclude that Plaintiffs sufficiently allege the materially

misleading nature of Green Mountain's statements regarding its inventory.

### b.    *Why the Statements were Fraudulent*

The Complaint also explains why these statements were fraudulent

by detailing numerous CWs' observations that Green Mountain's inventory was

decidedly not at "appropriate levels."  These witnesses are former employees of

Green Mountain and M.Block, and the Complaint specifies each witness's

position, length of employment, and job responsibilities.  Many witnesses

described the buildup of inventory "up to the rafters" and their need to throw

away "pallet after pallet after pallet" as the coffee products expired.  App. at 48.

CW1 stated that inventory was "backed up into various departments" and even

stored in operators' work spaces.  *Id.*

Specifically, CW2 recalled a second quarter QVC order where 500,000 brewers were loaded onto trucks right before an audit, and "put back in stock" immediately after the auditors left the facility. *Id.* at 62. The Einhorn report also discussed this specific transaction. This was the same quarter during which Green Mountain assured investors "we are not building any excess inventories at all at retail." *Id.* at 43. CW4 corroborated this story, stating that inventory was often temporarily loaded onto trucks or hidden behind black plastic in roped off areas during the quarterly auditor visits. Additionally, the Complaint details statements from CWs in management positions with a broader knowledge of the company's inventory and accounting practices. These managers reported to Green Mountain executives who discouraged questions about the inventory practices and ignored their repeated complaints. Hence, the Complaint pleads sufficient particularity to support the probability that the witnesses possessed the information alleged. *See Novak*, 216 F.3d at 314.

Green Mountain argues that confidential witnesses' statements must be linked to specific quarters to meet the pleading standard; yet the Second Circuit has held that allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period. *See Iowa Pub. Emps.'*

*Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).  Even if more specificity is required under our law, CW2's account of the fraudulent second quarter QVC order is closely linked to Green Mountain's misleading statements during the second quarter investor call.

Because the Complaint states with particularity the statements it alleges are misleading and the reasons why these statements are fraudulent, we hold that the Complaint adequately alleges false statements of material fact.

**2.**    ***The Complaint Alleges Scienter***

The Complaint's allegations, taken together, are also sufficient to show that Green Mountain had the requisite scienter.  Plaintiffs plead strong circumstantial evidence of Green Mountain's intent to deceive or defraud Plaintiffs by detailing both (1) Defendants' efforts to deceive auditors and investors and conceal the true facts about Green Mountain's excess inventory, and (2) Defendants' significant personal gain from these efforts.  Specifically, the CWs' statements about their supervisors' efforts to disguise inventory and the size and timing of Rathke and Blanford's stock sales pursuant to their May 2011 10b5-1 trading plans support an inference of scienter.  The facts in the Complaint

are thus sufficient to plausibly allege Defendants' motive and opportunity to commit fraud, as well as their recklessness.

### a.    *Defendants' Efforts to Deceive*

As pleaded, Defendants' efforts to conceal inventory from auditors demonstrate their intent to deceive or defraud.  The Complaint alleges that inventory was "stuffed to the rafters" and workers were discarding "pallet after pallet after pallet."  App. at 33.  CW2 and CW4 reported that shortly before audits, Defendants made phantom shipments to hide excess inventory, loading trucks with brewers and bags of coffee that either left the facility temporarily or just sat in the dock loaded with product.  Defendants would also hide overstocked inventory behind black plastic, and employees escorting auditors through the facility did not permit auditors beyond the areas blocked by these barriers.

The Complaint also details CWs' observations that high level managers discouraged questions about unorthodox inventory practices.  CW4 was told that Green Mountain did not want employees keeping track of the amount of discarded product and reported that a senior vice president told the crew to just "follow the lead with your supervisors" when calculating inventory.

*Id.* at 54.  Mid-level managers CW8 and CW9 expressed concern to senior managers about improper inventory practices that were "unheard of in the food industry," but their complaints fell on deaf ears.  *Id.* at 83.

      **b.**    ***Defendants' Personal Gain***

      Rathke and Blanford's sales of Green Mountain stock at opportune moments throughout the Class Period at significant personal gain further evinces Defendant's intent to deceive or defraud.  These stock sales occurred shortly after the quarterly investor calls during which Rathke and Blanford reassured investors of the strength and continued growth of Green Mountain's business.  Green Mountain held its second quarter investor call on May 3, and the next day, Green Mountain's stock price rose from $64.07 to $75.98 per share and Rathke and Blanford entered into new 10b5-1 trading plans governing the sales of their personal stock.  During Green Mountain's share offering the following week, Blanford and three other directors sold 410,456 shares for $29 million, and Blanford sold an additional 51,573 of his personal shares, in accordance with his new trading plan, for a personal profit of $3.6 million.

      The Complaint details similar executive stock sales following the third quarter investor call on July 27.  On August 3, Green Mountain's stock price

reached $110.96 per share, and on August 5, Rathke made her first and only sale of Green Mountain stock in the nine years she had been with the company.  That day Rathke sold 337,500 shares for a personal profit of nearly $32.7 million.  On August 16, Blanford sold another 45,000 shares for a personal profit of nearly $4.5 million.

These patterns continued throughout the Class Period.  Green Mountain's stock price peaked at $111.62 per share on September 19, and the following day, Blanford sold 45,000 shares for a personal profit of $3.6 million. Finally, on October 18, the day after the Einhorn report was released, Blanford made one last sale of 45,000 shares for a personal profit of $3.6 million.  In sum, Rathke and Blanford reaped a total of over $49 million from the sales of their personal stock during the Class Period.

Green Mountain argues that these trades do not support an inference of scienter because they were made pursuant to the pre-determined 10b5-1 trading plans.  This argument, however, ignores that Rathke and Blanford entered this trading plan in May after the second quarter investor call, long after the Complaint alleges that Green Mountain's fraudulent growth scheme began. When executives enter into a trading plan during the Class Period and the

Complaint sufficiently alleges that the purpose of the plan was to take advantage

of an inflated stock price, the plan provides no defense to scienter allegations.

*See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014) (noting

that a "10b5-1 plan does less to shield [a defendant] from suspicion [when] he

instituted the plan . . . after the start of the class period"); *George v. China Auto.*

*Sys., Inc.*, No. 11-CV-7533, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012)

("[W]here (as here) 10b5-1 trading plans are entered into during the class period,

they are not a cognizable defense to scienter allegations on a motion to dismiss."

(internal quotation marks omitted)).

The Complaint alleges that Rathke and Blanford made positive

public statements about Green Mountain's growth that drove up its stock price

immediately before the scheduled sales in February, May, and July.  While these

sales were made pursuant to their 10b5-1 trading plans, Rathke and Blanford

knew the dates of their scheduled sales where imminent when they made

allegedly misleading statements to investors.  This behavior remains suspicious

even if we discount the September and October stock sales -- which immediately

followed the stock price peaking and the release of the Einhorn Report -- as

coincidence.

### c.     *The Complaint Supports a Strong Inference of Scienter*

Taken together, and even in light of opposing inferences, the
Complaint's allegations articulate Defendants' intent to craft a false growth story
and the extraordinary opportunities for personal gain this "growth" created for
Green Mountain's executives.  The Supreme Court dictates that the standard on a
motion to dismiss is "whether *all* of the facts alleged, taken collectively, give rise
to a strong inference of scienter, not whether any individual allegation,
scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 323.  We have
held that motive for scienter can "be shown by pointing to the concrete benefits
that could be realized from one or more of the allegedly misleading statements or
nondisclosures; opportunity could be shown by alleging the means used and the
likely prospect of achieving concrete benefits by the means alleged."  *S. Cherry
St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009) (internal quotation
marks omitted).  Plaintiffs meet this standard.  Accordingly, we hold that the
Complaint plausibly alleges motive and opportunity for Defendants to commit
fraud and conscious misbehavior or recklessness on the part of Green Mountain's
executives.  *ATSI Commc'ns*, 493 F.3d at 99.

## *CONCLUSION*

Accordingly, we conclude that the district court erred in granting Green Mountain's motions to dismiss because the Complaint alleges misleading statements of material fact and a compelling inference of scienter.  For the reasons stated above, we VACATE the district court's judgment of dismissal and REMAND.