# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

LOUISIANA MUNICIPAL POLICE
EMPLOYEES' RETIREMENT SYSTEM,
SJUNDE AP-FONDEN, BOARD OF TRUSTEES
OF THE CITY OF FORT LAUDERDALE
GENERAL EMPLOYEES' RETIREMENT
SYSTEM, EMPLOYEES' RETIREMENT
SYSTEM OF THE GOVERNMENT OF THE
VIRGIN ISLANDS, AND PUBLIC EMPLOYEES'
RETIREMENT SYSTEM OF MISSISSIPPI
on behalf of themselves and all others similarly
situated,

                Plaintiffs,

    v.

GREEN MOUNTAIN COFFEE ROASTERS,
INC., LAWRENCE J. BLANFORD and
FRANCES G. RATHKE,

             Defendants.

No. 2:11-CV-00289-WKS

# DEFENDANTS' LOCAL RULE 56(a) STATEMENT OF
# UNDISPUTED MATERIAL FACTS

# TABLE OF CONTENTS

Page

I.    THE PARTIES ........................................................................................................ 1

II.   GREEN MOUNTAIN'S EXPLOSIVE GROWTH ............................................... 2

III.  GREEN MOUNTAIN'S FINANCIAL RESULTS, PUBLIC STATEMENTS
      REGARDING CAPACITY CONSTRAINTS, AND UNDISPUTED EVIDENCE
      SUPPORTING THOSE STATEMENTS ............................................................... 5

      A.    *Q4 FY2010* .................................................................................................. 5

      B.    *Q1 FY2011* .................................................................................................. 5

      C.    *Q2 FY2011* ................................................................................................ 11

      D.    *Q3 FY2011* ................................................................................................ 16

      E.    *David Einhorn's GAAP-uccino Presentation Criticizing Green Mountain at the
            Value Investing Congress on October 17, 2011* .................................... 25

      F.    *Q4 FY2011* ................................................................................................ 30

IV.   MR. BLANFORD'S AND MS. RATHKE'S TRADING PLANS ..................... 36

V.    MR. BLANFORD'S AND MS. RATHKE'S STOCK SALES PURSUANT TO THEIR
      10B5-1 PLANS .................................................................................................. 41

VI.   PLAINTIFFS' CLAIMS ...................................................................................... 42

VII.  MR. STAHL'S TESTIMONY CANNOT CREATE A MATERIAL ISSUE OF
      DISPUTED FACT .............................................................................................. 45

Pursuant to Local Rule 56(a) Defendants Keurig Green Mountain, Inc., formerly known as Green Mountain Coffee Roasters, Inc. ("Green Mountain" or the "Company"), Lawrence J. Blanford, and Frances G. Rathke respectfully submit this Statement of Undisputed Material Facts as to which there is no genuine issue and that entitle Defendants to judgment as a matter of law.[1]

## I.      The Parties

1.      Defendant Green Mountain is a Vermont-based leader in the specialty coffee and coffeemaker businesses.  Green Mountain sells the Keurig single-serve brewing system, which uses K-Cup portion packs of coffee, tea, and other beverages to produce ready-to-drink, single-serving size hot and cold beverages.  (Ex. 1, FY2011 Form 10-K, at 1).

2.      Defendant Lawrence J. Blanford was the Chief Executive Officer of Green Mountain from May 3, 2007 to December 3, 2012.  His employment with the Company ended on March 4, 2013.  (Ex. 2, Form 8-K/A, dated May 3, 2007; Ex. 3, Form 8-K, dated Nov. 20, 2012; Ex. 4, Blanford Tr. at 12:19-15:4).

3.      Defendant Frances G. Rathke was the Chief Financial Officer of Green Mountain from November 20, 2003 to August 17, 2015.  Her employment with the Company ended on December 31, 2015.  (Ex. 5, Form 8-K, dated Nov. 20, 2003; Ex. 6, FY2015 Form 10-K/A, dated September 26, 2015, at 4; Ex. 7, Rathke Tr. at 10:9-11:10).

4.      Plaintiffs are a class of persons and entities who allegedly purchased or otherwise acquired Green Mountain common stock during the Class Period, between February 2, 2011 and November 9, 2011.  (Ex. 8, Dkt. 279, at 2).

5.      Lead Plaintiffs are five institutional investors who allegedly purchased and/or sold Green Mountain securities during the Class Period:  Louisiana Municipal Police Employees'

---

[1] References herein are made to the Class Period, which is the period February 2, 2011 through November 9, 2011.

Retirement System; Sjunde AP-Fonden; Board of Trustees of the City of Fort Lauderdale General Employees' Retirement System; Employees Retirement System of the Government of the Virgin Islands; and Public Employees' Retirement System of Mississippi.  (Ex. 9, Dkt. 8-4).

## II.   Green Mountain's Explosive Growth

6.     During the relevant time period, Green Mountain operated two primary business units.  (Ex. 1, FY2011 10-K, at 33).

(a)     First, the Specialty Coffee Business Unit (The "SCBU"), which roasted, manufactured, and packaged K-Cup portion packs of coffee, tea, and other products.  The SCBU sold K-Cup portion packs to grocery stores and club stores such as Costco, Sam's Club, and BJ's.  (Ex. 1, FY2011 Form 10-K, at 33).

(b)     Second, the Keurig Business Unit (the "KBU"), which manufactured and sold the Company's single-cup brewer system.  The KBU also sold K-Cup portion packs to retail stores such as Bed Bath & Beyond, Wal-Mart, and Target.   (Ex. 1, FY2011 Form 10-K, at 33).

7.     The claims in this case relate exclusively to the production and sale of K-Cup portion packs, not brewers.  (Ex. 10, Dkt. 263, at 2; Ex. 11, Tabak Tr. at 62:16-63:3).  Plaintiffs have conceded that "none of the challenged misstatements – in February, May or July 2011 – involved sales projections or other forward looking statements.  (Ex. 10, Dkt. 263, at 13).

8.     Prior to fiscal year 2011, Green Mountain had significantly expanded the size of its business with several multi-million dollar acquisitions.  Specifically, in the two-year period from 2009 to May 2011:

(a)     On March 27, 2009, Green Mountain announced that it had acquired Seattle, Washington-based specialty coffee company Tully's Coffee Corporation.  (Ex. 12, Form 8-K, dated Mar. 27, 2009).

      (b)     On November 13, 2009, Green Mountain announced that it had entered into a share purchase agreement to purchase Canadian specialty coffee company Timothy's Coffees of the World Inc.  (Ex. 13, Form 8-K, dated Nov. 13, 2009).

      (c)     On May 11, 2010, Green Mountain announced that it had acquired specialty coffee company Diedrich Coffee, Inc.  (Ex. 14, Form 8-K, dated May 11, 2010).

      (d)     On August 10, 2010, Green Mountain announced that it had entered into a common stock purchase agreement with Italian coffee company Lavazza.  (Ex. 15, Form 8-K, dated Aug. 10, 2010).

      (e)     On December 17, 2010, Green Mountain acquired Canadian coffee company Van Houtte.  (Ex. 16, Form 8-K, dated Dec. 17, 2010).

9.     In fiscal years 2010 and 2011, Green Mountain also expanded its brand through licensing and manufacturing partnerships:

      (a)     On February 24, 2010, Green Mountain announced a licensing agreement with The J.M. Smucker Company (which includes the Folgers, Folgers Gourmet Selections, and Millstone brands).  (Ex. 17, Press Release, dated Feb. 24, 2010).

      (b)     On February 22, 2011, Green Mountain announced a partnership with Dunkin' Donuts.  (Ex. 18, Press Release, dated Feb. 22, 2011).

      (c)     On March 10, 2011, Green Mountain announced a partnership with Starbucks Corporation.  (Ex. 19, Form 8-K, dated Mar. 10, 2011).

10.    In fiscal year 2011, Green Mountain sold more than four billion K-Cups.  (Ex. 20, KGM00459735).

11.    The Company's revenue from K-Cup portion packs increased from $834.4 million FY2010 to $1.704 billion in FY2011.  (Ex. 21, Q4 FY2011 8-K, at Ex. 99.1).

12. Green Mountain's annual net sales grew 95% year-over-year, from $1.36 billion in FY2010 to $2.65 billion in FY2011. (Ex. 21, Q4 FY2011 8-K, at Ex. 99.1).

13. Green Mountain's rapid growth caused the Company to invest heavily in increasing its fixed assets in order to increase its K-Cup production capacity:

    (a) Green Mountain more than doubled its capital expenditures in FY2011, from $126.2 million in FY2010 to $283.4 million in FY2011. (Ex. 1, FY2011 Form 10-K, at 32). Much of this spending was used to increase K-Cup production capabilities. (Ex. 22, Q1 FY2011 Form 10-Q, at 39; Ex. 23, DX 56, Q2 FY2011 10-Q, at 37; Ex. 24, DX 55, Q3 FY2011 Form 10-Q at 39; Ex. 1, FY2011 Form 10-K, at 32; Ex. 25, PX 527, Kelly Report ¶ 43).

    (b) Green Mountain expanded its weekly K-Cup manufacturing capacity by 96% over FY2010 levels, from 47 to 82 installed and operational K-Cup packaging lines across its facilities. This represented a net increase of 35 lines in FY2011. (Ex. 26, KGM01102597; Ex. 27, PX 514, Thomas Report ¶ 36).

    (c) Green Mountain's K-Cup production capacity nearly doubled from 79.16 million K-Cups per week at the start of FY2011 to 155.06 million K-Cups per week at the end of FY2011 – an increase of 96% over the prior year. In Q4 FY2011 alone, manufacturing capacity increased by approximately 13.3%. (Ex. 26, KGM01102597; Ex. 27, PX 514, Thomas Report ¶ 36).

14. In addition, the Company also nearly doubled its full-time employees in fiscal year 2011, from 2,380 full-time employees at the end of FY 2010 to 5,600 full-time employees at the end of FY2011. (Ex. 28, FY2010 Form 10-K, at 9; Ex. 1, FY2011 Form 10-K, at 10).

III.   **Green Mountain's Financial Results, Public Statements Regarding Capacity Constraints, and Undisputed Evidence Supporting Those Statements**

A.   *Q4 FY2010*

15.   In December 2010, when reporting its actual financial results for Q4 FY2010 and the entirety of FY2010, the Company forecasted quarterly sales growth for Q1 FY2011 of 55%-65% and issued Q1 FY2011 quarterly EPS guidance of between $0.14-$0.18.  (Ex. 29, Q4 FY2010 Form 8-K, at Ex. 99.1).

B.   *Q1 FY2011*

16.   Green Mountain's fiscal year begins in September.  The Company's 2011 fiscal year ran from September 26, 2010 to September 24, 2011.  (Ex. 28, FY2010 Form 10-K; Ex. 1, FY2011 Form 10-K).

17.   Green Mountain's first quarter of FY2011 ("Q1") ran from September 26, 2010 through December 25, 2010.  (Ex. 29, Q4 FY2010 Form 8-K, at Ex. 99.1; Ex. 30, PX 183, Q1 FY2011 Form 8-K, at Ex. 99.1).

18.   Green Mountain reported its financial results for Q1 on February 2, 2011.  The Company announced at this time that it had achieved 67% net sales growth during the quarter (as compared with Q1 FY2010), exceeding the quarterly sales growth guidance of 55%-65% that the Company had issued back in December 2010, and EPS of $0.18, at the very top end of the Company's December EPS guidance range of $0.14-$0.18.  (Ex. 31, DX 88, Q1 FY2011 Earnings Call Tr., dated Feb. 2, 2011, at 2; Ex. 30, PX 183, Q1 FY2011 Form 8-K, at Ex. 99.1).

19.   Green Mountain also forecasted quarterly sales growth for Q2 of 92%-97% and 75%-80% annual sales growth for all of FY2011.  (Ex. 30, PX 183, Q1 FY2011 Form 8-K, at Ex. 99.1).  The Company also issued Q2 quarterly EPS guidance of between $0.38-$0.42.  (Ex. 30, PX 183, Q1 FY2011 Form 8-K, at Ex. 99.1).

20.     In prepared remarks filed that day, Green Mountain told investors that it had struggled to produce enough K-Cups during Q1 FY2011 to meet customer demand.  Specifically, Green Mountain stated that, "[a]s we mentioned last quarter, despite our efforts to ensure adequate capacity ahead of the holiday season, we experienced and continue to see some spot portion pack shortages," and that the Company remained "focused on increasing production to fulfill unmet demand and on achieving and maintaining optimum inventory levels to provide better customer service."  (Ex. 30, PX 183, Q1 FY2011 Form 8-K, at Ex. 99.2, at 4).

21.     Also on February 2, 2011, Green Mountain held an earnings call with investors, on which Mr. Blanford explained the Company's struggles to meet customer demand in further detail. Specifically, Mr. Blanford stated as follows:

> I would say in the first quarter and so far in our second quarter of our fiscal [year], we are definitely being stretched.  We are setting production records, it seems pretty frequently at individual plants and in total but demand is definitely stretching our ability to supply.  And we've not quite caught up with that demand curve yet.  We are hoping to build a little bit of cushion going forward, supply versus demand, but Scott McCreary has his – all he can handle here to get us ready for next fall.  We've got a number of lines we have to install to get ready.

(Ex. 31, DX 88, Q1 FY2011 Earnings Call Tr., dated Feb. 2, 2011, at 6).

22.     Mr. Blanford also stated on the earnings call:

> Try as we might, we did have some [issues] on the K-Cup side through our first quarter and we are continuing to experience that is I've had some personal interactions with a couple of accounts recently.  We are working very hard to improve our customer service.  And Scott McCreary and his team are getting the call from me about every other day as to how we are doing.  And we are making progress, but as I said earlier, we haven't quite caught the rabbit yet.

(Ex. 31, DX 88, Q1 FY2011 Earnings Call Tr., dated Feb. 2, 2011, at 11).
.

23.     The Company filed its Q1 FY2011 Form 10-Q with the SEC on February 3, 2011. There, Green Mountain reported that it had spent $47.4 million on capital expenditures during Q1 FY2011, up from $23.7 million for the same period a year earlier, with much of the spending

devoted to adding K-Cup manufacturing lines.  The Q1 Form 10-Q also announced an increase in Green Mountain's estimated capital expenditures for FY2011, from $215-$260 million to $245-$290 million.  (Ex. 1, FY2011 Form 10-K, at 37; Ex. 22, Q1 FY2011 Form 10-Q, at 39).

24.     Green Mountain's K-Cup production capacity increased by more than 25% in Q1 FY2011.  (Ex. 27, PX 514, Thomas Report ¶ 62; Ex. 26, KGM01102597).

25.     Green Mountain had a K-Cup obsolescence reserve of $2.132 million at the end of Q1 FY2011.  (Ex. 25, PX 527, Kelly Report ¶ 64).

26.     Numerous Green Mountain employees observed, both in contemporaneous documents and in deposition testimony, that the Company did not have sufficient inventory or production capacity to meet customer orders in Q1 FY2011.  For example:

>     (a)     On November 23, 2010, KBU VP of the At-Home channel, John Whoriskey observed, "W[e] are currently capacity constrained and will be in this situation through January. . . ."  (Ex. 32, DX 78).

>     (b)     SCBU VP of Operations John Wettstein testified that, "at the time we were behind customer orders, not shipping to demand, and the pressure to continue to install lines, staff, and produce . . . was substantial."  (Ex. 33, Wettstein Tr. at 165:20-168:2).

>     (c)     KBU VP of Finance John Heller testified that, "there wasn't a sufficient capacity available to fully support the demand requirements that existed across the numerous channels."  (Ex. 34, Heller Tr. at 299:16–24).

27.     On December 17, 2010, the senior leaders of both SCBU and KBU met at the Company's Executive Sales, Inventory, and Operations Planning ("SIOP") meeting to discuss key supply chain planning decisions.  (Ex. 35, PX 247).  The meeting minutes for this December

session state that one of the first topics of discussion was: "guidelines for prioritizing channels and products in capacity constrained circumstances."  The minutes go on to describe discussion "around making sure that existing customer needs are met before agreeing to add distribution to new customers."  (Ex. 35, PX 247).

28.     When asked about these meeting minutes at his deposition, Mr. Heller explained: "There wasn't sufficient capacity to meet the current requirements and there was a request not to add additional requirements [*i.e.*, take on new customers] that would further exacerbate the situation."  (Ex. 34, Heller Tr. at 301:22–302:9).

29.     Weeks-on-hand ("WOH") is a metric that expresses the amount of inventory a Company has as a function of the number of weeks of expected customer orders that inventory could fill.  (Ex. 27, PX 514, Thomas ¶ 45).  Viewing inventory as WOH provides a metric that scales inventory with the size of the business.  When sales grow substantially from one quarter to the next, what might be enough inventory in one quarter might not be enough to satisfy demand in the next quarter.  (Ex. 27, PX 514, Thomas ¶ 45).

30.     Green Mountain documents show that, during the class period, the Company set WOH targets for the level of K-Cup inventory necessary to maintain a "minimum service level" for each of its K-Cup package sizes.  (Ex. 27, PX 514, Thomas Report ¶ 48).  The Company's WOH targets varied from one K-Cup package size to the next, but taking a weighted average of these WOH targets based on the total FY2011 sales volume they accounted for reveals that the aggregate inventory target for the minimum service level of all K-Cups in FY2011 was 4.11 WOH. (Ex. 36, Thomas Supp. ¶¶ 16–20).

31.     Throughout the first quarter of FY2011, Green Mountain's aggregate K-Cup inventory level remained just below the minimum service level of 4 WOH.  (Ex. 27, PX 514,

Thomas Report ¶ 51).  Inventory levels for certain sales channels sometimes fell even farther below 4 WOH; for example a December SIOP meeting slide deck states that SCBU inventory was at 2.1 WOH as compared to a target of 3.9 WOH.  (Ex. 37, KGM00728290, at slide 26).

32.     During the first quarter of FY2011, Green Mountain customers were put "on allocation" in response to inventory shortages.  (Ex. 38, Fellows Tr. at 48:5-49:8).

33.     Jodi Fellows, the VP of Purchasing at KBU's third-party fulfillment vendor, M. Block, explained being placed "on allocation" as follows:  "[a] customer is on allocation due to short supply of inventory, and what it means is that a customer may not receive, we may not ship the entire quantity the customer orders due to the short supply of inventory."  (Ex. 38, Fellows Tr. at 47:13-48:3).

34.     The inventory allocation process was not selective, and as Ms. Fellows testified, when the Company did not have enough inventory to fill orders, "[a]ll customers would be on allocation."  (Ex. 38, Fellows Tr. at 48:13-49:8).

35.     Mr. Whoriskey testified that during the holiday season of calendar year 2010, the Company was "really beginning to get into a very significant allocation of available inventory. . . ."  (Ex. 39, Whoriskey Tr. at 183:15-184:19).

36.     Contemporaneous documents and deposition testimony show that during Q1 FY2011, Green Mountain received numerous complaints from customers about the Company's inability to supply enough K-Cups to fill customer orders.  For example:

>       (a)     On November 1, 2010 Michael Kovacs, a buyer at Bed Bath & Beyond, emailed the Company that it was waiting on over $35 million in coffee and brewers that it had ordered from Green Mountain.  (Ex. 40, DX 40; *see also* Ex. 41, Kovacs Tr. at 19:24-20:22).

(b)     A November 9, 2010 email chain references backorders to Bed Bath & Beyond of 9.8 million K-Cups.  (Ex. 42, DX 41).

(c)     Mr. Kovacs testified at his deposition that he recalled "many numerous times" when Green Mountain could not supply enough K-Cups due to an "[i]nability to make what we or the market needed quick enough."  (Ex. 41, Kovacs Tr. at 9:8-11:1).  Mr. Kovacs testified that the shortages affected "at least 10 to 20 flavors" of K-Cups.  (Ex. 41, Kovacs Tr. at 14:13-15:14).

(d)     A November 23, 2010 email chain from Kohl's to KBU VP of Retail Sales Ron DiFabio, explains that Green Mountain had shipped only 77% of Kohl's last order, and only 40% of the order before that during the "most important month" of the store's sales year.  (Ex. 32, DX 78).  Mr. DiFabio forwarded this message to Mr. Whoriskey, Mr. Heller, and Ms. Stacy, noting that they were "getting notes from all of our planners at retailers" and that KBU still had "a tremendous amount of backorders from November."  (Ex. 32, DX 78).

(e)     A December 16, 2010 email chain from Wakefern grocery stores states that Wakefern had cancelled promotional sales events for two weeks in November and one week in December 2010 "due to supply issues."  (Ex. 43, DX 48).

(f)     A November 11, 2010 email chain discusses concerns about a request from Publix grocery stores to add six new varieties of K-Cups to its shelves.  SCBU employee Don Barberio responded to the request by observing, "we can not guarantee that product supply issues will not happen," and SCBU VP of Sales Jim Travis noted that, "[d]ue to recent challenges on inventory, [Publix] are understandably skittish on our ability to ship."  Mr. Travis forwarded this message

-10-

to Mr. Blanford noting that he was "[k]eeping him in the loop on latest with Publix." (Ex. 44, DX 47).  At his deposition, Mr. Travis described Publix as "[o]ne of the toughest customers [for Green Mountain] to break through. . . . "  (Ex. 45, Travis Tr. at 239:13-18).

(g)    Mr. Travis further testified at his deposition that the lack of K-Cup inventory in the grocery channel generally resulted in "cuts and out of stocks left and right and the conversations we had with customers were tense." (Ex. 45, Travis Tr. at 79:10-17).

(h)    Mr. Blanford testified and contemporaneous documents confirm that he had interactions with Bed, Bath & Beyond in this time period as Bed, Bath & Beyond was upset that Green Mountain was unable to supply it with all of the K-Cups Bed, Bath & Beyond had ordered during the Q1 FY2011 holiday season.  (Ex. 4, Blanford Tr. at 135:2-136:9; Ex. 40, DX 40).  Similarly, Mr. Travis testified that Green Mountain's inability to supply its grocery store customers was so significant that he raised it directly with Mr. Blanford.  (Ex. 45, Travis Tr. at 241:24-242:13; Ex. 44, DX 47).

**C.    *Q2 FY2011***

37.    The second quarter of Green Mountain's FY2011 ("Q2") ran from December 26, 2010 through March 26, 2011.  (Ex. 30, PX 183, Q1 FY2011 Form 8-K, at Ex. 99.1; Ex. 46, PX 188, Q2 FY2011 Form 8-K, at Ex. 99.1).

38.    Green Mountain reported its financial results for Q2 on May 3, 2011.  Green Mountain announced at this time that it had achieved 101% sales growth for Q2 FY2011 (as compared with Q2 FY2010).  This sales growth was well ahead of the Company's forecasted quarterly sales growth for Q2 FY2011, issued on February 2, 2011, of 92%-97%.  (Ex. 47, Q2

FY2011 Earnings Call Tr., dated May 3, 2011, at 2; Ex. 46, PX 188, Q2 FY2011 Form 8-K, at Ex. 99.1; Ex. 30, PX 183, Q1 FY2011 Form 8-K, at Ex. 99.1).

39.     Green Mountain announced EPS for the quarter of $0.48, higher than the February 2, 2011 EPS guidance of $0.38-$0.42.  (Ex. 46, PX 188, Q2 FY2011 Form 8-K, at Ex. 99.1; Ex. 30, PX 183, Q1 FY2011 Form 8-K, at Ex. 99.1).

40.     At the same time, Green Mountain also forecasted quarterly sales growth for Q3 FY2011 of 90%-95% over Q3 FY2010, and it raised its earlier guidance for sales growth for the entire fiscal year to the range of 82%-87% as compared to FY2010.  The Company also issued Q3 FY2011 quarterly EPS guidance of between $0.34-$0.38.  (Ex. 46, PX 188, Q2 FY2011 Form 8-K, at Ex. 99.1).

41.     In prepared remarks filed on May 3, 2011, the Company stated:

> We continue to add capacity across all of our production locations. In fact, in recent weeks, we have repeatedly hit new records of production. As a result, our on-shelf product availability has improved, though we continue to experience some spot outages.  We expect to continue to install equipment and capacity over the remainder of the year to enable us to meet demand. . . . .

(Ex. 46, PX 188, Q2 FY2011 Form 8-K, at Ex. 99.2 at 4).

42.     On Green Mountain's earnings call that day, Green Mountain officers commented on the Company's capacity constraints during Q2 and the impact of those constraints on the Company's ability to fill customer orders:

> (a)     Mr. Blanford explained:
>
> In terms of our K-Cup portion pack production capacity, on shelf product availability has improved though we continued to experience some spot outages.  We continued to install equipment and capacity to meet demand including ramping up production for our new relationships.  In fact in recent weeks we have repeatedly hit new records of portion pack production.

(Ex. 47, Q2 FY2011 Earnings Call Tr., dated May 3, 2011, at 3).

    (b)      President of Green Mountain's Specialty Coffee Business Unit, Scott McCreary, stated:

> We have made good progress over this last quarter on catching up on our customers' demand so we are feeling good about our preparation going into the fall and that is where the significant portion of that capital will go to continue to prepare us for another good holiday season.

(Ex. 47, Q2 FY2011 Earnings Call Tr., dated May 3, 2011, at 5).

43.    Green Mountain had a K-Cup obsolescence reserve of $1.09 million at the end of Q2 FY2011. (Ex. 25, Kelly Report ¶ 64).

44.    The Company reported in its Q2 FY2011 10Q that it had spent $51.6 million in capital expenditures during the quarter, acquiring fixed assets "primarily related to manufacturing infrastructure and packaging equipment for K-Cup portion packs." (Ex. 23, DX 56, Q2 FY2011 Form 10-Q, at 37). In addition, the Company's Q2 FY2011 10Q announced an increased capital expenditures estimate for FY2011 of $275-$305 million for the fiscal year. (Ex. 23, DX 56, Q2 FY2011 Form 10-Q, at 37).

45.    Green Mountain's K-Cup production capacity increased by approximately 14% in Q2 FY2011. (Ex. 26, KGM01102597; Ex. 27, PX 514, Thomas Report ¶ 62).

46.    Green Mountain inventory data from Q2 FY2011 confirms that K-Cup inventory levels remained essentially flat throughout the quarter on a forward-looking WOH basis. Forward-looking WOH remained just below 4 WOH through Periods 4 and 5, and then increased slightly to 4.23 WOH in Period 6. (Ex. 27, PX 514, Thomas Report ¶ 51).

47.     In Q1 FY2011, numerous Green Mountain employees observed, both in contemporaneous documents and in deposition testimony, that the Company did not have sufficient inventory or production capacity to meet customer orders.  For example:

(a)     In a January 15, 2011 email exchange, Charlene Farmer, the SCBU Senior Director, Sales Operations & Trade Marketing, wrote to a group of senior leaders from both business units:

> [O]ur goal for this month is to bring in current and targeted inventory levels at both business units so we can jointly determine where to allocate the capacity we have.  This team has an opportunity to craft that plan together as we don[']t currently have capacity to meet the demand we have (be it for more inventory or actual customer demand).

(Ex. 48, DX 80).  She further wrote "I believe in grocery we are around 2 weeks on hand for the items we have in stock vs the 4 week min."  (Ex. 48, DX 80).  Mr. Heller, KBU VP of Finance responded to Ms. Farmer's email: "I now understand, however, that demand across all of the channels is still higher than the current production capacity." (Ex. 48, DX 80).

(b)     Don Holly, the Senior Director, Purchasing & Quality at SCBU, testified during his deposition, "we were in a position and had been during our growth cycles of having less production capacity than was possible to be able to meet customer demand."  (Ex. 49 Holly Tr. at 201:12-21).

(c)     Referring to the January 2011 time period, Michelle Stacy, the KBU President, testified: "we had demand that was far outstripping our supply."  (Ex. 50 Stacy Tr. at 193:17-194:2).

(d)     In a January 22, 2011 email, Mr. Heller wrote to summarize the inventory levels of the KBU's 41 "primary retail skus."  (Ex. 51, DX 82).  Mr. Heller stated

that 22 of those SKUs "have critically low inventory coverage."  (Ex. 51, DX 82).

In response, Mr. Whoriskey wrote: "This does not look very good at the moment

and it appears we will need to allocate for the next two months our best selling

SKU's."  (Ex. 51, DX 82).

48.     Green Mountain also continued to receive complaints from customers across its

various sales channels about the Company's inability to supply sufficient numbers of K-Cups.  For

example:

(a)     On January 4, 2011, SCBU sales representative Brian Babcock forwarded

complaints about K-Cup availability from supermarkets HEB and Winn Dixie to

other SCBU employees.  Babcock wrote: "This is at the crisis stage with most of

my customers."  (Ex. 52, DX 49).

(b)     Later in the same email chain, Jim Travis, the VP of Sales at SCBU,

reported that SCBU remained at 50% to 60% customer order fulfillment overall.

(Ex. 52, DX 49).  At his deposition, Mr. Travis characterized this level of customer

order fulfillment as a "failing" grade.  (Ex. 45, Travis Tr. at 246:8-247:22).

(c)     In a February 16, 2011 email chain, Target informed Green Mountain that

"based on our anticipated instocks . . . and based on our current allocations for

March we unfortunately have had to adjust our promotional calendar for the rest of

March."  Target explained that these adjustments included canceling a "Gift Card

event," noting, "This is unfortunate as it's a huge ad for us at Target and we really

wanted to be a part of it."  In addition, Target stated that it was also evaluating its

ability to stock K-Cup endcaps (promotional displays at the end of store aisles),

noting that if Green Mountain could not fill Target's orders "we may need to cancel

them as well." (Ex. 53, DX 83).

**D.**   *Q3 FY2011*

49.     Green Mountain's third quarter of FY2011 ("Q3") ran from March 27, 2011

through June 25, 2011. (Ex. 46, PX 188, Q2 FY2011 Form 8-K, at Ex. 99.1; Ex. 54, PX 192, Q3

FY2011 Form 8-K, at Ex. 99.1).

50.     Green Mountain reported its financial results for Q3 on July 27, 2011. (Ex. 55, DX

70, Q3 FY2011 Earnings Call Tr., dated July 27, 2017, at 2).

51.     On July 27, 2011, Green Mountain announced net sales of $717.2 million, a 127%

increase over third quarter sales in FY2010, driven in large part by an uptick in K-Cup sales. (Ex.

54, PX 192, Q3 FY2011 Form 8-K, at Ex. 99.1).

52.     Green Mountain also announced EPS of $0.49 for Q3 FY2011, an increase of 167%

as compared to Q3 FY2010. This was $0.11 higher than the high-end projection from May 2011.

(Ex. 54, PX 192, Q3 FY2011 Form 8-K, at Ex. 99.1; Ex. 46, PX 188, Q2 FY2011 Form 8-K, at

Ex. 99.1).

53.     Green Mountain also forecasted quarterly sales growth for Q4 of 100%-105% and

82%-87% annual sales growth for FY2011. (Ex. 54, PX 192, Q3 FY2011 Form 8-K, at Ex. 99.1).

The Company also issued Q4 quarterly EPS guidance of between $0.44-$0.48, resulting in

forecasted EPS of $1.63 to $1.67 for FY2011. (Ex. 54, PX 192, Q3 FY2011 Form 8-K, at Ex.

99.1).

54.     On July 27, 2011, the Company hosted an earnings call with analysts to discuss

Green Mountain's Q3 FY2011 financial results. (Ex. 55, DX 70, Q3 FY2011 Earnings Call Tr.,

dated July 27, 2017).

55.     Plaintiffs' purported damages expert Dr. David Tabak agreed that on the July 27, 2011 earnings call, ███████████████████████████████████████████

█████████████████████████████████ (Ex. 11, Tabak Tr. at 119:17-22).

56.     In the Company's prepared remarks provided on the July 27, 2011 Q3 FY2011 earnings call, Mr. Blanford stated:

> While difficult to quantify, we also believe we saw a bit of catch-up effect from Q1 and Q2 in our fiscal Q3.  As we have continued to add portion pack production capacity in Q3, we were able to fulfill customer demand that had pent-up in the system over the prior two quarters.

(Ex. 55, DX 70, Q3 FY2011 Earnings Call Tr., dated July 27, 2017, at 2).

57.     During the earnings call, analyst Scott Van Winkle of Canaccord Genuity asked:

> My one question is in 27 parts.  I just – I would love to dig further into the accelerated revenue growth of the portion packs this quarter versus the last two, and I understand the pent-up demand being alleviated with capacity (inaudible -- mic noise) price added – adding to – or price adding 13% to year-over-year revenue from the Company.  Can we just exclude brewer revenue and figure out what that 13% is and apply it all to K-Cups?  Is a portion of that higher prices, or a portion of that mix of K-Cups to BaristaPrima?   I'm just trying – to if you could expand a little bit on how we went from 60% growth seemingly overnight?

Ms. Rathke responded:

> So coming down to your point about Q3, I think we were surprised to the upside on the strength of the portion pack sales.  Some piece of it is related to, as we said, really products we didn't [manage] to ship out for customer orders in Q2 that we got caught up in Q3.  Also, a little bit of this that's hard to measure is the second price increase went into effect in June – toward the middle of June, so I think we had some customers who tended to order a little bit stronger on the heels of that, but I don't think that's a big piece of that.

(Ex. 55, DX 70, Q3 FY2011 Earnings Call Tr., dated July 27, 2017, at 5).

58.     Greg McKinley, an analyst from Dougherty & Company asked Mr. Blanford on the earnings call:

> I guess I wanted to hear your thoughts on sourcing capabilities, with the Company growing at the rate it has.  How do you feel about your distribution partners teeing

you up here for the holiday season?  Also, I guess supply of brewers as you think about retail demand?  And then with the K-Cup momentum as it is, can you comment if there's been any competitive fall out that you think may have benefited for you?  I know I'm not seeing Tassimo on shelves at grocery or mass-market like I used to.  Is that playing a role?

Mr. Blanford responded:

I would – Greg, this is Larry. I would just say broadly, certainly as mentioned, we have a tremendous efforts going on throughout the Company, and I'm very proud of our folks working with our partners throughout the supply chain.  That can be on procuring coffee, developing capability for Cafe Escapes, working with Simatelex's on brewer production and their suppliers to ensure that they have adequate parts and components, and certainly working with our own plants and our distribution partners to get brewers and coffee to our customers.  And very importantly, working with our customers where this business for them – for a number of them is getting so significant that I know a lot of the effort of our sales team is actually working with our customers on their logistics in terms of their ability to receive, to get the product out on the floor, get it merchandised, because as we move into the holiday season this product will be moving very quickly through a number of their stores.  So it's throughout the supply chain.

Having said all that I feel we're in pretty good shape. We are – we've worked very carefully with each of our customers to agree upon a target number of products that we're going to – we're committed to supplying them.  I think we're in position to do that.  I don't believe we have in Q1 and Q2 much upside beyond those committed numbers, but we are dedicated to supporting our customers to the extent that we have worked with them to come to agreement on the demand forecast.  And then we'll be adding capacity through this – the balance of this year and into next year, and we should be in – as we said – as I said in my notes, we're trying to get ourselves to a position ultimately where we have some excess capacity to handle customer needs and potentially upside.

(Ex. 55, DX 70, Q3 FY2011 Earnings Call Tr., dated July 27, 2017, at 6-7).

59.     Bryan Spillane, an analyst from Bank of America asked Mr. Blanford:

Do you feel like you have the capacity that you need for the orders that they're expecting to place over the next six months?  I'm just trying to get a sense for – there's a lot of the marketing at the holidays.  Are you going to be able to actually deliver on all the demand that could be there?

Mr. Blanford responded:

Yes, Bryan, this is Larry.  Right now, as we said, with the catch-up that – a little bit of the catch-up in Q3, I think our customers are at appropriate inventories, we're

[at] appropriate inventories, and we're working to make sure we're well positioned going into the holidays. As I indicated earlier, in referencing the planning – the detailed planning we do with our major customers, as John was referencing, we have their numbers, we are committed to trying to deliver those forecast numbers, but it will be – Q1 and Q2 [of FY2012] will be tight. We don't have a lot of room for any upside.

So we're working very carefully with all of our customers, we have good communications, we have plans as to rolling in inventories appropriately to get them ready for the holidays in front of our television advertising that will kick in in the US and Canada. But we will be tight Q1, Q2 as we continue to add capacity pretty aggressively now and into – well through fiscal 2012.

(Ex. 55, DX 70, Q3 FY2011 Earnings Call Tr., dated July 27, 2017, at 16-17).

60.    Scott Van Winkle of Cannacord Genuity asked Ms. Rathke:

[S]orry, I've got another question – the acceleration, could you balance it between units and dollars, dollars from mix and from price increase? You're not giving units, but were they 50/50? Was it more mix and new stuff or – Again, just trying to boil it down since there's lots of things happening with acquisitions and pricing and such and such.

Ms. Rathke replied:

So the – overall, in terms of trying to get to some kind of unit estimate, I think once again the 136% increase in portion pack dollars, if we sort of subtract off of that price, I would say more in 20% or so range. And then subtract – Van Houtte has historically and I think continues to be in the 8% to 10% or so of the total consumption out there in terms of the portion packs. That's something new we have that we didn't have last year in our numbers, so if you track that down, and then once again I said we had about half of Diedrich. So we're definitely have had an acceleration in units growth in Q3.

Our guidance as we gave Q4 – once again we don't give unit guidance, but I think we don't – we think this quarter was very, very strong as we just kind of tried to outline some of the reasons. I think next quarter we expect strong growth, but not as strong as what we saw this quarter. So in terms of boiling that down, we probably definitely close to the high 90s, 100% range growth-wise.

(Ex. 55, DX 70, Q3 FY2011 Earnings Call Tr., dated July 27, 2017, at 6).

61.    Analyst Alton Stump of Longbow Research asked:

If you gets [sic] back to the kick of acceleration, not just trying to beat a dead horse here, but with the capacity that came online, was there any channel fill benefit

there?  I know you mentioned Fran, that you thought the growth would come down a bit in Q4 for K-Cups versus Q3.  Is that what you're pointing to?  If so, any color you could provide as to how big that channel fill might have been if it was there?

Ms. Rathke responded:

> In terms of – there's one – in terms of channel fill, I think one thing that happened, as we said, is we had – for us a significant increase in a spring advertising campaign.  So I think a lot of our customers, as we planned for that, got very excited about that.  So it wasn't just portion packs, but also brewers.  I think we got a lot of space, demos, advertising, I think a lot of awareness.  So I think it wasn't necessarily channel fill, but I think it was to support an advertising campaign and demos, there was strong sales to our customers for portion packs, especially Brew Over Ice.

> Second, I think coming off of Q2 we definitely had shortages or outages of certain products.  So I do we know had a backlog that we fulfilled in Q3 on – so that was a piece of it.  So I feel what we've been seeing and hearing from all of our accounts is that during Q3 we got back into a place where we knew we had appropriate inventory levels, and they felt comfortable they were getting appropriate inventory levels for the products.  So I think we're in good shape.  So we don't have any of that anticipated to happen in Q4.  And then I think that's why I gave the guidance into Q4 that I don't expect as strong a growth rate.

(Ex. 55, DX 70, Q3 FY2011 Earnings Call Tr., dated July 27, 2017, at 13).

62.     Ms. Rathke also explained the effect of Keurig's next generation brewer on earnings in 2012, stating: "It's more of a drag on earnings, not an addition to earnings, as we start up and roll out this product line. . . . So I think it's much more a high probability this would be a drag on earnings rather than a help to earnings."  (Ex. 55, DX 70, Q3 FY2011 Earnings Call Tr., dated July 27, 2017, at 8).

63.     Mr. Blanford also discussed the Company's inventory goals stating: "In the past we've aimed to have enough capacity to meet our forecasted demand plus an additional 7% to 10%."  (Ex. 55, DX 70, Q3 FY2011 Earnings Call Tr., dated July 27, 2017, at 3).

64.     The Company provided the following warning about forward-looking statements on its July 27, 2011 earnings call:

Finally I will remind everyone that certain statements will be made today which are forward-looking within the means of the securities law. Owing to the uncertainties of forward-looking statements, our actual result may differ materially from anything projected in these forward-looking statements. We can give in assurance as their accuracy, and we assume no obligation to update them. For further information on risks and uncertainties please read the Company's SEC filings and the paragraph in today's press release that begins with the word certain statements.

(Ex. 55, DX 70, Q3 FY2011 Earnings Call Tr., dated July 27, 2017, at 2).

Green Mountain warned in each of the Form 10-Qs that it filed with the SEC during the Class Period that its financial performance could be adversely affected by "the loss of major customers . . . or reduction in the volume of purchases by major customers." (Ex. 22, Q1 FY2011 Form 10-Q, at 41; Ex. 23, DX 56, Q2 FY2011 Form 10-Q, at 51; Ex. 24, DX 55, Q3 FY2011 Form 10-Q, at 54).

65.     Green Mountain had a K-Cup obsolescence reserve of $1.59 million at the end of Q3 FY2011.  (Ex. 25, PX 527, Kelly Report ¶ 64).

66.     The Company reported in its Q3 FY2011 10Q that it had spent $76.4 million in capital expenditures during the quarter, primarily in K-Cup portion pack manufacturing and packaging equipment.  (Ex. 24, DX 55, Q3 FY2011 Form10-Q, at 39).

67.     The Company increased its K-Cup manufacturing capacity by nearly 20% in Q3. (Ex. 26, KGM01102597; Ex. 27, PX 514, Thomas Report ¶ 62).

68.     By the end of Q3 FY2011, Green Mountain had increased its K-Cup manufacturing capacity on a cumulative basis over where it was in the last week of FY2010 by a full 72.9%.  (Ex. 27, PX 514,Thomas Report ¶ 62; Ex. 26, KGM01102597).

69.     The Company again increased its projected capital expenditures for the year, this time to a range of $325-$350 million.  (Ex. 24, DX 55, Q3 FY2011 Form 10-Q at 39).

70.     Following the Q3 FY2011 earnings release, Green Mountain's stock price rose by 16% to close at $102.57 on July 28, 2011.  (Ex. 56, PX 540).

71.     Dr. Tabak also testified ███████████████████████████████████ ██████████████████████████████████████ (Ex. 11, Tabak Tr. at 45:9-12).

72.     Analysts covering Green Mountain stated in their reports following the earnings call that Green Mountain had been able to meet all demand in Q3 FY2011 and had also been able to meet pent-up demand from previous quarters.  *See infra ¶¶* 72 to 83.

73.     On July 27, 2011, William B. Chappell of SunTrust Robinson Humphrey reported: "Management indicated that it has been racing to meet retailer demand since the 2010 holidays and was finally able to replenish those accounts in 3Q."  (Ex. 57, SunTrust Robinson Humphrey, *Wow!; 3Q11 Results Impress, FY12 Guidance Astounds* (July 27, 2011), at 2).

74.     A July 28, 2011 Canaccord Genuity report by analyst Scott Van Winkle stated: "A significant K-cup acceleration probably doesn't recur in Q4 as capacity caught up to pent-up demand during Q3, but the K-cup outlook is enhanced as demand is now more obvious."  Finally, it noted:

> [T]here was certainly a one-time benefit of sorts in the quarter in that added capacity from a rapidly accelerating capital expenditure allowed pent-up demand to be serviced in the quarter.  The channel reload aided the Q3 results.  We should see the growth rate of K-cups revert somewhat in Q4, but with Starbucks likely being shipped late in the quarter, there is ample opportunity for another strong quarterly K-cup figure.

(Ex. 58, Canaccord Genuity, *Sometimes Big Quarters Even Surprise the Bulls; Reiterate Buy and Raise Target to $120* (July 28, 2011), at 1-2).

75.   ███████████████████████████████████████████

███████████████████████████████████████████████████

███████   (Ex 59, (CG-0006723)).

76.   Dougherty & Company LLC published a report on July 28, 2011 that stated: "GMCR attributed a portion of the K-Cup acceleration to replenishment of lean inventories in the retail channel.  For the aforementioned reasons, GMCR stated June's [Q3] portion pack sales acceleration will not be repeated in September [Q4]."  (Ex. 60, DX 100, Dougherty & Company LLC, *Wow!* (July 28, 2011), at 2).

77.   A July 28, 2011 Longbow Research analyst report stated that, "GMCR believes it was able to catch up on 'pent up' demand from earlier in the year as additional K-Cup capacity was brought online."  (Ex. 61, Longbow Research, *GMCR Reports 3Q11 Results and Offers Impressive Guidance; Maintaining NEUTRAL* (July 28, 2011), at 1).

78.   A report from William Blair & Co. released that same day noted:

Management indicated several factors contributed to the strong K-Cup sales growth, including good response from the company's first-ever spring advertising and brand support programs (which were designed to raise awareness for, and promote trial of, its brew-over-ice teas and coffees), contributions from acquisitions, and added production capacity, which enabled the company to satisfy pent-up K-Cup demand from the first and second quarters.

(Ex. 62, William Blair & Co., *Third-Quarter Upside Driven by Strong K-Cup Growth; Guidance and Estimates Increased* (July 28, 2011), at 2).

79.   Stifel Nicolaus published a report by Mark Astrachan, Mark Swartzberg, and Edward McPike on July 28, 2011 that stated that in Q3, K-Cup sales had experienced a "catch-up from recent supply related issues."  The report continued: "earnings visibility has increased, particularly heading into Holiday 2011."  (Ex 63, Stifel Nicolaus, *Another Beat & Improving N-T Visibility = Reevaluating Sell* (July 28, 2011), at 1).

-23-

80.     A July 28 Janney Capital Markets report stated: "We estimate K-Cup capacity will grow . . . creating some capacity breathing room."  (Ex. 64, DX 98, Janney Capital Markets, *We've Got to Admit It's Better Raising Fair Value Estimate to $125; Reiterate Buy* (July 28, 2011), at 4).

81.     On September 13, 2011, a SunTrust Robinson Humphrey report reiterated: "Management was comfortable that it has enough capacity to meet the demand over the next six months so we don't expect it to face the same supply constraints/out of stocks that negatively impacted earnings in 4Q10 and 1Q11." (Ex. 65, DX 101, SunTrust Robinson Humphrey, *Highlights from Waterbury; Full Steam Ahead* (Sept. 13, 2011), at 2).

82.     A Janney Capital Markets analyst report from October 18, 2011 reads:

GMCR's primary challenge has been to keep up with demand and it is building capacity as fast as it can.  We believe the current capital spending plans will expand capacity to nearly 14 billion K-Cups by FY13.  Our FY14 K-Cup estimate is 11.5 billion.  GMCR will have some excess capacity to enable it to optimize its supply chain, . . .

(Ex. 66, DX 97, Janney Capital Markets, *Doesn't Take an Einstein to See Growth is Real* (Oct. 18, 2011), at 1).

83.     A Roth Capital Partners analyst report from October 31, 2011 noted:

One of the reasons for the stronger than expected sales was that as a result of having added additional production capacity GMCR was able to fill pent-up demand that had restricted K-Cup sales for some time.  The shortage was especially noticeable in Q2 and Q3 (March and June) in fiscal 2010.

(Ex. 67, Roth Capital Partners, *GMCR: Q4 EPS Preview; Outlook Remains Attractive* (Oct. 31, 2011), at 3).

84.     On November 7, 2011, Mr. Astrachan and other analysts from Stifel Nicolaus again reported that on the Q3 earnings call, "the company commented on supply chain disruptions that were remedied in the [third] quarter resulting in a catch up of supply."  The report further attributed the strength of Green Mountain's Q3 FY 2011 financial results to the "sell-in ahead of the . . . price

increase."   The report then noted that the same K-cup growth was "unlikely to recur" in Q4 FY2011.  (Ex. 68, Stifel Nicolaus, *Reiterate Sell* (November 7, 2011), at 4).

85.      Analysts projected that K-Cup sales for Q4 FY2011 would grow by only 4.4% over Q3 FY2011.  (Ex. 69, Gompers Supp. Report Ex. 1).

86.      Over the course of Q3, inventory steadily increased from 4.23 WOH to 7.28 WOH, comfortably above the 4 WOH "minimum service level" that proved insufficient in Q1 and Q2. (Ex. 27, PX 514, Thomas Rep. ¶ 51).

87.      In the second half of FY2011, Green Mountain's order fulfillment rates increased steadily.  A September 7, 2011 report from SCBU to Green Mountain's Board of Directors noted, order fulfillment rates were "higher than [the Company] saw in the first half of FY11," and were aided by "strong" inventory levels.  (Ex. 70, PX 320, KGM1062193, at KGM1062201).

88.      Green Mountain was also able to better service KBU customer demand in Q3 FY2011.  Minutes from a May 11, 2011 meeting between Green Mountain and Target indicate that "[c]urrently, there are just 2 K-Cup flavors on allocation."  (Ex. 71, KGM00036549).  On July 13, 2011, the KBU sales team emailed Wal-Mart and reported:  "I just wanted to let you know we are in a very favorable stock position and if you feel you need additional inventory to support warehouse fills we do have inventory available."  (Ex. 72, KGM00603288).

E.      ***David Einhorn's GAAP-uccino Presentation Criticizing Green Mountain at the Value Investing Congress on October 17, 2011***

89.      David Einhorn is the president and founder of Greenlight Capital ("Greenlight"), which provides management advisory services to hedge funds and managed accounts.  (Ex. 73, Einhorn Tr. at 11:12-12:3).

90.    ███████████████████████████████████████████

███████████████████████████████████████ (Ex. 74, DX 65,

Brandler Decl. Ex. B).

91.    In the time between the beginning of the Class Period (again, February 2, 2011)

and the GAAP-uccino presentation (on October 17, 2011), Green Mountain's stock rose by almost

$60 per share – from a close of $32.96 on February 2, 2011 to a close of $92.09 on October 14,

2011.  (Ex. 56, PX 540).

92.    Mr. Einhorn sent quarterly update letters to Greenlight's investors detailing the

performance of Greenlight's funds.  Greenlight's calendar Q1 letter states that the Greenlight funds

had suffered loss of an average of 2.87% on the year.  (Ex. 75, DX 62).  The calendar Q2 letter

showed that the Greenlight funds' losses had increased to 5.1% on the year.  (Ex. 76, DX 63).  By

Greenlight's calendar Q3 letter, the Greenlight funds had lost an average of 5.97% on the year.

(Ex. 77, DX 64).

93.    On the day of Einhorn's presentation, Einhorn's funds were short ████████ shares

of Green Mountain stock.  (Ex. 74, DX 65, Brandler Decl. Ex. A).  For every dollar that Green

Mountain's stock went up, the value of Einhorn's funds declined by $███████   For every

dollar that Green Mountain's stock went down, the value of Einhorn's funds increased by

$███████  (Ex. 73, Einhorn Tr. at 140:11-141:10).

94.    At a closing price of $92.09 per share on October 16, 2011, █████████████

██████████████████████████████, Greenlight's position

in Green Mountain had declined by more than $████████ in value.  (Ex. 56, PX 540; Ex.  74,

DX 65, Brandler Decl. Ex. A).

95.     On October 17, 2011, Einhorn gave a presentation entitled GAAP-uccino to the Value Investing Congress, a meeting of other hedge fund managers and institutional investors. (Ex. 78, DX 51).

96.      As Einhorn was speaking, Green Mountain's stock price fell by almost $10 per share.

97.     Green Mountain's stock price dropped by $12.33 per share on October 17, 2011, the day of Einhorn's presentation.  (Ex. 56, PX 540).

98.     The implied stock price volatility in Green Mountain's stock – a measure of uncertainty surrounding an investment in the stock – increased on the day of the Einhorn presentation.  (Ex. 79, PX 555, Tabak Damages Report Ex. 9b4).

99.     *The Wall Street Journal* posted Einhorn's presentation online two days later on October 19, 2011, noting in an article that it was the presentation that "killed Green Mountain shares."  (Ex. 80, The Wall Street Journal, *Here's the Einhorn Presentation that Killed Green Mountain Shares* (Oct. 19, 2011)).

100.     Green Mountain's stock price dropped an additional $11.39 per share the day *The Wall Street Journal* posted the Einhorn presentation online.  (Ex. 56, PX 540).

101.     The implied stock price volatility in Green Mountain's stock increased again on the day *The Wall Street Journal* posted the Einhorn presentation online.  (Ex. 79, PX 555, Tabak Damages Report Ex. 9b4).

102.     The documents that PwC produced show that ████████████████████████ ████████████████████████  (Ex. 81, PwC00006844).

103.     Green Mountain felt that it could not rebut Einhorn's allegations at the time of the presentation beyond a general denial since it occurred during Green Mountain's "quiet period"

prior to its November 9, 2011 Q4 FY2011 earnings release – when Green Mountain did not consider itself free to refute the allegations.  (Ex. 78, DX 51, at 21).

104.    Einhorn's presentation was not a revelation of any new information or a revelation of any truth to the market.  *See infra* ¶¶ 105 to 109.

105.    Einhorn attacked the Company's agreement with Starbucks, claiming that the agreement would actually be ████████████████ and Green Mountain would earn a profit of only $0.07 per Starbucks K-Cup.  (Ex. 78, DX 51, at 37).

    (a)    Green Mountain's stock price had increased more than $18 per share upon the announcement of the Starbucks agreement.  (Ex. 82, PX 549, Gompers Damages Report ¶ 22; Ex. 56, PX 540).

    (b)    Green Mountain actually earned at least $██ and as much as $██ per K-Cup under the Starbucks agreement.  (Ex. 25, Kelly Report ¶ 85).

106.    Einhorn claimed that Green Mountain had recognized revenue on a phantom sale of 500,000 brewers to QVC in Q2 FY2011, which were taped off and stored on a loading dock.  (Ex. 78, DX 51, at 97).

    (a)    The Company recognized revenue on a total of 23,117 brewers sold to QVC in all of Q2 FY2011.  (Ex. 25, Kelly Report ¶ 28).

    (b)    Not a single M. Block warehouse in Chicago had the capacity to store 500,000 brewers.  (Ex. 38, Fellows Tr. at 65:4-66:2).

    (c)    ███████████████████████████████████████ ████████████████████████████████ (Ex. 83, DX 60).

(d) 

(Ex. 83, DX 60).

(e) ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████ (Ex. 84, DX 33; Ex. 85, KGM01094198, at KGM1094199; Ex. 86, Interrogatory Reponses).

107.  Einhorn claimed that Green Mountain had not adequately disclosed sales, general, and administrative expenses associated with its purchase of Van Houtte and had instead capitalized those expenses.  (Ex. 78, DX 51 at 75-77).

(a)   The Company disclosed all sales, general, and administrative expenses associated with its purchase of Van Houtte in its Q2 FY2011 10-Q.  (Ex. 25, PX 527, Kelly Report ¶ 72).

108.  Einhorn claimed that because the Company faced an open SEC investigation, ████ ███████████████████ (Ex. 78, DX 51, at 84).

(a)   The SEC announced on October 17, 2014 that after a nearly four-year investigation, it was closing its inquiry without initiating any enforcement action or finding any wrongdoing by the Company or anyone affiliated with Green Mountain.  (Ex. 87, Form 8-K, dated Oct. 17, 2014, at Ex. 99.1).

109.  Dr. Tabak writes in his Damages Report that it would not be "appropriate to treat the Einhorn Presentation as a revelation of new information, much less a revelation of truth, to the market."  (Ex. 79, PX 555, Tabak Damages Report ¶ 65).

110.   ███████████████████████████████████████████

███████████████████████████████████   (Ex. 81, PwC00006844; Ex.

89, PWC00008495).  On November 14, 2011, PWC issued a clear audit opinion in connection

with the filing of Green Mountain's FY2011 Form 10-K.  (Ex. 1, FY2011 Form 10-K, at F-2).

111.   On January 17, 2012, Einhorn sent Greenlight's Q4 2011 investor letter.  The letter

stated that Greenlight Capital's return had turned positive during Q4 2011, now averaging a

positive return of 2.5% on the year.  In the Q4 letter, Mr. Einhorn  explained that his short position

in Green Mountain's stock was one of "two significant winners in the quarter" because, in his

estimation, "[t]he market . . . took little comfort in GMCR's failure to provide any substantive

response to the questions we raised at the Value Investing Congress, other than a blanket denial of

wrongdoing."  (Ex. 88, DX 66, at 3).

**F.     *Q4 FY2011***

112.   Green Mountain's fourth quarter of its 2011 fiscal ("Q4") ran from June 26, 2011

through September 24, 2011.  (Ex. 54, PX 192, Q3 FY2011 Form 8-K, at Ex. 99.1; Ex. 21, Q4

FY2011 Form 8-K, at Ex. 99.1).

113.   Green Mountain reported its financial results for Q4 on November 9, 2011.  (Ex.

21, Q4 FY2011 Form 8-K, at Ex. 99.1).

114.   On November 9, 2011, Green Mountain reported that although the Company had

met earnings per share guidance, it fell short of its top-line projections issued on July 27, 2011 by

9% for the quarter and 3% for the year.  It reported net sales growth of 91% for Q4 FY2011 (over

Q4 FY2010) against the July 27, 2011 guidance of 100% to 105%, and net sales growth for the

year of 95% against the July 2011 guidance of 98% to 100%.  (Ex. 21, Q4 FY2011 Form 8-K; at

Ex. 99.1; Ex. 54, PX 192, Q3 FY2011 Form 8-K, at Ex. 99.1).

115.     Green Mountain met or exceeded its sales growth guidance for each quarter in FY2011 up until Q4.  (Ex. 29, Q4 FY2010 Form 8-K, at Ex. 99.1; Ex. 30, PX 183, Q1 FY2011 Form 8-K, at Ex. 99.1; Ex. 46, PX 188, Q2 FY2011 Form 8-K, at Ex. 99.1; Ex. 54, PX 192, Q3 FY2011 Form 8-K, at Ex. 99.1).

116.     Prior to Q4 FY2011, Green Mountain had met or exceeded its forecasted sales guidance for at least fifteen straight quarters.  (Ex. 69, Gompers Supp. ¶ 20).

117.     Green Mountain reported earnings per share for the quarter of $0.47 and $1.31 for the year above the guidance provided with the Q3 FY2011 earnings release of $0.34 to $0.38 for the quarter and $1.63 to $1.67 for the year.  (Ex. 21, Q4 FY2011 Form 8-K, at Ex. 99.1).

118.     Green Mountain met or exceeded its earnings per share guidance every quarter in FY 2011.  (Ex. 90, Q4 2010 FY 2011 Form 8-K, at Ex. 99.1; Ex. 30, PX 183, Q1 FY2011 Form 8-K at Ex. 99.1; Ex. 46, Q2 FY2011 Form 8-K at Ex. 99.1; Ex. 54, PX 192, Q3 FY2011 Form 8-K, at Ex. 99.1; Ex. 91, Q1 FY2012 Form 8-K, at Ex. 99.1).

119.     The Company's obsolescence reserve for K-Cups was $4.1 million at the end of Q4 FY2011.  (Ex. 25, PX 527, Kelly Report ¶ 64.).  This $4.1 million amount represented just 2.4% of Green Mountain's K-Cup inventory at the end of Q4 FY2011 and only 0.86% of its K-Cup sales for the quarter.  (Ex. 25, Kelly Report ¶ 64).

120.     On the Q4 FY2011 earnings call, Mr. Blanford stated that:

Our fourth-quarter revenue was off our estimates.  We believe this resulted from a number of factors, including changes in wholesale ordering patterns in our grocery and club channels.  We saw strong increases in orders from certain customers in those channels during our fiscal third quarter, followed by declines in their ordering patterns in our fiscal fourth quarter.  However, IRI's point of sale data for grocery and customer-provided point of sale data for clubs show a consistent level of year-over-year consumer portion pack demand growth over the same time period.

(Ex. 92, DX 87, Q4 FY2011 Earnings Call Tr., dated Nov. 9, 2011, at 3).

121.    Ms. Rathke stated on the call that the Q4 miss was "really driven by the K-Cup portion pack demand" rather than by lower brewer sales and that the Company had "overestimated what we anticipated primarily in the grocery and club channel, what the K-Cup portion pack sales were going to be in Q4."  (Ex. 92, DX 87, Q4 FY2011 Earnings Call Tr., dated Nov. 9, 2011, at 7).

122.    Mark Astrachan, an analyst from Stifel Nicholas, asked regarding inventories:

So, it was up 156% year-on-year, which was ahead of the sales growth, especially considering the previous commentary, you talked about it being capacity constrained.  So I guess I'm trying to figure out why inventories are building when you've talked about running your equipment basically 24/7.

Ms. Rathke responded:

So on the first question about inventory, and it is highlighted in our press release and the balance sheet highlights, so inventories were up significantly over September of last year at $672 million.  The increase this year, unlike other years, I think, for us, is we really saw a big increase in the raw material side on – because of, most notably, the green coffee volume, and the price of the coffee is up over 65% year-over-year.  So that drove a big piece, about $136 million of the increase.

And then the $273 million of the increase is in finished goods, with about half of that increase coming from K-Cup portion packs on-hand and the other half from the brewer's side.  And the K-Cups, in terms of, as we noted in our Q3 remarks, we caught up, in terms of our ability to feel confident, that we could produce K-Cups on a week-to-week basis to meet the weekly demand.  So we were not essentially short, if you will, in Q3 or Q4 on meeting orders.

(Ex. 92, DX 87, Q4 FY2011 Earnings Call Tr., dated Nov. 9, 2011, at 8-9).

123.    Mr. McCreary further explained on the call:

Going into Q1 of fiscal year 11, we were capacity-constrained and we had very low inventories.  Now we have caught up from a capacity standpoint, and we've come into this fiscal year [*i.e.,* FY 2012] with inventories that we think are appropriate to support the growth of the business.  And now we are in a capacity situation that allows us to meet the weekly demand, just as you said.

(Ex. 92, DX 87, Q4 FY2011 Earnings Call Tr., dated Nov. 9, 2011, at 9).

124.    Regarding the Mr. Astrachan's "previous commentary" comment, Dr. Tabak testified, in response to questioning:

██████████████████████████████████████████████████████

██████    ████████████████████████████████████████████

(Ex. 11, Tabak Tr. at 184:7-23).

125.    The July 27, 2011 earnings call makes no mention of capacity constraints, about which Astrachan could have been referring to with the "previous commentary" statement.  (Ex. 55, DX 70, Q3 FY2011 Earnings Call Tr., dated July 27, 2011).

126.    Dr. Tabak further testified at his deposition:  ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████    (Ex. 11, Tabak Tr. at 187:6-14).

127.    The price of Green Mountain's stock declined from $67.02 per share on the day of the earnings release to close at $40.89 per share on the day after the Q4 FY2011 earnings release, a decrease of $26.13 per share or 39%.  (Ex. 56, PX 540).

128.    A number of analysts who covered Green Mountain labeled the market reaction to the sales miss as an overreaction caused by the allegations in the Einhorn Presentation:

(a)    SunTrust Robinson Humphrey reported in its November 9, 2011 analyst's report that, "[w]e do not believe this shortfall is indicative of deteriorating fundamentals.  Consumer takeaway far outpaced sales in 4Q with k-cup takeaway up 130%+ in tracked channels." (Ex. 93, PX 560, SunTrust Robinson Humphrey, *Stealing Defeat From the Jaws of Victory*; *4Q Results Disappoint* (November 9, 2011), at 1).

(b)     A November 10, 2011 Roth Capital analyst's report called Green Mountain's stock price decline a "[r]idiculous [m]arket [r]eaction." (Ex. 94, Roth Capital Partners, *GMCR: A Ridiculous Market Reaction* (November 10, 2011), at 1).

(c)     A Canaccord Genuity analyst report on November 10, 2011 stated:

> [I]t was a bad time for a miss vs. guidance given the controversy created by accusations of accounting fraud by David Einhorn.  The reality is that GMCR is the exact same company it was a month ago, the fundamentals are just as strong and the earnings outlook is unchanged.  The shortfall to guidance is a simple and often-told story.  The company misforecasted sales of K-cups after a buy-in by retailers the quarter before, ahead of a price increase.  GMCR isn't the first packaged goods company to misgauge the magnitude of a buy-in and won't be the last.

(Ex. 95. Canaccord Genuity, *Bad Time for a Miss, Great Time to Buy; Reiterating Buy, Lowering Target to $94* (November 10, 2011), at 2).

(d)     Also on November 10, 2011, a Dougherty & Company LLC report stated: "Coupled with increased scrutiny on its accounting practices, the September quarter revenue miss had magnified these risks in the minds of investors." (Ex. 96, PX 562, Dougherty & Company LLC, *Consumer Demand Intact, But Context in Which Investors Evaluate Market Opportunity is Changed* (November 10, 2011), at 2).

(e)     Further on November 10, the report of Bank of America Merrill Lynch stated, "[w]e continue to believe end demand signals indicate that momentum has not broken." (Ex. 97, Bank of America Merrill Lynch, *Low quality 4Q; the debate continues* (November 10, 2011), at 1).

(f)     That same day, Janney Capital Markets stated in its analyst's report that while they "would understand a negative reaction to missing top line guidance, [ ]

the trading in after-hours does not match the magnitude or significance of the revenue miss."  (Ex. 98, Janney Capital Markets, *Blinded by the Light (Revenue) – Fundamentals Never Bean Better* (November 10, 2011), at 1).

129.   Had the market learned for the first time on November 9, 2011 that "true demand" for K-Cups no longer exceeded the Company's production capacity because capacity had caught up to demand, analysts would have responded by lowering their long-term projections for K-Cup sales.  (Ex. 32, PX 549, Gompers Damages Report ¶¶ 81–82).

130.   Analysts did not significantly decrease their long-term estimates for K-Cup shipments, sales growth, or EPS for FY2012 or FY2013 following the November 9, 2011 earnings release.  (Ex. 82, PX 549, Gompers Damages Report Exs. 1 & 2).

131.   Analyst projections of FY2012 K-Cup shipments fell only 4.0% while analyst projections of FY2013 K-Cup shipments actually increased 1.7%.  (Ex. 69, Gompers Supp. Report ¶ 49).

132.   The average analyst estimate of FY2012 net sales decreased only 2.7% following the November 9, 2011 earnings announcement.  The average analyst estimate of FY2013 net sales decreased only 1% following the November 9, 2011 earnings announcement. (Ex. 82, Gompers Damages Report Ex. 1).

133.   The average analyst estimate of FY2012 net income decreased only 2.2% following the November 9, 2011 earnings announcement.  The average analyst estimate of FY2013 net income increased 1.7% following the November 9, 2011 earnings announcement.  (Ex. 82, Gompers Damages Report Ex. 2).

134.   Green Mountain entered FY2012 with approximately 6.89 weeks of forward-looking K-Cup inventory on hand.  (Ex. 27, PX 514, Thomas Report ¶ 51).

135.   K-Cup obsolescence as a percentage of K-Cup inventory decreased from 3.78% in Q4 FY2010 to 2.44% in Q4 FY2011.  (Ex. 25, Kelly Report ¶ 64).

136.   During all of FY2011, K-Cup inventory obsolescence reserves remained at less than 1% of K-Cup net sales.   (Ex. 25, Kelly Report ¶ 2(d)).

137.   In Q1 FY2012, net sales grew by 102% (versus Q1 FY2011).  (Ex. 91, Q1 FY2012 Form 8-K, at Ex. 99.1).

138.   Green Mountain exceeded sales expectations in Q1 FY2012.  On November 9, 2011, Green Mountain forecasted sales growth of 85%-90% for Q1 FY2012 as compared to Q1 FY2011.  (Ex. 21, Q4 FY2011 Form 8-K, at Ex. 99.1).  On February 1, 2012, Green Mountain announced sales growth of 102% for Q1 FY2012 over Q1 FY2011.  (Ex. 91, Q1 FY2012 Form 8-K, at Ex. 99.1).

## IV.   Mr. Blanford's and Ms. Rathke's Trading Plans

139.   On May 3, 2011, the same day that Green Mountain announced its Q2 FY2011 financial results, the Company announced plans to offer an aggregate of 7,100,000 shares of its common stock in an underwritten public offering.  The Company also announced that certain stockholders planned to offer an aggregate of 403,883 shares of common stock in the offering. (Ex. 99, Form 8-K, dated May 3, 2011, at Ex. 99.1).

140.   The Company's Prospectus disclosed that officers and directors may enter into Rule 10b5-1 Plans concurrent with the public offering.  (Ex. 100, Form 424B7, dated May 5, 2011, at S-21).

141.   On May 4, 2011, Mr. Blanford and Ms. Rathke entered into Rule 10b5-1 trading plans. (Ex. 101, PX 480, Blanford 10b5-1 Plan; Ex. 102, KGM01108810; Ex. 103, PX 466, Rathke 10b5-1 Plan).

142.     In addition to Mr. Blanford and Ms. Rathke, eight other directors and officers at Green Mountain entered into Rule 10b5-1 plans in May 2011.  (Ex. 104, PX 546, Form 4 filed on behalf of Stephen J. Sabol, dated Aug. 5, 2011; Ex. 105, Form 4 filed on behalf of Richard Scott McCreary, dated Aug. 5, 2011; Ex. 106, Form 4 filed on behalf of Howard Malovany, dated Aug. 5, 2011; Ex. 107, Form 4 filed on behalf of Barbara D. Carlini, dated Aug. 5, 2011; Ex. 108, Form 4 filed on behalf of Hinda Miller, dated Aug. 5, 2011; Ex. 109, Form 4 filed on behalf of Michael J. Mardy, dated Aug. 5, 2011; Ex. 110, Form 4 filed on behalf of David E. Moran, dated Aug. 5, 2011; Ex. 111, Form 4 filed on behalf of Jules A. Del Vecchio, dated Aug. 9, 2011; Ex. 112, Form 4 filed on behalf of Jules A. Del Vecchio, dated Aug. 11, 2011).

143.     In accordance with Green Mountain's insider trading policy, the plans were reviewed and approved by Green Mountain's General Counsel, Howard Malovany.  (Ex. 137, KGM01093665; Ex. 4, Blanford Tr. at 81:23–83:6; Ex. 7, Rathke Tr. at 220:4–9).



(a)     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 7, Rathke Tr. at 269:16-19, 219:22-221:1, 245:7-17; Ex. 4, Blanford Tr. at 81:23–83:6).

(b)     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 4, Blanford Tr. at 82:17-22).

144.     Mr. Malovany represented in the Issuer Letter attached to Mr. Blanford's and Ms. Rathke's 10b5-1 Sales Plan that Green Mountain had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████   (Ex. 103, PX 466, Rathke 10b5-1 Plan; Ex. 101, PX 480, Blanford 10b5-1 Plan;

Ex. 102, KGM01108810).

145.    Prior to entering into their Rule 10b5-1 plans on May 4, 2011, Mr. Blanford and

Ms. Rathke had been prevented from trading in Green Mountain securities for nearly two years,

since September 2009.  (Ex. 128, PX 533, Coates Rebuttal Report ¶ 16; Ex. 7, Rathke Tr. at 234:8-

10).

146.    Mr. Blanford and Ms. Rathke complied with all of the blackout periods and

refrained from any stock sales or putting in place a Rule 10b5-1 trading plan during this period.

(Ex. 7, Rathke Tr. at 235:8-11, 245:23-25).

147.    Other officers and directors had not been restricted from trading to the same extent

as Mr. Blanford or Ms. Rathke.  (Ex. 128, PX 533, Coates Rebuttal Report ¶ 21).

148.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████   (Ex. 101, PX 480; Ex. 102, KGM01108810; Ex. 103, PX 466).

149.    Prior to the sale made pursuant to Ms. Rathke's Rule 10b5-1 trading plan, Ms.

Rathke owned 960,309 options and shares in Green Mountain stock.  (Ex. 129, Form DEF 14A,

dated Jan. 24, 2011, at 32; Ex. 130, Form DEF 14A, dated Feb. 2, 2012, at 32; Ex. 131, PX 461,

Form 4, filed on behalf of Frances G. Rathke, dated Aug. 5, 2011).

150.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



(Ex. 132, Coates Report ¶ 15; Ex. 103, PX 466).

151.    Ms. Rathke's Rule 10b5-1 trading plan included only her options that were closest to expiration.  All 337,500 shares that Ms. Rathke put into her Rule 10b5-1 plan were due to expire on October 31, 2013.  (Ex. 131, PX 461, Form 4 filed on behalf of Frances G. Rathke, dated Aug. 5, 2011).

152.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████  (Ex. 7, Rathke Tr. at 250:7–24).

(a)    Green Mountain disclosed to investors that here had been a series "of events at the Company over the last several years, including acquisitions and offerings," that prevented the Company's senior executives and board members from exercising options and selling their stock because they possessed material, non-public information.  (Ex. 54, PX 192, Q3 FY2011 Form 8-K, at 2).

(b) ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████ (Ex. 7, Rathke Tr. at

233:23–234:18).

(c) ███████████████████████████████████

███████████████████████████████████████

████████ (Ex. 7, Rathke Tr. at 235:13–14).

(d) ███████████████████████████████████

███████████████████████████████████████

(Ex. 7, Rathke Tr. at 234:21–22).

153. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████ (Ex. 132, Coates Report ¶ 15; Ex. 101, PX 480; Ex. 102, KGM01108810).

154. ████████████████████████████████████

████████████████████████ (Ex. 4, Blanford Tr. at 53:1–7)

(a) ███████████████████████████████████

███████████████████████████████████████



(Ex. 4, Blanford Tr. at 53:1–7).

(b)

(Ex. 4, Blanford Tr. at 56:3–22).

155.    Once executed, Mr. Blanford and Ms. Rathke's Rule 10b5-1 plans removed from them any discretion over how the sales contemplated by the plans would be effected, if at all.  (Ex. 132, Coates Report ¶ 15).

156.    Also during the open trading window following the Company's secondary offering, on May 5, 2011, Mr. Blanford sold 51,573 shares into Green Mountain's secondary offering.  (Ex. 133, PX 479, Form 4 filed on behalf of Lawrence J. Blanford, dated May 9, 2011).

**V.    Mr. Blanford's and Ms. Rathke's Stock Sales Pursuant to Their 10b5-1 Plans**

157.    Following the 90-day lock-up period, both Mr. Blanford's and Ms. Rathke's Rule 10b5-1 trading plans entered in May 2011 caused options to be executed and shares of Green Mountain's stock to be sold.  (Ex. 131, PX 461, Form 4 filed on behalf of Frances G. Rathke, dated Aug. 5, 2011; Ex. 134, PX 482, Form 4 filed on behalf of Lawrence J. Blanford, dated Aug. 17, 2011; Ex. 135, PX 483, Form 4 filed on behalf of Lawrence J. Blanford, dated Sep. 21, 2011; Ex. 136, PX 484, Form 4 filed on behalf of Lawrence J. Blanford, dated Oct. 20, 2011).

158.    Neither Mr. Blanford nor Ms. Rathke had any discretion over these sales.  (Ex. 132 Coates Report ¶ 15).

159.    Ms. Rathke's 10b5-1 trading plan caused 337,500 options to be exercised on August 5, 2011 and the 337,500 resulting shares of Green Mountain's stock to be sold.  (Ex. 131, PX 461, Form 4 filed on behalf of Frances G. Rathke, dated Aug. 5, 2011).

160.    Mr. Blanford's 10b5-1 trading plan caused 45,000 options to be exercised on August 16, 2011, 45,000 options to be exercised on September 20, 2011, and 45,000 options to be exercised on October 18, 2011, and the resulting shares of Green Mountain's stock to be sold immediately.  (Ex. 134, PX 482, Form 4 filed on behalf of Lawrence J. Blanford, dated Aug. 17, 2011; Ex. 135, PX 483, Form 4 filed on behalf of Lawrence J. Blanford, dated Sep. 21, 2011; Ex. 136, PX 484, Form 4 filed on behalf of Lawrence J. Blanford, dated Oct. 20, 2011).   Green Mountain's stock price fluctuated up and down between these sales.  (Ex. 56, PX 540).

161.    Between August 3, and August 11, 2011, the 10b5-1 trading plans of eight other directors and officers of Green Mountain caused options to be exercised and shares sold.  (Ex. 104, PX 546, Form 4 filed on behalf of Stephen J. Sabol, Aug. 5, 2011; Ex. 105, Form 4 filed on behalf of Richard Scott McCreary, Aug. 5, 2011; Ex. 106, Form 4 filed on behalf of Howard Malovany, Aug. 5, 2011; Ex. 107, Form 4 filed on behalf of Barbara D. Carlini, Aug. 5, 2011; Ex. 108, Form 4 filed on behalf of Hinda Miller, Aug. 5, 2011; Ex. 109, Form 4 filed on behalf of Michael J. Mardy, Aug. 5, 2011; Ex. 110, Form 4 filed on behalf of David E. Moran, Aug. 5, 2011; Ex. 111, Form 4 filed on behalf of Jules A. Del Vecchio, Aug. 9, 2011; Ex. 112, Form 4 filed on behalf of Jules A. Del Vecchio, Aug. 11, 2011).

## VI.    Plaintiffs' Claims

162.    Plaintiffs filed their initial complaint on November 29, 2011.  (Ex. 113, Dkt. 1). The initial complaint named as defendants, the Company, Mr. Blanford, Ms. Rathke, each member of the Company's Board of Directors, and ten underwriters of the Company's May 5, 2011 secondary offering of common stock.  (Ex. 113, Dkt. 1).

163.    Plaintiffs filed a subsequent Corrected Consolidated Complaint on November 5, 2012, the operative complaint in this matter (the "Complaint").  (Ex. 114, Dkt. 71).  In the Complaint, Plaintiffs allege violations of Section 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 87j(b), 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  In this Complaint, Plaintiffs also abandoned their claims against each member of the Company's Board of Directors and the underwriters who underwrote the Company's May 5, 2011 secondary offering of common stock. (Ex. 114, Dkt. 71).  The only claims that remain are against Green Mountain, Mr. Blanford, and Ms. Rathke.

164.    At the hearing on appeal of this Court's dismissal of the Complaint before the Second Circuit, the Court asked Plaintiffs' counsel to explain "what is alleged to show" that Defendants' Class Period statements were false.  Plaintiffs' counsel responded as follows:  "The fact that they were hiding inventory.  The fact that they were making shipments to nowhere.  Before an inventory count would come in, they would fill up these 18-wheelers, ship them around the corner; after the inventory count ended, they would shift them back."  (Ex. 115, 2d Cir. Tr. at 5:17–6:1).  Plaintiff's counsel continued: "We have sources from confidential witnesses who worked in at least four different locations who provided this information."  (Ex. 115, 2d Cir. Tr. at 6:18–21). The Court additionally asked: "At each of those warehouses there were incidents during the class period in which 18-wheelers were filled up with product, driven away, and then come back?" to which Plaintiffs' counsel responded "Yes."  (Ex. 115, 2d Cir. Tr., at 6:22–7:1). At the hearing before this Court on Defendants' Motion to Dismiss the Corrected Consolidated Complaint, Plaintiffs' counsel stated:

> We have alleged that they taped off areas of the warehouses where the auditors could not go . . . and that they shipped it [inventory] around the corner to [M. Block] and back to California and back, all those things, to keep the inventory from being

counted. That's the essence of our case. They didn't want to report the actual ballooning of inventory.

(Ex. 116, Mot. To Dismiss Hr'ing Tr. at 73).

165.    David Dewes, the Vice President of Operations at M. Block testified that the alleged fake sale of 500,000 brewers did not happen.  (Ex. 117, Dewes Tr. at 45:11–46:1).

166.    Jody Fellows, the Vice President of Purchasing at M. Block, similarly testified that there was no truth to the allegations regarding supposedly fake brewer sales to QVC.  (Ex. 38, Fellows Tr. at 64:18–65:2).  She added that there would not have been a warehouse at M. Block large enough to handle 500,000 brewers at one time.  (Ex. 38, Fellows Tr. at 65:14–18).  The largest QVC order Ms. Fellows could ever recall was one for 180,000 brewers that occurred after the Class Period.  (Ex. 38, Fellows Tr. at 64:7–13).

167.    Green Mountain's, M. Block's, and QVC's accounting records all support the conclusion that Green Mountain recognized revenue on only 23,117 brewers during Q2 FY2011. (Ex. 25, Kelly Report ¶ 2(a)).

168.    Confidential Witness 1, Mr. Robert Belajonas, was a machine operator with Green Mountain from July 2006 to January 2012.  (Ex. 118, Belajonas Decl. ¶ 1)  Mr. Belajonas has submitted an affidavit swearing: "I believe that the Consolidated Complaint incorrectly attributes to me several statements and inaccurately describes what I told Plaintiffs' representatives.  I specifically told Plaintiffs that I should not be a witness to any case because I did not witness anything."  (Ex. 118, Belajonas Decl. ¶ 4).

169.     (Ex. 11, Tabak Tr. at 238:19–24).

(Ex. 79, PX 555, Tabak

Damages Report ¶ 58).  Dr. Tabak claimed in his Damages Reply Report that the third quarter historically had not represented peak demand for the Company's product meaning that "even if Green Mountain could satisfy demand during the *low point* in the year, that would not mean that the market would expect that it could necessarily satisfy demand during the peak point in the year. (Ex. 119, Tabak Damages Reply ¶ 21). Dr. Tabak's supplemental report shows that K-Cups were not the lowest in Q3 of each fiscal year.  K-Cup sales were historically the lowest in Q1 of Green Mountain's fiscal year.  (Ex. 120, Tabak Supp. Ex. 2b).

**VII.   Mr. Stahl's Testimony Cannot Create a Material Issue of Disputed Fact**

170.    Plaintiffs' proposed expert, Mr. Robert Stahl, has submitted two reports in this matter:  an initial report dated April 14, 2017 (the "Stahl Report"), and a rebuttal report dated June 15, 2017 (the "Stahl Rebuttal").

171.    Mr. Stahl asserts that Green Mountain had "excess" inventory in every period of FY2011 but P1.  (Ex. 121, DX 75, Stahl Report ¶¶ 106–10; Ex. 122, Stahl Tr. at 116:16–117:18). Where Mr. Stahl states elsewhere in his reports that Green Mountain did not have "appropriate" inventory levels during certain periods, he means that the Company had "excess" inventory during those periods.  (Ex. 123, PX 526, Stahl Rebuttal ¶ 4; Ex. 122, Stahl Tr. at 112:19–113:9).  It is this "excess" inventory conclusion that provides the basis for Mr. Stahl's assertion that the Company's "inventory was not at 'appropriate levels' (as Defendants told the market)."   (Ex. 123, PX 526, Stahl Rebuttal ¶ 4).

172.    When Mr. Stahl states that Green Mountain had "excess" inventory, he means that Green Mountain's actual K-Cup inventory levels in a given period were higher than what he believes were the Company's "planned" or "target" inventory levels for that period.  (Ex. 121, DX 75, Stahl Report ¶¶ 107–09; Ex. 122, Stahl Tr. at 103:23–106:22).

173. ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ (Ex.

122, Stahl Tr. at 110:13–111:1). ███████████████████

████████████████████ (Ex. 122, Stahl Tr. at 110:13–111:1). Mr. Stahl claims

that the amount of Green Mountain's "excess" K-Cup inventory is equal to the difference between

actual inventory levels and what he asserts were its "planned" or "target" inventory levels. (Ex.

122, Stahl Tr. at 109:12–110:6).

174. The data that Mr. Stahl labels as Green Mountain's "target" or "planned" inventory

levels is taken from PX505-A, an Excel workbook titled Production Plan of Record, which was

created on May 17, 2011. (Ex. 122, Stahl Tr. at 249:17–251:15). Mr. Stahl takes what he considers

to be period-ending "planned" inventory for SCBU from row 127 of the "Chart Data" tab in

PX505-A. (Ex. 121, DX 75, Stahl Report ¶ 107, n.50). Mr. Stahl takes what he considers to be

period-ending "target" inventory for KBU from row 374 of the "Keurig" tab in PX505-A. (Ex.

121, DX 75, Stahl Report ¶ 107, n.51).

175. Mr. Stahl takes SCBU actual inventory numbers from PX502-A, an Excel

workbook titled Planning Weekly Report. Specifically, Mr. Stahl takes these numbers from row

66 in the "SCBU Summary – Planning Family" tab of PX502-A. (Ex. 121, DX 75, Stahl Report

¶ 107, n.48). Mr. Stahl takes KBU actual inventory numbers for each period of FY2011 from the

"Keurig-IBUs" tab in the Planning Weekly Report for the last week in that period. (Ex. 121, DX

75, Stahl Report ¶ 107, n.49). Mr. Stahl also uses row 64 of the "SCBU Summary – Planning

Family" tab in PX502-A as the source for actual K-Cup production. (Ex. 121, DX 75, Stahl Report

¶ 107, n.52). Also within the "SCBU Summary – Planning Family" tab in PX502-A, row 65

includes data for SCBU "planned inventory." (Ex. 124, PX502-A). Mr. Stahl does not use the data in row 65 in his analysis. (Ex. 121, DX 75, Stahl Report ¶¶ 106–10).

176. When asked about PX505-A at his deposition, Mr. Stahl testified that he did not know what that document was used for, how it was maintained at Green Mountain, who created it, or when it was created. (Ex. 122, Stahl Tr. at 251:1–15). ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ (Ex. 122, Stahl Tr. at 249:17–250:5). ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ (Ex. 122, Stahl Tr. at 262:6–20).

177. Mr. Stahl also asserts that Green Mountain had excess production capacity, based on what he terms a "data-driven observation" that Green Mountain produced more K-Cups than it shipped in each period of FY2011 but P3 and P8. (Ex. 121, DX 75, Stahl Report ¶¶ 106, 108).

178. During FY2011, Blaine Paxton was the Distribution Resource Planning Manager for SCBU. (Ex. 125, Paxton Tr. at 9:13–18). In this role, Mr. Paxton was responsible for planning all coffee production at Green Mountain, including K-Cup production. (Ex. 125, Paxton Tr. at 11:5–13:6). Mr. Paxton, along with those working at his direction, was responsible for creating and maintaining PX502-A and PX505-A. (Ex. 126, Paxton Aff. ¶ 6).

179. At Mr. Paxton's deposition, Plaintiffs' counsel asked him about PX505-A in general, and specifically the row of data within PX505-A that Mr. Stahl relies on for KBU "target" inventory levels. Mr. Paxton testified that he did not know what that data represented, stating: "I

don't remember working with these rows," "I don't know whose work this is," "I don't know whether it was just an ad hoc exercise or whether it was part of the core planning," "[t]his could be left over from something long ago," "I really don't understand how this – these few lines in this big spreadsheet were – were used. . . . I certainly don't remember myself working on this part of this spreadsheet." (Ex. 125, Paxton Tr. at 154:2–158:25).  Mr. Paxton stated that the "Keurig" tab where this row of data appears was one in a series of blue-colored tabs in that document that generally "contained [demand] forecast information," and that "the 'Keurig' tab is referring to K-Cups.  So that's generally what this tab had is K-Cup forecast information in it." (Ex. 125, Paxton Tr. at 154:17–155:2).  Mr. Paxton was asked only generally about the SCBU "planned" inventory levels in the "Chart Data" tab of PX505-A.  (Ex. 125, Paxton Tr. 146:6-153:24).

180.    Since the time of his deposition, Mr. Paxton has reviewed PX505-A in further detail.  (Ex. 126, Paxton Aff. ¶ 8).  In an affidavit dated September 19, 2011, Mr. Paxton states that row 374 in the "Keurig" tab of PX505-A does not contain KBU inventory "targets."  (Ex. 126, Paxton Aff. ¶ 30).  Mr. Paxton's affidavit states that the "Keurig" tab in PX505-A does not contain data that is specific to KBU at all, but instead is one of a series of five blue tabs in the May Production Plan of Record (PX505-A) that provide the demand forecast (as opposed to a production or inventory plan) for various Green Mountain product categories across the entire enterprise as a whole (including both of its U.S. business units, KBU and SCBU).  (Ex. 126, Paxton Aff. ¶¶ 25–26).  Other blue tabs labeled "RetailBag," "Bulk," and "Case" all refer to various package sizes of bagged coffee, while the "Volgen" tab includes demand information for Green Mountain's next-generation Vue single-cup brewing platform.  (Ex. 126, Paxton Aff. ¶ 25).  Mr. Paxton states that the "Keurig" tab is broken down into tables that present demand by K-Cup type, K-Cup package size, and distribution region.  (Ex. 126, Paxton Aff. ¶ 26).  As in all companies,

supply chain planning at Green Mountain accounted for three factors: K-Cup demand forecasts, K-Cup production plans and K-Cup inventory levels.  (Ex. 36, Thomas Supp. ¶ 28).  According to Mr. Paxton, the Company updated Production Plans of Record like PX505-A only episodically to plan its production of K-Cups and other coffee products for the upcoming 16 to 18 months.  (Ex. 126, Paxton Aff. ¶¶ 14, 25).  Production Plans of Record like PX-505-A are not revised on an ongoing basis to reflect changing circumstances, causing them to become obsolete over time.  (Ex. 126, Paxton Aff. ¶¶ 14–15).  Accordingly, the Production Plan of Record (including the May 17, 2011 version used by Mr. Stahl and marked as PX505-A) did not contain what the Company thought of at the time, or used in its day-to-day operations, as "planned" or "target" inventory levels.  (Ex. 126, Paxton Aff. ¶ 14).

181.    Mr. Paxton's affidavit also states that the "period ending inventory" numbers in row 374 of the "Keurig" tab in PX505-A were not generated at his direction, and he does not know who created the data, when it was created, or for what purpose it was created or used.  (Ex. 126, Paxton Aff. ¶ 28).  Mr. Paxton explains that he did not use this "inventory" data in this tab in any way in the supply chain planning process, and he is not aware of anyone else at Green Mountain who did so either.  (Ex. 126, Paxton Aff. ¶ 29).  Mr. Paxton states "definitively that this data did not represent KBU inventory 'targets' for FY2011 in any sense."  (Ex. 126, Paxton Aff. ¶ 30).

182.    Mr. Paxton's affidavit further explains that PX505-A was created on May 17, 2011 and was a *forward-looking* supply chain plan for Periods 9 through 12 of FY2011 and the entirety of FY2012.  (Ex. 126, Paxton Aff. ¶¶ 14–15).  Mr. Paxton states that, for this reason, PX505-A is not an accurate reliable source of "planned" inventory numbers for the first seven periods of FY2011, which occurred before it was even created.  (Ex. 126, Paxton Aff. ¶¶ 14–15).

183.    Mr. Paxton's affidavit states that the most up to date, accurate, and reliable source for real-time SCBU inventory "planned" levels that Green Mountain realistically expected to achieve is not PX505-A, but rather the "planned inventory" data that appears in row 65 of the "SCBU Summary – Planning Family" tab of PX502-A.  (Ex. 126, Paxton Aff. ¶ 19).  Mr. Paxton explains that PX502-A was updated every week through FY2011, and each iteration of the document includes forward-looking plans for future periods.  (Ex. 126, Paxton Aff. ¶¶ 17–18).  In contrast, Mr. Paxton states, when Production Plans of Record like PX505-A were created, a past version of the document was used as a template, but historical data for prior periods was not updated to reflect subsequent developments, and was not relevant to the creation of forward-looking plans.  (Ex. 126, Paxton Aff. ¶ 15).  Mr. Paxton states that when new Production Plans of Record were created, neither Mr. Paxton nor those working under his direction concerned themselves with data for past periods.  (Ex. 126, Paxton Aff. ¶ 15).

184.     (Ex. 122, Stahl Tr. at 257:3–7).



(Ex. 122, Stahl Tr. at 259:6–16, 261:19–262:20).

185.    When SCBU "planned" inventory numbers are taken from PX502-A rather than from PX505-A, the result is that SCBU's actual inventory totals are lower than its "planned" inventory levels at the end of Q1 FY2011 and at the end of Q2 FY2011.   (Ex. 36, Thomas Supp. ¶¶ 30–31, Table 2A).

186.    Mr. Stahl testified at his deposition that if Green Mountain had excess K-Cup inventory, he would expect to see that inventory either written off as an obsolescence expense in the Company's accounting records or diverted to some other use.  (Ex. 122, Stahl Tr. at 152:23–158:8).   Mr. Stahl acknowledged at his deposition that he did not perform an analysis of obsolescence or diversion of K-Cups at Green Mountain in FY2011.  (Ex. 122, Stahl Tr. at 152:23–158:8).

187.    Mr. Stahl states that Green Mountain had "capacity that far exceeded the Company's actual demand" during FY2011.  (Ex. 123, PX 526, Stahl Rebuttal ¶ 28).  Specifically, Mr. Stahl opines that Green Mountain had more production capacity than it needed to meet customer orders in every period but P3 and P8.  (Ex. 121, DX 75, Stahl Report ¶¶ 106–10).  Mr. Stahl reaches this conclusion based on a comparison of how many K-Cups Green Mountain

produced and how many K-Cups Green Mountain shipped to its customers in a given period. Where production in one period exceeds shipments in the same period, Mr. Stahl concludes that Green Mountain had excess production capacity.  (Ex. 121, DX 75, Stahl Report ¶ 108; Ex. 122, Stahl Tr. at 116:16–117:18).

188.    Mr. Stahl's comparison of K-Cup production and K-Cup shipment data within the same fiscal period does not account for the time it took Green Mountain to move K-Cups through its supply chain from production lines to customers.  Specifically, Mr. Stahl does not account for factors including the time it took to change lines from producing one K-Cup variety to another, to package K-Cups, to accumulate enough completed K-Cups to make shipment economical, to transport them from production centers to distribution facilities, to wait for customer orders, to prepare them for shipment, and to ship them.  (Ex. 27, PX 514, Thomas Report ¶¶ 43, 47, 52).

189.    Mr. Stahl acknowledges that there was a delay between the time that K-Cups were produced and the time that K-Cups were shipped from Green Mountain to its customers in FY2011. (Ex. 123, PX 526, Stahl Rebuttal ¶¶ 43-47).  Mr. Stahl asserts that Green Mountain should have reduced this delay by shortening the time it took to change over its production lines and by stocking at fewer locations and shipping small quantities to retailers.  (Ex. 123, PX 526, Stahl Rebuttal ¶ 45).  Mr. Stahl states that this "'built in' delay is, in actuality, unnecessary and detrimental to the supply chain . . ." (Ex. 123, PX 526, Stahl Rebuttal ¶ 44).

190.    Little's Law is a basic mathematical proof establishing that the time from entry into a system (production) until exit from the system (shipment) must be proportional to the number of units in the system (inventory).  Under Little's Law, the average time it takes for inventory to move through a company's supply chain is equal to the average number of weeks of inventory that company has on hand.  (Ex. 36, Thomas Supp. ¶¶ 35–36).

191.    When Green Mountain's K-Cup production in each fiscal period of FY2011 is compared to its K-Cup shipments the Company made in the next fiscal period, K-Cup production is less than the next period's shipments in three of the six periods in Q1 and Q2 FY2011.  (Ex. 27, PX 514, Thomas Report ¶ 55).

192.    Consistent with this Court's Order dated April 7, 2017, Defendants chose to waive their attorney-client privilege and produced more than 300 documents demonstrating the review and approval of Mr. Blanford's and Ms. Rathke's Rule 10b5-1 trading plans by Green Mountain's legal team, as well as discussions with its outside counsel regarding the plans.  (Ex. 127, Letter from Palmer to Rosen, dated Apr. 20, 2017).

Dated:  September 19, 2017

**COUNSEL FOR DEFENDANT KEURIG GREEN MOUNTAIN, INC.**

/s/  Randall W. Bodner
ROPES & GRAY LLP
Randall W. Bodner
John P. Bueker
Anne Johnson Palmer
William T. Davison
(admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7878
Facsimile: (617) 235-0569
randall.bodner@ropesgray.com
john.bueker@ropesgray.com
anne.johnsonpalmer@ropesgray.com
william.davison@ropesgray.com

DOWNS RACHLIN MARTIN PLLC
Robert B. Luce
Matthew S. Borick

Courthouse Plaza
199 Main Street
P.O. Box 190
Burlington, VT 05402-0190
Telephone: 802-863-2375
Facsimile: 802-862-7512
bluce@drm.com
mborick@drm.com

**COUNSEL FOR DEFENDANTS
LAWRENCE J. BLANFORD AND
FRANCES G. RATHKE**

/s/ Matthew B. Byrne
GRAVEL AND SHEA
Robert B. Hemley
Matthew B. Byrne
76 St. Paul Street, 7th Floor
P. O. Box 369
Burlington, VT 05402-0369
rhemley@gravelshea.com
mbyrne@gravelshea.com
Telephone: (802) 658-0220
Facsimile: (802) 658-1456

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered Participants as identified on the Notice of Electronic Filing (NEF) on September 19, 2017.


/s/ Randall W. Bodner

Dated: September 19, 2017                    Randall W. Bodner