**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

---

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, SJUNDE AP-FONDEN, BOARD OF TRUSTEES OF THE CITY OF FORT LAUDERDALE GENERAL EMPLOYEES' RETIREMENT SYSTEM, EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT OF THE VIRGIN ISLANDS, AND PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI on behalf of themselves and all others similarly situated, | No. 2:11-CV-00289-WKS |

Plaintiffs,

v.

GREEN MOUNTAIN COFFEE ROASTERS, INC., LAWRENCE J. BLANFORD and FRANCES G. RATHKE,

Defendants.

---

**DECLARATION OF ALEXANDER VILLANOVA IN SUPPORT OF**
**CLASS REPRESENTATIVES' UNOPPOSED MOTION**
**FOR APPROVAL OF DISTRIBUTION PLAN**

I, ALEXANDER VILLANOVA, hereby declare and state as follows:

1.      I am a Senior Project Manager for Epiq Class Action and Claims Solutions, Inc.

("Epiq"). I am over 21 years of age and am not a party to the above-captioned action ("Action").

I have personal knowledge of the facts set forth in this declaration (the "Declaration") and, if called

as a witness, could and would testify competently thereto.

2.      Epiq was retained by Class Counsel to serve as the Claims Administrator in connection with the Settlement of the Action.[1] In its Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 339) (the "Preliminary Approval Order"), the Court approved the retention of Epiq as the Claims Administrator. As Claims Administrator, Epiq has, among other things: (i) mailed the Notice of (I) Pendency of Class Action and Class Certification; (II) Proposed Settlement; (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses; and (IV) Settlement Fairness Hearing (the "Notice") and the Proof of Claim and Release Form (the "Claim Form" or "Proof of Claim Form", and together with the Notice, the "Notice Packet") to potential Class Members and brokers and other nominees; (ii) created and continues to maintain a toll-free helpline for inquiries during the course of the administration; (iii) created and continues to maintain a Settlement website and posted case-specific documents on it; (iv) caused the Summary Notice to be published; (v) provided, upon request, additional copies of the Notice Packet to potential Class Members, brokers, and other nominees; and (vi) received and processed Claims.

3.      On October 22, 2018, the Court issued its Order Approving Plan of Allocation of Net Settlement Fund (ECF No. 351) and Judgment Approving Class Action Settlement (ECF No. 350). Epiq has completed processing all Claims received through October 31, 2019, in accordance with the terms of the Stipulation and the Court-approved Plan of Allocation set forth in the Notice, and hereby submits its administrative determinations accepting and rejecting the Claims in preparation for a distribution of the Net Settlement Fund to Authorized Claimants. Epiq also

---

[1] Capitalized terms that are not defined in this Declaration have the same meanings as set forth in the Stipulation and Agreement of Settlement dated as of June 18, 2018 (ECF No. 336-1) (the "Stipulation"). The Settlement is contained in the Stipulation.

presents this Declaration in support of Class Representatives' Unopposed Motion for Approval of Distribution Plan.

## DISSEMINATION OF NOTICE

4.      As more fully described in the Declaration of Alexander Villanova Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (ECF No. 344-6) (the "Mailing Decl."), as of September 14, 2018, Epiq had mailed 149,477 Notice Packets to potential Class Members and their nominees. Mailing Decl. ¶ 8. Since that date, 40,434 additional Notice Packets have been disseminated. In total, Epiq has disseminated 189,911 Notice Packets to potential Class Members, brokers, and other nominees.

5.      Epiq established and continues to maintain a website (www.GreenMountainSecuritiesLitigation.com) and a toll-free telephone helpline (1-888-836-0903) to assist potential Class Members. The Settlement website (which provides access to important documents relevant to the Settlement) and the telephone helpline enable Class Members to obtain information about the Settlement.

6.      In accordance with Paragraph 5(d) of the Preliminary Approval Order, on August 13, 2018, Epiq caused the Summary Notice to be published once in *Investor's Business Daily* and to be transmitted over the *PR Newswire*. Mailing Decl. ¶ 9.

## PROCEDURES FOLLOWED IN PROCESSING CLAIMS

7.      Under the terms of the Preliminary Approval Order and as set forth in the Notice, each Class Member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to Epiq a properly executed Claim Form postmarked no later than December 1, 2018, together with adequate supporting documentation for the

transactions and holdings reported in the Claim. Through October 31, 2019, Epiq has received and fully processed 25,115 Claims (the "Presented Claims").

8.      In preparation for receiving and processing Claims, Epiq: (i) conferred with Class Counsel to define the guidelines for processing Claims; (ii) created a unique database to store Claim details, images of Claims, and supporting documentation (the "Settlement Database"); (iii) trained staff in the specifics of the Settlement so that Claims would be properly processed; (iv) formulated a system so that telephone and email inquiries would be properly responded to; (v) developed various computer programs and screens for entry of Class Members' identifying information and their transactional information; and (vi) developed a proprietary "calculation module" that would calculate Recognized Claims pursuant to the Court-approved Plan of Allocation of the Net Settlement Fund stated in the Notice.

9.      Class Members seeking to share in the Net Settlement Fund were directed in the Notice to submit their Claims to a post office box address specifically designated for the Settlement. Notice Packets returned by the United States Postal Service as undeliverable were reviewed for updated addresses and, where available, updated addresses were entered into the database and Notice Packets were mailed to the updated addresses. Any correspondence received at the post office box was reviewed and, when necessary, appropriate responses were provided to the senders.

## PROCESSING CLAIMS

### A.      Paper Claims

10.      Of the 25,115 Presented Claims, 3,355 are paper Claims. Once received, the paper Claims were opened and prepared for scanning. This process included unfolding documents, removing staples, copying nonconforming-sized documents, and sorting documents. This manual

task of preparing the paper Claims is very laborious and time-intensive. Once prepared, paper Claims were scanned into the Settlement Database together with all submitted documentation. Subsequently, each Claim was assigned a unique Claim number. Once scanned, the information from each Claim (including the Claimant's name, address, account number/information from the supporting documentation, and the Claimant's purchase/acquisition transactions, sale transactions, and holdings listed on the Claim) was entered into the Settlement Database. Once entered into the Settlement Database, each Claim was reviewed to verify that all required information had been provided. The documentation provided by the Claimant in support of the Claim was reviewed for authenticity and compared to the information provided in the Claim to verify the Claimant's identity and the purchase/acquisition transactions, sale transactions, and holdings listed on the Claim.

11.     To process the transactions detailed in the Claims, Epiq utilized internal codes ("message codes") to identify and classify deficiency or ineligibility conditions existing within those Claims. Appropriate message codes were assigned to the Claims as they were processed. For example, where a Claim was submitted by a Claimant who did not have any eligible transactions in Green Mountain common stock during the Class Period (*e.g.*, the Claimant purchased Green Mountain common stock only before or after the Class Period), that Claim would receive a message code that denoted ineligibility. Similar defect message codes were used to denote other ineligible conditions, such as duplicate Claims. These message codes would indicate to Epiq that the Claimant was not eligible to receive any payment from the Net Settlement Fund with respect to that Claim unless the deficiency was cured in its entirety. Examples of conditions of ineligibility are as follows:

- No Documentation Submitted for the Entire Claim

- Duplicate Claim Submitted

- No Eligible Purchase During the Class Period

- No Signature

- No Recognized Claim

12.     Because a Claim may be deficient only in part, but otherwise acceptable, Epiq utilized message codes that were applied only to specific transactions within a Claim. For example, if a Claimant submitted a Claim with supporting documentation for all but one purchase transaction, that one transaction would receive a defect message code. The message code indicated that although the transaction was deficient, the Claim was otherwise eligible for payment if other transactions in the Claim calculated to a Recognized Claim according to the Court-approved Plan of Allocation. Thus, even if the deficiency was never cured, the Claim could still be partially accepted. Examples of transaction-specific message codes are as follows:

- Claim did not Balance/Trade Discrepancy

- Inadequate Documentation for Transaction

- Received Shares or Delivered Shares (i.e., shares transferred into or out of an account)

- No Proof of Unsold Holdings

**B.     Electronic Claims**

13.     Of the 25,115 Presented Claims, 21,760 were filed electronically ("Electronic Claims"). Electronic Claims are typically submitted by institutional investors ("Electronic Claim Filers" or "E-Claim Filers") who may have hundreds or thousands of transactions during the Class Period. Rather than provide reams of paper requiring data entry, the E-Claim Filers submitting

Electronic Claims either mail a computer disc or electronically submit a file to Epiq so that Epiq can upload all transactions to the Settlement Database.

14.     Epiq maintains an electronic filing operations team (the "Electronic Filing Team") to coordinate and supervise the receipt and handling of all Electronic Claims. In this case, the Electronic Filing Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with Epiq's required format and to identify any potential data issues or inconsistencies within the file. If any issues or inconsistencies arose, Epiq notified the filer. If the electronic file was deemed to be in an acceptable format, it was then loaded to the Settlement Database.

15.     Once each electronic file was loaded, the Electronic Claims were coded to denote any deficient or ineligible conditions that existed within them. These message codes are similar to those applied to paper Claims. In lieu of manually applying message codes, the Electronic Filing Team performed programmatic reviews on Electronic Claims to identify deficient and ineligible conditions (such as, but not limited to, price out-of-range issues, out-of-balance conditions, transactions outside the Class Period, etc.). The output was thoroughly verified and confirmed as accurate.

16.     The review process also included message coding any Electronic Claims that were not accompanied by a signed Proof of Claim Form, which serves as a "Master Proof of Claim Form" for all Claims referenced on the electronic file submitted. This process was reviewed by Epiq's Electronic Filing Team and, when appropriate, Epiq contacted the E-Claim Filers whose submissions were missing information. This ensured that only fully completed Claims, submitted by properly authorized representatives of the Claimants, were considered eligible for payment from the Net Settlement Fund.

17.     Finally, at the end of the process, Epiq performed various targeted reviews of Electronic Claims. Specifically, Epiq used criteria such as the calculated Recognized Claims and other identified criteria to message code and reach out to a number of E-Claim Filers and request that various sample purchases, sales, and holdings selected by Epiq be documented by providing confirmation slips or other transaction-specific supporting documentation. These targeted reviews help to ensure that electronic data supplied by Claimants does not contain inaccurate information.

## EXCLUDED PERSONS

18.     Epiq also reviewed all Claims to ensure that they were not submitted by, or on behalf of, "Excluded Persons," to the extent that the identities of such persons or entities were known to Epiq through the list of Defendants and other excluded persons and entities set forth in the Stipulation and the Notice and from the Claimants' certifications on the Proof of Claim Forms. Epiq also reviewed all Claims against the list of persons who were excluded from the Class pursuant to request.

## THE DEFICIENCY PROCESS

### A.     Paper Claims

19.     Approximately 56% of the paper Claims, *i.e.*, 1,882 of the 3,355 paper Claims, were incomplete or had one or more defects or conditions of ineligibility, such as the Claim not being signed, not being properly documented, or indicating no eligible transactions in Green Mountain common stock during the Class Period. The "Deficiency Process," which primarily involved mailing letters to Claimants and responding to communications from Claimants by email and/or telephone, was intended to assist Claimants in properly completing their otherwise deficient submissions so that they could be eligible to participate in the Settlement.

20.     If paper Claims were determined to be defective, a Notice of Deficient Proof of Claim Submission ("Deficiency Notice") was sent to the Claimants describing the defect(s) in the Claims and what, if anything, was necessary to cure the defect(s) in these Claims. The Deficiency Notice advised Claimants that submission of appropriate information and/or documentary evidence to complete the Claim had to be sent within twenty (20) days from the date of the Deficiency Notice or the Claim would be recommended for rejection to the extent that the deficiency or condition of ineligibility was not cured. The Deficiency Notice also advised Claimants that to contest these administrative determinations, they were required to submit written statements to Epiq requesting Court review of their Claims and setting forth the basis for such requests. Epiq sent a total of 1,905 Deficiency Notices to Claimants who filed paper Claims that Epiq determined to be defective. It is possible for a Claimant to be sent more than one Deficiency Notice for their Claim and thus the number of Deficiency Notices sent would exceed the number of Deficient Claims discussed in paragraph 19. Attached hereto as Exhibit A is an example of a Deficiency Notice.

21.     Claimants' responses to Deficiency Notices were scanned into the Settlement Database and associated with the corresponding Claims. The responses were then carefully reviewed and evaluated by Epiq's team of processors. If a Claimant's response corrected the defect(s), Epiq manually updated the Settlement Database to reflect the changes in the status of the Claim.

### B.     Electronic Claims

22.     In addition, for Electronic Claims, Epiq used the following process to contact the banks, brokers, nominees, and other filers who submitted their data electronically to confirm receipt of their submissions and to notify the filers of any deficiencies or Electronic Claims that

were ineligible. These filers were sent an email to the email address included with their Proof of Claim Form ("Status Email") with an attached report containing detailed information associated with the Claims and indicating which of those Claims within the filing were deficient and/or rejected ("Transaction Report").

23.     The Status Email sent to the email address of record provided with the Proof of Claim Form:

(a)     Notified the filer that any Claims with deficiencies not corrected within twenty (20) days from the date of the email may be rejected;

(b)     Advised the filer of the right to contest the rejection of the Claim(s) and request this Court's review of Epiq's administrative determination within twenty (20) days from the date of the Status Email; and

(c)     Provided instructions for how to submit corrections.

24.     The Transaction Report attached to the Status Email identified each of the individual Claims that were found to be deficient or ineligible and the basis for that deficiency or condition of ineligibility.

25.     Epiq has mailed a Status Email and Transaction Report to 191 E-Claim Filers. Samples of a Status Email and Transaction Report are attached hereto as Exhibits B and C, respectively.

26.     The E-Claim Filers' responses were reviewed by the Electronic Filing Team, scanned and/or loaded into Epiq's database, and associated with the corresponding Electronic Claims. If a response corrected the defect(s) or affected an Electronic Claim's status, Epiq manually and/or programmatically updated the database to reflect such change in status of the Electronic Claim.

## NO DISPUTED CLAIMS

27.     As noted above, Claimants were advised they had the right to contest Epiq's administrative determination of deficiencies or ineligibility within twenty (20) days from the date of notification and that they could request that the dispute be submitted to the Court for review. More specifically, Claimants were advised in the Deficiency Notice or Status Email that, if they disputed Epiq's determination, they had to provide a statement of reasons indicating the grounds for contesting the determination, along with supporting documentation, and if the dispute concerning the Claim could not otherwise be resolved, Class Counsel would thereafter present the request for review to the Court for a final determination.

28.     A total of 10 Claimants contested Epiq's administrative determinations and requested review by the Court. To resolve the disputes without necessitating the Court's intervention, Epiq contacted all persons requesting Court review and attempted to answer all questions, fully explain Epiq's determination of the Claim's status, and facilitate the submission of missing information or documentation where applicable. As a result of these efforts, all requests for Court review have either been cured or the request for Court review has been retracted.

## LATE BUT OTHERWISE ELIGIBLE CLAIMS

29.     Of the Presented Claims, 4,065 were received or postmarked after the December 1, 2018 Claim submission deadline established by the Court. Epiq processed all late Claims received through October 31, 2019, and 1,830 have been found to be otherwise eligible in whole or in part (the "Late But Otherwise Eligible Claims"). Epiq has not rejected any Claim received through October 31, 2019, solely based on its late submission, and Epiq believes no delay has resulted from the provisional acceptance of these Late but Otherwise Eligible Claims. To the extent they are eligible but for the fact that they were late, they are recommended for payment.

30.     However, there must be a final cut-off date after which no more Claims will be accepted so that there may be a proportional allocation of the Net Settlement Fund and the distribution may be accomplished. Acceptance of additional Claims or responses received during the finalization of the administration and the preparation of this application would necessarily require a delay in the distribution. Accordingly, Epiq also respectfully requests that this Court order that no Claim received or adjusted after October 31, 2019, be eligible for payment for any reason whatsoever subject only to the provision of paragraph 39(f) of the proposed distribution plan discussed below. If the Court adopts the proposed distribution plan, then, after Class Counsel have determined that further distributions are not cost-effective and before any contribution of the residual funds to charity, if sufficient funds remain to warrant the processing of Claims received after October 31, 2019, these Claims will be processed and, if any would have been eligible if timely received, these Claimants may be paid the distribution amounts on a *pro rata* basis that would bring them into parity with other Authorized Claimants who have cashed all their prior distribution checks to the extent permitted by the amount of remaining funds. *See* ¶ 39(f) below. With respect to previously-filed Claims that are cured or adjusted after October 31, 2019, such Claims will be reevaluated upon receipt of the adjustment and, to the extent that they are found eligible for a distribution or additional distribution, they will be treated in the same manner as Claims received after October 31, 2019. However, should an adjustment be received that results in a lower Recognized Claim amount, that adjustment will be made and the Recognized Claim amount will be reduced accordingly prior to a distribution to that Claimant.

## **QUALITY ASSURANCE**

31.     An integral part of the claims administration process is the Quality Assurance review. Throughout the administration process, Epiq's Quality Assurance personnel worked to

verify that Claims were processed properly by ensuring that information was entered correctly into the database, deficiency and/or rejection message codes were assigned accurately, and deficiency and/or rejection notification letters were sent appropriately. After all Claims were processed, deficiency and/or rejection letters were mailed, and Claimants' responses to the deficiency and/or rejection letters were reviewed and processed, Epiq's Quality Assurance personnel performed additional Quality Assurance reviews. These final Quality Assurance reviews further ensured the correctness and completeness of all Claims processed prior to preparing this Declaration and all Epiq's final documents in support of distribution of the Net Settlement Fund.  As part of the Quality Assurance reviews, Epiq:

(a)     Verified that all Proof of Claim Forms had signatures of authorized individuals;

(b)     Verified that true duplicate Claims were identified, verified, and rejected;

(c)     Verified that persons and entities excluded from the Class did not file Claims or their Claims were rejected upon review;

(d)     Performed a final Quality Assurance review of Claims and all supporting documentation to ensure completeness of Claims;

(e)     Determined that all Claimants requiring deficiency and/or rejection letters were sent such letters;

(f)     Performed a review of deficient Claims;

(g)     Performed an additional review of Claims with high Recognized Claim amounts;

(h)     Reviewed Claims that were designated invalid;

(i)     Reviewed Claims with a Recognized Claim amount equal to zero;

(j)     Performed other reviews based on Claims completion requirements and the approved calculation specifications based on the Court-approved Plan of Allocation; and

(k)     Re-tested the accuracy of the Recognized Claim amount calculation program.

32.     As part of its due diligence in processing the Claims, Epiq reviewed and compared the entire database for the Settlement against the "watch list" of known questionable filers that Epiq has developed throughout its years of experience as a claims administrator. Epiq performs searches based on names, aliases, addresses, and city/zip codes. In addition, Epiq's claim processors are trained to identify any potentially inauthentic documentation when processing claims, including claims submitted by Claimants not previously captured in the "watch list." Processors are instructed to message code any claim that matches to a record on the "watch list" and escalate them to management for review. Five (5) potentially fraudulent Claims were identified as having been submitted by someone on the "watch list." These Claims were then reviewed by management to consider the documentation submitted with each Claim in conjunction with other factors (including a review of the Claimant's website registration, address, and registration with the SEC or asset management organizations) and determined to be potentially fraudulent. Epiq sent these Claimants Deficiency Notices and/or Status Emails notifying the Claimants that additional documentation was required for their Claim for them to be eligible to participate in the Settlement. No additional documentation has been received supporting these potentially fraudulent Claims and all five (5) potentially fraudulent Claims are recommended for rejection for failure to cure their conditions of ineligibility.

## RECOMMENDATIONS FOR APPROVAL AND REJECTION

33.     As noted above, the number of Claims presented in this motion is 25,115.

### Timely Submitted and Valid Claims

34.     A total of 21,050 Claims were received or postmarked on or before the Court-approved Claim submission deadline of December 1, 2018, of which 9,217 were determined by Epiq to be eligible and are recommended for approval ("Timely Eligible Claims"). The total Recognized Claim amount for these Claims is $913,267,822.01.

### Late But Otherwise Eligible Claims

35.     A total of 4,065 Claims were received or postmarked after the Court-approved Claim submission deadline of December 1, 2018, but received on or before October 31, 2019. Of those, 1,830 were determined by Epiq to be otherwise eligible and are recommended for approval ("Late But Otherwise Eligible Claims"). The total Recognized Claim amount for these Claims is $171,536,385.60.

### Rejected Claims

36.     After the responses to Deficiency Notices and Status Emails were processed, a total of 14,068 Claims remain recommended for rejection by the Court ("Rejected Claims") for the following reasons:

    (a)     5,370 Claims had no purchase(s) of Green Mountain common stock during the Class Period;

    (b)     7,782 Claims did not result in a Recognized Claim;

    (c)     96 Claims were duplicates;

    (d)     578 Claims were withdrawn or voided by the filer; and

    (e)     242 Claims had uncured conditions of ineligibility.

**Lists of All Presented Claims**

37.     Attached hereto as Exhibits D through F are listings of all the Presented Claims:

    (a)     Exhibit D lists the Timely Eligible Claims and shows each Claimant's Recognized Claim;

    (b)     Exhibit E lists the Late But Otherwise Eligible Claims and shows each Claimant's Recognized Claim; and

    (c)     Exhibit F lists the Rejected Claims and the reasons for rejection.

## FEES AND DISBURSEMENTS

38.     Epiq agreed to be the Claims Administrator in exchange for payment of its fees and out-of-pocket expenses. Class Counsel received reports on and invoices for the work Epiq performed with respect to the provision of notice and administration of the Settlement. Attached hereto as Exhibit G are copies of Epiq's invoices for its work performed on behalf of the Class as well as an estimate for the work that will be performed and the costs that will be incurred in connection with the initial distribution of the Net Settlement Fund.[2] As set forth in these invoices, the cost of administration for this project through the initial distribution is $442,780.53 in fees and expenses. To date, Epiq has received payment in the amount of $236,544.12 for its fees and expenses. Accordingly, there is an outstanding balance of $206,236.41 payable to Epiq.

## DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND

39.     Should the Court concur with Epiq's determinations concerning the provisionally accepted and rejected Claims, including the Late But Otherwise Eligible Claims, Epiq recommends the following distribution plan (the "Distribution Plan"):

---

[2]  Should the estimate of fees and expenses to conduct the Initial Distribution of the Net Settlement Fund exceed the actual cost to conduct the distribution, the excess will be returned to the Net Settlement Fund and will be available for subsequent distribution to Authorized Claimants.

(a)     Epiq will conduct an initial distribution (the "Initial Distribution") of the Net Settlement Fund, after deducting all payments approved by the Court, and after payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, while maintaining a 5% reserve to address any tax liability and claims administration-related contingencies that may arise, as follows:

(1)     Epiq will calculate award amounts for all Authorized Claimants as if the entire Net Settlement Fund were to be distributed now. In accordance with the Court-approved Plan of Allocation, Epiq will calculate each Authorized Claimant's *pro rata* share of the Net Settlement Fund based on the amount of the Authorized Claimant's Recognized Claim in comparison to the total Recognized Claims of all Authorized Claimants.

(2)     Epiq will, pursuant to the terms of the Plan of Allocation, eliminate from the Initial Distribution any Authorized Claimant whose *pro rata* share calculates to less than $10.00. These Claimants will not receive any payment from the Net Settlement Fund, and Epiq will send notifications to those Authorized Claimants advising them of that fact.

(3)     After eliminating Claimants who would have received less than $10.00, Epiq will recalculate the *pro rata* share of the Net Settlement Fund for Authorized Claimants who would have received $10.00 or more pursuant to the calculations described in subparagraph (a)(1) above. This *pro rata* share is the Authorized Claimant's "Distribution Amount."

(4)     95% of the remaining balance of the Net Settlement Fund will be distributed to Authorized Claimants whose Distribution Amount calculates to

$10.00 or more pursuant to subparagraph (a)(3) above, on a *pro rata* basis based on their Distribution Amounts. The remaining 5% of the Net Settlement Fund will be held in reserve (the "Reserve") to address any tax liability and claims administration-related contingencies that may arise. To the extent the Reserve is not depleted, the remainder will be distributed in the "Second Distribution" described in subparagraph (d) below.

(b)     In order to encourage Authorized Claimants to deposit their payments promptly, all distribution checks will bear a notation: "CASH PROMPTLY. VOID AND SUBJECT TO REDISTRIBUTION IF NOT CASHED BY [DATE 90 DAYS AFTER ISSUE DATE]."[3]

(c)     Authorized Claimants who do not cash their Initial Distribution checks within the time allotted or on the conditions set forth in footnote 3 will irrevocably forfeit all recovery from the Settlement. The funds allocated to all such stale-dated checks will be

---

[3]  For Authorized Claimants whose checks are returned as undeliverable, Epiq will endeavor to locate new addresses through reasonable methods. Where a new address is located, Epiq will update the Settlement Database accordingly and reissue a distribution check to the Authorized Claimant at the new address. In the event that a check is lost or damaged or an Authorized Claimant otherwise requires a new check, Epiq will issue replacements. Distribution reissues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the previous check where appropriate. For all checks, Epiq will void the initial payment prior to reissuing a payment. In order not to delay further distributions to Authorized Claimants who have timely cashed their checks, Epiq's outreach program, described in the preceding sentences, shall end 30 days after the initial void date. Authorized Claimants will be informed that, if they do not cash their Initial Distribution checks within 90 days of the mail date, or they do not cash check reissues within 30 days of the mailing of such reissued check, their check will lapse, their entitlement to recovery will be irrevocably forfeited, and the funds will be reallocated to other Authorized Claimants. Reissue requests for lost or damaged checks will be granted after the void date on the checks as long as the request for the reissue is received no later than 45 days prior to the next planned distribution. Requests for reissued checks in connection with any subsequent distributions (should such distributions occur) will be handled in the same manner.

available to be redistributed to other Authorized Claimants in the second distribution. Similarly, Authorized Claimants who do not cash their second or subsequent distribution checks (should such distributions occur) within the time allotted or on the conditions set forth in footnote 3 will irrevocably forfeit any further recovery from the Net Settlement Fund.

(d)     Consistent with the Court-approved Plan of Allocation, after Epiq has made reasonable and diligent efforts to have Authorized Claimants cash their Initial Distribution checks, which efforts shall consist of the follow-up efforts described in footnote 3, but not earlier than nine (9) months after the Initial Distribution, Epiq will, after consulting with Class Counsel, conduct a second distribution of the Net Settlement Fund (the "Second Distribution"). Any amounts remaining in the Net Settlement Fund after the Initial Distribution (including from the Reserve and the funds for all void stale-dated checks), after deducting Epiq's fees and expenses incurred in connection with administering the Settlement for which it has not yet been paid (including Epiq's estimated costs of the Second Distribution), and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, will be distributed to all Authorized Claimants in the Initial Distribution who cashed their first distribution check and who would receive at least $10.00 from such distribution based on their *pro rata* share of the remaining funds. Additional distributions, after deduction of costs and expenses as described above and subject to the same conditions, may occur thereafter in six-month intervals until Class Counsel, in consultation with Epiq, determine that further distribution is not cost-effective.

(e)     At such time as Class Counsel, in consultation with Epiq, determine that

further distribution of the funds remaining in the Net Settlement Fund is not cost-effective, if sufficient funds remain to warrant the processing of Claims received after October 31, 2019, such Claims will be processed, and any such Claims that are otherwise valid as well as any earlier received Claims for which an adjustment was received after submission of Class Representatives' motion that resulted in an increased Recognized Claim, will be paid in accordance with subparagraph (f) below. If any funds remain in the Net Settlement Fund after payment of such late or late-adjusted Claims, the remaining balance of the Net Settlement Fund, after payment of any unpaid fees or expenses incurred in connection with administering the Net Settlement Fund and after the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, will be contributed to Vermont Legal Aid, a non-sectarian, not-for-profit 501(c)(3) organization providing civil legal services to indigent persons.

(f)     No new Claims may be accepted after October 31, 2019, and no further adjustments to previously received Claims that would result in an increased Recognized Claim amount may be made, subject to the following exception. If Claims are received or modified that would have been eligible for payment or additional payment under the Plan of Allocation if timely received, then, at the time that Class Counsel, in consultation with Epiq, determine that a redistribution is not cost-effective as provided in subparagraph (e) above, and after payment of any unpaid fees or expenses incurred in connection with administering the Net Settlement Fund and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, such Claimants, at the discretion of Class Counsel, may be paid the distribution amounts or additional distribution amounts on a *pro rata* basis that would bring them into parity with other

Authorized Claimants who have cashed all their prior distribution checks to the extent possible.

(g)     Unless otherwise ordered by the Court, one year after the Second Distribution, if that occurs, or, if there is no Second Distribution, two years after the Initial Distribution, Epiq may destroy the paper copies of the Claims and all supporting documentation, and one year after all funds have been distributed, Epiq may destroy electronic copies of the same.

## **CONCLUSION**

40.     Epiq respectfully requests that the Court enter an Order approving its administrative determinations accepting and rejecting the Claims submitted herein and approving the proposed Distribution Plan. Epiq further respectfully submits that its unpaid fees and expenses, as reflected on the invoices attached hereto as Exhibit G, should be approved for payment from the Settlement Fund.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of January 2020.

_____
Alexander Villanova